# In The Matter Of:

*TREVOR DAVIS vs.*
*CHRISTOPHER ALLEN*

---

*CHRISTOPHER ALLEN*
*May 5, 2022*
*Christopher Allen - 5-5-22*

---

*Shaddix & Associates*
*7400 Lyndale Avenue South*
*Suite 190*
*Richfield, MN 55423*

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 1

```
 1
 2
 3              UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WISCONSIN
 4
 5                   File No. 21-CV-565
 6    *******************************************
      TREVOR DAVIS,
 7                              Plaintiff,
 8              vs.
 9    CHRISTOPHER ALLEN, in his Individual and
      Official Capacities,
10                              Defendant.
      *******************************************
11
12
13                      DEPOSITION
14                         OF
15                  CHRISTOPHER ALLEN
16
17    Date:   May 5, 2022
      Time:   10:00 o'clock a.m.
18    Place:  Zoom Transmission
19
20    REPORTER:  Lorna D. Jacobson, Notary Public
21
22         ON BEHALF OF SHADDIX & ASSOCIATES
23
24
25
```

Page 2

```
 1
 2
 3                      APPEARANCES
 4
 5
 6         MR. RICHARD E. STUDENT of Meshbesher &
 7    Associates, Attorneys at Law, #310, 9800 Shelard
 8    Parkway, Minneapolis, Minnesota 55441; appearing
 9    via Zoom transmission for and on behalf of
10    PLAINTIFF.
11
12
13         MR. ANDREW A. JONES of Hansen Reynolds, LLC,
14    Attorneys at Law, Suie 400, 301 North Broadway,
15    Milwaukee, Wisconsin 53202; appearing via Zoom
16    transmission for and on behalf of DEFENDANT.
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2                   I N D E X
 3
 4    WITNESS:                         Page  Line
 5
 6    CHRISTOPHER ALLEN
 7
 8
 9    EXAMINATION  BY MR. STUDENT:       5     5
10
11
12
13
14
15
16    REPORTER'S CERTIFICATE             106
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2    (Witness Identification Verified by Mr. Jones)
 3
 4        CHRISTOPHER ALLEN
 5    Of lawful age, being by me first duly examined,
 6    cautioned and solemnly sworn to testify the truth,
 7    the whole truth and nothing but the truth, deposes
 8    and says:
 9
10        MR. STUDENT: Good morning,
11    Deputy Allen.  My name is Richard Student.  I'm one
12    of the attorneys for the plaintiff, Trevor Davis,
13    regarding his lawsuit arising out of the injuries
14    he sustained on May 9th or May 10th of 2019.
15        I would note for record here that
16    although we are doing this by Zoom technology it
17    may involve some sort of recording of the video and
18    audio that's going on here, the deposition, itself,
19    will only consist of the transcript produced by the
20    court reporter and will not include any recording
21    that may, you know, go along with the Zoom
22    technology.
23        And, I think, Mr. Jones, we
24    stipulated to that.
25        Does that sound correct to you?
```

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

1 **MR. JONES:** It does. Thank you,
2 Rich.
3 **MR. STUDENT:** You're welcome.
4
5 **EXAMINATION**
6
7 **BY MR. STUDENT:**
8 Q. Deputy Allen, are you familiar with the
9 incident -- and if I refer to it as "the incident"
10 of May 9th, 2019, would you know what I am
11 referring to, involving Trevor Davis?
12 **A. Yes, sir.**
13 Q. Okay. Can you hear me okay?
14 **A. Yes. I can hear you just fine.**
15 Q. Okay. Thank you. Are you able to state
16 your full name and date of birth for the record?
17 **A. Christopher John Allen,** ███████████.
18 Q. Okay. Deputy Allen -- and is deputy the
19 correct rank that you currently have at
20 Barron County?
21 **A. I'm currently a sergeant.**
22 Q. Sergeant Allen. I'm sorry.
23 **A. That's okay.**
24 Q. Sergeant, have you ever had your deposition
25 taken before?

1 **A. No, I have not.**
2 Q. Okay.
3 **MR. STUDENT:** As you know, we are
4 on the record with a court reporter and you've been
5 placed under oath. It's important that you and I
6 don't talk over one another and that we speak
7 clearly, so that we can get a good, clean
8 transcript of my questions and your answers.
9 Does that sound fair to you?
10 **THE WITNESS:** Yes, it does.
11 **MR. STUDENT:** If you don't
12 understand a question that I ask, don't hesitate to
13 ask for clarification and I will provide it to the
14 extent that I can. And, of course, your attorney
15 may have objections on that basis.
16 Does that sound fair?
17 **THE WITNESS:** Yes, it does.
18 **MR. STUDENT:** If you do need to
19 take a break, don't hesitate to ask. I
20 anticipate we'll be taking one or two here today.
21 I would just ask if there's an unanswered question
22 pending, that you answer the question before we
23 take a break.
24 Is that fair?
25 **THE WITNESS:** Yes, it is.

1 Q. (BY MR. STUDENT) Are you currently a
2 resident of the Western District of Wisconsin?
3 **A. Yes, I am.**
4 Q. Okay. Do you know if that will be changing
5 over the next year, or so?
6 **A. No, it will not.**
7 Q. Okay. I understand you might be attending
8 some additional law enforcement training that may
9 be out of state. Is that correct?
10 **A. Yes; at the FBI academy.**
11 Q. Okay. And if you know, will you be
12 changing your permanent residency in connection
13 with that? Or maintaining your residency in
14 Wisconsin?
15 **A. Maintaining my residency.**
16 Q. Okay.
17 **MR. STUDENT:** And, Mr. Jones, I
18 don't need a specific address from Sergeant Allen
19 right now. If it comes up, I'm sure we can deal
20 with the issue later.
21 Q. (BY MR. STUDENT) Have you ever been a
22 party, Sergeant, to a civil case before?
23 **A. No, I have not.**
24 Q. As either a plaintiff or a defendant?
25 **A. No, I have not.**

1 Q. Have you ever been a defendant in a
2 criminal case?
3 **A. No, I have not.**
4 Q. Have you ever provided testimony under
5 oath, either in the courtroom or in a deposition?
6 **A. Yes, I have.**
7 Q. Let me try to narrow it down here.
8 Would all of those cases of
9 testimony be in criminal cases in which you were a
10 police officer/witness?
11 **A. That is correct.**
12 Q. Would all of those cases have been
13 Barron County prosecutions?
14 **A. They would have been in Barron County.**
15 **They would have been as a sheriff's deputy and as a**
16 **Cumberland Police Officer.**
17 Q. Understood. We'll get to that in just a
18 moment here, your employment history.
19 Have you ever been, to your
20 knowledge, investigated by either federal or state
21 agencies with respect to use-of-force incidents?
22 **A. No, I have not.**
23 Q. Did you graduate from high school?
24 **A. Yes, I did.**
25 Q. When and where did you graduate?

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 9

1  A.  I graduated from Winona-Cotter High School,
2  in Winona, Minnesota, in 2004.
3  Q.  Did you grow up in the Winona area?
4  A.  Yes, I did.
5  Q.  Did you do any formal education after high
6  school?
7  A.  Yes.  I have an associate and a bachelor's
8  degree.
9  Q.  Okay.  Did you obtain the associate's
10  degree before the bachelor's?
11  A.  Correct.  In 2012.
12  Q.  Okay.  Where did you obtain that from?
13  A.  Rasmussen College, in Eden Prairie,
14  Minnesota.
15  Q.  Okay.  Did you have a major or an area of
16  specialization with respect to that degree?
17  A.  It was in criminal justice.
18  Q.  Okay.  And then after that?
19  A.  I got my bachelor's degree in 2021.  I
20  finished it through American Military University.
21  Q.  And where is that located?
22  A.  I believe it's out of West Virginia.
23  Q.  Did you attend school in
24  West Virginia?  Or was it a remote education?
25  A.  It was an online degree program.

Page 10

1  Q.  Understood.  And that was a bachelor's
2  degree.
3      Was there any sort of
4  specialization or major that you had?
5  A.  Yes.  That was also in criminal justice.
6  Q.  Okay.  Any other formal education that you
7  have had?
8  A.  I went to the Chippewa Valley Technical
9  College for my law enforcement academy
10  certification.
11  Q.  And when did you first obtain that
12  certification?
13  A.  2013.
14  Q.  Okay.  Was that certification active as of
15  May 9th, 2019?
16  A.  Yes, it was.
17  Q.  Is it active now?
18  A.  Yes, it is.
19  Q.  Okay.  Prior to getting that certification,
20  had you ever worked as a sworn law enforcement
21  officer?
22  A.  No.
23  Q.  Okay.  So, that's probably a good starting
24  point.
25      As of 2013 -- let's start

Page 11

1  there --  what was the first job in law enforcement
2  that you had?
3  A.  As a sworn law enforcement, my first job
4  was for the Cumberland Police Department.
5  Q.  Okay.  When did you work there?
6  A.  I started there in April of 2014.
7  Q.  When did you work there until?
8  A.  November of 2014.
9  Q.  Okay.  What was your rank while you were
10  there?
11  A.  Patrol officer.
12  Q.  Okay.  Why did you leave that department?
13  A.  I was hired as a patrol deputy for the
14  Barron County Sheriff's Department.
15  Q.  Okay.  When did you start there?
16  A.  November of 2014.
17  Q.  Okay.  And have you been there since?
18  A.  Yes, I have.
19  Q.  Have you worked any other law enforcement
20  jobs during your time with Barron County?  Or has
21  it just been Barron County?
22  A.  Just Barron County.
23  Q.  Okay.  Tell me if I'm wrong here, but as of
24  2019, were you a deputy rank with Barron County?
25  A.  Yes; that's correct.

Page 12

1  Q.  And were you promoted to sergeant at some
2  time in the past couple of years?
3  A.  In May of 2020.
4  Q.  Okay.  Are you aware of any use-of-force
5  complaints against you by citizens when you were
6  either with the Cumberland PD or with the
7  Barron County Sheriff's Department?
8  A.  No, I am not.
9  Q.  Okay.  In connection with the degrees you
10  obtained in criminal justice, did part of your
11  education include use-of-force training?
12  A.  Yes, it did.
13  Q.  Did you take courses specifically on use of
14  force?
15  A.  Yes.
16  Q.  At both institutions?
17  A.  I took a course on use of force in the law
18  enforcement academy.
19  Q.  Okay.  And where was that, again?
20  A.  Chippewa Valley Technical College, in
21  Eau Claire, Wisconsin.
22  Q.  Was it a year-long course?  Or a mulit-year
23  course or a semester course?
24  A.  I believe it was a 528-hour class.  It was
25  about a semester's worth.

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 13

1 Q.  Okay.  Was it in-classroom instruction?  Or
2 did it involve in-the-field training?
3 A.  In-classroom, and as well as practical
4 hands-on exercises.
5 Q.  Okay.  Do you currently have any of the
6 course materials from that use-of-force class?
7 A.  No, I do not.
8 Q.  Okay.  And I guess I should have asked you
9 first, were there any written materials or videos
10 that you received in connection with that class?
11 A.  Yes.  We were given a written manual.
12 Q.  Okay.  Anything besides the manual that you
13 can think of?
14 A.  Not that I recall.
15 Q.  Okay.  Do you know what you did with the
16 manual?
17 A.  I do not.
18 Q.  Did part of this course include,
19 specifically, any instruction about K9 use of
20 force?
21 A.  Not that I recall.
22 Q.  Okay.  Putting aside any training you had
23 at either Cumberland or Barron County, any other
24 formal use-of-force training that you received?
25     MR. JONES: I'm going to object

Page 14

1 to the form of the question.
2     You may answer.
3 A.  We had some use-of-force training in my
4 K9 certification training.
5 Q.  (BY MR. STUDENT) Okay.  Let's talk about
6 that for a couple of minutes.
7     When was that?
8 A.  That was April, 2018, through June of 2018.
9 Q.  And was that with your K9, Koda?
10 A.  That is correct.
11 Q.  Do you still work with Koda?
12 A.  Yes, I do.
13 Q.  Okay.  Does anybody else work with Koda?
14 A.  No.
15 Q.  Okay.  And looking through the records, it
16 looks like before you did this K9 certification,
17 there was another officer -- or I should say,
18 deputy or sergeant at the department that worked
19 with Koda.  Is that correct?
20 A.  Yes.  Deputy Michael Carroll.
21 Q.  Okay.  Can you describe to me what the
22 K9 certification entailed that you did?
23 A.  I attended the, either an 11 or 12-week
24 course through McDonough K9, which is in
25 Anoka, Minnesota.

Page 15

1 Q.  During that course, did you receive written
2 materials or videos as a part of the instruction?
3 A.  I believe I received some articles and a
4 schedule.  No videos, that I recall.
5 Q.  Okay.  Anything that you still have in your
6 possession?
7 A.  I had the schedule, which I believe, was
8 turned over.
9 Q.  Okay.  Do you recall if there were any
10 field training forms that you received in
11 connection with that course?
12     MR. JONES: Objection to the
13 form.
14     Go ahead and answer.
15 A.  Not that I recall.
16 Q.  (BY MR. STUDENT)  Okay.  Did you have a
17 specific field training officer in connection with
18 that course?
19 A.  No.
20 Q.  Okay.  Prior to that course, did you have
21 any training or experience with police K9s?
22 A.  I had some experience working as a K9 decoy
23 for our other K9.
24 Q.  And that's not an enviable job, I don't
25 think.

Page 16

1     MR. STUDENT: And you can object
2 that that wasn't a question.  That was just my side
3 comment.
4     MR. JONES: I almost objected.
5 Then I thought, well, now everyone knows that's a
6 rhetorical question.
7     MR. STUDENT: Understood.  Thank
8 you.
9 Q.  (BY MR. STUDENT)  So, you did this
10 McDonough course between April and June of 2018?
11 A.  Yes.
12 Q.  And was Koda involved in that course with
13 you?
14 A.  Yes, he was.
15 Q.  Okay.  We did receive some training
16 materials that mention McDonough.
17     Do you know if your department
18 maybe has some of the materials that you might not
19 have?
20 A.  Not that I'm aware of.
21 Q.  Okay.  And what was the culmination of the
22 course there?  Was there, like, a test and a
23 certification at the end of it?
24 A.  There was a certification event at the end.
25 Q.  Okay.  And then you got a certificate that

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 17

1 says Koda has passed as a Patrol Dog 1 or a Police
2 Dog 1. Is that right?
3 A. Correct.
4 Q. And I think Koda previously had some
5 certification as a narcotics dog. Is that correct?
6 A. We certified at that time as both a patrol
7 and a narcotics dog. And Deputy Carroll achieved
8 the same certifications with Koda, as well, prior
9 to my having him.
10 Q. Okay. Is there a separate certification
11 that you can get, either through McDonough or the
12 ASPCA for suspect apprehension like there is for
13 narcotics? If you're aware.
14 A. So, there is a certification for patrol
15 dog, which includes suspect apprehension that's
16 through the United States Police K9 Association, or
17 USPCA.
18 Q. USPCA. Did I say "ASPCA"?
19 A. Yes, sir.
20 Q. I believe I meant USPCA. Thank you.
21 Do you recall the use-of-force
22 principles that were taught at the McDonough
23 course?
24 A. I don't recall specific use-of-force
25 principles. It was a topic that was covered,

Page 18

1 though.
2 Q. Okay. Are you familiar with the
3 use-of-force continuum, generally?
4 MR. JONES: Object to the form.
5 Go ahead and answer.
6 A. Yes. Through the Wisconsin DOJ.
7 Q. (BY MR. STUDENT) Understood. Were you
8 ever instructed, or are you familiar with where on
9 that continuum K9 use of force can fall?
10 MR. JONES: Object to form.
11 Go ahead.
12 A. To my knowledge, K9 use of force isn't
13 specified in that continuum.
14 Q. (BY MR. STUDENT) Okay. In connection with
15 that training at McDonough, were you instructed
16 that K9 use of force must be stopped when it's no
17 longer necessary?
18 A. We're instructed that it falls under the
19 general use-of-force principle as not to use
20 unreasonable force.
21 Q. Okay. Did you receive any training from
22 either the Cumberland Police Department or
23 Barron County regarding K9 use of force?
24 A. Not specifically through either agency.
25 Q. Okay. In order to become a K9 deputy with

Page 19

1 Barron County, did they have you do the McDonough
2 K9 course?
3 A. That is correct.
4 Q. So, nothing separate from that at
5 Barron County?
6 A. Correct.
7 Q. Okay. As of the date of the incident, do
8 you know if Barron County had a use-of-force
9 reporting policy in effect?
10 A. Yes.
11 Q. And can you describe to me what that policy
12 entails?
13 A. In general, the use-of-force policy
14 reporting is to document any use of force and then
15 to notify administration of any use of force.
16 Q. Okay. Is there a specific use-of-force
17 report that you're required to author after an
18 incident?
19 A. There's only a specific use of force as
20 it's related to taser use.
21 Q. Okay. What about firearm use?
22 A. My understanding is, there's a formal
23 investigation process with that. However, I've
24 never been personally involved in one of those.
25 Q. Okay. Are use-of-force reports required if

Page 20

1 a deputy strikes a subject with a fist or a foot?
2 A. The only specification to that would be in
3 a normal incident report that we would complete.
4 Q. Understood. And then same question with
5 respect to K9 use of force.
6 Does that just go in a normal
7 report? Or is there a separate use-of-force
8 report?
9 A. It would go on a normal report.
10 Q. Okay. So, it's just the taser that has a
11 special report?
12 A. That is correct.
13 Q. Okay. I don't want you to speculate too
14 much, but I'm kind of curious as to why they have a
15 separate use-of-force report for the taser but
16 nothing else.
17 Do you know why?
18 A. I do not.
19 Q. Okay. Was there a body-worn camera policy
20 in effect at the time of the incident?
21 A. Yes, there was.
22 Q. And what is your understanding of what that
23 policy required?
24 A. Generally speaking, our body-worn camera
25 policy states that we have to have it activated

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 21

1 when there's possible enforcement action with a
2 member of the public.
3 Q. Do you know the make and model of the body
4 cameras that you guys were wearing at the time of
5 the incident?
6 A. The brand was L3.
7    I don't know if I had a
8 Generation 1 or Generation 2, at the time. It
9 would have been one of those two.
10 Q. Okay. Is there a button on it that you
11 push to activate it before you have a potential
12 incident where you have got to record?
13 A. Correct. It was a slide button that you
14 would slide it across and it would activate it.
15 Q. Okay. And is that worn on kind of the
16 center of the torso?
17 A. As close to the center as possible.
18 Q. And does it record both video and audio?
19 A. That is correct.
20 Q. Okay. And if you make a recording of an
21 incident, let's say, a use-of-force incident, what
22 do you do with the recording after the incident?
23 A. The body camera would be put in a special
24 docking station which would upload it to a server
25 at the sheriff's department.

Page 22

1 Q. Okay. Do you know the hardware make and
2 model of that docking station?
3 A. I do not.
4 Q. Do you know if it's still the same one
5 that they had on May of 2019?
6 A. It should have been.
7    We have recently transitioned, or
8 are in the process of transitioning body cameras.
9 But, that's what we were using at the time.
10 Q. Okay. Do you know if that docking station
11 is still at the sheriff's department?
12 A. Yes, it is.
13 Q. Okay. And then from there, what's the next
14 step with the data again? It goes onto a server?
15 A. That's correct. And then we can make a
16 copy onto a DVD disc.
17 Q. Okay. Is that server still the same one as
18 it was in May of 2019?
19 A. As far as I know, they still have that
20 server. Like I said, we are transitioning, so
21 there are two different ones at this time.
22 Q. Okay.
23    MR. STUDENT: Counsel, I would
24 just note on the record that I would request that
25 this docking station and the server are preserved.

Page 23

1    MR. JONES: It's on the record.
2 Q. (BY MR. STUDENT) Sergeant, do you know the
3 make and model of the server?
4    Did I ask you that?
5 A. I do not know that.
6 Q. Okay. Once a video is saved onto the
7 server, who at the department has access to it?
8 A. Every deputy has access to the videos to
9 burn them. I believe our IT department has access
10 to the server, as well.
11 Q. Okay. Do you know if there's a policy or a
12 practice as to how long anything uploaded to the
13 server is preserved?
14 A. There's a certain amount of days that it's
15 preserved, unless there's an incident. And that is
16 videos are burned onto discs. I don't know the
17 specifics on the servers. I don't have access or
18 ability to change any of those retentions.
19 Q. Okay. I think you mentioned the IT folks
20 have access to it.
21    Would that be access to, like,
22 delete things?
23 A. Not to my knowledge. I don't know what
24 their access capabilities are.
25 Q. Okay. Do you know if deputies or other law

Page 24

1 enforcement officers can access things and delete
2 them?
3 A. Not to my knowledge.
4 Q. Okay. During your McDonough training
5 course, were you ever instructed regarding the
6 difference between on-leash and off-leash searches
7 for subjects?
8 A. We practice both, yes.
9 Q. Okay. Were you taught that off-leash
10 searches are inherently more risky than on-leash
11 searches?
12 A. No, we were not.
13 Q. Okay. In your opinion, are off-leash
14 searches no more risky than on-leash searches?
15    MR. JONES: Objection to the
16 form.
17    Go ahead.
18 A. I guess it would be situational; depending
19 on each situation.
20 Q. (BY MR. STUDENT) Does having a K9 on leash
21 easier to control the K9 than if the K9 is off
22 leash?
23 A. I don't agree with that question, I guess.
24 I think it depends on the situation.
25 Q. Okay. Can you describe some factors where

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 25

1 an off-leash search might be safer or less risky
2 than an on-leash search?
3 A. There would be a variety of factors,
4 including environmental and any known weapon or
5 threats made.
6 Q. Okay. Does an on-leash search make it
7 easier for officers to control the K9 than an
8 off-leash search?
9 MR. JONES: Objection. Asked and
10 answered.
11 You may answer again.
12 A. Again, it would be situational. I don't
13 agree that that's the case.
14 Q. (BY MR. STUDENT) That being on leash
15 doesn't necessarily make it easier to control the
16 K9?
17 A. That there are situations where a K9 being
18 off leash would be better controlled.
19 Q. Okay. And in this incident, we know that
20 there was an off-leash search. Correct?
21 A. That is correct.
22 Q. Did you ever consider whether an on-leash
23 search might be more appropriate?
24 MR. JONES: Objection to the
25 form. I'm not sure if you mean in the moment, or

Page 26

1 in retrospect.
2 Q. (BY MR. STUDENT) In the moment before you
3 released Koda, did you consider whether an on-leash
4 search might be more appropriate?
5 A. No, I did not.
6 Q. Okay. Do you ever consider that before you
7 conduct an off-leash search?
8 A. I've used both. So, there's been
9 consideration in the past.
10 Q. Okay. Was there a reason you didn't
11 consider it in the incident with Mr. Davis?
12 A. The reason it wasn't used at the time was
13 because of the environmental situation. It went
14 from an on-leash search to an off-leash search at
15 the trailer.
16 Q. Understood. So, prior to going into the
17 trailer, it was an on-leash search?
18 A. That's correct.
19 Q. And then you made a decision to release the
20 K9 and make it an off-leash search. Correct?
21 A. That's correct.
22 Q. What was the reason for that decision, or
23 reasons, if there's more than one?
24 A. There were several. At the trailer, it
25 became environmental, due to space, as well as the

Page 27

1 belief of the suspect being armed.
2 Q. What do you mean by "space"?
3 A. The trailer was smaller in nature and was
4 extremely cluttered with items, which can cause
5 issues when there's an on-leash search.
6 Q. Understood. And Koda could have reached
7 spaces that maybe an officer could not have
8 reached. Is that right?
9 A. That is correct.
10 Q. And then presumably, if that's going to
11 happen, you would have the ability to call off Koda
12 from that space. Correct?
13 A. Correct.
14 Q. If it appears to you that force is no
15 longer necessary, then Koda would have to come out
16 that space. Correct?
17 A. That's correct.
18 Q. Okay. Are you able to list the verbal
19 commands that you use with Koda?
20 A. Yes. For finding or searching an area, I
21 use the command of "Find him." If he's searching
22 for drugs you use the words, "Seek dope."
23 Q. "Seek dope"?
24 A. Correct.
25 Q. D-o-p-e?

Page 28

1 A. Correct.
2 Q. That's straight and to the point.
3 A. Yep.
4 Q. Go on.
5 A. The only other command I generally use
6 would be "Get him," if he was being used
7 specifically on a criminal apprehension where the
8 suspect is actively running in front of us.
9 Q. Okay. And that's to cause Koda to
10 apprehend by a bite, the subject?
11 A. Correct.
12 Q. And that's a bite and hold. Correct?
13 A. That is correct.
14 Q. And then what's the command for releasing
15 the bite?
16 A. "Out," O-u-t.
17 Q. Okay. And if Koda is at a distance, what's
18 the command to have Koda come back to you?
19 A. Depends on the situation. If it's a recall
20 before an apprehension, it would be, "No. Come."
21 If it's just a coming back, it would be "Come,"
22 C-o-m-e.
23 Q. Okay. Are those verbal commands that were
24 in place with Koda at the time you took over
25 handling from Deputy Carroll?

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 29

1 A. Yes.
2 Q. Okay. And at the time that the handling
3 transitioned to you, did you and Deputy Carroll
4 have a conversation about these commands?
5 A. I believe so.
6 Q. Okay. Anything in writing, like emails or
7 text messages?
8 A. No. I don't believe so.
9 Q. Okay. All right. We received a number of
10 documents regarding training sessions for Koda. I
11 think most or all of them involve you as the
12 handler.
13 Are these training sessions that
14 were done at Barron County? Or at McDonough?
15 A. Through Barron County, after McDonough.
16 Q. Okay. Do you know if these training
17 sessions were recorded?
18 A. No.
19 Q. You don't know? Or they were not recorded?
20 A. I'm sorry. They were not recorded.
21 Q. Okay. So, none of the training sessions
22 through Barron County would have been recorded?
23 A. Correct.
24 Q. Were any of the training sessions that you
25 may have done at McDonough recorded?

Page 30

1 A. Not to my knowledge.
2 Q. Okay.
3 MR. STUDENT: Give me just a
4 second here.
5
6 (Pause.)
7
8 MR. STUDENT: Counsel, I'd like
9 to take a look at Bate-stamped document, 814
10 through 816. And we're doing this remotely. We
11 can do this a couple of different ways. I can
12 email it, unless you guys have it handy to look at.
13 MR. JONES: What is it?
14 MR. STUDENT: It's a Koda
15 training session document.
16 MR. JONES: If you have it
17 available where you can pull it up, why don't you
18 just pull it up and share your screen.
19 MR. STUDENT: Okay. Let me see
20 if I can do that. Let me give this a shot.
21 Does everyone see this document
22 that I am scrolling up on?
23 THE WITNESS: Yes.
24 MR. STUDENT: Okay.
25 Q. (BY MR. STUDENT) Sergeant, are you

Page 31

1 familiar with this form? Let's start with that.
2 Just generally, what is this
3 form?
4 A. It is a training log for K9 training
5 purposes.
6 Q. Okay. And just for the record, this is
7 Bate-stamped 814. And I'm scrolling down to the
8 next page, which is 815. And it says, "Activity
9 bite work."
10 Do you see that?
11 A. Yes.
12 Q. What is bite work?
13 A. That would be any type of criminal
14 apprehension work, whether it's on a sleeve or with
15 a decoy in a bite suit.
16 Q. Okay. And then would you work with Koda
17 with commands for commencing a bite and coming off
18 of a bite, as part of bite work?
19 A. Yes; that's correct.
20 Q. Does department policy dictate any
21 specific amount of hours that you're required or
22 Koda is required to do bite work during, like, a
23 year?
24 A. No, it does not.
25 Q. Okay. Any requirements with respect to

Page 32

1 ongoing certification for Koda?
2 A. I don't believe there's a policy for it.
3 We certify yearly.
4 Q. Okay. And there's not a specific number of
5 hours that Koda has to do bite work for that
6 certification. Is that correct?
7 A. Correct.
8 Q. Okay. Do you know if Koda was trained to
9 release from a bite and stay with the subject? Or
10 to release and then come back to you, or both?
11 A. Train both.
12 Q. Okay. Are there different commands for him
13 to do one, versus the other?
14 A. Yes.
15 Q. And what are those commands?
16 A. One would be "Out and down," which would
17 keep him in the down at that location. Otherwise,
18 it would be "Out and come."
19 Q. Okay. And I refer to Koda as "him." And I
20 guess I should ask; I shouldn't presume. Is Koda a
21 male? Or a female K9?
22 A. Male.
23 Q. Is he neutered?
24 A. No, he's not.
25 Q. Is that standard?

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 33

1 A. I've seen both.
2 Q. Okay. Now, looking at the form, there's a
3 spot -- I'll scroll down a little bit. Actually,
4 I'll scroll up.
5    The bottom written lines on the
6 document that we're looking at say, "Handler
7 comments and trainer comments."
8    Do you see that?
9 A. Yes.
10 Q. And there aren't comments there for either.
11 Above there, a handler comment, "Did well with this
12 today, responsive to both nonverbal and verbal
13 commands."
14    Do you see that?
15 A. Yes.
16 Q. Was that your comment?
17 A. Yes. That would be my comment.
18 Q. Were you the handler, as far as you know,
19 on all the training sessions you did with Koda? Or
20 were you ever a trainer?
21 A. I was always the handler.
22 Q. Was there ever a separate trainer involved?
23 A. No. Generally speaking, training is either
24 on your own with the dog or we will do group
25 training. Usually, monthly, but it's not always

1 every month.
2 Q. Okay. Tell me a little bit more about the
3 group training.
4    Does that involve other K9s with
5 Koda?
6 A. Correct. It does. So, there's other K9s
7 in the northwest Wisconsin area that we train with.
8 Q. Okay. And in these bite work exercises
9 that you do, is there a human decoy involved?
10 A. Yes, there is.
11 Q. Sometimes? Or always?
12 A. Most of the time. Sometimes there would
13 just be myself. I would work with Koda on some
14 bite work. But, generally speaking, if there's
15 somebody in a bite suit, yeah; there would be a
16 decoy.
17 Q. Okay. Do you recall doing a formal
18 certification session for USPCA certification with
19 Koda?
20 A. Yes. We do one yearly.
21 Q. Okay. And are you familiar with the
22 requirements for that certification?
23 A. Yes.
24 Q. Is it true that a K9 can't be certified if
25 it's required to physically remove the K9 from a

1 decoy bite?
2 A. That's not correct. There are three
3 apprehensions in the certification, and you have to
4 have one non-physical removal of a bite to certify.
5 Q. Okay. And when you say, "apprehension,"
6 are you talking about a human in a decoy suit? A
7 bite suit?
8 A. They're in a bite sleeve.
9 Q. A bite sleeve?
10 A. Correct.
11 Q. And there are three bite and then
12 call-offs. And only one of them has to be without
13 physical removal?
14 A. That is correct.
15 Q. Okay. All right. I'm just going to page
16 through some of these training records and ask you
17 questions that I have.
18    MR. JONES: Rich, were you going
19 to mark this one document, 814 to 816, as an
20 exhibit?
21    MR. STUDENT: I'm not. I think
22 that complicates the motion briefing process.
23 Q. (BY MR. STUDENT) I'm scrolling down to
24 940, just so I can understand some terminology
25 here. And just so I know, we're looking at the top

1 of 865, Sergeant. And it says, "Allen,
2 Christopher."
3    That's, presumably, a reference
4 to you. Correct?
5 A. Yes, it is.
6 Q. And then there's a training number
7 beginning with, I assume, is the year of the
8 training session.
9 A. Yes; that's correct.
10 Q. And below it, it says, "Team" and then
11 "Koda/Allen."
12    Do you see that?
13 A. Yes, I do.
14 Q. Does that mean that this is a form that you
15 completed, yourself?
16 A. Yes; that's correct.
17 Q. Did anyone else have a hand in authoring
18 this document?
19 A. No, they did not.
20 Q. Is that your understanding with respect to
21 each of the other Koda training documents like this
22 that identify you and identify you and Koda?
23 A. That's my understanding, yes.
24 Q. Okay. I'll continue on.
25    Here we are at Bate Stamp 940.

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 37

1 And I'm going to read an objective. It says,
2 "Three downhill bites, finished with recall."
3 Do you see that?
4 **A. Yes.**
5 Q. What is "finish with recall"?
6 **A. Did a recall practice, was the final**
7 **exercise.**
8 Q. Okay. And what does "recall" mean?
9 **A. So, a recall would be the decoy is running**
10 **down the field, I send Koda. After a certain**
11 **distance, I give him the recall command, and then**
12 **he comes back to my location.**
13 Q. What is the next sentence? The last
14 two words are "bite pillow."
15 What is a bite pillow?
16 **A. It's a reward toy. It's about the size of**
17 **a small pillow that's a little bit heftier than a**
18 **regular pillow. It's similar to a tug or a ball**
19 **reward.**
20 Q. Okay. And then it goes on to say, "Three
21 verbal outs, no issues there."
22 Do you see that?
23 **A. Yep.**
24 Q. And tell me again what the verbal "Out"
25 means.

Page 38

1 **A. It means when they're on an apprehension,**
2 **it's a verbal "Out." He releases from the bite.**
3 Q. Okay. And if you want Koda to come back,
4 you say something to the effect of "Out and come"?
5 **A. Correct.**
6 Q. Okay. There's a reference in some of the
7 documents to the use of an E-collar in these
8 training sessions.
9 **A. Yes.**
10 Q. What is an E-collar? Can you explain that
11 to me?
12 **A. An E-collar is an electronic collar that**
13 **has a remote to use as an electronic correction**
14 **tool in training.**
15 Q. Okay. Is that only used in training? Or
16 is it ever used in the field when you're doing your
17 law enforcement duties with citizens?
18 **A. He wears it in the field. I have not had**
19 **to utilize it in the field.**
20 Q. Okay. Was he wearing it in connection with
21 the incident with Mr. Davis in May of 2019?
22 **A. Yes, he was.**
23 Q. Okay. And did you have the remote, so to
24 speak?
25 **A. I had the remote with me. I believe,**

Page 39

1 **however, it was on my vest, and not on my belt.**
2 **So, it was not with me for part of the incident.**
3 Q. Okay. Did you attempt to use it during the
4 incident?
5 **A. No, I did not.**
6 Q. Did you consciously consider using it
7 during the incident?
8 **A. No, I did not.**
9 Q. Okay. I want to start talking about the
10 May 9th, 2019, incident involving Mr. Davis. And I
11 want to kind of start with the scene setup,
12 starting at the point in time where you released
13 Koda into the trailer.
14 Do you know what I'm referring
15 to?
16 **A. Yes, I do.**
17 Q. Okay. Who was present with you at the door
18 to the trailer when you released Koda?
19 **A. Sergeant Darren Hodek. I think he was a**
20 **detective at the time. Detective Cook was nearby,**
21 **but he wasn't up at the door with me.**
22 Q. Okay. Was a deputy or Sergeant Sedani with
23 you? Sedani?
24 **A. Deputy Sedani was also there. However, he**
25 **was dealing with Mr. Hazeltine. And I believe he**

Page 40

1 was walking him away from the trailer.
2 Q. Okay. And after Koda was released at some
3 point, you moved inside the trailer. Correct?
4 **A. That is correct.**
5 Q. Who moved inside the trailer with you?
6 **A. Sergeant Hodek.**
7 Q. Anybody else?
8 **A. Eventually, Detective Cook did, at some**
9 **point. I don't know what time -- like, I don't**
10 **remember exactly what point we were in the trailer,**
11 **but he did come in at some point.**
12 Q. Okay. And at some point, Sergeant Hodek
13 and you make your way to the bedroom that Mr. Davis
14 was in. Is that correct?
15 **A. That is correct.**
16 Q. Were you moving single file? Or
17 side-by-side at that point in time?
18 **A. It would have been a staggered, single**
19 **file.**
20 **The space wasn't very wide in**
21 **there.**
22 Q. And who was it ahead of that single file?
23 **A. I was.**
24 Q. Okay. And Deputy Hodek was behind you?
25 **A. Yes. Sergeant Hodek was behind me.**

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 41

1  Q.  What I'm looking at -- and we'll be
2  watching your body-worn camera video.  And it
3  appears that there's an officer in front of you as
4  you make your way to the bedroom.
5      Is that not what your memory is
6  telling you?
7  A.  That's not my recollection.  I was in
8  front.  Sergeant Hodek would have been off to my
9  left shoulder, behind me.
10  Q.  Okay.  Did either you or Sergeant Hodek
11  have your firearms drawn?
12  A.  Yes.  We both did.
13  Q.  Okay.  And Koda during the incident, had a
14  harness that you could attach a leash to.  Is that
15  correct?
16  A.  Yes; that's correct.
17  Q.  And he also had the E-collar?
18  A.  Correct.
19  Q.  Okay.  All right.  I'd kind of like you to
20  walk me through what you recall of that incident,
21  starting from the point in time when you and
22  Deputy Hodek enter the trailer through the point in
23  time where you removed Mr. Davis from the trailer.
24  Are you able to do that?
25      MR. JONES: Objection to the

Page 42

1  form.
2      You can go ahead.
3  A.  Okay.  So, from entering the trailer we
4  make our way into a kitchen area where I was able
5  to get a little bit of a move to the right a little
6  bit, to see an angle into the back bedroom where I
7  could see a hand, and I would get a glimpse of
8  Mr. Davis's face.  We continued to move forward, to
9  try to get to Mr. Davis, while giving commands for
10  him to come to us.
11      At some point, in the hallway,
12  Sergeant Hodek made mention of a knife being in the
13  area.  And we got to a room where there was a
14  barricade preventing us from entering.  I attempted
15  to move the barricade, which was a large box
16  spring.  The size of the room and the amount of
17  clothing, blankets, other articles and such, I was
18  not able to move it to gain entry.
19      Sergeant Hodek then attempted to
20  gain entry.  However, he was not able to do so,
21  either.  So, the decision was made to take our
22  exterior Kevlar vests off.  And in an attempt to
23  gain entry, I then went into the room first,
24  Sergeant Hodek providing cover.  Sergeant Hodek
25  followed.

Page 43

1      I got to K9 Koda, gave him the
2  "Out" command while Sergeant Hodek took control of
3  Mr. Davis and placed him into custody.
4  Q.  (BY MR. STUDENT)  I understand you had
5  Mr. Davis placed in handcuffs.
6  A.  That is correct.
7  Q.  Were the handcuffs placed on him when he
8  was lying down?  Or standing up?
9  A.  I believe he was still lying down.
10  Q.  Okay.  And then what happened?
11  A.  Detective Cook made room for us, as he had
12  our equipment.  And then we went out of the
13  trailer.  Sergeant Hodek escorted Mr. Davis out of
14  the trailer and I brought K9 Koda out of the
15  trailer with me.
16  Q.  Okay.  At some point in time, either you or
17  Sergeant Hodek says, "I can see his hands."
18      Do you recall that being
19  announced in the incident?
20  A.  Yes.  I do recall that.
21  Q.  Okay.  And then at some point in time,
22  somebody says, "Let's go get him."
23      Do you remember that?
24  A.  Yes.
25  Q.  Okay.  Now, that entire time, did either

Page 44

1  you or Sergeant Hodek have deadly cover on
2  Mr. Davis?
3      MR. JONES: Objection to form.
4      You can answer.
5  A.  During the attempt to enter the room, yes;
6  there was lethal cover.
7  Q.  (BY MR. STUDENT)  Okay.  Prior to entering
8  the room, there was not lethal cover?
9  A.  We had our firearms drawn, but we did not
10  have a full view of Mr. Davis at that point.
11  Q.  Okay.  You were able to identify Mr. Davis,
12  though.  Correct?
13  A.  Correct.
14  Q.  And so, a firearm could have been pointed,
15  at the very least, at his head.  Correct?
16  A.  That's correct.
17  Q.  Okay.  And both you and Deputy Hodek had
18  your firearms unholstered and raised during the
19  entire time.  Correct?
20  A.  They were in a tactical position for
21  searching.
22  Q.  That's a better way to put it.  Thank you.
23      Did you see any weapons in that
24  room at any point in time?
25  A.  Not in the bedroom.

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 45

1 Q. Did you see any other individuals in the
2 room during the incident?
3 A. No, I did not.
4 Q. Did you see any other doors or exits from
5 the room during the incident?
6 A. Not that I recall.
7 Q. Okay. And just so I'm clear, Koda didn't
8 alert to the presence of any other individuals or
9 weapons or narcotics while Koda was in that room,
10 did he?
11 MR. JONES: Objection to the
12 form.
13 You can go ahead and answer.
14 A. Not that I can recall.
15 Q. (BY MR. STUDENT) Okay. And it didn't
16 appear to you that Mr. Davis was attempting to
17 flee, did it?
18 MR. JONES: Objection to form.
19 You can go ahead.
20 A. He was not attempting to flee from the
21 bedroom at that time.
22 Q. (BY MR. STUDENT) Before Koda found him,
23 you thought he was trying to hide from you. Right?
24 A. That is correct.
25 Q. Okay. And then as soon as Koda found him,

Page 46

1 he started yelling for help. Right?
2 A. He did start yelling from the back bedroom,
3 yes.
4 Q. And at any time after Koda apprehended
5 Mr. Davis, did Mr. Davis resist?
6 MR. JONES: Objection to the
7 form.
8 A. He did not respond to commands to come out
9 of the bedroom at that time.
10 Q. (BY MR. STUDENT) Okay. And would that
11 have been something he would have been able to do
12 with Koda biting his upper arm?
13 A. I would say it's possible, yes.
14 Q. But at the same time, it was impossible for
15 either you or Deputy Hodek to go in the room?
16 A. That is correct, due to our external vests.
17 Q. Okay. And the vests, do they stick out
18 further than a dog hanging off your arm might stick
19 out?
20 MR. JONES: Objection to the form
21 of the question.
22 Go ahead.
23 A. I guess it would depend on how you would
24 attempt to exit the room.
25 Q. (BY MR. STUDENT) Okay. Did you instruct

Page 47

1 Mr. Davis as to how to exit the room?
2 A. Just to come out with his hands up.
3 Q. Okay. And because he didn't do that, you
4 took that as resistance?
5 A. It is resistance. He wasn't following the
6 order.
7 Q. Early during the incident, you and/or
8 Deputy Hodek were able to see Mr. Davis's hands.
9 Correct?
10 A. I was, yes.
11 Q. Did you know who made that initial
12 announcement, "I can see his hands"?
13 A. I did.
14 Q. Okay. And where were his hands when you
15 first saw them?
16 A. They appeared to be above his head.
17 Q. Okay. Now, he testified at his deposition
18 that he put his hands interlaced on top of his head
19 and they remained there until Koda pulled his arm;
20 and therefore, one of his hands was off his head.
21 Is that correct?
22 A. That is not something I observed.
23 Q. Okay. Can you tell me everything you
24 remember about the location of Mr. Davis's hands
25 during the incident?

Page 48

1 A. I saw what appeared to be a right hand
2 above his head as we moved forward at one point,
3 and then saw his left hand above his head, as well.
4 When we got to the room, both hands were up and he
5 was attempting to pull his left arm away from
6 K9 Koda, who had apprehended him in the left arm.
7 Q. Okay. And was that in response to your
8 command to him to show his hands?
9 MR. JONES: Objection to form.
10 A. I guess I can't speculate on that.
11 Q. (BY MR. STUDENT) Fair enough.
12 At the time, Mr. Davis was laying
13 on his stomach. Correct?
14 A. Correct.
15 Q. Mr. Davis testified at his deposition that
16 he did not have any items like articles of clothing
17 or bedding material on top of him as he was laying
18 on the bed.
19 Is that consistent with what you
20 recall?
21 MR. JONES: Objection to form.
22 A. My recollection is that he was partially
23 covered by the articles of clothing and bedding in
24 the room.
25 Q. (BY MR. STUDENT) Okay. Did Mr. Davis

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

1  ever make any verbal threats to either you or
2  Deputy Hodek?
3  A.  Not that I recall.
4  Q.  I want to ask you a hypothetical question,
5  subject to objections I anticipate.  But, if
6  Mr. Davis had been in the room, lying on his
7  stomach with his hands above his head and Koda had
8  not been in the room, would you have been justified
9  in using your taser on Mr. Davis?
10     MR. JONES: Objection to the
11  form, and it's an incomplete hypothetical.
12     But you may answer.
13  A.  It would depend on Mr. Davis's actions and
14  reactions to commands given.
15  Q.  (BY MR. STUDENT)  Okay.  If he were showing
16  his hands in response to your command and he was
17  laying on the bed, would you have been justified,
18  in your opinion, in using your taser on him at that
19  point in time?
20     MR. JONES: Same objection.
21  A.  Again, it would depend on Mr. Davis's
22  actions while we attempted to take him into
23  custody.
24  Q.  (BY MR. STUDENT)  Okay.  Do you agree, or
25  disagree with the proposition that you cannot use a

1  taser on a subject who is not resisting or fleeing?
2     MR. JONES: Objection to form.
3  A.  I would agree that a taser would not be
4  appropriate if someone was not resisting.
5  Q.  (BY MR. STUDENT)  Okay.  Now, at some point
6  during the incident, the body camera recording
7  video -- or I should say, audio -- indicates that
8  somebody says, "Come to me."
9     Do you recall somebody saying
10  that?
11  A.  Yes.  I believe that was me.
12  Q.  Okay.  And what does that mean?  "Come to
13  me"?
14  A.  To have Mr. Davis come to us, because I
15  believe that was when we had already attempted to
16  get into the room, and we could not.
17  Q.  That wasn't a command to your K9?
18  A.  No, it was not.
19  Q.  Okay.  At any point in time during the
20  incident, did you attempt to have Koda come to
21  you?
22     MR. JONES: Objection to the
23  form.
24     Go ahead.
25  A.  No.  I did not give Koda a command to come

1  back to me.
2  Q.  (BY MR. STUDENT)  And why was that?
3  A.  Because Mr. Davis was not yet in custody or
4  under control.
5  Q.  But just so I understand this.  You felt it
6  was necessary for Koda to continue apprehending
7  Mr. Davis until Mr. Davis was in handcuffs?
8  A.  Until he was under control, yes.
9  Q.  And he wasn't under control while Koda was
10  apprehending him?
11  A.  He was not in our physical control by
12  either myself or Sergeant Hodek, Mr. Davis was not.
13  Q.  Okay.  Although, I mean, you had deadly
14  force cover on him.  Correct?
15  A.  Yes; that's correct.
16  Q.  He was complying to the extent he could
17  with all of your commands.  Correct?
18  A.  I don't necessarily agree with that.
19  However, he was not attempting to flee.
20  Q.  Okay.  And his hands were showing, he
21  wasn't reaching for anything with his hands.
22  Correct?
23     MR. JONES: Objection to the
24  form.
25  A.  I guess I don't know if he was reaching for

1  anything.  He did not appear to be.
2  Q.  (BY MR. STUDENT)  Okay.  Did you consider
3  the option of calling off Koda while Deputy Hodek
4  trained his gun on Mr. Davis?
5  A.  No, I did not.
6  Q.  Okay.  And at some point, somebody says,
7  "Take off your vest."
8     Do you remember who first said
9  that?
10  A.  I believe Sergeant Hodek said that.
11  Q.  Okay.  And can you describe to me the
12  process of taking off your vest.
13  A.  So, we have external vest carriers that at
14  the time, they zipped up the middle.  So, it
15  involved unzipping and, basically, comes apart.  It
16  stays together, but it comes apart in the front to
17  slip off your arms.
18  Q.  Okay.  Like a zip-up vest without sleeves?
19  A.  Basically, yes.
20  Q.  Okay.  And how long does that process of
21  taking off the vest take?
22  A.  A matter of seconds.
23  Q.  Was there any reason that you had to think
24  that Koda would not have been able to come off
25  Mr. Davis if you had called him off?

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 53

1 A. Can you clarify further on that?
2 Q. Yeah. Did you have any reason to think
3 Koda would not come off his bite of Mr. Davis if
4 you had verbally commanded it?
5 A. No. I did not have a reason to believe
6 that.
7 Q. Okay. And is the E-collar, does that
8 assist if there is a delay or a hesitation with a
9 verbal "Out" command being complied with? Does the
10 E-collar assist with that?
11 A. Yes. That can be used for such reasons.
12 Q. Okay. But you're testifying here that you
13 did not issue any sort of verbal "Out" command to
14 Koda?
15     MR. JONES: Objection to form.
16     Go ahead.
17 A. Not until we were in the room with
18 Mr. Davis.
19 Q. (BY MR. STUDENT) Okay. Now, Mr. Davis
20 testified that Koda was physically removed from his
21 body. Is that correct?
22     MR. JONES: Objection to form.
23     Go ahead.
24 A. No. That is not correct.
25 Q. (BY MR. STUDENT) Can you describe how Koda

Page 54

1 came off the bite?
2 A. With a verbal "Out" command.
3 Q. A verbal "Out" command?
4 A. Correct.
5 Q. And when that occurred, was Deputy Hodek
6 present?
7 A. Yes, he was.
8 Q. Okay. Now, there's a point in time on the
9 recording -- and we will watch it, eventually, but
10 I want to ask you about it now -- where Mr. Davis
11 is placed in handcuffs and there are commands for
12 him get up.
13     Do you recall this?
14 A. Yes.
15 Q. And then he's either rolled over or
16 something else happens, and his arm is revealed and
17 then you can hear one or more people saying
18 something along the lines of, "Oh shit."
19     Do you recall that?
20     MR. JONES: Objection to form.
21 A. I don't recall that.
22 Q. (BY MR. STUDENT) Okay. Were you able to
23 see Mr. Davis's injury as it was being sustained?
24     MR. JONES: Objection to form.
25     Go ahead.

Page 55

1 A. I could not see the extent of Mr. Davis's
2 injury until later on.
3 Q. (BY MR. STUDENT) Okay. So, you don't have
4 any evidence that would conflict with Mr. Davis's
5 testimony as to when the ripping of his arm muscle
6 occurred, do you?
7     MR. JONES: Objection to form.
8 A. I guess, can you clarify that question?
9 Q. (BY MR. STUDENT) Sure. Let me put it a
10 different way: So, at one or more points during
11 the incident, Mr. Davis announces that Koda is
12 ripping his arm.
13     Do you recall him saying that?
14 A. Yes, I do.
15 Q. Okay. I want to just confirm that you
16 don't have any information or evidence that would
17 conflict with his account of the injuries as they
18 occurred in real time, do you?
19 A. No. I guess I do not.
20 Q. Okay. All right.
21     MR. STUDENT: Can we take a
22 five-minute break, Counsel and Sergeant?
23     MR. JONES: Sure.
24     MR. STUDENT: Thank you.
25

Page 56

1     (Whereupon a short recess was had.)
2
3     MR. STUDENT: Just give me just a
4 moment here. I'm getting the next docs ready to
5 share.
6     We can go back on the record.
7 Q. (BY MR. STUDENT) Sergeant Allen, I want to
8 talk about two reports that I received that appear
9 to be both drafted by you in connection with this
10 incident.
11     Do you recall drafting two
12 separate reports?
13 A. There would have been an incident report
14 and a K9 incident report, which is the same program
15 that those training reports are logged in that you
16 have shown already.
17 Q. I see. So, I'll share screen in just a
18 second. I want to make this sure I get these up
19 for you.
20     Can you hear me okay?
21 A. Yes.
22 Q. I'm sharing with you a report that's
23 Bate-stamped 3, then 5, then 6, with no 4 in
24 between. So, Bate Stamps 3, 5, 6. And I'll page
25 through it here. If this is part of the report,

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 57

1 this would be Bate-stamped 4.
2    Sergeant, do you know if this is
3 a part of that report?
4 A.  It appears to be the involvement table that
5 would be in front of me, the incident report.
6 Q.  Okay.  There's Page 5 and Page 6.  And at
7 the bottom of the writing here on the last page, it
8 says, "Per Deputy Christopher Allen."
9    Do you see that?
10 A.  Yes.
11    MR. JONES: Rich, I haven't
12 noticed, but if these are Bates numbered, can you
13 identify the Bates numbers?
14    MR. STUDENT: That's what I'm
15 doing.
16    MR. JONES: Oh, I see.  So,
17 you're not using the Bates numbers in the top
18 right?
19    MR. STUDENT: Correct.  Yeah;
20 this is at the beginning of the batch, so it is 3,
21 4, 5, 6.
22    MR. JONES: Okay.
23 Q.  (BY MR. STUDENT)  Sergeant, does this
24 appear to be a four-page report that you authored
25 about the incident?

Page 58

1 A.  It appears to be my incident narrative.  To
2 clarify, I think those involvements are supposed to
3 be before the narrative.  I'm not sure why they are
4 in the middle of the narrative.  I don't know if it
5 was sent wrong.  But, generally, they're not
6 stacked like that in the middle of the narrative.
7 Q.  Understood.  That had been my assumption.
8    This specific narrative, do you
9 know if you drafted this the day of the incident,
10 or after the incident?
11 A.  I believe it would have been the day of the
12 incident or the next day.  I'm not sure, exactly.
13 Q.  Okay.  And then there's another report.
14 And I'm scrolling down to Bate Stamp 13 and 14.
15    Do you see this?
16 A.  Yes.
17 Q.  Sergeant, this is page Bate-stamped 13 and
18 then Bate-stamped 14.
19 A.  Yes, I do.
20 Q.  Is this a report that you authored?
21 A.  Yes.
22 Q.  Okay.  So, in one of the reports you say,
23 "All I could see was the subject's head and face,
24 which, based on looking at prior photos of
25 Trevor Davis, I did immediately recognize him to be

Page 59

1 Trevor."
2    And that's on Bate Stamp 5.
3    MR. JONES: Can you show him
4 that?
5    MR. STUDENT: Yep.  It would be
6 nice to do this in person at some point in the
7 future.  Right?
8    MR. JONES: Yeah.  That would be
9 easier.
10 Q.  (BY MR. STUDENT)  So, do you see here --
11 I'll use my mouse.  Can you see my mouse?
12 A.  Yep.
13 Q.  Do you see where it says, "All I could see
14 was the subject's head and face, which, based on
15 looking at prior photos of Trevor Davis, I did
16 immediately recognize him to be Trevor."
17    Do you see that?
18 A.  Uh-huh.
19 Q.  Do you know if this narrative was drafted
20 before the other one was drafted?
21 A.  I don't know the timeline of how they both
22 were drafted.  I don't recall.
23 Q.  Okay.  Because in the other narrative on
24 Bates 13, it says, "Entry was made and I could see
25 the subject's face and a hand."

Page 60

1    So, I'm wondering why one of the
2 reports says you couldn't see hands, and the other
3 says you can see a hand.
4    MR. JONES: Objection to the
5 form, multiple; and objection to the form,
6 mischaracterizing the written report that you have
7 up in front of him.
8    MR. STUDENT: I'll show it.
9 Q.  (BY MR. STUDENT)  Going down to 13.  Can
10 you see my mouse?
11 A.  Yes.
12 Q.  It says, "Entry was made and I could see a
13 subject's face and a hand."
14    Do you see that?
15 A.  Yes.
16 Q.  So, I guess what I want to know is, when
17 you made entry, could you see a hand?  Two hands?
18 Or no hands?
19 A.  Depending on where we were in the trailer,
20 that varied.  At one point, I could see a hand.  At
21 one point, I could see a face and a hand.  And then
22 at one point I could see two hands when we got
23 closer to the door.  So, it varied, depending on
24 where we were in the trailer.
25 Q.  Did you speak with any captains or

Page 61

1 sergeants about drafting these reports before you
2 drafted them?
3     Did you hear my question?
4 **A. I'm sorry. Not that I recall.**
5 Q. Okay. Do you recall speaking with a
6 Captain Ronald Baures about these reports?
7     **MR. JONES:** Hold on one second,
8 Rich. We're going to adjust the microphone.
9     Would you go ahead and ask the
10 question again?
11 Q. (BY MR. STUDENT) Do you recall speaking
12 with a Captain Ronald Baures about these reports
13 before you drafted the reports?
14 **A. I recall speaking to Captain Baures about**
15 **the incident at some point. But, I don't recall**
16 **the time frame of when that occurred, as**
17 **Captain Baures did not come out the night of the**
18 **incident.**
19 Q. Do you mean, come out to the scene?
20 **A. Correct.**
21 Q. Okay. I want to read an email to you that
22 Captain Baures sent on May 20th, and then I want to
23 ask you about it. Okay?
24 **A. Okay.**
25 Q. So, the email, it's to you, Darren Hodek,

Page 62

1 307 Randy Cook, and an Erik -- that's E-r-i-k,
2 Sedani, S-e-d-a-n-i. And the subject is the case
3 number and then Trevor Davis. It says, "Chris,
4 Darren, Randy, Erik, please make sure your reports
5 on the K9 bite case involving Trevor Davis is
6 completed this week. Davis is represented by a
7 civil attorney in the bite case, who is requesting
8 reports, video, et cetera."
9     Does this email communication
10 sound familiar to you?
11 **A. Yes, it does.**
12 Q. At that point in time, had you drafted
13 reports, or one of the reports?
14 **A. I believe so, yes.**
15 Q. Do you know if it was just one of the
16 reports? Or both of the reports?
17 **A. I do not recall.**
18 Q. Okay. Do you recall ever discussing with
19 either Darren, Randy or Erik, drafting the reports
20 or this email from Captain Baures?
21     **MR. JONES:** Objection to the
22 form.
23 **A. No. I don't recall having specific**
24 **conversations with either -- any of those subjects**
25 **regarding the reports of this incident.**

Page 63

1 Q. (BY MR. STUDENT) Okay. Do you know if you
2 had any either emails or text messages with either
3 of those three about either the reports or about
4 the incident, generally?
5 **A. No. I do not have any of those.**
6 Q. You're confirming, categorically, that you
7 sent no text messages, you received no text
8 messages from or to any of those three about the
9 incident or the reports?
10 **A. Correct.**
11 Q. And likewise, with respect to email
12 messages?
13 **A. Correct. Any emails regarding this**
14 **incident were produced.**
15 Q. Okay. And all emails that you sent
16 regarding the incident, were they to and from your
17 Barron County email address?
18 **A. That's correct.**
19 Q. You did not use a personal email address?
20 **A. No, I did not.**
21 Q. Okay. Do you have a separate work phone
22 that you use?
23 **A. Yes, I do.**
24 Q. What's the phone number for that?
25 **A. 715-418-9714.**

Page 64

1 Q. Who is the carrier for that?
2 **A. Verizon.**
3 Q. And that's a Barron County work phone?
4 **A. Correct.**
5 Q. Okay. Are you able to confirm you haven't
6 sent any messages on your personal phone or
7 personal computer about this incident?
8 **A. That's correct.**
9 Q. Okay. Thank you.
10     Do you recall, with respect to
11 either of the reports that you wrote, if you
12 submitted, like, a draft for review that was then
13 returned to you with comments to finalize?
14 **A. Given this incident, there most likely was**
15 **a rough draft submitted. The way our report system**
16 **works is we dictate over the phone, a secretary**
17 **types it up and sends it back for review.**
18 Q. And that's just to the author that it's
19 sent for review? Or does somebody else review it,
20 too?
21 **A. It's sent back to the officer that dictates**
22 **it, to review it to make sure that everything is in**
23 **there. And it's sent back, and I believe**
24 **administration reviews them. But, it's a final**
25 **draft once the officer approves it before it gets**

Page 65

1 sent to administration.
2 Q. I see. Okay.
3 So, the final draft that you
4 submitted, you had no input from any other
5 administrator or law enforcement officer?
6 A. No.
7 Q. Okay. All right.
8 I'm going to go up to Bates 9.
9 And this is, I understand it to be a report by
10 Sergeant Darren Hodek.
11 Do you see here where my -- these
12 last two lines on this page?
13 A. Yes, I do.
14 Q. It says, "Per Sergeant Darren Hodek." And
15 then underneath it, it says, "DJH." I assume
16 that's him.
17 A. No. That's for Danette Hellman (phonetic).
18 She's our administrative assistant that types all
19 of our reports.
20 Q. Okay. This last paragraph on Bates
21 Stamp 9, it states, "Myself and Deputy Allen went
22 inside the trailer and attempted to retrieve K9."
23 Do you see that?
24 A. I do.
25 Q. Is that an accurate statement as to what

Page 66

1 you and Deputy Hodek did when you were inside the
2 trailer?
3 A. It would be part of what we did.
4 Q. Okay. You testified that you didn't try to
5 recall Koda. Is that correct?
6 A. Correct.
7 Q. So, was there anything you guys did to
8 attempt to retrieve Koda, besides just going into
9 the back room and putting him on his leash?
10 MR. JONES: Objection to the
11 form; mischaracterizes his testimony up until now.
12 But go ahead.
13 A. Other than trying to have Mr. Davis come
14 back to us with the K9, no.
15 Q. (BY MR. STUDENT) Okay. And that's what
16 you wanted. You wanted Mr. Davis to come out of
17 that back bedroom. Correct?
18 A. That's correct.
19 Q. Alrighty. That covers that.
20 I want to walk through the
21 body-worn camera recording from, I believe, your
22 body-worn camera, Sergeant. And what I'm going to
23 do, I'm going to share screen and I'm going to make
24 sure we can see it and hear it, and then I'm going
25 to stop it at various places. And I don't want a

Page 67

1 transcript of what is said on the video, but I will
2 ask you questions that will be transcribed; and I
3 will be quoting from the video, and then you can
4 answer the questions.
5 Does that sound fair?
6 A. Yes.
7 Q. Okay.
8 MR. JONES: Rich, can you confirm
9 that what you're going to play for him is Bates
10 Numbered 67?
11 MR. STUDENT: Correct. And I'm
12 about to open it by the shared screen here.
13 This is what I received as Bate Stamp 0067.
14 MR. JONES: All right.
15 Q. (BY MR. STUDENT) Do you recognize this box
16 that's at the front of this screen, Sergeant?
17 A. Yes, I do.
18 Q. Okay. And it says, "Certified copy" at the
19 top.
20 Is that something that you
21 recognize?
22 A. That's typical if video is made on the
23 discs, yes.
24 Q. Okay. So, I'm going to play it.
25

Page 68

1 (Pause.)
2
3 Q. (BY MR. STUDENT) At this point -- I mean,
4 we're outside, so it's kind of dark.
5 Are you able to confirm that this
6 is your body camera recording?
7 MR. JONES: We are still seeing
8 that original still frame. Is that what you intend
9 us to be seeing?
10 MR. STUDENT: No. Hang on. Let
11 me fast-forward.
12 Do you see a video playing?
13 MR. JONES: No.
14 MR. STUDENT: I wonder why it's
15 not sharing the video.
16 Can we go off the record for a
17 couple of minutes?
18
19 (Off the record discussion.)
20
21 Q. (BY MR. STUDENT) Do you see the Flashback
22 player?
23 A. Yes, I do.
24 Q. Okay. Does this appear to be your body
25 camera recording?

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 69

1  A.  Yes, it does.
2  Q.  Okay.  Do you know who just said that, "I'd
3  rather talk face-to-face, than through the door"?
4     MR. JONES: We are not actually
5  hearing any audio.
6     MR. STUDENT: You're not hearing
7  any audio?
8     MR. JONES: No.
9     MR. STUDENT: Do you have your
10 volumes up?
11    MR. JONES: Yeah.
12    MR. STUDENT: Okay.  Are you guys
13 in separate locations?
14    Let's go off the record here.
15
16    (Off the record discussion.)
17    (Recording Played)
18 Q.  (BY MR. STUDENT)  Okay.  At 37:23,
19 somebody says, "Trevor Davis, where is he at?"
20    Sergeant, do you know who that
21 is?  Who said that?
22    MR. JONES: I will just note an
23 objection for the record that since we are not
24 hearing the audio he is not able to agree that
25 that's what was said at a particular point in time.

Page 70

1     MR. STUDENT: Understood.
2     Are you able to --
3     MR. JONES: And he's not hearing
4  the voice, so he's only going to be able to go off
5  of his memory of either the incident or his review
6  of this audio at some point.  So, you know, I will
7  object on that basis.  But, you know, if you want
8  to ask him the question, of course he'll answer.
9     MR. STUDENT: Do you have the
10 video available to play on your end?
11    MR. JONES: Yeah.  Do you want to
12 try it that way?
13    MR. STUDENT: Yeah.  And you
14 don't have to play it along with me.  What I'll do,
15 I'm just going to play it and I'm going to pause it
16 when I want to ask a question about something.  And
17 maybe on your end, you can play that clip and then
18 answer the question.
19    MR. JONES: All right.  Hang on a
20 minute.
21    MR. STUDENT: I can send you the
22 video if you need me to.
23    MR. JONES: No, no.  I've got the
24 video.
25

Page 71

1     (Pause.)
2
3     MR. JONES: So, an issue that
4  immediately comes up, Rich, is that when you were
5  in screen share mode, I can't minimize that, and
6  it's going to be a little tricky.
7     MR. STUDENT: Okay.  Well, I
8  don't have to screen share if you've got the video,
9  too.
10    MR. JONES: All right.
11    MR. STUDENT: We're on the
12 record.
13    Can you go to current time,
14 37.20, and play it from 37.20 until about
15 37.25?
16    MR. JONES: All right.  I'm
17 starting it at 37.17.
18    MR. STUDENT: All right.
19    MR. JONES: And you said until
20 when?
21    MR. STUDENT: 25.
22
23    (Recording played)
24
25    MR. STUDENT: You can pause it.

Page 72

1  Q.  (BY MR. STUDENT)  Do you know who says
2  that, Sergeant?
3  A.  Yes.  That was me.
4  Q.  Okay.  Let's play it from 44.00 to about 44
5  and 50 seconds.
6
7     (Off the record discussion.)
8
9     MR. JONES: I'm going to play
10 from 44.37.  It's a little hard to manipulate the
11 time.
12    MR. STUDENT: I know.  I'm hoping
13 to get, you know from 44.30.  There's a K9
14 announcement; Sergeant Allen that makes that
15 announcement.
16    MR. JONES: All right.  So, do
17 you want to do 44.40?
18    MR. STUDENT: Yeah; 44.15, 44.20,
19 either of those would work.
20    MR. JONES: All right.  So,
21 starting at 44.37 -- 43.37.
22
23    (Recording played)
24
25    MR. JONES: I played it through

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 73

1  44.38.
2      MR. STUDENT: Yep. Let's pause
3  it there.
4  Q. (BY MR. STUDENT) Sergeant, I just want to
5  confirm that was you making that K9 announcement.
6  A. Yes, it was.
7  Q. Did you hear any response from anybody
8  inside the house in response to your announcement?
9  A. No, I did not.
10 Q. Okay. Now, I understand you can start
11 hearing Mr. Davis yelling at about 45.17. And I
12 would ask that you play that and confirm whether
13 I'm correct, or not.
14     MR. JONES: Meaning that the
15 voice is Mr. Davis?
16     MR. STUDENT: Yes.
17     MR. JONES: Where do you want me
18 to start?
19     MR. STUDENT: I have 45.17 as my
20 point. So, if you want to go to, like, to 45.10
21 and just play it from there.
22
23     (Recording played)
24
25     MR. JONES: I've got it at 45.08.

Page 74

1      MR. STUDENT: Okay. Thank you.
2
3      (Recording played)
4
5      MR. JONES: I played it to about
6  45.20 or 21.
7  Q. (BY MR. STUDENT) Sergeant, did you
8  perceive that yelling as Mr. Davis yelling?
9  A. I perceived it as a male subject yelling at
10 that time. Did you surmise from that, that Koda
11 Q. Okay. Did you surmise from that, that Koda
12 had made an apprehension by bite?
13 A. I had surmised that Koda was in contact. I
14 did not know if he was apprehending him at that
15 point yet.
16 Q. Okay. Now at 45.30, somebody says, "I can
17 see his hands."
18     I want to confirm whether it was
19 you or Sergeant Hodek that said that. So, if you
20 can go to 45.30, maybe five seconds prior to that,
21 somebody says, "I can see his hands."
22     MR. JONES: I've got to play it
23 from 45.21.
24
25     (Recording played)

Page 75

1
2      MR. JONES: I played it to 45.32.
3
4  Q. (BY MR. STUDENT) Sergeant, did you hear
5  someone say, "I can see his hands"?
6  A. I stated that I can only see his hand.
7  Q. Okay. Now at 45.35 there's a command,
8  "Walk out to the sound of my voice."
9      And I want to play that. And
10 then, Sergeant, I would ask you who made that
11 command.
12     MR. JONES: I'm just playing
13 again from 45.32.
14     MR. STUDENT: Perfect.
15     MR. JONES: And you said it's at
16 45.35?
17     MR. STUDENT: Yep.
18
19     (Recording played)
20
21     MR. JONES: I played it through
22 45.38.
23 Q. (BY MR. STUDENT) Okay. Somebody says,
24 "Walk out to the sound of my voice."
25     Do you know who that was,

Page 76

1  Sergeant?
2  A. Yes. That was Sergeant Hodek.
3  Q. Can you hear me?
4      MR. JONES: He answered.
5
6      (Court Reporter instruction)
7
8  Q. (BY MR. STUDENT) Sergeant Allen, can you
9  hear me?
10 A. I can hear you now.
11 Q. Okay. Do you know who said, "Walk out to
12 the sound of my voice"?
13 A. Yes. That was Sergeant Hodek.
14 Q. Okay. And then somebody else says, or
15 maybe Sergeant Hodek says -- you tell me -- "Walk
16 out with my dog"?
17 A. That was me.
18 Q. Okay. All right. Now at 45.45, somebody
19 says, "Keep your hands above your head."
20     And if we can play and then
21 listen to that and stop it after 45.45.
22     MR. JONES: All right. I'm
23 playing from 45.38.
24     MR. STUDENT: Thank you.
25

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 77

1  (Recording played)
2  **MR. JONES:** All right. I played
3  through 45.49.
4  Can you repeat the question?
5  Q. (BY MR. STUDENT) Yeah. I just want to
6  know who says, "Keep your hands above your head."
7  If you know.
8  **A. I believe that was me.**
9  Q. Okay. And then right after this, at 45.47,
10 somebody says, "I can see his hands."
11 And I want to find out who said
12 that, if we can keep playing it.
13 **MR. JONES:** At what time?
14 **MR. STUDENT:** 45.47.
15 **MR. JONES:** All right. I have to
16 go back.
17 **A. I can answer that question. That was me.**
18 **I believe I was saying, "I can see his hand."**
19 Q. (BY MR. STUDENT) Okay. Thank you. All
20 right. At 46.23, thereabouts, somebody says,
21 "Let's go get him."
22 If we could play that, and then I
23 want to confirm who it was that said that.
24 **MR. JONES:** What was the time
25 again?

Page 78

1  **MR. STUDENT:** 46.23.
2
3  (Recording played)
4
5  **MR. JONES:** What was the question
6  again? I played it through 46.26.
7  Q. (BY MR. STUDENT) At about 46.23, somebody
8  says in a lower voice, "Let's go get him."
9  Did you hear that, or not?
10 **A. Yes. Sergeant Hodek says that.**
11 Q. Okay. Did you say anything in response to
12 that?
13 **A. I don't believe so. I believe I was**
14 **putting my gun away at that point, to attempt to**
15 **make entry.**
16 Q. Okay. Did Sergeant Hodek have his gun
17 holstered? Or was that still out at that point in
18 time?
19 **A. I believe it was still out.**
20 Q. Okay. And again, where was he in relation
21 to you as you were at that doorway?
22 **A. Staggered behind me.**
23 Q. He was behind you?
24 **A. Correct.**
25 Q. Okay. I want to look at 46.35. Somebody

Page 79

1  says, "Come to me," and I want to know who said
2  that, if we can.
3  **MR. STUDENT:** 46.35, Counsel.
4  **MR. JONES:** I'm playing from
5  46.26.
6
7  (Recording played)
8
9  **MR. JONES:** I played through
10 46.38.
11 Q. (BY MR. STUDENT) Sergeant, did you hear
12 somebody say, "Come to me" there?
13 **A. Yes. That was me.**
14 Q. Okay. And was that a command to Koda? Or
15 to Mr. Davis?
16 **A. That was to Mr. Davis.**
17 Q. Okay. Did you -- again, did you ever make
18 the command to Koda to come to you from the room?
19 **A. No, I did not; no.**
20 Q. Okay. Just a command to Mr. Davis to come
21 to you from the room?
22 **A. Yes. That's correct.**
23 Q. Okay.
24
25 (Pause.)

Page 80

1
2  **MR. STUDENT:** Question pending.
3  Just give me a moment here. I appreciate
4  everyone's flexibility with this.
5  Q. (BY MR. STUDENT) All right. At about
6  47.17, somebody says, "Put your hands behind your
7  back."
8  And I'd like to play that and
9  confirm who said that.
10 **MR. JONES:** I played it through
11 47.20.
12 Can you repeat the question?
13 Q. (BY MR. STUDENT) Yeah. Sergeant, did you
14 hear somebody say, "Put your hands behind your
15 back"?
16 **A. Yes. That was Sergeant Hodek.**
17 Q. Okay. Did he say it twice?
18 **A. Yes.**
19 Q. Second time with more umph than the first?
20 **A. Yes. He was louder with the second one.**
21 Q. Okay. Did you hear either gaps or exclamatory
22 statements like, "Oh, shoot," or, "Oh, shit,"
23 around that point of time?
24 **MR. JONES:** Objection to form.
25 **A. No, I did not.**

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 81

1 Q. (BY MR. STUDENT) Okay. Do you recall
2 making any sort of response to seeing Trevor's
3 injury? Mr. Davis's injury?
4 A. No, I do not.
5 Q. Do you recall Sergeant Hodek having any
6 reaction like that?
7 A. No, I do not.
8 Q. Okay. At that point in time, who is
9 holding your vests? Was that Deputy Cook?
10 A. Yes; that's correct.
11 Q. Okay. Was he -- did he have a line of
12 sight on you and Sergeant Hodek and Mr. Davis at
13 the time you put Mr. Davis in handcuffs?
14 A. I do not know if he did or not.
15 Q. Okay. After you arrested, or after you
16 placed Mr. Davis in handcuffs, did you tell him to
17 roll over or stand up?
18 A. I did not place him in handcuffs.
19 Sergeant Hodek did that.
20 Q. Okay. You had taken Koda off of Mr. Davis.
21 Correct?
22 MR. JONES: Objection to form.
23 Go ahead.
24 A. I had control of Koda. Sergeant Hodek had
25 control of Mr. Davis at this time.

Page 82

1 Q. (BY MR. STUDENT) Okay. Did you take
2 control of Koda by putting a leash on him?
3 A. That was part of it. The other part was, I
4 had a hand on his -- one of his collars has a
5 built-in handle to it.
6 Q. Okay. And you took Koda off of Mr. Davis's
7 arm?
8 MR. JONES: Objection to form.
9 You can answer.
10 A. Koda was outed from Mr. Davis when I had a
11 hand on his collar. And he was pulled back and
12 then hooked up to a leash.
13 Q. (BY MR. STUDENT) Okay. Was there a verbal
14 command, along with pulling back on his collar?
15 A. Correct.
16 Q. Okay. So, there's both a physical maneuver
17 and a verbal command?
18 A. No. That's not how I would characterize
19 it. I would characterize it as, he was a verbal
20 "Out" as I was grabbing his collar.
21 Q. Okay. And he did that as you commanded it?
22 A. Yes; that's correct.
23 Q. Okay. Could he have done that when you
24 were at the doorway of the bedroom?
25 MR. JONES: Done what? Objection

Page 83

1 to form.
2 Q. (BY MR. STUDENT) Could he have responded
3 sufficiently to a verbal "Out" command?
4 A. I suppose he could have, yes.
5 Q. That's what you would expect from him.
6 Correct?
7 A. Correct.
8 Q. Okay. That's what he's trained to do.
9 Correct?
10 A. Correct.
11 Q. Have you ever talked to Deputy Hodek about
12 his body-worn camera recording of this incident, or
13 lack thereof?
14 A. No, I have not.
15 Q. Okay. Has anybody spoken with you about
16 that besides your attorney? I don't want to know
17 anything you and your attorney talked about.
18 A. I'm not aware if Sergeant Hodek had body
19 camera video or not.
20 Q. Okay. Do you know if he was wearing his
21 body camera at the time?
22 A. I do not know.
23 Q. If he wasn't wearing it, would that have
24 been a violation of policy?
25 A. Not necessarily. As we -- part of the

Page 84

1 reason why we switched body cameras is they were
2 notorious for breaking; the ones that we had prior.
3 Q. Do you know if Sergeant Hodek would have
4 had to do a report about not having his body camera
5 on his person at the time of the incident?
6 MR. JONES: Objection to form.
7 A. I don't know that he would have had to have
8 done a specific report. He may have had to let
9 Captain Baures know prior. But not a specific
10 report.
11 Q. (BY MR. STUDENT) Okay. Have you ever
12 talked to Captain Baures about Sergeant Hodek's
13 body-worn camera video?
14 MR. JONES: Objection. Asked and
15 answered.
16 Go ahead.
17 A. No, I have not.
18 Q. (BY MR. STUDENT) Okay. All right.
19 All right. I want to shift gears
20 and talk about some other Koda deployment
21 use-of-force incidents, if we can.
22 MR. JONES: Before you do that,
23 could I take down the video then?
24 MR. STUDENT: Yes, sir. Thank
25 you.

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 85

1    MR. JONES: Hang on a second,
2  please.
3
4    (Pause.)
5
6    MR. JONES: Go ahead.
7  Q.  (BY MR. STUDENT)  Sergeant, can you remind
8  me again when you took over handling duties of Koda
9  from Deputy Carroll?
10  A.  In 2018.
11  Q.  Okay.  Prior to that point in time, had you
12  been involved in any use-of-force incidents
13  involving Koda?
14  A.  Not to my recollection, no.
15  Q.  Okay.  This is kind of a unique scenario.
16  So, if you were involved, you might recall it.
17    Were you ever involved in an
18  incident where Deputy Carroll put Koda up into an
19  attic space?
20  A.  I was not present at that incident.
21  Q.  Okay.  Are you familiar with it?
22  A.  I recall when it happened.  But, I don't
23  know the specifics or circumstances of the case.
24  Q.  Okay.  Deputy Carroll never discussed it
25  with you?

Page 86

1  A.  No.  We didn't discuss that incident.
2  Q.  Okay.  There's an incident in July of 2018
3  where Koda bit a Cameron City Police Officer.
4    Do you recall that incident?
5  A.  Yes, I do.
6  Q.  Okay.  Can you describe to me what
7  happened?
8  A.  Myself and Koda were called to assist on a
9  possible burglary in progress at an elementary
10  school that was no longer used as an elementary
11  school, that was in the village of Cameron.
12    Upon arrival, myself and other
13  officers attempted to search the building for
14  possible subjects still inside the building.
15  During the search -- I believe it was on the second
16  floor of a -- it's a three-story building.  Koda
17  was sent down on lead to a -- down a dark hallway.
18  And at some point, the Cameron officer went down to
19  the other end of the hallway and entered the same
20  hallway as Koda.
21    Koda approached the Cameron
22  officer and kind of stopped and looked at him; the
23  Cameron officer started yelling and began to move
24  away from Koda; and at which point, Koda nipped at
25  him in the buttocks area.

Page 87

1    I called Koda back immediately,
2  and he came right back to me.
3  Q.  Okay.  How far away were you from Koda when
4  the bite occurred?
5  A.  Probably 15 to 20 feet.
6  Q.  Okay.  Do you know if there was any
7  body-worn camera recording this incident?
8  A.  Not to my knowledge, there isn't.
9  Q.  Okay.  This was back in July of 2018.
10    Did your department use body-worn
11  cameras at that point in time?
12  A.  Yeah.  I believe we had them at that time.
13  Q.  Okay.  Are there any rules about how long
14  they're preserved?  The recordings?
15  A.  I don't know the specific rules.
16  Generally, it's longer in criminal cases.  But, I
17  don't know the specific timeline for an incident
18  where an arrest was not made.
19  Q.  Okay.  Do you know if there were any, like,
20  workers' compensation proceedings that this Cameron
21  police officer was a part of based on the bite?
22  A.  Not to my knowledge.
23  Q.  Okay.  I want to talk about an incident
24  that occurred on July 27th of 2018 involving -- and
25  I'll get you the report Bate stamp.  But, I want to

Page 88

1  know if the name is familiar to you first; a
2  suspect with the last name of "Enersen."
3  A.  Yes.  I do recall that incident.
4  Q.  He was apprehended by Koda?
5  A.  Yes; that's correct.
6  Q.  Okay.  And just one incident where
7  Mr. Enersen was apprehended by Koda?
8  A.  Yes; that's correct.
9  Q.  Okay.  There's a note that after Koda
10  apprehended Enersen, Koda was removed from Enersen.
11    Do you recall if Koda was called
12  off verbally, or if he was physically removed from
13  Mr. Enersen?
14  A.  I believe the circumstances were similar to
15  Davis, with there being an "Out" command while
16  holding on to his collar.  But, I don't recall the
17  specifics.
18  Q.  Okay.  Do you know if there's body-worn
19  camera recordings with this incident?
20  A.  I do not know, specifically.
21  Q.  Do you know if you ever testified in court
22  against Mr. Enersen?
23  A.  I do not believe I did.
24  Q.  Do you know if Mr. Enersen was charged with
25  anything?

TREVOR DAVIS vs.  
CHRISTOPHER ALLEN

Christopher Allen  
5-5-22

CHRISTOPHER ALLEN  
May 5, 2022

Page 89

1 A. I believe he was charged and I believe he
2 pled out to some type of charge.
3 Q. Okay.
4 MR. STUDENT: And, Counsel, just
5 for the record, the report -- at least, one of them
6 regarding Mr. Enersen -- is Bate-stamped 523
7 through 24. And that's one of the body-worn camera
8 recordings that I would, hopefully, like to get, if
9 we can meet and confer about it. But, just for
10 your reference, that's the incident report that
11 that body-worn camera would be related to.
12 MR. JONES: Okay.
13 "Okay," in the sense of noted.
14 MR. STUDENT: Noted. Understood.
15 Q. (BY MR. STUDENT) There was an incident in
16 February of 2020 where Koda was released looking
17 for a Dale Nedland.
18 Do you recall that incident where
19 Koda apprehended a female subject instead?
20 A. Yes, I do.
21 Q. Okay. And the report on that is Bates 645.
22 But if you recall it, I just want to know what you
23 remember about it. Okay? We don't have to look at
24 the report now.
25 You note twice in the report that

Page 90

1 you unsuccessfully gave commands for Koda to come
2 back to you.
3 Do you recall that happening?
4 A. I recall giving Koda commands to come back,
5 yes.
6 Q. Okay. And what happened in response to
7 those commands?
8 A. Koda was not able to exit the room. It was
9 my understanding the door closed behind him when he
10 entered the room.
11 Q. Okay. And so, because of that, you weren't
12 able to see the subject that Koda had apprehended.
13 Correct?
14 A. That's correct.
15 Q. And despite that, you still made the
16 decision to call Koda off. Correct?
17 A. That's correct.
18 Q. Even though you didn't know if the suspect
19 was attempting to flee or had a weapon?
20 A. That's correct.
21 Q. And that's because you understand a K9
22 apprehension is a significant use of force.
23 Correct?
24 MR. JONES: Objection to the form
25 of the question.

Page 91

1 A. I would classify a K9 as just a use of
2 force.
3 Q. (BY MR. STUDENT) Okay. Did you consider
4 not calling Koda off until you had taken this
5 person into custody or had a full visual on this
6 person?
7 A. I made the determination to call him off,
8 due to it not being the subject we were looking
9 for.
10 Q. Okay. I think you note in the report this
11 is a known drug house that this occurred at.
12 A. That's correct.
13 Q. Okay. And you had no idea the identity of
14 the subject that Koda had apprehended besides it
15 was a female. It was not Dale Nedland. Correct?
16 A. That's correct.
17 Q. Okay. Do you know if you took any remedial
18 training steps with Koda following this incident?
19 MR. JONES: Following which
20 incident? The one involving Mr. Nedland?
21 MR. STUDENT: Yes.
22 A. Any remedial training, as far as correcting
23 something? Is that what you're asking me?
24 Q. (BY MR. STUDENT) Yes.
25 A. No, I did not.

Page 92

1 Q. Okay. How about with respect to the
2 incident at the school where Koda bit the Cameron
3 police officer?
4 A. I did not take any specific remedial
5 training for Koda following the Cameron incident.
6 Q. Okay. Now, there's an incident involving a
7 James King in September of 2021. Do you remember
8 that?
9 A. I do.
10 Q. And in that incident, it looks like you
11 used Koda to locate Mr. King. Correct?
12 A. Correct.
13 Q. But he did not apprehend, by way of a bite,
14 Mr. King. Is that correct?
15 A. That's correct.
16 Q. (BY MR. STUDENT) And you note in the
17 report that Mr. King had a serious criminal
18 history. Correct?
19 A. Correct.
20 Q. And yet, you still did not feel it was
21 necessary -- or did you feel it was necessary to
22 deploy Koda to apprehend him?
23 A. I deployed Koda into the residence in an
24 attempt to locate Mr. King.
25 Q. Okay. And then Koda, was he on leash? Or

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 93

1  off leash?
2  A.  He was off leash.
3  Q.  Okay.  And why did you not have Koda
4  apprehend by bite, Mr. King?
5  A.  When we got to -- myself and Koda got to a
6  closed bedroom door, I attempted to give a warning,
7  received no response, attempted to push the door
8  open; it pushed back and Koda began barking at the
9  door.  At that time, I heard a male respond that he
10  was giving up and coming out.
11  Q.  Okay.  So, this individual was in a
12  bedroom.  Correct?
13  A.  Correct.
14  Q.  He was not fleeing?
15  A.  Correct.
16  Q.  He was not resisting?
17  A.  I wouldn't classify it at that point.
18  He was resisting up until that
19  point.
20  Q.  Okay.  But, at the time that he came out,
21  he was complying with your commands.  Correct?
22  A.  When he came out of the bedroom, yes; he
23  complied with the officer's commands.
24  I don't believe I gave commands
25  at that point.

Page 94

1  Q.  Okay.  Would it have been reasonable, at
2  that point in time, to have Koda apprehend Mr. King
3  by bite?
4  A.  Not at that time when he was exiting to the
5  other officers.
6  Q.  Okay.  What if he had just been laying in
7  the room with his hands on his head and you could
8  see him and you could gain entry into him?
9  MR. JONES:  Objection.
10  Incomplete hypothetical.
11  Go ahead and answer.
12  A.  Again, it would be dependent on the
13  situation and the environmental factors, with
14  whether or not there were weapons in the room and
15  his actions being taken at that time.
16  Q.  (BY MR. STUDENT)  Okay.  Do you know if
17  there's body-worn camera footage of this incident?
18  A.  I believe there was.
19  Q.  Okay.  Do you know if Mr. King was charged
20  with a crime?
21  A.  Yeah, I believe so.  It was regarding an
22  incident that happened the night before.  And
23  that's why we were there to arrest him.
24  Q.  Okay.  Do you know if that case is still
25  pending?

Page 95

1  A.  I believe it might be.  We've had recent
2  contacts involving it.  I just don't know what the
3  status is in court for it.
4  Q.  Okay.
5  MR. STUDENT:  And, Counsel, for
6  your reference, the report on that incident with
7  Mr. King is Bate Stamp 726 through 27.
8  MR. JONES:  Thank you.
9  MR. STUDENT:  You're welcome.
10  Q.  (BY MR. STUDENT)  Since the incident,
11  Sergeant, have you had any written or otherwise
12  recorded, like, voicemail communications with
13  anybody about the incident, aside from your
14  attorney?
15  A.  Of the Davis incident?
16  Q.  Correct.  Yeah.  I'm sorry.
17  A.  Not to my knowledge, other than the emails
18  provided to you.
19  Q.  Okay.  So, drafting the report and --
20  A.  Correct.
21  Q.  And the emails about the report?
22  A.  Correct.
23  Q.  Okay.  Have you discussed the incident with
24  either Sergeant Hodek or Deputy Cook or Deputy
25  Sedani?

Page 96

1  A.  No.  We haven't discussed it.
2  Q.  Okay.  Are each of them still employed at
3  Barron County?
4  A.  Yes, they are.
5  Q.  Okay.  Have you made any social media posts
6  about the incident?
7  A.  No, I have not.
8  Q.  I assumed that was the answer.
9  Other than the documents and
10  recordings that have been turned over to us, do you
11  have any evidence, either documents or tangible
12  items or audio recordings, or anything else, that
13  relate to the incident, in your possession?
14  MR. JONES:  Objection to the
15  form.
16  You can go ahead.
17  Q.  (BY MR. STUDENT)  It is a very compound
18  question, but. . .
19  A.  To my knowledge, all items related to this
20  incident were turned over.
21  Q.  Okay.  Thank you.
22  Have you authored a use-of-force
23  report for each incident in which Koda apprehended
24  somebody by bite?
25  A.  I have completed either an incident report

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

1 or a K9 incident report, yes.
2 Q. Okay. Understood.
3 How long have you worked with
4 Sergeant Hodek?
5 A. Well, I've worked on his crew for the
6 period of approximately, a year -- two years. In
7 total, we've been at the department for eight years
8 together.
9 He was employed before I was
10 hired there.
11 Q. Okay. As of the date of the incident, did
12 you have any reason to doubt his abilities with a
13 firearm?
14 A. No, sir.
15 Q. Okay. During the incident, did he ever
16 tell you that he did not have a line of sight on
17 Mr. Davis?
18 A. That's correct. He stated he could not see
19 him from where we were.
20 Q. Deputy Hodek said he could not see him?
21 A. Correct.
22 Q. Okay. I thought that somebody was able to
23 point their gun at Mr. Davis as he laid on that bed.
24 MR. JONES: Objection to the form
25 of the question.

1 Q. (BY MR. STUDENT) Is that not true?
2 A. Once we got to the bedroom area, I believe
3 Sergeant Hodek had eyes on and was able to provide
4 cover when I made entry into the room.
5 Q. That's what I'm hoping to find out.
6 So, at all points in time when
7 you made entry into the room, you had deadly cover?
8 MR. JONES: Objection to the form
9 of the question.
10 You can answer if you understand.
11 A. When I entered the room, my understanding
12 was I had cover from Sergeant Hodek until I got to
13 K9 Koda.
14 Q. (BY MR. STUDENT) Okay. From the point in
15 time where somebody first said, "I can see hands,"
16 until the time you went in the room, did anything
17 change that you perceived about Mr. Davis?
18 MR. JONES: Objection to the form
19 of the question.
20 A. Did anything change from the kitchen to the
21 entry of the bedroom? Is that what you're asking
22 me?
23 Q. (BY MR. STUDENT) From when either you or
24 Sergeant Hodek first said, "I can see hands," to
25 the point in time where you went into the bedroom,

1 did anything change about Mr. Davis's conduct or
2 behavior?
3 MR. JONES: Objection to the
4 form. And, also, objection in that it
5 mischaracterizes his prior testimony.
6 But you can go ahead.
7 A. At that point, Mr. Davis was still in a
8 barricaded room where I could not see the majority
9 of his body. So, I can't give you anything
10 specific that changed or did not change.
11 Q. (BY MR. STUDENT) Okay. Understood.
12 Was there anything preventing you
13 from calling Koda off to allow Mr. Davis to comply
14 with your command to exit the room?
15 MR. JONES: Objection to form.
16 Do you mean anything physically
17 preventing him?
18 MR. STUDENT: Correct.
19 A. Well, the room was barricaded, and I did
20 not know the status of it at that point, as well
21 as, I did not know the status of Mr. Davis or K9
22 Koda.
23 Q. (BY MR. STUDENT) Okay. Could you have
24 said, "Off," "Heel" or, "Off," "Down" to Koda to
25 allow Mr. Davis to stand up and exit the room?

1 MR. JONES: Objection to form.
2 You can answer.
3 A. No; as the reasons were still present as to
4 why K9 Koda was being used.
5 Q. (BY MR. STUDENT) And what were those
6 reasons?
7 A. The belief that Mr. Davis was possibly
8 armed, and was in a barricaded room.
9 Q. Are those the two reasons?
10 A. The other reasons would be the warrants
11 that we were there to arrest him on, and the fact
12 that he had actively fled into the residence and
13 hid from us trying to arrest him.
14 Q. Okay. And are those all the reasons?
15 MR. JONES: Object to form.
16 Go ahead.
17 A. Are those all the reasons why I made the
18 determination to use Koda?
19 Q. (BY MR. STUDENT) No. I'm asking what were
20 reasons you did not simply have Koda come off the
21 bite to allow Mr. Davis to exit the bedroom.
22 A. From what point in time? From when we made
23 it to the bedroom? Or from the kitchen? Are you
24 asking a specific point? Or just in general?
25 Q. Well, there are multiple commands that I

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

Page 101

1 think you made to Mr. Davis, "Come out here with my
2 dog." Correct?
3 A. That's correct.
4 Q. And prior to that, somebody says, "I can
5 see his hands." Correct?
6 MR. JONES: Objection to form.
7 A. Correct.
8 Q. (BY MR. STUDENT) And at that point in
9 time, Sergeant Hodek had a gun pointed at
10 Mr. Davis. Correct?
11 A. I don't believe that is correct, as he
12 could not see Mr. Davis.
13 Q. Okay. In your report, you say you could
14 see hands and face of Mr. Davis.
15 Is that not something
16 Sergeant Hodek could see?
17 MR. JONES: Objection to form;
18 objection, asked and answered; and foundation.
19 You can go ahead.
20 A. Correct. I had a different angle than
21 Sergeant Hodek. I could get glimpses of
22 Mr. Davis's hand and face, and then another hand.
23 However, where Sergeant Hodek was standing, he
24 could not see Mr. Davis at that time.
25 Q. (BY MR. STUDENT) Okay. And at that time,

Page 102

1 your firearm was still out and aimed. Correct?
2 That was before you holstered it?
3 A. It was out. It was not aimed at Mr. Davis.
4 Q. Okay. But, you had a clear line of fire to
5 Mr. Davis?
6 MR. JONES: Objection to form.
7 What are you speaking of?
8 You may answer.
9 A. From the kitchen area I could see part of
10 Mr. Davis. The rest of which was -- the majority
11 of which was blocked by a wall. And I also could
12 not see K9 Koda at that time, either.
13 Q. (BY MR. STUDENT) Okay. And again, the
14 reasons you did not call Koda off were because
15 Mr. Davis fled into the house previously and
16 because of the reason for the warrants?
17 MR. JONES: Objection to form;
18 mischaracterizes his testimony.
19 You may answer.
20 A. The warrants, belief he was possibly armed.
21 And, yes; because he had fled, getting into the
22 residence, ignoring our order to surrender?
23 Q. (BY MR. STUDENT) Okay. And then is it
24 your position that he did not surrender after Koda
25 apprehended him? Or did he surrender?

Page 103

1 A. He was not surrendered at that time, is my
2 position.
3 Q. Did you perceive him as trying to
4 surrender?
5 A. No, I did not.
6 Q. What was he doing that you thought
7 constituted him not surrendering to you?
8 A. He remained in a barricaded room and was
9 attempting to pull his arm away from the dog at
10 that point, and for the reasons of safety and the
11 fact that he was not complying with the orders to
12 come out of the room.
13 Those are all factoring into why
14 I did not believe he was surrendering at that
15 point.
16 Q. Isn't it possible that he was pulling his
17 arm away from Koda because he was trying to show
18 his hands, as commanded? Or trying to walk up and
19 get out of the room, as commanded?
20 MR. JONES: Objection to the
21 form.
22 You may answer.
23 A. I can't speak to what Mr. Davis's
24 perception was at that time, or what he was doing.
25 Q. (BY MR. STUDENT) Okay. But in any event,

Page 104

1 you could see Mr. Davis attempting to move his arm?
2 A.      At the bedroom entrance, yes.
3 Q.      Okay.
4           MR. STUDENT: I think that covers
5 everything that I want to ask for the timebeing.
6           Mr. Jones, I don't know if you
7 have any follow-up here.
8           MR. JONES: I do not have any
9 questions.
10           He will read and sign, however.
11           MR. STUDENT: Thank you.
12
13       (Off the record discussion.)
14
15           MR. STUDENT: Our standard order
16 is just the electronic condensed for the first run.
17           MR. JONES: Electronic copies are
18 fine for me, also.
19
20           ***************
21       (Whereupon at 12:40 o'clock p.m.,
22        this deposition was concluded.)
23
24                    _____
25                    (Signature Reserved)

**TREVOR DAVIS vs.**
**CHRISTOPHER ALLEN**

**Christopher Allen**
**5-5-22**

**CHRISTOPHER ALLEN**
**May 5, 2022**

Page 105

1
2      VERIFICATION OF DEPONENT TO TRANSCRIPT

3          I, CHRISTOPHER ALLEN, do hereby verify that

4   I have read the foregoing transcript consisting of

5   the preceding 104 pages and do further verify that

6   it is a true and complete transcript of the

7   testimony given by me on May 5, 2022, (except for

8   the following, stating page and line number and the

9   reason for the change)

10  1.

11  2.

12  3.

13  4.

14  5.

15  6.

16  7.

17  8.

18  9.

19  10.

20                    _____
                        Christopher Allen
21
    Dated this _____ day of _____, 2022.
22

23  _____
    Notary Public

24

25          ON BEHALF OF SHADDIX & ASSOCIATES

---

Page 106

1
2   STATE OF MINNESOTA  )
                        )  SS:
3   COUNTY OF BELTRAMI  )

4          REPORTER'S CERTIFICATE

5          Be it known that I took the deposition of
    CHRISTOPHER ALLEN on May 5, 2022, at 10:00 a.m.;
6
           That I was then and there a notary public
7   in and for the County of Beltrami and State of
    Minnesota, and that I was duly authorized to
8   administer an oath;

9          That the witness before testifying was
    first duly sworn to testify the truth and nothing
10  but the truth;

11         That the testimony was recorded by myself
    and transcribed into a computer-aided transcription
12  and that the deposition is a true record of the
    testimony given by the witness to the best of my
13  ability;
           That I am not related to any of the parties
14  hereto nor interested in the outcome of the action;

15         That the cost of the original transcript has
    been charged to the party noticing the deposition,
16  unless otherwise agreed by Counsel, and that copies
    have been made available to all parties at the same
17  cost, unless otherwise agreed upon by Counsel;

18         That the reading and signing of the
    deposition by the witness was not waived, and that
19  the original transcript is retained by Shaddix &
    Associates.
20
           WITNESS MY HAND AND SEAL this 23rd day of
21  May, 2022.

22                  /s/Lorna D. Jacobson, RPR
                    Lorna D. Jacobson, Notary Public
23                  Registered Professional Reporter
                    My Commission Expires: 01/31/25
24

25

---

Page 107

1
2              SHADDIX & ASSOCIATES
                 COURT REPORTERS
3        7400 LYNDALE AVENUE SOUTH, SUITE 190
                RICHFIELD, MN 55423
4

5   May 23, 2022

6
    MR. ANDREW A. JONES
7   Hansen Reynolds, LLC
    Suite 400
8   301 North Broadway
    Milwaukee, Wisconsin 53202
9
    Re: Davis vs. Allen
10      Christopher Allen deposition

11  Dear Mr. Jones:

12  A copy of the above-referenced deposition is
    attached, along with the reading and signing
13  certificate.  When the witness has completed the
    reading and signing, please return the executed
14  certificate to me at: reporters@janetshaddix.com
    and copy all counsel of record.
15
    In accordance with the Rules of Civil Procedure, if
16  I do not receive the executed certificate within
    thirty (30) days, pursuant to the rules, I will
17  send the unsigned original transcript to the
    attorney who took the deposition for proper filing.
18
    Should you have any questions, please do not
19  hesitate to contact my office.

20  Sincerely,

21  SHADDIX & ASSOCIATES

22

23  Cc: Mr. Richard E. Student

24

25

---

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

## A

**abilities (1)**
97:12
**ability (2)**
23:18;27:11
**able (20)**
5:15;27:18;41:24;
42:4,18,20;44:11;
46:11;47:8;52:24;
54:22;64:5;68:5;69:24;
70:2,4;90:8,12;97:22;
98:3
**Above (7)**
33:11;47:16;48:2,3;
49:7;76:19;77:6
**academy (3)**
7:10;10:9;12:18
**access (8)**
23:7,8,9,17,20,21,24;
24:1
**account (1)**
55:17
**accurate (1)**
65:25
**achieved (1)**
17:7
**across (1)**
21:14
**action (1)**
21:1
**actions (3)**
49:13,22;94:15
**activate (2)**
21:11,14
**activated (1)**
20:25
**active (2)**
10:14,17
**actively (2)**
28:8;100:12
**Activity (1)**
31:8
**Actually (2)**
33:3;69:4
**additional (1)**
7:8
**address (3)**
7:18;63:17,19
**adjust (1)**
61:8
**administration (3)**
19:15;64:24;65:1
**administrative (1)**
65:18
**administrator (1)**
65:5
**again (15)**
12:19;22:14;25:11,
12;37:24;49:21;61:10;
75:13;77:25;78:6,20;
79:17;85:8;94:12;

102:13
**against (2)**
12:5;88:22
**age (1)**
4:5
**agencies (1)**
8:21
**agency (1)**
18:24
**agree (6)**
24:23;25:13;49:24;
50:3;51:18;69:24
**ahead (23)**
15:14;18:5,11;24:17;
40:22;42:2;45:13,19;
46:22;50:24;53:16,23;
54:25;61:9;66:12;
81:23;84:16;85:6;
94:11;96:16;99:6;
100:16;101:19
**aimed (2)**
102:1,3
**alert (1)**
45:8
**ALLEN (13)**
4:4,11;5:8,17,18,22;
7:18;36:1;56:7;57:8;
65:21;72:14;76:8
**allow (3)**
99:13,25;100:21
**almost (1)**
16:4
**along (4)**
4:21;54:18;70:14;
82:14
**Alrighty (1)**
66:19
**although (2)**
4:16;51:13
**always (3)**
33:21,25;34:11
**American (1)**
9:20
**amount (3)**
23:14;31:21;42:16
**and/or (1)**
47:7
**angle (2)**
42:6;101:20
**announced (1)**
43:19
**announcement (5)**
47:12;72:14,15;73:5,
8
**announces (1)**
55:11
**Anoka (1)**
14:25
**answered (4)**
25:10;76:4;84:15;
101:18
**anticipate (2)**
6:20;49:5

**apart (1)**
52:15,16
**appear (5)**
45:16;52:1;56:8;
57:24;68:24
**appeared (2)**
47:16;48:1
**appears (4)**
27:14;41:3;57:4;
58:1
**appreciate (1)**
80:3
**apprehend (5)**
28:10;92:13,22;93:4;
94:2
**apprehended (10)**
46:4;48:6;88:4,7,10;
89:19;90:12;91:14;
96:23;102:25
**apprehending (3)**
51:6,10;74:14
**apprehension (9)**
17:12,15;28:7,20;
31:14;35:5;38:1;74:12;
90:22
**apprehensions (1)**
35:3
**approached (1)**
86:21
**appropriate (3)**
25:23;26:4;50:4
**approves (1)**
64:25
**approximately (1)**
97:6
**April (3)**
11:6;14:8;16:10
**area (9)**
9:3,15;27:20;34:7;
42:4,13;86:25;98:2;
102:9
**arising (1)**
4:13
**arm (11)**
46:12,18;47:19;48:5,
6;54:16;55:5,12;82:7;
103:9,17
**armed (3)**
27:1;100:8;102:20
**arms (1)**
52:17
**around (1)**
80:23
**arrest (4)**
87:18;94:23;100:11,
13
**arrested (1)**
81:15
**arrival (1)**
86:12
**articles (4)**
15:3;42:17;48:16,23
**aside (2)**

13:22;95:13
**ASPCA (2)**
17:12,18
**assist (3)**
53:8,10;86:8
**assistant (1)**
65:18
**associate (1)**
9:7
**associate's (1)**
9:9
**Association (1)**
17:16
**assume (2)**
36:7;65:15
**assumed (1)**
96:8
**assumption (1)**
58:7
**attach (1)**
41:14
**attempt (8)**
39:3;42:22;44:5;
46:24;50:20;66:8;
78:14;92:24
**attempted (8)**
42:14,19;49:22;
50:15;65:22;86:13;
93:6,7
**attempting (6)**
45:16,20;48:5;51:19;
90:19;103:9
**attend (1)**
9:23
**attended (1)**
14:23
**attending (1)**
7:7
**attic (1)**
85:19
**attorney (5)**
6:14;62:7;83:16,17;
95:14
**attorneys (1)**
4:12
**audio (8)**
4:18;21:18;50:7;
69:5,7,24;70:6;96:12
**August (1)**
5:17
**author (2)**
19:17;64:18
**authored (3)**
57:24;58:20;96:22
**authoring (1)**
36:17
**available (2)**
30:17;70:10
**aware (4)**
12:4;16:20;17:13;
83:18
**away (7)**
40:1;48:5;78:14;

86:24;87:3;103:9,17

## B

**bachelor's (4)**
9:7,10,19;10:1
**back (26)**
28:18,21;32:10;
37:12;38:3;42:6;46:2;
51:1;56:6;64:17,21,23;
66:9,14,17;77:16;80:7,
15;82:11,14;87:1,2,9;
90:2,4;93:8
**ball (1)**
37:18
**barking (1)**
93:8
**barricade (2)**
42:14,15
**barricaded (4)**
99:8,19;100:8;103:8
**Barron (20)**
5:20;8:13,14;11:14,
20,21,22,24;12:7;
13:23;18:23;19:1,5,8;
29:14,15,22;63:17;
64:3;96:3
**based (2)**
58:24;59:14;87:21
**basically (2)**
52:15,19
**basis (2)**
6:15;70:7
**batch (1)**
57:20
**Bate (7)**
36:25;56:24;58:14;
59:2;67:13;87:25;95:7
**Bates (8)**
57:12,13,17;59:24;
65:8,20;67:9;89:21
**Bate-stamped (7)**
30:9;31:7;56:23;
57:1;58:17,18;89:6
**Baures (8)**
61:6,12,14,17,22;
62:20;84:9,12
**became (1)**
26:25
**become (1)**
18:25
**bed (3)**
48:18;49:17;97:23
**bedding (2)**
48:17,23
**bedroom (17)**
40:13;41:4;42:6;
44:25;45:21;46:2,9;
66:17;82:24;93:6,12,
22;98:2,21,25;100:21,
23
**began (2)**
86:23;93:8

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

**beginning (2)**
36:7;57:20
**behavior (1)**
99:2
**behind (8)**
40:24,25;41:9;78:22,
23;80:6,14;90:9
**belief (3)**
27:1;100:7;102:20
**below (1)**
36:10
**belt (1)**
39:1
**besides (4)**
13:12;66:8;83:16;
91:14
**better (2)**
25:18;44:22
**birth (1)**
5:16
**bit (7)**
33:3;34:2;37:17;
42:5,6;86:3;92:2
**bite (36)**
28:10,12,15;31:9,12,
15,17,18,18,22;32:5,9;
34:8,14,15;35:1,4,7,8,
9,11;37:14,15;38:2;
53:3;54:1;62:5,7;
74:12;87:4,21;92:13;
93:4;94:3;96:24;
100:21
**bites (2)**
37:2
**biting (1)**
46:12
**blankets (1)**
42:17
**blocked (1)**
102:11
**body (12)**
21:3,23;22:8;50:6;
53:21;68:6,24;83:18,
21;84:1,4;99:9
**body-worn (13)**
20:19,24;41:2;66:21,
22;83:12;84:13;87:7,
10;88:18;89:7,11;
94:17
**both (16)**
12:16;17:6;21:18;
24:8;26:8;32:10,11;
33:1,12;41:12;44:17;
48:4;56:9;59:21;62:16;
82:16
**bottom (2)**
33:5;57:7
**box (2)**
42:15;67:15
**brand (1)**
21:6
**break (3)**
6:19,23;55:22

**breaking (1)**
84:2
**briefing (1)**
35:22
**brought (1)**
43:14
**building (3)**
86:13,14,16
**built-in (1)**
82:5
**burglary (1)**
86:9
**burn (1)**
23:9
**burned (1)**
23:16
**buttocks (1)**
86:25
**button (2)**
21:10,13

## C

**call (4)**
27:11;90:16;91:7;
102:14
**called (4)**
52:25;86:8;87:1;
88:11
**calling (3)**
52:3;91:4;99:13
**call-offs (1)**
35:12
**came (4)**
54:1;87:2;93:20,22
**camera (19)**
20:19,24;21:23;41:2;
50:6;66:21,22;68:6,25;
83:12,19,21;84:4,13;
87:7;88:19;89:7,11;
94:17
**cameras (4)**
21:4;22:8;84:1;
87:11
**Cameron (8)**
86:3,11,18,21,23;
87:20;92:2,5
**Can (81)**
5:13,14;6:7,14;7:19;
13:13;14:21;16:1;
17:11;18:9;19:11;
22:15;24:1,25;27:4;
30:11,11,17,20;35:24;
38:10;42:2;43:17;44:4;
45:13,14,19;47:12,23;
52:11;53:1,11,25;
54:17;55:8,21;56:6,20;
57:12;59:3,11;60:3,9;
66:24;67:3,8;68:16;
70:17,21;71:13,25;
73:10;74:16,20,21;
75:5,6;76:3,8,10,20;
77:4,10,12,17,18;79:2;

80:12;82:9;84:21;85:7;
86:6;89:9;96:16;98:10,
15,24;99:6;100:2;
101:4,19
**capabilities (1)**
23:24
**Captain (8)**
61:6,12,14,17,22;
62:20;84:9,12
**captains (1)**
60:25
**carrier (1)**
64:1
**carriers (1)**
52:13
**Carroll (7)**
14:20;17:7;28:25;
29:3;85:9,18,24
**case (8)**
7:22;8:2;25:13;62:2,
5,7;85:23;94:24
**cases (4)**
8:8,9,12;87:16
**categorically (1)**
63:6
**cause (2)**
27:4;28:9
**cautioned (1)**
4:6
**center (2)**
21:16,17
**certain (2)**
23:14;37:10
**certificate (1)**
16:25
**certification (18)**
10:10,12,14,19;14:4,
16,22;16:23,24;17:5,
10,14;32:1,6;34:18,18,
22;35:3
**certifications (1)**
17:8
**certified (3)**
17:6;34:24;67:18
**certify (2)**
32:3;35:4
**cetera (1)**
62:8
**change (5)**
23:18;98:17,20;99:1,
10
**changed (1)**
99:10
**changing (2)**
7:4,12
**characterize (2)**
82:18,19
**charge (1)**
89:2
**charged (3)**
88:24;89:1;94:19
**Chippewa (2)**
10:8;12:20

**Chris (1)**
62:3
**CHRISTOPHER (4)**
4:4;5:17;36:2;57:8
**circumstances (2)**
85:23;88:14
**citizens (2)**
12:5;38:17
**City (1)**
86:3
**civil (1)**
7:22;62:7
**Claire (1)**
12:21
**clarification (1)**
6:13
**clarify (3)**
53:1;55:8;58:2
**class (3)**
12:24;13:6,10
**classify (2)**
91:1;93:17
**clean (1)**
6:7
**clear (2)**
45:7;102:4
**clearly (1)**
6:7
**clip (1)**
70:17
**close (1)**
21:17
**closed (2)**
90:9;93:6
**closer (1)**
60:23
**clothing (3)**
42:17;48:16,23
**cluttered (1)**
27:4
**collar (2)**
38:12;82:11,14,20;
88:16
**collars (1)**
82:4
**College (3)**
9:13;10:9;12:20
**C-o-m-e (1)**
28:22
**coming (3)**
28:21;31:17;93:10
**command (24)**
27:21;28:5,14,18;
37:11;43:2;48:8;49:16;
50:17,25;53:9,13;54:2,
3;75:7,11;79:14,18,20;
82:14,17;83:3;88:15;
99:14
**commanded (4)**
53:4;82:21;103:18,
19
**commands (19)**
27:19;28:23;29:4;

31:17;32:12,15;33:13;
42:9;46:8;49:14;51:17;
54:11;90:1,4,7;93:21,
23,24;100:25
**commencing (1)**
31:17
**comment (4)**
16:3;33:11,16,17
**comments (4)**
33:7,7,10;64:13
**communication (1)**
62:9
**communications (1)**
95:12
**compensation (1)**
87:20
**complaints (1)**
12:5
**complete (1)**
20:3
**completed (3)**
36:15;62:6;96:25
**complicates (1)**
35:22
**complied (2)**
53:9;93:23
**comply (1)**
99:13
**complying (3)**
51:16;93:21;103:11
**compound (1)**
96:17
**computer (1)**
64:7
**conduct (2)**
26:7;99:1
**confer (1)**
89:9
**confirm (9)**
55:15;64:5;67:8;
68:5;73:5,12;74:18;
77:23;80:9
**confirming (1)**
63:6
**conflict (2)**
55:4,17
**connection (8)**
7:12;12:9;13:10;
15:11,17;18:14;38:20;
56:9
**consciously (1)**
39:6
**consider (7)**
25:22;26:3,6,11;
39:6;52:2;91:3
**consideration (1)**
26:9
**consist (1)**
4:19
**consistent (1)**
48:19
**constituted (1)**
103:7

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

**contact (1)**
74:13
**contacts (1)**
95:2
**continue (2)**
36:24;51:6
**continued (1)**
42:8
**continuum (3)**
18:3,9,13
**control (11)**
24:21;25:7,15;43:2;
51:4,8,9,11;81:24,25;
82:2
**controlled (1)**
25:18
**conversation (1)**
29:4
**conversations (1)**
62:24
**Cook (6)**
39:20;40:8;43:11;
62:1;81:9;95:24
**copy (2)**
22:16;67:18
**correcting (1)**
91:22
**correction (1)**
38:13
**Counsel (6)**
22:23;30:8;55:22;
79:3;89:4;95:5
**County (20)**
5:20;8:13,14;11:14,
20,21,22,24;12:7;
13:23;18:23;19:1,5,8;
29:14,15,22;63:17;
64:3;96:3
**couple (4)**
12:2;14:6;30:11;
68:17
**course (19)**
6:14;12:17,22,23,23;
13:6,18;14:24;15:1,11,
18,20;16:10,12,22;
17:23;19:2;24:5;70:8
**courses (1)**
12:13
**court (5)**
4:20;6:4;76:6;88:21;
95:3
**courtroom (1)**
8:5
**cover (8)**
42:24;44:1,6,8;
51:14;98:4,7,12
**covered (2)**
17:25;48:23
**covers (1)**
66:19
**crew (1)**
97:5
**crime (1)**

94:20
**criminal (9)**
8:2,9;9:17;10:5;
12:10;28:7;31:13;
87:16;92:17
**culmination (1)**
16:21
**Cumberland (5)**
8:16;11:4;12:6;
13:23;18:22
**curious (1)**
20:14
**current (1)**
71:13
**currently (4)**
5:19,21;7:1;13:5
**custody (4)**
43:3;49:23;51:3;
91:5

**D**

**Dale (2)**
89:17;91:15
**Danette (1)**
65:17
**dark (2)**
68:4;86:17
**Darren (6)**
39:19;61:25;62:4,19;
65:10,14
**data (1)**
22:14
**date (3)**
5:16;19:7;97:11
**Davis (75)**
4:12;5:11;26:11;
38:21;39:10;40:13;
41:23;42:9;43:3,5,13;
44:2,10,11;45:16;46:5,
5;47:1;48:12,15,25;
49:6,9;50:14;51:3,7,7,
12;52:4,25;53:3,18,19;
54:10;55:11;58:25;
59:15;62:3,5,6;66:13,
16;69:19;73:11,15;
74:8;79:15,16,20;
81:12,13,16,20,25;
82:10;88:15;95:15;
97:17,23;98:17;99:7,
13,21,25;100:7,21;
101:1,10,12,14,24;
102:3,5,10,15
**Davis's (13)**
42:8;47:8,24;49:13,
21;54:23;55:1,4;81:3;
82:6;99:1;101:22;
103:23
**day (3)**
58:9,11,12
**days (1)**
23:14
**deadly (3)**

44:1;51:13;98:7
**deal (1)**
7:19
**dealing (1)**
39:25
**decision (4)**
26:19,22;42:21;
90:16
**decoy (7)**
15:22;31:15;34:9,16;
35:1,6;37:9
**defendant (2)**
7:24;8:1
**degree (6)**
9:8,10,16,19,25;10:2
**degrees (1)**
12:9
**delay (1)**
53:8
**delete (2)**
23:22;24:1
**Department (14)**
11:4,12,14;12:7;
14:18;16:17;18:22;
21:25;22:11;23:7,9;
31:20;87:10;97:7
**depend (3)**
46:23;49:13,21
**dependent (1)**
94:12
**depending (3)**
24:18;60:19,23
**depends (2)**
24:24;28:19
**deploy (1)**
92:22
**deployed (1)**
92:23
**deployment (1)**
84:20
**deposes (1)**
4:7
**deposition (5)**
4:18;5:24;8:5;47:17;
48:15
**deputies (1)**
23:25
**Deputy (36)**
4:11;5:8,18,18;8:15;
11:13,24;14:18,20;
17:7;18:25;20:1;23:8;
28:25;29:3;39:22,24;
40:24;41:22;44:17;
46:15;47:8;49:2;52:3;
54:5;57:8;65:21;66:1;
81:9;83:11;85:9,18,24;
95:24,24;97:20
**describe (6)**
14:21;19:11;24:25;
52:11;53:25;86:6
**despite (1)**
90:15
**detective (4)**

39:20,20;40:8;43:11
**determination (2)**
91:7;100:18
**dictate (2)**
31:20;64:16
**dictates (1)**
64:21
**difference (1)**
24:6
**different (5)**
22:21;30:11;32:12;
55:10;101:20
**disagree (1)**
49:25
**disc (1)**
22:16
**discs (2)**
23:16;67:23
**discuss (1)**
86:1
**discussed (3)**
85:24;95:23;96:1
**discussing (1)**
62:18
**discussion (3)**
68:19;69:16;72:7
**distance (2)**
28:17;37:11
**District (1)**
7:2
**DJH (1)**
65:15
**docking (4)**
21:24;22:2,10,25
**docs (1)**
56:4
**document (7)**
19:14;30:9,15,21;
33:6;35:19;36:18
**documents (5)**
29:10;36:21;38:7;
96:9,11
**Dog (10)**
17:1,2,5,7,15;33:24;
46:18;76:16;101:2;
103:9
**DOJ (1)**
18:6
**done (5)**
29:14,25;82:23,25;
84:8
**door (8)**
39:17,21;60:23;69:3;
90:9;93:6,7,9
**doors (1)**
45:4
**doorway (2)**
78:21;82:24
**dope (1)**
27:22,23
**D-o-p-e (1)**
27:25
**doubt (1)**

97:12
**down (16)**
8:7;31:7;32:16,17;
33:3;35:23;37:10;43:8,
9;58:14;60:9;84:23;
86:17,17,18;99:24
**downhill (1)**
37:2
**draft (4)**
64:12,15,25;65:3
**drafted (8)**
56:9;58:9;59:19,20,
22;61:2,13;62:12
**drafting (4)**
56:11;61:1;62:19;
95:19
**drawn (2)**
41:11;44:9
**drug (1)**
91:11
**drugs (1)**
27:22
**due (3)**
26:25;46:16;91:8
**duly (1)**
4:5
**during (18)**
11:20;15:1;24:4;
31:22;39:3,7;41:13;
44:5;18;45:2,5;47:7,
25;50:6,19;55:10;
86:15;97:15
**duties (2)**
38:17;85:8
**DVD (1)**
22:16

**E**

**Early (1)**
47:7
**easier (4)**
24:21;25:7,15;59:9
**Eau (1)**
12:21
**E-collar (6)**
38:7,10,12;41:17;
53:7,10
**Eden (1)**
9:13
**education (4)**
9:5,24;10:6;12:11
**effect (3)**
19:9;20:20;38:4
**eight (1)**
97:7
**either (33)**
7:24;8:5,20;12:6;
13:23;14:23;17:11;
18:22,24;33:10,23;
41:10;42:21;43:16,25;
46:15;49:1;51:12;
54:15;62:19,24;63:2,2,

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

3;64:11;70:5;72:19;
80:21;95:24;96:11,25;
98:23;102:12
**electronic (2)**
38:12,13
**elementary (2)**
86:9,10
**else (8)**
14:13;20:16;36:17;
40:7;54:16;64:19;
76:14;96:12
**email (8)**
30:12;61:21,25;62:9,
20;63:11,17,19
**emails (6)**
29:6;63:2,13,15;
95:17,21
**employed (2)**
96:2;97:9
**employment (1)**
8:18
**end (5)**
16:23,24;70:10,17;
86:19
**Enersen (8)**
88:2,7,10,10,13,22,
24;89:6
**enforcement (11)**
7:8;10:9,20;11:1,3,
19;12:18;21:1;24:1;
38:17;65:5
**enough (1)**
48:11
**entailed (1)**
14:22
**entails (1)**
19:12
**enter (2)**
41:22;44:5
**entered (3)**
86:19;90:10;98:11
**entering (3)**
42:3,14;44:7
**entire (2)**
43:25;44:19
**entry (11)**
42:18,20,23;59:24;
60:12,17;78:15;94:8;
98:4,7,21
**enviable (1)**
15:24
**environmental (4)**
25:4;26:13,25;94:13
**equipment (1)**
43:12
**Erik (3)**
62:1,4,19
**E-r-i-k (1)**
62:1
**escorted (1)**
43:13
**et (1)**
62:8

**Even (1)**
90:18
**event (2)**
16:24;103:25
**Eventually (2)**
40:8;54:9
**everyone (2)**
16:5;30:21
**everyone's (1)**
80:4
**evidence (3)**
55:4,16;96:11
**exactly (2)**
40:10;58:12
**EXAMINATION (1)**
5:5
**examined (1)**
4:5
**exclamatory (1)**
80:21
**exercise (1)**
37:7
**exercises (2)**
13:4;34:8
**exhibit (1)**
35:20
**exit (6)**
46:24;47:1;90:8;
99:14,25;100:21
**exiting (1)**
94:4
**exits (1)**
45:4
**expect (1)**
83:5
**experience (2)**
15:21,22
**explain (1)**
38:10
**extent (3)**
6:14;51:16;55:1
**exterior (1)**
42:22
**external (2)**
46:16;52:13
**extremely (1)**
27:4
**eyes (1)**
98:3

**F**

**face (8)**
42:8;58:23;59:14,25;
60:13,21;101:14,22
**face-to-face (1)**
69:3
**fact (2)**
100:11;103:11
**factoring (1)**
103:13
**factors (3)**
24:25;25:3;94:13

**fair (5)**
6:9,16,24;48:11;67:5
**fall (1)**
18:9
**falls (1)**
18:18
**familiar (8)**
5:8;18:2,8;31:1;
34:21;62:10;85:21;
88:1
**far (3)**
22:19;33:18;87:3;
91:22
**fast-forward (1)**
68:11
**FBI (1)**
7:10
**February (1)**
89:16
**federal (1)**
8:20
**feel (2)**
92:20,21
**feet (1)**
87:5
**felt (1)**
51:5
**female (3)**
32:21;89:19;91:15
**field (6)**
15:10,17;37:10;
38:16,18,19
**file (3)**
40:16,19,22
**final (3)**
37:6;64:24;65:3
**finalize (1)**
64:13
**Find (3)**
27:21;77:11;98:5
**finding (1)**
27:20
**fine (1)**
5:14
**finish (1)**
37:5
**finished (2)**
9:20;37:2
**fire (1)**
102:4
**firearm (4)**
19:21;44:14;97:13;
102:1
**firearms (3)**
41:11;44:9,18
**first (12)**
4:5;10:11;11:1,3;
13:9;42:23;47:15;52:8;
80:19;88:1;98:15,24
**fist (1)**
20:1
**five (1)**
74:20

**five-minute (1)**
55:22
**Flashback (1)**
68:21
**fled (3)**
100:12;102:15,21
**flee (4)**
45:17,20;51:19;
90:19
**fleeing (2)**
50:1;93:14
**flexibility (1)**
80:4
**floor (1)**
86:16
**folks (1)**
23:19
**followed (1)**
42:25
**following (4)**
47:5;91:18,19;92:5
**foot (1)**
20:1
**footage (1)**
94:17
**force (16)**
12:14,17;13:20;18:9,
12,16,20,23;19:14,15,
19;20:5;27:14;51:14;
90:22;91:2
**form (50)**
14:1;15:13;18:4,10;
24:16;25:25;31:1,3;
33:2;36:14;42:1;44:3;
45:12,18;46:7,20;48:9,
21;49:11;50:2,23;
51:24;53:15,22;54:20,
24;55:7;60:5,5;62:22;
66:11;80:24;81:22;
82:8;83:1;84:6;90:24;
96:15;97:24;98:8,18;
99:4,15;100:1,15;
101:6,17;102:6,17;
103:21
**formal (5)**
9:5;10:6;13:24;
19:22;34:17
**forms (1)**
15:10
**forward (2)**
42:8;48:2
**found (2)**
45:22,25
**foundation (1)**
101:18
**four-page (1)**
57:24
**frame (2)**
61:16;68:8
**front (7)**
28:8;41:3,8;52:16;
57:5;60:7;67:16
**full (3)**

**5:16;44:10;91:5**
**further (2)**
46:18;53:1
**future (1)**
59:7

**G**

**gain (4)**
42:18,20,23;94:8
**gaps (1)**
80:21
**gave (3)**
43:1;90:1;93:24
**gears (1)**
84:19
**general (3)**
18:19;19:13;100:24
**generally (9)**
18:3;20:24;28:5;
31:2;33:23;34:14;58:5;
63:4;87:16
**Generation (2)**
21:8,8
**gets (1)**
64:25
**given (3)**
13:11;49:14;64:14
**giving (3)**
42:9;90:4;93:10
**glimpse (1)**
42:7
**glimpses (1)**
101:21
**goes (2)**
22:14;37:20
**Good (3)**
4:10;6:7;10:23
**grabbing (1)**
82:20
**graduate (2)**
8:23,25
**graduated (1)**
9:1
**group (2)**
33:24;34:3
**grow (1)**
9:3
**guess (10)**
13:8;24:18,23;32:20;
46:23;48:10;51:25;
55:8,19;60:16
**gun (5)**
52:4;78:14,16;97:23;
101:9
**guys (4)**
21:4;30:12;66:7;
69:12

**H**

**hallway (4)**
42:11;86:17,19,20

**hand (16)**
36:17;42:7;48:1,3;
59:25;60:3,13,17,20,
21;75:6;77:18;82:4,11;
101:22,22
**handcuffs (7)**
43:5,7;51:7;54:11;
81:13,16,18
**handle (1)**
82:5
**handler (5)**
29:12;33:6,11,18,21
**handling (3)**
28:25;29:2;85:8
**hands (32)**
43:17;47:2,8,12,14,
18,20,24;48:4,8;49:7,
16;51:20,21;60:2,17,
18,22;74:17,21;75:5;
76:19;77:6,10;80:6,14;
94:7;98:15,24;101:5,
14;103:18
**hands-on (1)**
13:4
**handy (1)**
30:12
**Hang (3)**
68:10;70:19;85:1
**hanging (1)**
46:18
**happen (1)**
27:11
**happened (5)**
43:10;85:22;86:7;
90:6;94:22
**happening (1)**
90:3
**happens (1)**
54:16
**hard (1)**
72:10
**hardware (1)**
22:1
**harness (1)**
41:14
**Hazeltine (1)**
39:25
**head (12)**
44:15;47:16,18,20;
48:2,3;49:7;58:23;
59:14;76:19;77:6;94:7
**hear (15)**
5:13,14;54:17;56:20;
61:3;66:24;73:7;75:4;
76:3,9,10;78:9;79:11;
80:14,21
**heard (1)**
93:9
**hearing (5)**
69:5,6,24;70:3;73:11
**Heel (1)**
99:24
**heftier (1)**

37:17
**Hellman (1)**
65:17
**help (1)**
46:1
**hesitate (2)**
6:12,19
**hesitation (1)**
53:8
**hid (1)**
100:13
**hide (1)**
45:23
**high (3)**
8:23;9:1,5
**hired (3)**
11:13;97:10
**history (2)**
8:18;92:18
**Hodek (52)**
39:19;40:6,12,24,25;
41:8,10,22;42:12,19,
24,24;43:2,13,17;44:1,
17;46:15;47:8;49:2;
51:12;52:3,10;54:5;
61:25;65:10,14;66:1;
74:19;76:2,13,15;
78:10,16;80:16;81:5,
12,19,24;83:11,18;
84:3;95:24;97:4,20;
98:3,12,24;101:9,16,
21,23
**Hodek's (1)**
84:12
**hold (2)**
28:12;61:7
**holding (2)**
81:9;88:16
**holstered (2)**
78:17;102:2
**hooked (1)**
82:12
**hopefully (1)**
89:8
**hoping (2)**
72:12;98:5
**hours (2)**
31:21;32:5
**house (3)**
73:8;91:11;102:15
**human (2)**
34:9;35:6
**hypothetical (3)**
49:4,11;94:10

### I

**idea (1)**
91:13
**Identification (1)**
4:2
**identify (4)**
36:22,22;44:11;

57:13
**identity (1)**
91:13
**ignoring (1)**
102:22
**immediately (4)**
58:25;59:16;71:4;
87:1
**important (1)**
6:5
**impossible (1)**
46:14
**incident (85)**
5:9,9;19:7,18;20:3,
20;21:5,12,21,22,22;
23:15;25:19;26:11;
38:21;39:2,4,7,10;
41:13,20;43:19;45:2,5;
47:7,25;50:6,20;55:11;
56:10,13,14;57:5,25;
58:1,9,10,12;61:15,18;
62:25;63:4,9,14,16;
64:7,14;70:5;83:12;
84:5;85:18,20;86:1,2,
4;87:7,17,23;88:3,6,19;
89:10,15,18;91:18,20;
92:2,5,6,10;94:17,22;
95:6,10,13,15,23;96:6,
13,20,23,25;97:1,11,15
**incidents (3)**
8:21;84:21;85:12
**in-classroom (2)**
13:1,3
**include (3)**
4:20;12:11;13:18
**includes (1)**
17:15
**including (1)**
25:4
**incomplete (2)**
49:11;94:10
**indicates (1)**
50:7
**individual (1)**
93:11
**individuals (2)**
45:1,8
**information (1)**
55:16
**inherently (1)**
24:10
**initial (1)**
47:11
**injuries (2)**
4:13;55:17
**injury (4)**
54:23;55:2;81:3,3
**input (1)**
65:4
**inside (6)**
40:3,5;65:22;66:1;
73:8;86:14
**instead (1)**

89:19
**institutions (1)**
12:16
**instruct (1)**
46:25
**instructed (4)**
18:8;15,18;24:5
**instruction (4)**
13:1,19;15:2;76:6
**intend (1)**
68:8
**interlaced (1)**
47:18
**in-the-field (1)**
13:2
**into (20)**
26:16;39:13;42:4,6,
23;43:3;49:22;50:16;
66:8;85:18;91:5;92:23;
94:8;98:4,7,25;100:12;
102:15,21;103:13
**investigated (1)**
8:20
**investigation (1)**
19:23
**involve (4)**
4:17;13:2;29:11;
34:4
**involved (8)**
16:12;19:24;33:22;
34:9;52:15;85:12,16,
17
**involvement (1)**
57:4
**involvements (1)**
58:2
**involving (8)**
5:11;39:10;62:5;
85:13;87:24;91:20;
92:6;95:2
**issue (3)**
7:20;53:13;71:3
**issues (2)**
27:5;37:21
**items (4)**
27:4;48:16;96:12,19

### J

**James (1)**
92:7
**job (3)**
11:1,3;15:24
**jobs (1)**
11:20
**John (1)**
5:17
**Jones (110)**
4:2,23;5:1;7:17;
13:25;15:12;16:4;18:4,
10;23:1;24:15;25:9,24;
30:13,16;35:18;41:25;
44:3;45:11,18;46:6,20;

48:9,21;49:10,20;50:2,
22;51:23;53:15,22;
54:20,24;55:7,23;
57:11,16,22;59:3,8;
60:4;61:7;62:21;66:10;
67:8,14;68:7,13;69:4,8,
11,22;70:3,11,19,23;
71:3,10,16,19;72:9,16,
20,25;73:14,17,25;
74:5,22;75:2,12,15,21;
76:4,22;77:2,13,15,24;
78:5;79:4,9;80:10,24;
81:22;82:8,25;84:6,14,
22;85:1,6;89:12;90:24;
91:19;94:9;95:8;96:14;
97:24;98:8,18;99:3,15;
100:1,15;101:6,17;
102:6,17;103:20
**July (3)**
86:2;87:9,24
**June (2)**
14:8;16:10
**justice (3)**
9:17;10:5;12:10
**justified (2)**
49:8,17

### K

**K9 (44)**
13:19;14:4,9,16,22,
24;15:22,23;17:16;
18:9,12,16,23,25;19:2;
20:5;24:20,21,21;25:7,
16,17;26:20;31:4;
32:21;34:24,25;43:1,
14;48:6;50:17;56:14;
62:5;65:22;66:14;
72:13;73:5;90:21;91:1;
97:1;98:13;99:21;
100:4;102:12
**K9s (3)**
15:21;34:4,6
**keep (4)**
32:17;76:19;77:6,12
**Kevlar (1)**
42:22
**kind (7)**
20:14;21:15;39:11;
41:19;68:4;85:15;
86:22
**King (9)**
92:7,11,14,17,24;
93:4;94:2,19;95:7
**kitchen (4)**
42:4;98:20;100:23;
102:9
**knife (1)**
42:12
**knowledge (9)**
8:20;18:12;23:23;
24:3;30:1;87:8,22;
95:17;96:19

**TREVOR DAVIS vs.**
**CHRISTOPHER ALLEN**

**Christopher Allen**
**5-5-22**

**CHRISTOPHER ALLEN**
**May 5, 2022**

**known (2)**
25:4;91:11
**knows (1)**
16:5
**Koda (121)**
14:9,11,13,19;16:12;
17:1,4,8;26:3;27:6,11,
15,19;28:9,17,18,24;
29:10;30:14;31:16,22;
32:1,5,8,19,20;33:19;
34:5,13,19;36:21,22;
37:10;38:3;39:13,18;
40:2;41:13;43:1,14;
45:7,9,22,25;46:4,12;
47:19;48:6;49:7;50:20,
25;51:6,9;52:3,24;
53:3,14,20,25;55:11;
66:5,8;74:11,13;79:14,
18;81:20,24;82:2,6,10;
84:20;85:8,13,18;86:3,
8,16,20,21,24,24;87:1,
3;88:4,7,9,10,11;89:16,
19;90:1,4,8,12,16;91:4,
14,18;92:2,5,11,22,23,
25;93:3,5,8;94:2;
96:23;98:13;99:13,22,
24;100:4,18,20;102:12,
14,24;103:17
**Koda/Allen (1)**
36:11

**L**

**L3 (1)**
21:6
**lack (1)**
83:13
**laid (1)**
97:23
**large (1)**
42:15
**last (5)**
37:13;57:7;65:12,20;
88:2
**later (2)**
7:20;55:2
**law (10)**
7:8;10:9,20;11:1,3,
19;12:17;23:25;38:17;
65:5
**lawful (1)**
4:5
**lawsuit (1)**
4:13
**laying (4)**
48:12,17;49:17;94:6
**lead (1)**
86:17
**leash (11)**
24:20,22;25:14,18;
41:14;66:9;82:2,12;
92:25;93:1,2
**least (2)**

44:15;89:5
**leave (1)**
11:12
**left (4)**
41:9;48:3,5,6
**less (1)**
25:1
**lethal (2)**
44:6,8
**likely (1)**
64:14
**likewise (1)**
63:11
**line (3)**
81:11;97:16;102:4
**lines (3)**
33:5;54:18;65:12
**list (1)**
27:18
**listen (1)**
76:21
**little (7)**
33:3;34:2;37:17;
42:5,5;71:6;72:10
**locate (2)**
92:11,24
**located (1)**
9:21
**location (3)**
32:17;37:12;47:24
**locations (1)**
69:13
**log (1)**
31:4
**logged (1)**
56:15
**long (4)**
23:12;52:20;87:13;
97:3
**longer (4)**
18:17;27:15;86:10;
87:16
**look (4)**
30:9,12;78:25;89:23
**looked (1)**
86:22
**looking (9)**
14:15;33:2,6;35:25;
41:1;58:24;59:15;
89:16;91:8
**looks (2)**
14:16;92:10
**louder (1)**
80:20
**lower (1)**
78:8
**lying (3)**
43:8,9;49:6

**M**

**maintaining (2)**
7:13,15

**major (2)**
9:15;10:4
**majority (2)**
99:8;102:10
**makes (1)**
72:14
**making (2)**
73:5;81:2
**male (4)**
32:21,22;74:9;93:9
**maneuver (1)**
82:16
**manipulate (1)**
72:10
**manual (3)**
13:11,12,16
**mark (1)**
35:19
**material (1)**
48:17
**materials (5)**
13:6,9;15:2;16:16,18
**matter (1)**
52:22
**May (22)**
4:14,14,17,21;5:10;
6:15;7:8;10:15;12:3;
14:2;22:5,18;25:11;
29:25;38:21;39:10;
49:12;61:22;84:8;
102:8,19;103:22
**maybe (5)**
16:18;27:7;70:17;
74:20;76:15
**McDonough (11)**
14:24;16:10,16;
17:11,22;18:15;19:1;
24:4;29:14,15,25
**mean (9)**
25:25;27:2;36:14;
37:8;50:12;51:13;
61:19;68:3;99:16
**Meaning (1)**
73:14
**means (2)**
37:25;38:1
**meant (1)**
17:20
**media (1)**
96:5
**meet (1)**
89:9
**member (1)**
21:2
**memory (2)**
41:5;70:5
**mention (2)**
16:16;42:12
**mentioned (1)**
23:19
**messages (6)**
29:7;63:2,7,8,12;
64:6

**Michael (1)**
14:20
**microphone (1)**
61:8
**middle (3)**
52:14;58:4,6
**might (8)**
7:7;16:18;25:1,23;
26:4;46:18;85:16;95:1
**Military (1)**
9:20
**minimize (1)**
71:5
**Minnesota (3)**
9:2,14;14:25
**minute (1)**
70:20
**minutes (2)**
14:6;68:17
**mischaracterizes (3)**
66:11;99:5;102:18
**mischaracterizing (1)**
60:6
**mode (1)**
71:5
**model (3)**
21:3;22:2;23:3
**moment (5)**
8:18;25:25;26:2;
56:4;80:3
**month (1)**
34:1
**monthly (1)**
33:25
**more (9)**
24:10,14;25:23;26:4,
23;34:2;54:17;55:10;
80:19
**morning (1)**
4:10
**most (5)**
29:11;34:12;64:14
**motion (1)**
35:22
**mouse (3)**
59:11,11;60:10
**move (5)**
42:5,8,15,18;86:23
**moved (3)**
40:3,5;48:2
**moving (1)**
40:16
**much (1)**
20:14
**mulit-year (1)**
12:22
**multiple (2)**
60:5;100:25
**muscle (1)**
55:5
**must (1)**
18:16
**myself (6)**

34:13;51:12;65:21;
86:8,12;93:5

**N**

**name (4)**
4:11;5:16;88:1,2
**narcotics (4)**
17:5,7,13;45:9
**narrative (7)**
58:1,3,4,6,8;59:19,23
**narrow (1)**
8:7
**nature (1)**
27:3
**nearby (1)**
39:20
**necessarily (1)**
25:15;51:18;83:25
**necessary (5)**
18:17;27:15;51:6;
92:21,21
**Nedland (3)**
89:17;91:15,20
**need (3)**
6:18;7:18;70:22
**neutered (1)**
32:23
**next (6)**
7:5;22:13;31:8;
37:13;56:4;58:12
**nice (1)**
59:6
**night (2)**
61:17;94:22
**nipped (1)**
86:24
**none (1)**
29:21
**non-physical (1)**
35:4
**nonverbal (1)**
33:12
**normal (3)**
20:3,6,9
**northwest (1)**
34:7
**note (7)**
4:15;22:24;69:22;
88:9;89:25;91:10;
92:16
**noted (2)**
89:13,14
**noticed (1)**
57:12
**notify (1)**
19:15
**notorious (1)**
84:2
**November (2)**
11:8,16
**number (5)**
29:9;32:4;36:6;62:3;

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

63:24
**numbered (2)**
57:12;67:10
**numbers (2)**
57:13,17

### O

**oath (2)**
6:5;8:5
**object (6)**
13:25;16:1;18:4,10;
70:7;100:15
**objected (1)**
16:4
**Objection (49)**
15:12;24:15;25:9,24;
41:25;44:3;45:11,18;
46:6,20;48:9,21;49:10,
20;50:2,22;51:23;
53:15,22;54:20,24;
55:7;60:4,5;62:21;
66:10;69:23;80:24;
81:22;82:8,25;84:6,14;
90:24;94:9;96:14;
97:24;98:8,18;99:3,4,
15;100:1;101:6,17,18;
102:6,17;103:20
**objections (2)**
6:15;49:5
**objective (1)**
37:1
**observed (1)**
47:22
**obtain (3)**
9:9,12;10:11
**obtained (1)**
12:10
**occurred (7)**
54:5;55:6,18;61:16;
87:4,24;91:11
**off (36)**
24:21;25:18;27:11;
31:17;41:8;42:22;
46:18;47:20;52:3,7,12,
17,21,24,25;53:3;54:1;
68:16,19;69:14,16;
70:4;72:7;81:20;82:6;
88:12;90:16;91:4,7;
93:1,2;99:13,24,24;
100:20;102:14
**Officer (16)**
8:16;10:21;11:11;
14:17;15:17;27:7;41:3;
64:21,25;65:5;86:3,18,
22,23;87:21;92:3
**officer/witness (1)**
8:10
**officers (4)**
24:1;25:7;86:13;
94:5
**officer's (1)**
93:23

**off-leash (9)**
24:6,9,13;25:1,8,20;
26:7,14,20
**Once (3)**
23:6;64:25;98:2
**one (33)**
4:11;6:6,20;19:24;
21:9;22:4,17;26:23;
32:13,16;34:20;35:4,
12,19;47:20;48:2;
54:17;55:10;58:22;
59:20;60:1,20,21,22;
61:7;62:13,15;80:20;
82:4;88:6;89:5,7;91:20
**ones (2)**
22:21;84:2
**ongoing (1)**
32:1
**on-leash (10)**
24:6,10,14;25:2,6,
22;26:3,14,17;27:5
**online (1)**
9:25
**only (8)**
4:19;19:19;20:2;
28:5;35:12;38:15;70:4;
75:6
**onto (4)**
22:14,16;23:6,16
**open (2)**
67:12;93:8
**opinion (2)**
24:13;49:18
**option (1)**
52:3
**order (3)**
18:25;47:6;102:22
**orders (1)**
103:11
**original (1)**
68:8
**Otherwise (2)**
32:17;95:11
**out (45)**
4:13;7:9;9:22;27:15;
28:16;32:16,18;37:24;
38:2,4;43:2,12,13,14;
46:8,17,19;47:2;53:9,
13;54:2,3;61:17,19;
66:16;75:8,24;76:11,
16;77:11;78:17,19;
82:20;83:3;88:15;89:2;
93:10,20,22;98:5;
101:1;102:1,3;103:12,
19
**O-u-t (1)**
28:16
**outed (1)**
82:10
**outs (1)**
37:21
**outside (1)**
68:4

**over (10)**
6:6;7:5;15:8;28:24;
54:15;64:16;81:17;
85:8;96:10,20
**own (1)**
33:24

### P

**page (8)**
31:8;35:15;56:24;
57:6,6,7;58:17;65:12
**paragraph (1)**
65:20
**part (13)**
12:10;13:18;15:2;
31:18;39:2;56:25;57:3;
66:3;82:3,3;83:25;
87:21;102:9
**partially (1)**
48:22
**particular (1)**
69:25
**party (1)**
7:22
**passed (1)**
17:1
**past (2)**
12:2;26:9
**Patrol (5)**
11:11,13;17:1,6,14
**Pause (8)**
30:6;68:1;70:15;
71:1,25;73:2;79:25;
85:4
**PD (1)**
12:6
**pending (3)**
6:22;80:2;94:25
**people (1)**
54:17
**Per (2)**
57:8;65:14
**perceive (2)**
74:8;103:3
**perceived (2)**
74:9;98:17
**perception (1)**
103:24
**Perfect (1)**
75:14
**period (1)**
97:6
**permanent (1)**
7:12
**person (4)**
59:6;84:5;91:5,6
**personal (3)**
63:19;64:6,7
**personally (1)**
19:24
**phone (5)**
63:21,24;64:3,6,16

**phonetic (1)**
65:17
**photos (2)**
58:24;59:15
**physical (3)**
35:13;51:11;82:16
**physically (4)**
34:25;53:20;88:12;
99:16
**pillow (4)**
37:14,15,17,18
**place (2)**
28:24;81:18
**placed (6)**
6:5;43:3,5,7;54:11;
81:16
**places (1)**
66:25
**plaintiff (2)**
4:12;7:24
**play (5)**
67:9,24;70:10,14,15,
17;71:14;72:4,9;73:12,
21;74:22;75:9;76:20;
77:22;80:8
**Played (8)**
69:17;71:23;72:23,
25;73:23;74:3,5,25;
75:2,19,21;77:1,2;78:3,
6;79:7,9;80:10
**player (1)**
68:22
**playing (5)**
68:12;75:12;76:23;
77:12;79:4
**please (2)**
62:4;85:2
**pled (1)**
89:2
**point (55)**
10:24;28:2;39:12;
40:3,9,10,11,12,17;
41:21,22;42:11;43:16,
21;44:10,24;48:2;
49:19;50:5,19;52:6;
54:8;59:6;60:20,21,22;
61:15;62:12;68:3;
69:25;70:6;73:20;
74:15;78:14,17;80:23;
81:8;85:11;86:18,24;
87:11;93:17,19,25;
94:2;97:23;98:14,25;
99:7,20;100:22,24;
101:8;103:10,15
**pointed (2)**
44:14;101:9
**points (2)**
55:10;98:6
**police (10)**
8:10,16;11:4;15:21;
17:1,16;18:22;86:3;
87:21;92:3
**policy (10)**

19:9,11,13;20:19,23,
25;23:11;31:20;32:2;
83:24
**position (3)**
44:20;102:24;103:2
**possession (2)**
15:6;96:13
**possible (5)**
21:1,17;46:13;86:9,
14;103:16
**possibly (2)**
100:7;102:20
**posts (1)**
96:5
**potential (1)**
21:11
**practical (1)**
13:3
**practice (3)**
23:12;24:8;37:6
**Prairie (1)**
9:13
**presence (1)**
45:8
**present (4)**
39:17;54:6;85:20;
100:3
**preserved (4)**
22:25;23:13,15;
87:14
**presumably (2)**
27:10;36:3
**presume (1)**
32:20
**preventing (3)**
42:14;99:12,17
**previously (2)**
17:4;102:15
**principle (1)**
18:19
**principles (2)**
17:22,25
**Prior (13)**
10:19;15:20;17:8;
26:16;44:7;58:24;
59:15;74:20;84:2,9;
85:11;99:5;101:4
**probably (2)**
10:23;87:5
**proceedings (1)**
87:20
**process (5)**
19:23;22:8;35:22;
52:12,20
**produced (2)**
4:19;63:14
**program (2)**
9:25;56:14
**progress (1)**
86:9
**promoted (1)**
12:1
**proposition (1)**

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

49:25
**prosecutions (1)**
8:13
**provide (2)**
6:13;98:3
**provided (2)**
8:4;95:18
**providing (1)**
42:24
**public (1)**
21:2
**pull (4)**
30:17,18;48:5;103:9
**pulled (2)**
47:19;82:11
**pulling (2)**
82:14;103:16
**purposes (1)**
31:5
**push (2)**
21:11;93:7
**pushed (1)**
93:8
**put (8)**
21:23;44:22;47:18;
55:9;80:6,14;81:13;
85:18
**Putting (4)**
13:22;66:9;78:14;
82:2

## Q

**quoting (1)**
67:3

## R

**raised (1)**
44:18
**Randy (3)**
62:1,4,19
**rank (3)**
5:19;11:9,24
**Rasmussen (1)**
9:13
**rather (1)**
69:3
**reached (2)**
27:6,8
**reaching (2)**
51:21,25
**reaction (1)**
81:6
**reactions (1)**
49:14
**read (2)**
37:1;61:21
**ready (1)**
56:4
**real (1)**
55:18
**reason (9)**

26:10,12,22;52:23;
53:2,5;84:1;97:12;
102:16
**reasonable (1)**
94:1
**reasons (11)**
26:23;53:11;100:3,6,
9,10,14,17,20;102:14;
103:10
**recall (51)**
13:14,21;15:4,9,15;
17:21,24;28:19;34:17;
37:2,5,6,8,9,11;41:20;
43:18,20;45:6,14;
48:20;49:3;50:9;54:13,
19,21;55:13;56:11;
59:22;61:4,5,11,14,15;
62:17,18,23;64:10;
66:5;81:1,5;85:16,22;
86:4;88:3,11,16;89:18,
22;90:3,4
**receive (3)**
15:1;16:15;18:21
**received (9)**
13:10,24;15:3,10;
29:9;56:8;63:7;67:13;
93:7
**recent (1)**
95:1
**recently (1)**
22:7
**recess (1)**
56:1
**recognize (4)**
58:25;59:16;67:15,
21
**recollection (3)**
41:7;48:22;85:14
**record (17)**
4:15;5:16;6:4;21:12,
18;22:24;23:1;31:6;
56:6;68:16,19;69:14,
16,23;71:12;72:7;89:5
**recorded (6)**
29:17,19,20,22,25;
95:12
**recording (21)**
4:17,20;21:20,22;
50:6;54:9;66:21;68:6,
25;69:17;71:23;72:23;
73:23;74:3,25;75:19;
77:1;78:3;79:7;83:12;
87:7
**recordings (5)**
87:14;88:19;89:8;
96:10,12
**records (2)**
14:15;35:16
**refer (2)**
5:9;32:19
**reference (4)**
36:3;38:6;89:10;
95:6

**referring (2)**
5:11;39:14
**regarding (9)**
4:13;18:23;24:5;
29:10;62:25;63:13,16;
89:6;94:21
**regular (1)**
37:18
**relate (1)**
96:13
**related (3)**
19:20;89:11;96:19
**relation (1)**
78:20
**release (3)**
26:19;32:9,10
**released (5)**
26:3;39:12,18;40:2;
89:16
**releases (1)**
38:2
**releasing (1)**
28:14
**remained (2)**
47:19;103:8
**remedial (3)**
91:17,22;92:4
**remember (4)**
40:10;43:23;47:24;
52:8;89:23;92:7
**remind (1)**
85:7
**remote (4)**
9:24;38:13,23,25
**remotely (1)**
30:10
**removal (2)**
35:4,13
**remove (1)**
34:25
**removed (4)**
41:23;53:20;88:10,
12
**repeat (2)**
77:4;80:12
**report (37)**
19:17;20:3,7,8,9,11,
15;56:13,14,22,25;
57:3,5,24;58:13,20;
60:6;64:15;65:9;84:4,
8,10;87:25;89:5,10,21,
24,25;91:10;92:17;
95:6,19,21;96:23,25;
97:1;101:13
**reporter (3)**
4:20;6:4;76:6
**reporting (2)**
19:9,14
**reports (22)**
19:25;56:8,12,15;
58:22;60:2;61:1,6,12,
13;62:4,8,13,13,16,16,
19,25;63:3,9;64:11;

65:19
**represented (1)**
62:6
**request (1)**
22:24
**requesting (1)**
62:7
**required (6)**
19:17,25;20:23;
31:21,22;34:25
**requirements (1)**
31:25;34:22
**residence (3)**
92:23;100:12;102:22
**residency (3)**
7:12,13,15
**resident (1)**
7:2
**resist (1)**
46:5
**resistance (2)**
47:4,5
**resisting (4)**
50:1,4;93:16,18
**respect (8)**
8:21;9:16;20:5;
31:25;36:20;63:11;
64:10;92:1
**respond (2)**
46:8;93:9
**responded (1)**
83:2
**response (8)**
48:7;49:16;73:7,8;
78:11;81:2;90:6;93:7
**responsive (1)**
33:12
**rest (1)**
102:10
**retentions (1)**
23:18
**retrieve (2)**
65:22;66:8
**retrospect (1)**
26:1
**returned (1)**
64:13
**revealed (1)**
54:16
**review (6)**
64:12,17,19,19,22;
70:5
**reviews (1)**
64:24
**reward (2)**
37:16,19
**rhetorical (1)**
16:6
**Rich (6)**
5:2;35:18;57:11;
61:8;67:8;71:4
**Richard (1)**
4:11

**right (31)**
7:19;17:2;27:8;29:9;
35:15;41:19;42:5;
45:23;46:1;48:1;55:20;
57:18;59:7;65:7;67:14;
70:19;71:10,16,18;
72:16,20;76:18,22;
77:2,9,15,20;80:5;
84:18,19;87:2
**ripping (2)**
55:5,12
**risky (3)**
24:10,14;25:1
**roll (1)**
81:17
**rolled (1)**
54:15
**Ronald (2)**
61:6,12
**room (38)**
42:13,16,23;43:11;
44:5,8,24;45:2,5,9;
46:15,24;47:1;48:4,24;
49:6,8;50:16;53:17;
66:9;79:18,21;90:8,10;
94:7,14;98:4,7,11,16;
99:8,14,19,25;100:8;
103:8,12,19
**rough (1)**
64:15
**rules (2)**
87:13,15
**running (2)**
28:8;37:9

## S

**safer (1)**
25:1
**safety (1)**
103:10
**same (8)**
17:8;20:4;22:4,17;
46:14;49:20;56:14;
86:19
**saved (1)**
23:6
**saw (3)**
47:15;48:1,3
**saying (4)**
50:9;54:17;55:13;
77:18
**scenario (1)**
85:15
**scene (2)**
39:11;61:19
**schedule (2)**
15:4,7
**school (7)**
8:23;9:1,6,23;86:10,
11;92:2
**screen (7)**
30:18;56:17;66:23;

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

67:12,16;71:5,8
**scroll (2)**
33:3,4
**scrolling (4)**
30:22;31:7;35:23;
58:14
**search (15)**
25:1,2,6,8,20,23;
26:4,7,14,14,17,20;
27:5;86:13,15
**searches (5)**
24:6,10,11,14,14
**searching (3)**
27:20,21;44:21
**second (7)**
30:4;56:18;61:7;
80:19,20;85:1;86:15
**seconds (3)**
52:22;72:5;74:20
**secretary (1)**
64:16
**Sedani (5)**
39:22,23,24;62:2;
95:25
**S-e-d-a-n-i (1)**
62:2
**seeing (3)**
68:7,9;81:2
**Seek (2)**
27:22,23
**semester (1)**
12:23
**semester's (1)**
12:25
**send (2)**
37:10;70:21
**sends (1)**
64:17
**sense (1)**
89:13
**sent (10)**
58:5;61:22;63:7,15;
64:6,19,21,23;65:1;
86:17
**sentence (1)**
37:13
**separate (8)**
17:10;19:4;20:7,15;
33:22;56:12;63:21;
69:13
**September (1)**
92:7
**sergeant (72)**
5:21,22,24;7:18,22;
12:1;14:18;23:2;30:25;
36:1;39:19,22;40:6,12,
25;41:8,10;42:12,19,
24,24;43:2,13,17;44:1;
51:12;52:10;55:22;
56:7;57:2,23;58:17;
65:10,14;66:22;67:16;
69:20;72:2,14;73:4;
74:7,19;75:4,10;76:1,2,

8,13,15;78:10,16;
79:11;80:13,16;81:5,
12,19,24;83:18;84:3,
12;85:7;95:11,24;97:4;
98:3,12,24;101:9,16,
21,23
**sergeants (1)**
61:1
**serious (1)**
92:17
**server (9)**
21:24;22:14,17,20,
25;23:3,7,10,13
**servers (1)**
23:17
**session (3)**
30:15;34:18;36:8
**sessions (7)**
29:10,13,17,21,24;
33:19;38:8
**setup (1)**
39:11
**several (1)**
26:24
**share (6)**
30:18;56:5,17;66:23;
71:5,8
**shared (1)**
67:12
**sharing (2)**
56:22;68:15
**sheriff's (5)**
8:15;11:14;12:7;
21:25;22:11
**shift (1)**
84:19
**shit (2)**
54:18;80:22
**shoot (1)**
80:22
**short (1)**
56:1
**shot (1)**
30:20
**shoulder (1)**
41:9
**show (4)**
48:8;59:3;60:8;
103:17
**showing (2)**
49:15;51:20
**shown (1)**
56:16
**side (1)**
16:2
**side-by-side (1)**
40:17
**sight (2)**
81:12;97:16
**significant (1)**
90:22
**similar (2)**
37:18;88:14

**simply (1)**
100:20
**single (3)**
40:16,18,22
**situation (5)**
24:19,24;26:13;
28:19;94:13
**situational (2)**
24:18;25:12
**situations (1)**
25:17
**size (2)**
37:16;42:16
**sleeve (3)**
31:14;35:8,9
**sleeves (1)**
52:18
**slide (2)**
21:13,14
**slip (1)**
52:17
**small (1)**
37:17
**smaller (1)**
27:3
**social (1)**
96:5
**solemnly (1)**
4:6
**somebody (23)**
34:15;43:22;50:8,9;
52:6;64:19;69:19;
74:16,21;75:23;76:14,
18;77:10,20;78:7,25;
79:12;80:6,14;96:24;
97:22;98:15;101:4
**someone (2)**
50:4;75:5
**Sometimes (2)**
34:11,12
**soon (1)**
45:25
**sorry (4)**
5:22;29:20;61:4;
95:16
**sort (4)**
4:17;10:3;53:13;
81:2
**sound (8)**
4:25;6:9,16;62:10;
67:5;75:8,24;76:12
**space (6)**
26:25;27:2,12,16;
40:20;85:19
**spaces (1)**
27:7
**speak (4)**
6:6;38:24;60:25;
103:23
**speaking (7)**
20:24;33:23;34:14;
61:5,11,14;102:7
**special (2)**

20:11;21:23
**specialization (2)**
9:16;10:4
**specific (16)**
7:18;15:17;17:24;
19:16;19:31:21;32:4;
58:8;62:23;84:8,9;
87:15,17;92:4;99:10;
100:24
**specifically (5)**
12:13;13:19;18:24;
28:7;88:20
**specification (1)**
20:2
**specifics (3)**
23:17;85:23;88:17
**specified (1)**
18:13
**speculate (2)**
20:13;48:10
**spoken (1)**
83:15
**spot (1)**
33:3
**spring (1)**
42:16
**stacked (1)**
58:6
**staggered (2)**
40:18;78:22
**Stamp (7)**
36:25;58:14;59:2;
65:21;67:13;87:25;
95:7
**Stamps (1)**
56:24
**stand (2)**
81:17;99:25
**standard (1)**
32:25
**standing (2)**
43:8;101:23
**start (8)**
10:25;11:15;31:1;
39:9,11;46:2;73:10,18
**started (3)**
11:6;46:1;86:23
**starting (5)**
10:23;39:12;41:21;
71:17;72:21
**state (3)**
5:15;7:9;8:20
**stated (2)**
75:6;97:18
**statement (1)**
65:25
**statements (1)**
80:22
**States (3)**
17:16;20:25;65:21
**station (1)**
21:24;22:2,10,25
**status (3)**

95:3;99:20,21
**stay (1)**
32:9
**stays (1)**
52:16
**step (1)**
22:14
**steps (1)**
91:18
**stick (2)**
46:17,18
**still (19)**
14:11;15:5;22:4,11,
17,19;43:9;68:7,8;
78:17,19;86:14;90:15;
92:20;94:24;96:2;99:7;
100:3;102:1
**stipulated (1)**
4:24
**stomach (2)**
48:13;49:7
**stop (2)**
66:25;76:21
**stopped (2)**
18:16;86:22
**straight (1)**
28:2
**strikes (1)**
20:1
**STUDENT (139)**
4:10,11;5:3,7;6:3,11,
18;7:1,17,21;14:5;
15:16;16:1,7,9;18:7,
14;22:23;23:2;24:20;
25:14;26:2;30:3,8,14,
19,24,25;35:21,23;
43:4;44:7;45:15,22;
46:10,25;48:11,25;
49:15,24;50:5;51:2;
52:2;53:19,25;54:22;
55:3,9,21,24;56:3,7;
57:14,19,23;59:5,10;
60:8,9;61:11;63:1;
66:15;67:11,15;68:3,
10,14,21;69:6,9,12,18;
70:1,9,13,21;71:7,11,
18,21,25;72:1,12,18;
73:2,4,16,19;74:1,7;
75:4,14,17,23;76:8,24;
77:5,14,19;78:1,7;79:3,
11;80:2,5,13;81:1;
82:1,13;83:2;84:11,18,
24;85:7;89:4,14,15;
91:3,21,24;92:16;
94:16;95:5,9,10;96:17;
98:1,14,23;99:11,18,
23;100:5,19;101:8,25;
102:13,23;103:25
**subject (11)**
20:1;28:10;32:9;
49:5;50:1;62:2;74:9;
89:19;90:12;91:8,14
**subjects (3)**

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

24:7;62:24;86:14
**subject's (4)**
58:23;59:14,25;
60:13
**submitted (3)**
64:12,15;65:4
**sufficiently (1)**
83:3
**suit (4)**
31:15;34:15;35:6,7
**suppose (1)**
83:4
**supposed (1)**
58:2
**sure (10)**
7:19;25:25;55:9,23;
56:18;58:3,12;62:4;
64:22;66:24
**surmise (1)**
74:11
**surmised (1)**
74:13
**surrender (4)**
102:22,24,25;103:4
**surrendered (1)**
103:1
**surrendering (2)**
103:7,14
**suspect (6)**
17:12,15;27:1;28:8;
88:2;90:18
**sustained (2)**
4:14;54:23
**switched (1)**
84:1
**sworn (3)**
4:6;10:20;11:3
**system (1)**
64:15

**T**

**table (1)**
57:4
**tactical (1)**
44:20
**talk (6)**
6:6;14:5;56:8;69:3;
84:20;87:23
**talked (3)**
83:11,17;84:12
**talking (2)**
35:6;39:9
**tangible (1)**
96:11
**taser (7)**
19:20;20:10,15;49:9,
18;50:1,3
**taught (2)**
17:22;24:9
**Team (1)**
36:10
**Technical (2)**

10:8;12:20
**technology (2)**
4:16,22
**telling (1)**
41:6
**terminology (1)**
35:24
**test (1)**
16:22
**testified (5)**
47:17;48:15;53:20;
66:4;88:21
**testify (1)**
4:6
**testifying (1)**
53:12
**testimony (6)**
8:4,9;55:5;66:11;
99:5;102:18
**thereabouts (1)**
77:20
**therefore (1)**
47:20
**thereof (1)**
83:13
**though (3)**
18:1;44:12;90:18
**thought (3)**
16:5;45:23;97:22;
103:6
**threats (2)**
25:5;49:1
**three (6)**
35:2,11;37:2,20;
63:3,8
**three-story (1)**
86:16
**timeline (2)**
59:21;87:17
**today (2)**
6:20;33:12
**together (2)**
52:16;97:8
**took (7)**
12:17;28:24;43:2;
47:4;82:6;85:8;91:17
**tool (1)**
38:14
**top (7)**
35:25;47:18;48:17;
57:17;67:19
**topic (1)**
17:25
**torso (1)**
21:16
**total (1)**
97:7
**toy (1)**
37:16
**trailer (20)**
26:15,17,24;27:3;
39:13,18;40:1,3,5,10;
41:22,23;42:3;43:13,

14,15;60:19,24;65:22;
66:2
**Train (2)**
32:11;34:7
**trained (3)**
32:8;52:4;83:8
**trainer (3)**
33:7,20,22
**training (37)**
7:8;12:11;13:2,22,
24;14:3,4;15:10,17,21;
16:15;18:15,21;24:4;
29:10,13,16,21,24;
30:15;31:4,4;33:19,23,
25;34:3;35:16;36:6,8,
21;38:8,14,15;56:15;
91:18,22;92:5
**transcribed (1)**
67:2
**transcript (3)**
4:19;6:8;67:1
**transitioned (2)**
22:7;29:3
**transitioning (2)**
22:8,20
**Trevor (9)**
4:12;5:11;58:25;
59:1,15,16;62:3,5;
69:19
**Trevor's (1)**
81:2
**tricky (1)**
71:6
**true (1)**
34:24;98:1
**truth (3)**
4:6,7,7
**try (4)**
8:7;42:9;66:4;70:12
**trying (6)**
45:23;66:13;100:13;
103:3,17,18
**tug (1)**
37:18
**turned (3)**
15:8;96:10,20
**twice (2)**
80:17;89:25
**two (11)**
6:20;21:9;22:21;
37:14;56:8,11;60:17,
22;65:12;97:6;100:9
**type (2)**
31:13;89:2
**types (2)**
64:17;65:18
**typical (1)**
67:22

**U**

**umph (1)**
80:19

**unanswered (1)**
6:21
**under (6)**
6:5;8:4;18:18;51:4,8,
9
**underneath (1)**
65:15
**Understood (12)**
8:17;10:1;16:7;18:7;
20:4;26:16;27:6;58:7;
70:1;89:14;97:2;99:11
**unholstered (1)**
44:18
**unique (1)**
85:15
**United (1)**
17:16
**University (1)**
9:20
**unless (2)**
23:15;30:12
**unreasonable (1)**
18:20
**unsuccessfully (1)**
90:1
**unzipping (1)**
52:15
**up (26)**
7:19;9:3;30:17,18,
22;33:4;39:21;43:8;
47:2;48:4;52:14;54:12;
56:18;60:7;64:17;65:8;
66:11;69:10;71:4;
81:17;82:12;85:18;
93:10,18;99:25;103:18
**upload (1)**
21:24
**uploaded (1)**
23:12
**Upon (1)**
86:12
**upper (1)**
46:12
**use (29)**
12:13,17;13:19;18:9,
12,16,19,23;19:14,15,
19,20,21;20:5;27:19,
21,22;28:5;38:7,13;
39:3;49:25;59:11;
63:19,22;87:10;90:22;
91:1;100:18
**used (9)**
26:8,12;28:6;38:15,
16;53:11;86:10;92:11;
100:4
**use-of-force (20)**
8:21;12:4,11;13:6,
24;14:3;17:21,24;18:3,
19;19:8,13,16,25;20:7,
15;21:21;84:21;85:12;
96:22
**using (5)**
22:9;39:6;49:9,18;

57:17
**USPCA (4)**
17:17,18,20;34:18
**Usually (1)**
33:25
**utilize (1)**
38:19

**V**

**Valley (2)**
10:8;12:20
**varied (2)**
60:20,23
**variety (1)**
25:3
**various (1)**
66:25
**verbal (15)**
27:18;28:23;33:12;
37:21,24;38:2;49:11;
53:9,13;54:2,3;82:13,
17,19;83:3
**verbally (1)**
53:4;88:12
**Verified (1)**
4:2
**Verizon (1)**
64:2
**versus (1)**
32:13
**vest (6)**
39:1;52:7,12,13,18,
21
**vests (4)**
42:22;46:16,17;81:9
**video (18)**
4:17;21:18;23:6;
41:2;50:7;62:8;67:1,3,
22;68:12,15;70:10,22,
24;71:8;83:19;84:13,
23
**videos (5)**
13:9;15:2,4;23:8,16
**view (1)**
44:10
**village (1)**
86:11
**violation (1)**
83:24
**Virginia (2)**
9:22,24
**visual (1)**
91:5
**voice (6)**
70:4;73:15;75:8,24;
76:12;78:8
**voicemail (1)**
95:12
**volumes (1)**
69:10

TREVOR DAVIS vs.
CHRISTOPHER ALLEN

Christopher Allen
5-5-22

CHRISTOPHER ALLEN
May 5, 2022

## W

**walk (7)**
41:20;66:20;75:8,24;
76:11,15;103:18
**walking (1)**
40:1
**wall (1)**
102:11
**warning (1)**
93:6
**warrants (3)**
100:10;102:16,20
**watch (1)**
54:9
**watching (1)**
41:2
**way (8)**
40:13;41:4;42:4;
44:22;55:10;64:15;
70:12;92:13
**ways (1)**
30:11
**weapon (2)**
25:4;90:19
**weapons (3)**
44:23;45:9;94:14
**wearing (4)**
21:4;38:20;83:20,23
**wears (1)**
38:18
**week (1)**
62:6
**welcome (2)**
5:3;95:9
**weren't (1)**
90:11
**West (2)**
9:22,24
**Western (1)**
7:2
**what's (4)**
22:13;28:14,17;
63:24
**Whereupon (1)**
56:1
**whole (1)**
4:7
**wide (1)**
40:20
**Winona (2)**
9:2,3
**Winona-Cotter (1)**
9:1
**Wisconsin (5)**
7:2,14;12:21;18:6;
34:7
**without (2)**
35:12;52:18
**Witness (5)**
4:2;6:10,17,25;30:23
**wonder (1)**

68:14
**wondering (1)**
60:1
**words (2)**
27:22;37:14
**work (17)**
11:5,7;14:11,13;
31:9,12,14,16,18,22;
32:5;34:8,13,14;63:21;
64:3;72:19
**worked (5)**
10:20;11:19;14:18;
97:3,5
**workers' (1)**
87:20
**working (1)**
15:22
**works (1)**
64:16
**worn (1)**
21:15
**worth (1)**
12:25
**writing (2)**
29:6;57:7
**written (6)**
13:9,11;15:1;33:5;
60:6;95:11
**wrong (2)**
11:23;58:5
**wrote (1)**
64:11

## Y

**year (4)**
7:5;31:23;36:7;97:6
**year-long (1)**
12:22
**yearly (2)**
32:3;34:20
**years (3)**
12:2;97:6,7
**yelling (7)**
46:1,2;73:11;74:8,8,
9;86:23
**Yep (6)**
28:3;37:23;59:5,12;
73:2;75:17

## Z

**zipped (1)**
52:14
**zip-up (1)**
52:18
**Zoom (2)**
4:16,21

## 0

**0067 (1)**
67:13

## 1

**1 (3)**
17:1,2;21:8
**10th (1)**
4:14
**11 (1)**
14:23
**12-week (1)**
14:23
**13 (4)**
58:14,17;59:24;60:9
**14 (2)**
58:14,18
**15 (1)**
87:5
**1986 (1)**
5:17

## 2

**2 (1)**
21:8
**20 (1)**
87:5
**2004 (1)**
9:2
**2012 (1)**
9:11
**2013 (2)**
10:13,25
**2014 (3)**
11:6,8,16
**2018 (7)**
14:8,8;16:10;85:10;
86:2;87:9,24
**2019 (8)**
4:14;5:10;10:15;
11:24;22:5,18;38:21;
39:10
**2020 (2)**
12:3;89:16
**2021 (2)**
9:19;92:7
**20th (1)**
61:22
**21 (1)**
74:6
**24 (1)**
89:7
**25 (1)**
71:21
**27 (1)**
95:7
**27th (1)**
87:24

## 3

**3 (3)**
56:23,24;57:20
**307 (1)**

62:1
**37.17 (1)**
71:17
**37.20 (2)**
71:14,14
**37.25 (1)**
71:15
**37:23 (1)**
69:18
**3rd (1)**
5:17

## 4

**4 (3)**
56:23;57:1,21
**43.37 (1)**
72:21
**44 (1)**
72:4
**44.00 (1)**
72:4
**44.15 (1)**
72:18
**44.20 (1)**
72:18
**44.30 (1)**
72:13
**44.37 (2)**
72:10,21
**44.38 (1)**
73:1
**44.40 (1)**
72:17
**45.08 (1)**
73:25
**45.10 (1)**
73:20
**45.17 (2)**
73:11,19
**45.20 (1)**
74:6
**45.21 (1)**
74:23
**45.30 (2)**
74:16,20
**45.32 (1)**
75:2,13
**45.35 (2)**
75:7,16
**45.38 (2)**
75:22;76:23
**45.45 (2)**
76:18,21
**45.47 (2)**
77:9,14
**45.49 (1)**
77:3
**46.23 (3)**
77:20;78:1,7
**46.26 (2)**
78:6;79:5
**46.35 (2)**

78:25;79:3
**46.38 (1)**
79:10
**47.17 (1)**
80:6
**47.20 (1)**
80:11

## 5

**5 (5)**
56:23,24;57:6,21;
59:2
**50 (1)**
72:5
**523 (1)**
89:6
**528-hour (1)**
12:24

## 6

**6 (4)**
56:23,24;57:6,21
**645 (1)**
89:21
**67 (1)**
67:10

## 7

**715-418-9714 (1)**
63:25
**726 (1)**
95:7

## 8

**814 (3)**
30:9;31:7;35:19
**815 (1)**
31:8
**816 (2)**
30:10;35:19
**865 (1)**
36:1

## 9

**9 (2)**
65:8,21
**940 (2)**
35:24;36:25
**9th (4)**
4:14;5:10;10:15;
39:10