Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WISCONSIN


TREVOR DAVIS,

    Plaintiff,

  -vs-        Case No. 21-CV-565


CHRISTOPHER ALLEN,

    Defendant.

_____/

PAGE 1 TO 133


   The Deposition of THOMAS J. TIDERINGTON,

   Taken Magna Remote

   Commencing at 10:00 a.m.

   Monday, July 18, 2022,

   Before Gina A. Ruggeri CSR #7805.



*All parties appearing remotely, including the court

reporter.



Page 2

```
 1    APPEARANCES:
 2    RICHARD STUDENT
 3    MESHBESHER & ASSOCIATES
 4    9800 Shelard Parkway, Suite 310
 5    Minneapolis, Michigan 55441
 6    612.332.2000
 7    rich@stevemesbesher.com
 8         Appearing on behalf of Plaintiff.
 9
10    ANDREW A. JONES
11    HANSEN REYNOLDS
12    301 North Broadway, Suite 400
13    Milwaukee, Wisconsin 53202
14    414.326.4952
15    ajones@hansenreynolds.com
16         Appearing on behalf of Defendant.
17
18
19
20
21
22
23
24
25
```

Page 3

TABLE OF CONTENTS

```
 2    THOMAS J. TIDERINGTON                    Page
 3    Examination by Mr. Jones            4
 4    Examination by Mr. Student          52
```

INDEX TO EXHIBITS

(Exhibits attached to transcript)

| Exhibit | Description | Page |
|---|---|---|
| 1 | Report | 5 |
| 2 | Appendix one | 104 |
| 3 | Appendix two | 6 |
| 4 | Appendix three | 6 |
| 5 | Publication by the IACP | 19 |
| 6 | Document | 20 |
| 7 | DMJ publication | 20 |
| 8 | Article | 21 |
| 9 | Document | 127 |

Page 4

```
 1    Remote deposition
 2    July 18, 2022
 3    About 10:02 a.m.
 4         COURT REPORTER:  My name is Gina Ruggeri, a
 5    Michigan State notary public and certified shorthand
 6    reporter and this deposition is being held via
 7    videoconferencing equipment.  The witness, reporter,
 8    and attorneys are not in the same room.  The witness
 9    will be sworn in remotely pursuant to agreement of all
10    parties.  The parties stipulate that the testimony is
11    being given as if the witness was sworn in person.
12         Do you solemnly swear that the testimony you
13    are about to give will be the truth, the whole truth and
14    nothing but the truth?
15         THE WITNESS:  Yes.
16         THOMAS J. TIDERINGTON,
17    having first been duly sworn, was examined and testified on
18    his oath as follows:
19    EXAMINATION BY MR. JONES:
20    Q.   Good morning, Mr. Tiderington.  We didn't actually meet
21         before we started, but my name is Andrew Jones.  I'm an
22         attorney here in Milwaukee representing the defendant
23         in this matter, Christopher Allen.  I know you've been
24         deposed before so I'll dispense with the usual
25         instructions.  Because we're doing this by video
```

Page 5

```
 1    conference sometimes the audio can be an issue.  If,
 2    for whatever reason, you don't hear one of my
 3    questions, please let me know.  Is that understood?
 4    A.   It is understood, yes.
 5    Q.   And I'll try and move quickly through this, but that's
 6         relative.  If you need a break at some point, just
 7         please let me know.
 8    A.   I will.  Thank you.
 9    Q.   So let me start.  Are you able to see my screen, Mr.
10         Tiderington?
11    A.   I do.  Yes, I can see it.
12    Q.   So I have put up on the screen what I will mark as
13         Exhibit 1 for the deposition, which I understand to be
14         a copy of your report in this matter, and the
15         attachments or appendices which are 34 pages in length.
16         Do you recognize the document as your report?
17    A.   I do.
18    Q.   Okay.  So I put up on the screen now part of what was
19         or what will be marked as Exhibit 1, and that is
20         appendix one to your report.  Do you recognize the
21         document?
22    A.   I do.
23    Q.   And appendix one, if I understand it correctly, that's
24         a copy of your CV, is that correct?
25    A.   That is correct.
```



Page 6

1   Q.  And I have on the screen now what I will mark as
2       Exhibit 3, which is appendix two to your report.  Do
3       you recognize the document?
4   A.  Yes, I do.
5   Q.  And appendix two, is that a copy of your fee schedule
6       for your work in this case and then also a list of your
7       prior testimony experience as an expert?
8   A.  That's correct.
9   Q.  And then lastly, I'll show you what I'll mark as
10      Exhibit 4 for the deposition, which is appendix three
11      to your report.  Do you recognize the document?
12  A.  Yes, I do.
13  Q.  Is appendix three, what I will mark as Exhibit 4, a
14      list of the materials you reviewed in the course of
15      your work as an expert in this matter?
16  A.  That's correct.
17  Q.  And those are all documents you've reviewed in
18      preparing your report, is that correct?
19  A.  Yes, it is.
20  Q.  And in reaching the opinions that you have as an expert
21      witness in this case?
22  A.  That's correct.
23  Q.  I'll go back to Exhibit 1.  And, obviously, it's 34
24      pages long so if at any point you want me to move
25      within the document just let me know, okay?

Page 7

1   A.  I also, just to let you know, I do have a copy of it
2       printed out, if you don't mind if I refer to that
3       versus on the screen?
4   Q.  No.  Understood.  That was going to be my next
5       question, whether you had a copy in front of you.  By
6       all means, either refer to the printed copy if that's
7       easier or if you want me to move within the document on
8       the screen, that's also fine.
9   A.  Okay.
10  Q.  The report that you prepared in this matter, Exhibit 1,
11      does that express all of your opinions as an expert
12      witness at this time in this case?
13  A.  It does.
14  Q.  And is it a complete and accurate account of those
15      opinions?
16  A.  Yes, it is.
17  Q.  Exhibit or appendix three, Exhibit 4 for the
18      deposition, is that a complete list of all of the
19      materials that you reviewed in preparing your report?
20  A.  Yes, it is.
21  Q.  It's noted as being current as of June 11th of 2022.
22      Have you reviewed any materials since in connection with your
23      work in this case, since June 11th?
24  A.  Yes.  There's been some additional information provided
25      such as some case studies or some case law.

Page 8

1         MR. STUDENT:  And I'm going to put an
2      objection on the record to the extent we might be
3      talking about communications or materials that are
4      protected under Rule 26 as either attorney/expert
5      communications, expert work product or attorney work
6      product.
7   BY MR. JONES:
8   Q.  Are there any other materials, beyond those that are
9      listed in appendix three, to your report that you have
10      reviewed since June 11th --
11         MR. STUDENT:  Same objection.
12         MR. JONES:  I'm sorry.  I'm not done quite
13      done with the question, Rich.
14         MR. STUDENT:  I'm sorry.
15  BY MR. JONES:
16  Q.  That identify any facts in connection with the
17      underlying events?
18  A.  Just as a point of clarification, the items listed in
19      appendix three are the items that were provided to me
20      by counsel.  If you look at my report on page four
21      there's some additional documents that I referenced in
22      there that I considered in reaching my opinions.
23  Q.  And going back to the fact that there are some
24      materials that you have reviewed in connection with
25      your work since the date of appendix three, June 11th,

Page 9

1      are there any materials that you reviewed since then
2      that identified or provided you with any facts relating
3      to the events at issue in this lawsuit?
4   A.  No.
5   Q.  In your work in this case, did you review any
6      photographs relating to the scene of the events at
7      issue in this case?
8   A.  I did, yes.
9   Q.  And what did those photographs relate to?
10  A.  The incident involving the apprehension of Mr. Davis
11      and the injuries that he sustained.
12  Q.  So aside from photographs of injuries to Mr. Davis,
13      what photographs did you review?
14  A.  I believe those were the photographs that I reviewed.
15  Q.  Did you review any photographs of the trailer or the
16      inside of the trailer?
17  A.  I know I reviewed the video that depicts the inside of
18      the trailer.  I don't know if there were still photos.
19      If there were still photos, I would have reviewed
20      those.
21      But as we're talking here this morning, do you
22      specifically recall reviewing any photographs of the
23      inside of the trailer or still shots of the inside of
24      the trailer?
25  A.  I don't know.  I would have to go and look.  If we want



Page 10

1    to do that on a break, I could go back.  I don't know
2    if it was video or still photos.  I know it was video
3    for sure, and I believe there may have been still
4    photos as well, but I can't be certain unless I go back
5    and look at the documents that I reviewed.
6    Q.   I'm going to ask you some questions about your process
7         as an expert witness.  In reviewing the materials that
8         are listed in appendix three to your report or as you
9         note the various publications that you referred to in
10        your report, did you keep notes?
11   A.   No, I don't -- the only notes I have were basically
12        communications between myself and Mr. Student.
13   Q.   And by that do you mean e-mails or do you mean notes of
14        conversations between the two of you?
15   A.   Notes of conversation --
16   Q.   Okay.
17   A.   -- between the two of us.
18   Q.   And do you have any notes relating to your work as an
19        expert in this matter, outside of your notes, of those
20        communications?
21   A.   No, I don't.
22   Q.   Was anyone, other than you, involved in preparing your
23        report in this matter?
24   A.   No.  As a point of clarification on the last question,
25        other than my wife who's the proofreader.  She may

Page 11

1    have.  I don't recall if she proofread this or not, but
2    if she did it was certainly just for formatting and
3    sentence structure.
4    Q.   I have someone else proofread sometimes.  I understand.
5         Did your wife provide any input or assistance in
6         connection with your work in this matter, aside from
7         simply proofing your report for grammar, syntax, et
8         cetera?
9    A.   She did not.
10   Q.   I want to ask you about a particular paragraph in your
11        report.  On page three, the last paragraph above the
12        introduction header starts, opinions that I present in
13        this report?
14   A.   Yes.
15   Q.   You write in that report or rather in that sentence,
16        use of specific/similar legal terminology is not
17        intended to draw legal conclusions or to subvert the
18        function of the Court or to inappropriately influence
19        triers of the fact, correct?
20   A.   That is correct.
21   Q.   And you understand, of course, that the ultimate issue
22        or question in this case is whether or not Deputy Allen
23        used excessive force in deploying his canine, correct?
24   A.   Well, whether the force was reasonable, yes.
25   Q.   And so, I guess, to put it differently then whether or

Page 12

1    not the force used by Deputy Allen was objectively
2    reasonable under all of the circumstances, yes?
3    A.   I would agree with that.
4    Q.   And so when you offer the opinion in your report that
5         the force used by Deputy Allen was excessive or
6         unreasonable are you intending, when you use those
7         terms, for them to be coterminous with the fourth
8         amended?
9              MR. STUDENT:  Object on form grounds.  Go
10        ahead and answer.
11   A.   I'm not sure I understand the question.
12   BY MR. JONES:
13   Q.   Well, you say in your report that you do not intend to
14        offer legal conclusions or to interfere with the rule
15        of the Court or the trier of fact, correct?
16   A.   That is correct.
17   Q.   So when you use or offer the opinion in your report
18        that the force used by Deputy Allen was not reasonable
19        and was excessive do you mean that or do you mean to
20        say with those terms that the force used was not
21        reasonable and excessive under the fourth amended or do
22        you mean it in some other way?
23   A.   I think I mean it in some other way.
24   Q.   And how do you mean it then?
25   A.   I mean it as police practices practice expert and being

Page 13

1    in the field of law enforcement for over 44 years on
2    how a other perhaps well trained officer would have
3    reacted in a similar situation.  So I don't mean it --
4    I mean it comparing the activities of what other police
5    officers would have done faced with the same
6    circumstances.
7    Q.   You do not mean to say when you offer the opinion that
8         the force used by Deputy Allen was not reasonable and
9         was excessive that it violated the fourth amendment?
10             MR. STUDENT:  I'm going to object to form and
11        to the extent it mischaracterizes the report or his
12        testimony.  You can go ahead and answer.
13   A.   Yeah, I'm not going to -- I don't think I want to get
14        into a debate about the fourth amendment.  I think I
15        want to focus on the police practices and whether or
16        not it was appropriate use of force.
17   Q.   So just to be very, very clear, you are not offering
18        the opinion that the force used was excessive or not
19        reasonable under the fourth amendment?
20             MR. STUDENT:  Same objection.
21   A.   Under the Graham standard is what I compared it to.
22   BY MR. JONES:
23   Q.   You're saying that the force used was not reasonable or
24        was excessive under the standard articulated by the
25        Supreme Court in Graham -v- Connor?



Page 14

1    A.  That's correct.
2    Q.  So then how is it that that's different than saying
3        that the force used was excessive or not reasonable
4        under the fourth amount?
5    A.  I'm not saying that.  I think you asked me when I
6        prepared the report what I was comparing it to, and I
7        was comparing it to police practices or my
8        understanding of what is reasonable based on what other
9        police officers would have done faced with the same set
10       of facts and circumstances.
11   Q.  I just want to understand whether or not you're
12       offering an opinion that the force used by Deputy Allen
13       was excessive or unreasonable under the fourth
14       amendment?  Are you or are you not offering that
15       opinion?
16   A.  I think I answered that.  I believe that I compared it
17       to the Graham standard, and that would be my answer on
18       that.
19   Q.  The Graham standard articulates the level of force
20       that's reasonable under the fourth amendment.  How is
21       it that you are not offering the opinion that the force
22       used here was excessive or not reasonable under the
23       fourth amendment?
24           MR. STUDENT:  I'm going to object on grounds
25       of form, and that this is argumentative, and the

Page 15

1        question has been asked and answered, and to the extent
2        it mischaracterizes his testimony, and the disclaimer
3        that's in his report that you referenced, counsel.
4    BY MR. JONES:
5    Q.  Go ahead and answer, sir.
6    A.  I do believe I answered.  I don't know how else I can
7        answer, other than what I have already provided.
8    Q.  When you offer the opinion that the force used by
9        Deputy Allen wasn't consistent, in your view, with the
10       force that a reasonable officer would have used under
11       the same circumstances am I correct in understanding
12       that you are offering the opinion that the force was
13       inconsistent with the standard articulated in Graham?
14   A.  I am.  That's correct.
15   Q.  Is there any difference between your view of what
16       typical or normal police practices would have dictated
17       in this situation relative to the use of the canine and
18       what you understand the Graham standard to be?
19           MR. STUDENT:  Object as to form.  Go ahead
20       and answer.
21   A.  Yes, I believe there's a difference between what a
22       reasonable officer would have done and what the officer
23       did in this particular case.
24   BY MR. JONES:
25   Q.  I think my question may not have been clear.  I

Page 16

1        understood you in a prior answer to say that the
2        opinions you're offering in this case relate to what
3        typical or normal police practices would have dictated
4        in terms of the use of force in this situation.  Did I
5        understand you correctly?
6    A.  That's correct.
7    Q.  And so when you're articulating in your opinions what
8        normal or typical police practices would have dictated
9        in this situation is there any difference, in your
10       mind, between those normal or typical police practices
11       and what the Graham standard would dictate in this
12       situation?
13           MR. STUDENT:  Object to form.
14   A.  I'm not sure I fully understand the question.
15   BY MR. JONES:
16   Q.  Fair enough.  I'm trying to understand is there any
17       difference between what you believe typical or normal
18       police practices would dictate and what you understand
19       the Graham standard would dictate in this situation, is
20       there any difference between those?
21           MR. STUDENT:  Same objection.
22   A.  Well, it's the reasonableness of it, not necessarily
23       what a normal or typical officer would have done.  It's
24       what a reasonable officer would have done faced with
25       the same set of facts and circumstances.

Page 17

1    BY MR. JONES:
2    Q.  And when you talk about what normal or typical police
3        practices would dictate here you're essentially that's
4        a different way of saying what a reasonable police
5        officer would do in these same circumstances as
6        contemplated by the Graham standard?
7    A.  I -- I don't think so.  I mean I think it's the same
8        thing.  When you say normal or typical I'm not sure
9        what you mean by that, but I think the terminology is
10       what would a reasonable officer have done.
11   Q.  I want to ask you about some of the publications that
12       you mentioned in your report.
13   A.  Okay.
14   Q.  Starting at page four.
15   A.  Correct.
16   Q.  You talk on page four about publications that the
17       International Association of Chiefs of Police, the
18       IACP, through its national law enforcement policy
19       center, have published and that you referred to or
20       relied on in forming your opinions, yes?
21   A.  That is correct.
22   Q.  And at the bottom of page four there are six bullet
23       pointed subjects that I understand you to be saying
24       that the IACP has published on and that you referred to
25       or relied on in forming your opinions, yes?



Page 18

1   A.   That is correct.
2   Q.   There is -- there's specific reference later on in your
3        report to an IACP model policy about canines, correct?
4   A.   I believe so, yes.
5   Q.   And there is also specific reference in your report to
6        a use of force white paper put out by the IACP that you
7        referred to or relied on, correct?
8   A.   That is correct.
9   Q.   I didn't see other specific references to other IACP
10       publications so my question is:  As it relates to those
11       six bullet point subjects at the bottom of page four,
12       were there any other particular or specific IACP
13       publications that you relied on or referred to?
14  A.   No.
15  Q.   On page 15 of your report you refer to a model policy
16       from the IACP about canine use, yes, towards the bottom
17       of page 15?
18  A.   Yes.
19  Q.   Do you know what year that policy was from?
20  Q.   Are you talking about the bark and hold, the second
21       paragraph from the bottom?
22  Q.   In that paragraph you state, IACP's model policy
23       regarding canine unit utilization, and then you go on
24       to describe it.  And I'm asking what year that model
25       policy is from?

Page 19

1   A.   I don't know offhand.  I would have to look at that and
2        get back with you.  I could make a note and let you
3        know, if we take a break.
4   Q.   I'm going to share my screen again.  Can you see the
5        screen?
6   A.   I can.
7            MR. STUDENT:  Again, I think my screen is
8        frozen up.  Can you guys hear me?
9            THE WITNESS:  I can hear you.
10           MR. JONES:  Are you good, Rich?  Can you hear
11       us, Rich?  Can you still see and hear us?
12           MR. STUDENT:  Yeah.  Yeah.  I'm good.  Sorry.
13  BY MR. JONES:
14  Q.   So I've got up what I will mark as Exhibit 5, Mr.
15       Tiderington, which I understand to be a publication by
16       the IACP on patrol canine from May of 2015, which I
17       also understand to include a model policy and a concept
18       and issues paper.  Are you familiar with this document?
19  A.   I am.
20  Q.   Is that or does this document, Exhibit 5, include the
21       model policy that you were referring to in your report?
22       If you need me to scroll through it, I'm happy to.
23  A.   It does, yes.
24  Q.   In footnote 11 of your report you refer to a guidance
25       document put out by the Police Executive Research

Page 20

1        Foundation, if I've got the name right?  Do you see
2        that reference?
3   A.   I do.  PERF, yes.
4   Q.   I'm still showing my screen.  I put up what I'll mark
5        as Exhibit 6, which is a copy of a document titled
6        guidance on policies and practices for patrol canines
7        from PERF.  Do you recognize that document?
8   A.   I do.
9   Q.   And is that what you were referring to in footnote 11
10       to your report?
11  A.   Yes, it is.
12  Q.   And that's the same document you were referring to into
13       the in footnote 17 of your report?
14  A.   Yes.
15  Q.   In footnote 16 you referred to a US Department of
16       Justice publication from 2001, correct?
17  A.   I did.
18  Q.   I put on the screen what I'll mark as Exhibit 7, a DMJ
19       publication from January 2001, Principals for Promoting
20       Police Integrity.  Do you see that on the screen?
21  A.   I do.
22  Q.   Is that the document you were referring to in footnote
23       16 of your report?
24  A.   It is, yes.
25  Q.   And last one of these on or rather on footnotes 14 and

Page 21

1        15 of your report you referred to a paper authored by a
2        Charlie Mesloh, yes?
3   A.   That is correct, yes.
4   Q.   And I'll put on the screen what I'll mark as Exhibit 8,
5        a September 2006 article authored by Charlie Mesloh.
6        Do you see what I have on the screen?
7   A.   I do.
8   Q.   And is that the same article that you were referring to
9        in your report?
10  A.   It is.
11  Q.   Were there any other articles or publications relating
12       to the use of canines in law enforcement that you
13       relied or on or referred to in forming your opinions
14       and drafting your report, other than those that are
15       specifically listed in your report?
16  A.   No.  Just the ones listed in my report.
17  Q.   Outside of the articles, publications that you refer to
18       in your report, are there any other publications
19       relating to the use of canines in law enforcement that
20       you consider to be authoritative on the subject?
21  A.   No.  Other than what I relied upon.
22  Q.   And those publications that you did refer to in your
23       report, do you consider them to be authoritative on the
24       subject of the use of canines in law enforcement?
25  A.   For the most part, yes.



Page 22

1   Q.   What do you mean by for the most part?
2   A.   Well, I may not necessarily agree with everything
3      that's in every word of every document. I've
4      identified the areas that I do agree with and included
5      in my report.
6   Q.   Having reviewed those articles and other publications
7      in your work in this file or in this matter, are there
8      any portions of those articles or publications that you
9      specifically disagree with?
10         MR. STUDENT: Object to form.
11   A.   I can't think offhand without reading every word, but
12      for the most part I agree with the concept of the
13      documents that I've listed in my report.
14 BY MR. JONES:
15   Q.   I wanted to ask you about in footnote five of your
16      report you refer to a bar review article from the
17      University of Pittsburgh law review. Do you recall
18      that?
19   A.   I do, yes.
20   Q.   And the tech that footnote ties into, to my
21      understanding, was an observation you were making
22      relating to the fear that a canine, particularly the
23      canine that's biting a subject, will induce in that
24      subject, yes?
25   A.   That's what the reference is, yes.

Page 23

1   Q.   Okay. And is that a point or a reference that you
2      agree with?
3   A.   It is.
4   Q.   And so can you explain to me how that reference ties
5      into this case and your opinions in this case?
6   A.   Sure. Essentially, when a dog is biting a person, and
7      I had experience in working with canines during
8      training exercises, certainly individuals react to a
9      vicious dog coming towards them. And often times their
10      reaction causes the canine to become even more
11      aggressive. And that's essentially what I was speaking
12      to in that paragraph.
13   Q.   The fact that that -- the fact that that can occur, how
14      did that factor in or relate to your opinions in this
15      case, if at all?
16   A.   Well, certainly it factored into the -- the Officer
17      Allen was directing Davis to do things that were either
18      from a practical standpoint impossible for him to do or
19      not consistent with somebody that was being attacked by
20      a dog, you know, stop fighting my dog. When somebody
21      is biting you a normal reaction is to try to get the
22      dog to stop biting you. It doesn't necessarily mean
23      he's fighting the dog. It means he's reacting to it in
24      a way that somebody that's afraid of being bitten is
25      going to react.

Page 24

1   Q.   The point of that observation or that reference in that
2      article was relevant and factored into your opinions in
3      this case in the sense that it explains potentially Mr.
4      Davis' response to the fact that he was being bitten?
5   A.   Partially. It also explains how, in my experience, how
6      people react when they're being attacked by a police
7      canine.
8   Q.   Is there any other relevance or importance to that
9      observation or point in connection with your opinions
10      in this case, other than what you've described for me?
11         MR. STUDENT: Object to form. You can
12      answer.
13   A.   It's relevant to my opinions throughout the report,
14      yes.
15 BY MR. JONES:
16   Q.   Well I'm simply trying to understand how. So if there
17      are other ways that it's relevant could you explain
18      those to me?
19   A.   Well, I guess, the example of when Koda was placed up
20      in the attic by another dog handler it attacked an
21      individual that was hiding in the attic, and that
22      officer was telling him to stop moving around, to hold
23      still, because the dog's trained to attack based on
24      movement. And on the one hand he's directing Koda or
25      directing the suspect not to move, but on the other

Page 25

1      hand the dog is biting him and what do you expect a
2      person to do that's being bitten by a dog? It's a
3      rhetorical question. I know you're not here to answer
4      my questions, of course.
5   Q.   Are there any other ways that that point or observation
6      made in the Pittsburgh law article was relative to your
7      opinions in this case?
8   A.   There may have been. I would have to read the article
9      again, but that was essentially the importance of that
10      article or that section of the article is relevant to
11      my opinion.
12   Q.   I want to ask some questions about your understanding
13      of the facts or the events underlying this lawsuit.
14   A.   Okay.
15   Q.   Am I correct that this set of events began with an
16      anonymous call to the Barron County dispatch about the
17      location of Mr. Davis?
18   A.   That is my understanding, yes.
19   Q.   And this was a call that was shortly before midnight on
20      that night, correct?
21   A.   I believe so, yes.
22   Q.   And the call essentially reported that Mr. Davis was at
23      or on this property connected with David Haseltine,
24      correct?
25   A.   That is correct.



Page 26

1  Q.  And at the time Mr. Davis was wanted on several
2      outstanding arrest warrants, correct?
3  A.  That's my understanding, yes.
4  Q.  What were those warrants for, if you know?
5  A.  I don't know the details.  It appeared one was a felony
6      warrant for perhaps armed robbery, I believe, according
7      to the police report.  And the other matters perhaps it
8      appears to be some type of a domestic.  Again, I did
9      not have information about the details of what the
10     warrants were for, but according to the police reports
11     that was my takeaway from that.
12 Q.  Well, do you have any reason to dispute that one of the
13     arrest warrants was for felony armed robbery?
14 A.  That's what I believe it was for, yes.
15 Q.  Okay.  And do you have any reason to dispute that the
16     second of the three warrants was for felony possession
17     of methamphetamine?
18 A.  That's what was indicated in the police report.
19 Q.  Okay.  And the last one, do you have any reason to
20     dispute that was for charges of felony strangulation
21     and suffocation, felony false imprisonment, felony
22     aggravated battery, disorderly conduct, and multiple
23     counts of felony bail jumping?
24 A.  I don't have any reason to dispute that.
25 Q.  Would you agree that those charges relating to those

Page 27

1      arrest warrants were included serious felonies?
2  A.  I would -- yes, they were felonies.  Serious, I guess
3      you would have to -- each department may define it
4      differently, but certainly in my definition it would be
5      serious felonies, yes.
6  Q.  And would you agree that those arrest warrants included
7      charges among them that were violent felonies?
8  A.  It appears so, yes.
9  Q.  When the officers arrived at the property Mr. Davis was
10     in a car in the driveway to the property with the
11     engine running, correct?
12 A.  That's my understanding, yes.
13 Q.  And when the officers arrived one of the squad cars
14     pulled into the driveway, correct?
15 A.  I believe so.  I don't know exactly, but according --
16     that sounds correct, yes.
17 Q.  And when that happened Mr. Davis responded by getting
18     out of the car and running into the trailer on the
19     property, correct?
20 A.  Apparently, yes.
21 Q.  And when he did that he did it because he knew the
22     officers had arrived at the property, correct?
23 A.  I have no way of knowing what he knew at the time.
24 Q.  Well, you read his deposition, correct?
25 A.  I did.  I don't recall that section, but --

Page 28

1  Q.  Okay.  Would you --
2  A.  -- I wouldn't argue the fact with you.
3  Q.  Okay.  I mean he ran because he didn't want to get
4      caught by the police, correct?
5  A.  That makes sense.  Again, I don't -- I can't say
6      exactly what he was thinking, but that would be a
7      conclusion that I would think is reasonable.
8  Q.  A reasonable officer at the scene would or might
9      conclude that Mr. Davis was running from them because
10     he did not want to get caught by them, correct?
11 A.  Certainly.  Yes.
12 Q.  And is it your understanding that at least one of the
13     officers had called out to him as he was running for
14     him to stop, yes?
15 A.  I believe so.  According to the police reports, yes.
16 Q.  So Mr. Davis' first move when the officers arrived was
17     to flee from them, correct?
18 A.  Apparently, yes.
19 Q.  And when he fled, again, he went into a trailer on the
20     property and into a back room in that trailer, correct
21     that trailer?
22 A.  That's my understanding, yes.
23 Q.  And is it your understanding that the officers, when
24     they approached the area outside that trailer, at least
25     initially they could hear two voices talking, two male

Page 29

1      voices talking in the trailer?
2  A.  I'm not sure if I remember that, but I -- perhaps, yes.
3  Q.  Would you have any reason to dispute that that was the
4      case?
5  A.  No.
6  Q.  And then several of the officers had an interaction
7      with David Haseltine at the front door to the trailer,
8      correct?
9  A.  That is my understanding, yes.
10 Q.  And at first Mr. Haseltine was in the trailer behind
11     the door, that is on the other side of the front door
12     of the trailer, correct?
13 A.  I believe so.
14 Q.  And then after some exchange of words he came out onto
15     the front porch, correct?
16 A.  I believe so.
17 Q.  And at first Mr. Haseltine told them, that is he told
18     the officers that he didn't know Trevor Davis, correct?
19 A.  I believe that's what he told them, that's correct.
20 Q.  And that was a lie, correct?
21 A.  Apparently, yes.
22 Q.  Mr. Haseltine told the officers that there was no one
23     other than him in the trailer, correct?
24 A.  I believe that's what he told the officers, yes.
25 Q.  That was also a lie?

MAGNA
LEGAL SERVICES

Page 30

1    A.   It would have been.
2    Q.   Mr. Haseltine then told the officers, after
3         acknowledging that he did know Trevor Davis, he told
4         them that Mr. Davis had been there but he was going,
5         yes?
6    A.   I believe that's what he told them, yes.
7    Q.   And that was a lie, correct?
8    A.   It would have been, yes.
9    Q.   He told them, that is Mr. Haseltine, told the officers
10        he did not know where Mr. Davis had gone, correct?
11   A.   I believe that's what told him, correct.
12   Q.   That was a lie?
13   A.   It would have been.
14   Q.   And Mr. Haseltine next told them that Mr. Davis
15        probably had gone into the woods, yes?
16   A.   I believe that's what he told them, yes.
17   Q.   Also a lie, correct?
18   A.   Correct.
19   Q.   Mr. Haseltine was covering for Mr. Davis, yes?
20            MR. STUDENT:  Object to form.
21   A.   It appears that that's what he was doing, that's
22        correct.
23   BY MR. JONES:
24   Q.   A reasonable police officer at the scene could well
25        have concluded that Mr. Haseltine was covering for Mr.

Page 31

1         Davis, correct?
2    A.   Correct.
3    Q.   Mr. Haseltine was obstructing their search for Mr.
4         Davis, correct?
5    A.   It appears so, yes.
6    Q.   And a reasonable officer well could have concluded
7         that, yes?
8    A.   Correct.
9    Q.   And the officers knew or learned from dispatch that Mr.
10        Haseltine was on probation, yes?
11   A.   According to the police report, that was correct.
12   Q.   Do you have any reason to dispute that?
13   A.   No.
14   Q.   And what was the probation for, if you know?
15   A.   I don't know.
16   Q.   Any reason to dispute that it was for a drug offense?
17   A.   I have no reason to dispute that.
18   Q.   Would that have been relevant to an officer standing
19        there outside Mr. Haseltine's trailer looking for Mr.
20        Davis, the fact that the trailer was owned or occupied
21        by someone on probation for a drug offense?
22   A.   It would or should have been part of the overall
23        assessment of the situation, correct.
24   Q.   And what reasonable inferences could an officer
25        standing there looking for Mr. Davis draw from that

Page 32

1         piece of information?
2             MR. STUDENT:  Object to form.  You can
3         answer.
4    A.   The fact that Haseltine was on probation?
5    BY MR. JONES:
6    Q.   For a drug offense.
7    A.   Well, there's a number of things that they could have
8         concluded that perhaps he was selling drugs from the
9         trailer, he was associating with other drug
10        traffickers, drug dealers, a number of factors that
11        they could have considered.
12   Q.   In your experience, which I understand to be roughly 40
13        years in law enforcement, someone selling drugs and
14        interacting with others in the drug trade, are those
15        individuals often armed?
16   A.   They could be, yes.
17   Q.   Could that have been a reasonable concern for an
18        officer standing in front of Mr. Haseltine's trailer
19        knowing that he was on probation for a drug offense?
20            MR. STUDENT:  Object to form.
21   BY MR. JONES:
22   Q.   Either that he was armed or that there were weapons in
23        his trailer?
24            MR. STUDENT:  Same objection.
25   A.   It would be a reasonable conclusion.

Page 33

1    BY MR. JONES:
2    Q.   And at some point Deputy Allen moved to the front of
3         the trailer, the front door I mean, and he issued
4         several canine warnings, correct?
5    A.   He did.
6    Q.   And that is to say that he yelled into the trailer that
7         he had a police canine and that he would release the
8         canine into the trailer if whoever was in the trailer
9         didn't come out, correct?
10   A.   That's correct.
11   Q.   And you watched or listened to the body camera
12        recording, yes?
13   A.   I did.
14   Q.   So you -- I paraphrase, but you heard the actual words
15        used by Deputy Allen, correct?
16   A.   Yes.
17   Q.   And the warning he gave, was that consistent with how
18        officers are trained to give canine warnings?
19   A.   It is consistent, yes.
20   Q.   And he gave that warning at least three times, correct?
21   A.   I believe it was three times, yes.
22   Q.   And is it your understanding that Mr. Davis, where he
23        was in the trailer, heard those warnings?
24   A.   I don't know if he heard them or not.
25   Q.   If --



Page 34

1    A.   I'm assuming he heard them though.
2    Q.   Your expectation would be, given the volume, the layout
3         of the trailer and the other circumstances, that he
4         would have heard those warnings?
5    A.   That's correct.
6    Q.   And your understanding would be that Mr. Davis knew the
7         officers were still on the property, yes?
8             MR. STUDENT:  Object to form.  You can
9         answer.
10   A.   It seems that he would have known that, that's correct.
11   BY MR. JONES:
12   Q.   And he knew the officers were still looking for him,
13        yes?
14            MR. STUDENT:  Same objection.
15   A.   I'm assuming that he did, yes.
16   BY MR. JONES:
17   Q.   I mean, again, I'm asking these questions with the
18        understanding that you reviewed his deposition
19        transcript as part of your work in the case?
20   A.   I did.
21   Q.   And Mr. Davis would have known that he was the only
22        person in the trailer, yes?
23   A.   That's correct.
24   Q.   And based on the warnings he knew that a dog was going
25        to be released into the trailer if he did not show

Page 35

1         himself, yes?
2    A.   That's correct.
3    Q.   And when Mr. Davis heard those warnings he did not come
4         out of the trailer?
5    A.   That's correct.
6    Q.   He did not show himself?
7    A.   That is correct.
8    Q.   He did not announce himself?
9    A.   That is correct.
10   Q.   So up until that point in time he was still trying to
11        evade the officers, correct?
12   A.   He was hiding from the officers apparently, yes.
13   Q.   And hiding is, to put it differently, evading, yes?
14   A.   Passively evading, I guess, yes.  I don't want to split
15        hairs with you, but yes.
16   Q.   He was not being compliant?
17   A.   That's correct.
18   Q.   And he was not attempting to surrender?
19   A.   Initially that is correct, yes.
20   Q.   And would you agree that he was not passively resisting
21        the officers at that time?
22   A.   Well, I believe hiding is passive resistance.
23   Q.   Why do you categorize hiding as passive resistance?
24   A.   Well, it's not active resistance where he's running,
25        jumping over fences, high speed chase.  He's simply

Page 36

1         hiding from the officers and hoping that he's not going
2         to be found.
3    Q.   He had actively run from the officers, correct?
4    A.   That's correct.
5    Q.   And would you characterize that as passive resistance?
6    A.   Well, in every scenario things change minute by minute
7         or second by second.  At the point that he decided to
8         hide from the officers I believe that was a form of
9         passive resistance hoping that the officers were not
10        going to find him.
11   Q.   What is your definition of passive resistance?
12   A.   Just that, that he's not making an overt attempt to get
13        away from the officers, he's not jumping over fences,
14        he's not in a high speed chase.
15   Q.   That's the point in time when Deputy Allen released the
16        dog in the trailer, yes?
17   A.   After the announcement, yes, he apparently released the
18        dog, yes.
19   Q.   And at that point in time, that is the point in time
20        when the dog is released in the trailer, would it have
21        been reasonable for an officer on the scene to believe
22        that Davis was suspected of having committed serious
23        and/or violent felonies?
24   A.   That's correct.
25   Q.   That would have been reasonable for an officer to

Page 37

1         believe?
2    A.   It would have been, yes.
3    Q.   And at least one of those having occurred through the
4         use of a weapon, correct?
5    A.   Apparently, yes.
6    Q.   Would it have been reasonable for an officer at the
7         scene, at that point in time, to believe that Davis was
8         potentially dangerous, either to them or to others?
9    A.   Yes.
10   Q.   Would it have been reasonable for an officer on the
11        scene at that point in time, again, when the dog was
12        released into the trailer, to believe that Davis was
13        potentially armed?
14   A.   That's correct.
15   Q.   And would it have been reasonable for an officer on the
16        scene, at that point in time, to be concerned that
17        there might be weapons in the trailer?
18   A.   Correct.
19   Q.   Would it have been reasonable for an officer on the
20        scene, at that point in time, to believe that Davis
21        knew they were there and was trying to flee or evade
22        capture?
23   A.   I don't believe he was fleeing.  I don't believe he had
24        any way to flee.  When we use the term flee that's
25        means he was going to be able to run away.  I don't



## Page 38

1  believe he had that ability.  Certainly, he was hiding
2  and he was hoping that they were not going it find him
3  is the conclusion that I drew from the police reports.
4  Q.  So would it have been reasonable for an officer at the
5     scene to believe at that point that Davis knew they
6     were there and was trying to evade capture?
7  A.  Yes.
8  Q.  Given all of the circumstances, including what
9     Haseltine had told the officer, the warnings that
10    Officer Allen had given at the doorstep, the size of
11    the trailer, and everything else that had occurred up
12    until that point, would it have been reasonable for an
13    officer at the scene to believe that if Davis was in
14    the trailer that he was the only person in the trailer?
15 A.  Well, I don't know how they would have known that.
16    There certainly could have been another person hiding
17    in the trailer.  I don't know that they had any way of
18    knowing that.
19 Q.  Is there anything in the facts that you understand
20    about this case that would have suggested to an officer
21    on the scene that there was, in fact, someone other
22    than Davis in the trailer?
23 A.  Well, the officers would have no way of knowing that.
24    I haven't seen anything that was --
25 Q.  I understand your point, but looking at it from a

## Page 39

1  different perspective, was there anything, as you
2  understand the facts, that would have suggested
3  affirmatively to an officer on the scene that there was
4  more than one person, that one being person being
5  Davis, in the trailer at the moment the dog was
6  released into the trailer?
7  A.  Affirmatively, no, but using your scenario of a known
8     drug house certainly officers, reasonable officers,
9     would have concluded that there could possibly have
10    been someone else in there, could have been a child in
11    there, could have been anybody else in there.  I'm not
12    saying that there was any affirmative evidence that
13    there were, but the officers had no way of knowing that
14    at the time.
15 Q.  Even if the officers -- strike that.
16        You would agree then that there were no
17    facts, at least as you understand them, that would have
18    affirmatively suggested to the officers that there was
19    someone else besides Davis in the trailer.  Do you
20    agree with that?
21 A.  I do agree.
22 Q.  I'm going to ask you some questions about the trailer
23    itself.  So I'll share my screen again.  And I'm
24    showing you or I have up on the screen what was marked
25    as Exhibit 1 at Mr. Davis' deposition.  I'll scroll --

## Page 40

1  it's nine photographs and I'm scrolling through.  Have
2  you seen these photos before?
3  A.  I believe I seen some of those.  Some of those appear
4     to be new to me, but for the most part, yes, I've seen
5     those photos.
6  Q.  Are you able to identify the ones you've seen and those
7     that you haven't?
8  A.  Not really.  I don't know if I've ever seen that photo,
9     the one that is currently on the screen, but certainly
10    so I didn't -- I believe in the video, but I may have
11    seen it.  I may have reviewed it and just don't recall.
12 Q.  Fair enough.  So this first photo which is page one of
13    Exhibit 1 of Mr. Davis' deposition, what do you
14    recognize that as showing, if you know?
15 A.  It appears to be the interior of the trailer.
16 Q.  What from what vantage point?
17 A.  I don't know that.
18 Q.  I'll show you the second photo.  Have you ever seen
19    this before?
20 A.  I believe so, but I don't know if it was the exact
21    photo, but a similar photo perhaps.  Maybe it was the
22    same one, yes.
23 Q.  What does it depict?
24 A.  It appears the kitchen area and perhaps the hallway of
25    the trailer.

## Page 41

1  Q.  When you say perhaps the hallway do you know if --
2  A.  I'm sorry.  Go ahead.
3  Q.  Well, that's probably as clear of question as I can
4     ask.  Do you know what that shows, other than the
5     kitchen?
6  A.  Other than what's obvious, no.
7  Q.  Do you know what's at the end of that hallway?
8  A.  It appears to be a bathroom.
9  Q.  The third picture of the nine, what does that show?
10    Well, strike that.
11        Have you seen this before?
12 A.  It's the same photo -- the photo you have on the screen
13    is the same one that we just discussed.
14 Q.  Okay.  The fourth photo, have you ever seen this one
15    before?
16 A.  I'm not sure.
17 Q.  Fifth photo, have you ever seen that one before?
18 A.  It looks familiar.  I certainly seen it either in video
19    or in still photo, yes.
20 Q.  And what does it depict, other than the obvious that
21    that is a mirror and a sink?
22 A.  I believe that is the entrance to the back bedroom
23    where Mr. Davis was apprehended.
24 Q.  And this photo, what does that show?  Strike that.
25        Have you ever seen this one before?



Page 42

1  A.  I believe so, yes.
2  Q.  And what does it show?
3  A.  The narrow entranceway into the bedroom where Mr. Davis
4     was apprehended.
5  Q.  The seventh photo, what does that depict?
6  A.  That was the area where Mr. Davis was apprehended.
7  Q.  Same for the eighth photo?
8  A.  I believe so, yes.
9  Q.  And the ninth photo, that's of that same entryway with
10    a tape measure, yes, showing the width of the gap
11    between what looks like a box spring and the frame of
12    the doorway?
13  A.  Yes.
14  Q.  Have you ever seen that before?
15  A.  I believe so, yes.
16  Q.  So going back to the second picture, is it your
17    understanding based on the fact that this is sort of
18    the view of the trailer the officers would have had
19    when they first came in through the door?
20  A.  That's my understanding, yes.
21  Q.  And so Mr. Davis would have been down this hallway in
22    that back bedroom at the time, correct?
23  A.  That's my understanding.
24  Q.  And it's your expectation, as an experienced police
25    officer, that the officers standing from this vantage

Page 43

1     point would have been able to see Mr. Davis?
2  A.  It does not appear that they would have been able to
3     see Mr. Davis.
4  Q.  This third photo is roughly the same vantage point but
5     a little bit closer towards the start of that hallway,
6     correct?
7  A.  That's correct.
8  Q.  And to your understanding from this vantage point would
9     the officers have been able to see Mr. Davis?
10  A.  Probably not.
11  Q.  This third photo is in the hallway closer to the
12    bathroom and the end of the hallway, correct?
13  A.  That is correct.
14  Q.  And to your understanding would the officers have been
15    able to see Mr. Davis from this vantage point?
16  A.  I don't know that.  I know at one point they said that
17    they were able to see Mr. Davis so I don't know exactly
18    where they were standing when they were able to see
19    him.
20  Q.  Understood.  But from this vantage point do you think
21    an officer would be able to see Mr. Davis?
22  A.  I have no way of knowing.  Based on the photograph,
23    probably not.
24  Q.  And this vantage point is basically from the entrance
25    to the bathroom, correct?

Page 44

1  A.  It appears so, yes.
2  Q.  And from your understanding of the facts where was Mr.
3     Davis lying relative to the doorway into that back
4     bedroom, that is when the officers entered the trailer
5     and started moving back towards him?
6  A.  He was in that area that appears to be a bed next to a
7     closet, in that area.
8  Q.  He was somewhere in that back bedroom?
9  A.  That's me understanding, yes.
10  Q.  And my question was:  Specifically, where in the back
11    bedroom was he, to your knowledge, based on your review
12    of the facts?
13  A.  My understanding he was lying on the bed.
14  Q.  Where?
15  A.  I don't know that exactly.
16  Q.  To get from the kitchen to that back bedroom an
17    individual would have to go down the hallway into the
18    bathroom, then jog left, and then jog right to go
19    through the doorway into that back bedroom, correct?
20  A.  Apparently.  I don't know how many jogs they would have
21    to do.  I don't know if it's a straight shot from that
22    hallway through where that picture is showing where the
23    mattress is, whether they have to jog right or left at
24    that point.  I have no way of knowing that.
25  Q.  Well, certainly you don't just proceed down the hallway

Page 45

1     straight and go right into the bedroom, correct?
2  A.  I don't know that.
3  Q.  And you can't tell that from the pictures?
4  A.  Well, I can tell you go down the hallway and you have
5     to jog to the left, if you're standing in the bathroom,
6     but I guess I assume that that was the entranceway to
7     that bedroom back there.
8  Q.  The ninth picture is showing the measurement of the
9     opening between the box spring and the frame.  Do you
10    have any reason to dispute that's how wide that opening
11    was at the time the officers were trying to get into
12    that room?
13  A.  I have no reason to dispute that.
14  Q.  And the picture shows it to be about a 12 inch, 11 and
15    a half inch gap, correct?
16  A.  That's correct.
17  Q.  Now the back room of the trailer that Mr. Davis was in,
18    do you know whether or not it has any windows?
19  A.  I don't believe it did or I guess I should say it's my
20    understanding that there were no windows in there.
21  Q.  And that's based on what?
22  A.  I believe officer, one of the officer's depositions,
23    Officer Allen's deposition where they said that there
24    was no chance that Allen was going to be able to or
25    that Davis was going to be able to flee because there



Page 46

1   was no windows in the bedroom.
2   Q.   If there had been a window, that would have been a
3        potential way for Davis to continue to flee, correct?
4   A.   Perhaps.  I don't know how big the window would have
5        been.  If he was able to fit through it, perhaps.
6   Q.   In your experience as a law enforcement officer, if
7        there's a window some suspects will try and go through
8        the window to flee, correct?
9   A.   If it's large enough for them to get through.
10       Obviously, if it wasn't large enough my experience
11       would be that they wouldn't try to force themselves
12       through an opening that they could not get through.
13  Q.   Do you know whether Officer Allen or Sergeant Hodek
14       knew whether or not there were any windows in the back
15       bedroom as they entered the trailer?
16  A.   I believe officer -- the officer's testimony, Officer
17       Allen's testimony was that they knew that Davis could
18       not flee from that location is my understanding from
19       the testimony.
20  Q.   Other than your belief as to Officer Allen's testimony,
21       is there any other information you have about whether
22       or not the officers knew whether or not there was a
23       window in that back room?
24  A.   I did not see any reference to it or any evidence that
25       suggests that there was a window.  I would have to

Page 47

1   conclude that there was not.  Perhaps if there was, the
2   officers would have been attempting to look into that
3   bedroom from the exterior of the trailer, which would
4   have been a more tactical, sound way to approach the
5   situation.  So I have to assume that there was not.
6   Q.   Do you know whether or not there was a door to the
7        outside from that back bedroom?
8   A.   I don't know.  I don't -- I don't know if there was or
9        not.
10  Q.   Do you know whether or not there was a second door in
11       and out of that trailer, that is aside from the front
12       door, anywhere in the trailer?
13  A.   Based on the officer's deposition testimony I concluded
14       that there was not, that there was no ability for Mr.
15       Davis to flee from that back bedroom.  Whether there
16       was a door there or not, I have no way of knowing that,
17       other than what the officers testified to.
18  Q.   And do you know whether or not the officers knew as
19       they entered the trailer whether or not there was a
20       door either in the back bedroom or a second door
21       elsewhere in the trailer?
22  A.   That led out of the trailer?
23  Q.   Yes.
24  A.   They should have known that.
25  Q.   I'm not asking if they should have.  I'm asking if you

Page 48

1   know whether or not they knew?
2   A.   There was no indication in any of the reports that they
3        knew that so I concluded that there was not any means
4        for Davis to escape the from the back bedroom,
5        according to their testimony.
6   Q.   There was no mention of a second door so you concluded
7        that there wasn't?
8   A.   Well, I concluded based on Officer Allen's testimony
9        that Davis did not flee, he knew Davis could not flee
10       from that bedroom.  So I concluded that there was no
11       means of escape from a back bedroom according to
12       Officer Allen.  And can I -- perhaps -- and there was
13       no indication, based on the body camera, that there
14       were concerns that he was going to flee out a window or
15       another door because there was no communications from
16       Allen to any of the officers that were on the exterior
17       of the trailer to cover the back bedroom or to cover
18       the window or to cover the door.  So I don't believe
19       that that was a concern that they had at the time.
20  Q.   As we've seen in the pictures, the back bedroom was
21       cluttered, to say the least, yes?
22  A.   It appears so, yes.
23  Q.   There was a lot of bedding and clothing on the bed,
24       yes?
25  A.   Correct.

Page 49

1   Q.   There was some sort of cabinet or a set of drawers just
2        to the other side of the bed, correct?
3   A.   It appears to be, yes.
4   Q.   And there was a closet filled with clothes and other
5        items to the right of that set of drawers, yes?
6        MR. STUDENT:  I'll object to the extent it
7        might mischaracterize the photograph.  I don't know if
8        you want to look at the photograph, counsel.
9   BY MR. JONES:
10  Q.   Do you agree with my question?
11  A.   Well, it's my --
12  Q.   Do you remember my question?
13  A.   I remember it, but it perhaps would be easier if we
14       looked at the photograph and I could tell you exactly
15       what the photograph depicts.
16  Q.   Well, I'm guess I'm asking you, based on your
17       understanding of the facts of this case, was there a
18       closet in that bedroom filled with clothing and other
19       articles?
20  A.   My understanding, and again it's only based on my
21       viewing of the photographs that there was, yes.
22  Q.   And as the officers entered the trailer and moved to
23       that back room did they know whether or not there were
24       any weapons in the room?
25       MR. STUDENT:  Object to form.



Page 50

1  A.   There was no indication that they knew that the suspect
2       was armed or that there were weapons in there.  They
3       suspected that there could be, which was reasonable.
4  BY MR. JONES:
5  Q.   Would it be fair to say, based on your review and
6       understanding of the facts, that they were -- they did
7       not know whether or not there were weapons in that back
8       room?
9  A.   I'm assuming they did not believe there were weapons,
10      yes.
11 Q.   No.  My question is:  Based on your understanding of
12      the facts, your review of the facts in this case, did
13      the officers know whether or not there were weapons in
14      the back room?
15 A.   Well, based on their actions, I have to conclude that
16      they knew that there were not weapons.
17 Q.   Setting that aside for the moment, is there any other
18      evidence that would suggest that the officers knew one
19      way or the other whether there were weapons in the back
20      room?
21 A.   I concluded that they knew that there were not weapons,
22      based on their actions.
23 Q.   And what in their actions led you to believe that the
24      officers knew that there weren't weapons in the back
25      room?

Page 51

1  A.   Well, if they believed that the suspect Davis was in
2       the back room with a firearm or some type of a weapon,
3       they certainly would not have taken their vest off,
4       holstered their weapons, and walked into that back
5       bedroom area.  It makes absolutely no tactical sense
6       whatsoever.
7  Q.   And so from the fact that they took their tactical
8       vests off to get into the room you concluded that they
9       knew there weren't weapons in the room.  Is that a
10      correct understanding of your testimony?
11 A.   Well, their actions led me to believe that they did not
12      believe there were weapons in the room.  Otherwise,
13      they would not have made the tactical decisions that
14      they made to enter a room where, in their terms, an
15      individual that was barricaded you certainly just don't
16      holster your weapon, take off your vest, and walk into
17      a back bedroom if you believe the suspect is armed.
18 Q.   Other than from, again, taking off their tactical vests
19      and holstering their weapons, that led you to believe
20      that the officers knew there weren't any weapons in the
21      back room.  Is that your testimony?
22 A.   Well, I guess my testimony is that their actions
23      indicate to me that they did not believe that there was
24      a threat of weapons or they would not have acted as
25      they did.  They would have considered other tactical

Page 52

1       options instead of holstering their weapons, removing
2       their ballistic vests, and walking into a back bedroom.
3  Q.   And other than those three things, removing their
4       vests, holstering their weapons, and walking into the
5       back room, are there any other actions that lead you to
6       believe that they did not have a concern that there
7       were weapons in that back bedroom?
8  A.   There were other tactical options that they certainly
9       should have considered, such as backing out of the
10      trailer, calling for a SWAT team, introducing perhaps
11      chemical spray into the back bedroom.  There's a number
12      of things that if they truly believed that the suspect
13      was armed that their actions were inconsistent with the
14      reasonable tactical decision.
15 Q.   And calling a SWAT team, introducing chemical spray
16      into the back room, those are things that they would
17      have done while Koda had a bite on Mr. Davis.  Is that
18      your testimony?
19 A.   Well, there's a number of things.  If they believe that
20      a suspect was armed and they referenced that he was --
21      the reason for the use of force by the dog was they
22      believed he was in a barricaded position and possibly
23      armed, under those circumstances it would have been
24      reasonable for them to contain the location, set up a
25      perimeter, and request a SWAT time to respond if they

Page 53

1       truly believed that he was armed with a weapon and was
2       barricaded.  Certainly, they had the ability to recall
3       the dog and to reassess the situation at that point,
4       and they did not do that.  Let me just qualify my
5       answer.  If, in fact, they had the ability to verbally
6       recall the dog.  And I'm not convinced that they did.
7  Q.   Aside from -- let's set aside for the moment your view
8       of the decision that Officers Allen and Hodek made as
9       they got to the entryway to the back bedroom.  Would a
10      reasonable officer have been concerned, given
11      everything that they knew and that had occurred up
12      until the point that they entered the trailer, would a
13      reasonable officer have been concerned about the
14      presence of weapons in the back bedroom as he or she
15      moved down the hallway toward the back bedroom?
16 A.   They should have been concerned, absolutely.  And the
17      actions that they took are inconsistent --
18 Q.   Hang on.  Hang on, Mr. Tiderington.  Do you know
19      whether either of the officers observed any weapons, as
20      they moved down the hallway?
21 A.   There was some reference to a knife being seen or
22      observed, but I don't know if that was in the bathroom
23      or exactly where that was.
24 Q.   And at the point where the officer got to the back
25      bedroom Mr. Davis obviously had not been searched,



Page 54

1  correct?
2 A. He had not been, yes, that's correct.
3 Q. And would you agree that given the layout of the
4  bedroom and given the state of the bedroom, that is
5  relative to the clutter on the bed, in the drawers, and
6  in the closet, that it would be reasonable to be
7  concerned about the presence of weapons in that room
8  even standing in the doorway?
9 A. Absolutely.  I was surprised that they were not
10  concerned about that and perplexed that they were not
11  concerned about it.
12 Q. If you look at your report on page six?
13 A. Yes.
14 Q. There is a timeline that you give?
15 A. That's correct.
16 Q. Is that timeline drawn from something Mr. Student gave
17  you or is that your own sort of transcript, rough
18  transcript of the audio on the body camera footage?
19 A. It's -- I listened to it many times, and it's a rough,
20  as you phrased it, a rough transcript of what I
21  understood the exchange during this time period was.
22 Q. There were two officers that entered the trailer,
23  correct?
24 A. That's my understanding, yes.
25 Q. Officer Allen and Sergeant Hodek?

Page 55

1 A. That's correct.
2 Q. And when they entered the trailer they moved from the
3  entryway to the back room, correct?
4 A. They did.
5 Q. And I understand that-- I understand that you hold the
6  opinion that they should have or Officer Allen should
7  have released the dog sooner.  So my question is not
8  intended to get to that.
9 A. Wait a minute.  Clarify that statement.
10 Q. Sure.  I understand that one of your opinions is that
11  Officer Allen should have he released or called the dog
12  off Mr. Davis sooner than he did.
13 A. That's one of my opinions, yes.
14 Q. Okay.  And I understand the other or another of the
15  opinions to be that he should not have released Koda
16  into the trailer to begin with, correct?
17 A. That is correct.
18 Q. Okay.  So my question is not intended to get at the
19  issue of whether or not he released Koda quickly
20  enough.  Setting that aside, do you agree that the
21  officers moved quickly down the hallway?
22 A. After the dog had already engaged Mr. Davis or --
23 Q. Yes.
24 A. Did they move quickly?  I -- I think they moved as
25  quickly as they could, but then they realized that

Page 56

1  there were tactical options that they could not bypass.
2 Q. You mean they realized there was a blockage in the
3  doorway?
4 A. I call it tactical obstructions, yes, a blockage in the
5  doorway.  Well, they knew that perhaps before they
6  released the dog.
7 Q. Let me understand what you just said.  Are you saying
8  that the officers knew that the doorway was blocked
9  before they entered the trailer?
10 A. Not before they -- no.  No, not before they entered,
11  but once they entered they -- there was testimony that
12  the trailer was cluttered and many obstructions
13  throughout.
14 Q. Am I correct that as they moved down the hallway
15  Officer Allen was first and Sergeant Hodek was second?
16 A. That's my understanding, based on their testimony, yes.
17 Q. And Allen was sort of slightly to the right hand side
18  of the hallway and Hodek was behind him slightly to the
19  left hand side of the hallway?
20 A. I believe that was the testimony, yes.
21 Q. And do you know how long that hallway is?
22 A. I don't.
23 Q. Do you know how wide it is?
24 A. It looks fairly narrow.
25 Q. Beyond that, do you know?

Page 57

1 A. I don't.
2 Q. If an officer cannot see a subject, is it possible for
3  him to have deadly force cover?
4 A. I'm not sure I understand the question.
5 Q. Well, you refer in your report several times to what
6  you call deadly force coverage.  Do you know what I'm
7  talking about?
8 A. I do.
9 Q. What do you mean by deadly force coverage?
10 A. Well, it's when an officer is or has his weapon in a
11  ready position and has the ability to apply deadly
12  force if it's required.
13 Q. And the ability to apply deadly force would that be
14  line of sight unbroken by cover?
15 A. You would have to be able to see your target to shoot
16  at it, I guess, if I understand your question
17  correctly.  Yes, you don't shoot at anything unless you
18  are able to confirm a target.
19 Q. Now an officer trying to determine whether or not he
20  has identified and can see the target, does it matter
21  how much of the target the officer can see?
22 A. When you say does it matter, based on what -- based on
23  whether or not they use deadly force?
24 Q. No.  Based on whether or not it can be concluded or
25  judged that they have deadly force coverage?



Page 58

1   A.   Well, it changes moment to moment.  They may have it at
2        one point and may not have it at another point.
3   Q.   If all you can see of a suspect is a hand and you have
4        your weapon drawn, would that be considered having
5        deadly force coverage?
6   A.   It's -- it's -- I can't really answer that question.
7        It's -- if all that an officer can see is somebody's
8        hand, does that mean he has deadly force coverage,
9        perhaps, but the officer may have to move in order to
10       deploy deadly force.  Certainly, I'm not suggesting
11       that -- I'm sorry.  I'm not suggesting that an officer
12       would be shooting at a hand that's waving above
13       somebody's head.  They would have to certainly
14       determine a target before deadly force would be used.
15  Q.   If all the officer can see is the top of someone's head
16       and a hand, would you consider that officer to have
17       deadly force coverage?
18  A.   I would consider to have deadly force coverage when the
19       officer removes his weapon from the holster.  When he
20       decides to use that deadly force would be a decision
21       that the officer would have to make based on a number
22       of factors.  So --
23  Q.   Including what they can see of the subject, yes?
24  A.   From second to second, moment to moment, yes.
25  Q.   And that can change from second to second and moment to

Page 59

1        moment?
2   A.   It could, yes.
3   Q.   And if an officer can't see a subject at all is it
4        possible for him to have deadly force coverage on the
5        subject?
6   A.   If he can't see the suspect?
7   Q.   Yes.
8   A.   Well, certainly he could still have deadly force, the
9        ability to deploy deadly force if he needed to so his
10       weapon would be at the ready, and that would be
11       considered deadly force coverage.  Does he have the
12       ability to deploy deadly force I think is the question
13       you're asking versus whether or not he had deadly force
14       coverage.
15  Q.   Okay.  I apologize for being slow to understand, but --
16  A.   No, no worries.  That's what I'm here to --
17       Thirty years as a lawyer, but zero years as a law
18       enforcement officer.  So deadly force coverage, as you
19       use it in your report, is an officer having his weapon
20       out and at the ready?
21  A.   That's -- yes, that is correct.
22  Q.   And the ability to deploy deadly force coverage depends
23       on a number of other factors?
24  A.   Whether it's justified or whether it's reasonable, yes.
25  Q.   And among those would be whether or not the officer can

Page 60

1        see the suspect?
2   A.   Well, whether or not the suspect poses an eminent
3        threat and whether or not the officer has the ability
4        to safely and reasonably deploy deadly force would be
5        all factors that would have to be taken into
6        consideration, moving from coverage to actual
7        deployment of deadly force.
8   Q.   Does the issue of whether or not the officer can see
9        the suspect is that a factor in determining whether the
10       officer has the ability to deploy deadly force?
11  A.   Yes.
12  Q.   If an officer cannot see a subject, is it possible or
13       is it reasonable for him to deploy deadly force?
14  A.   It would be unreasonable.
15  Q.   If an officer does not have unobstructed line of sight
16       to a subject, is it reasonable for him to deploy deadly
17       force?
18  A.   Well, again, these are hypothetical questions that
19       you're asking and you say unobstructed.  There's many
20       times when deadly forced is used and you have a
21       somewhat obstructed view of your target.  Again, these
22       are hypothetical questions that you're asking so it's
23       all based on facts and circumstances that I'm not sure
24       at that moment based on the decision that they make on
25       whether or not deadly force is appropriate and whether

Page 61

1        it's reasonable.
2   Q.   Do you know whether or not Sergeant Hodek could see Mr.
3        Davis, as the two officers worked their way down the
4        hallway?
5   A.   There is testimony that both Allen and Davis, I'm
6        sorry, Allen and the sergeant at times did see Davis.
7        I don't know exactly when in the scenario that they
8        were able to see him, but both testified that at one
9        point they could see -- I think Allen said he
10       identified Davis as the suspect.  So it led me to
11       believe that he was able to see him, obviously.
12  Q.   I'm asking about Sergeant Hodek.
13  A.   I would have to review his deposition, but it's my
14       understanding is that he also was able to view Davis at
15       certain points in time during the encounter with Davis.
16  Q.   Are you saying that's based on Sergeant Hodek's
17       deposition?
18  A.   No.  I said I would have to review that to determine
19       that or I believe also in Allen's deposition there was
20       some reference to what the sergeant could see and not
21       see.
22  Q.   What was that reference?
23  A.   Again, I would have to review the deposition again to
24       clarify exactly what they could or could not see.
25  Q.   So as you sit here today now do you know what Sergeant



Page 62

1    Hodek could or could not see as they moved down the
2    hallway?
3  A.  I do not.
4  Q.  And do you know, as you sit here now, what Deputy Allen
5    could see of Davis as they moved down the hallway?
6  A.  Based on his report or deposition I believe he said
7    that he could see -- he identified Davis as the suspect
8    they were looking for.
9  Q.  Other than that, do you know what he could see as they
10    moved down the hallway?
11  A.  He mentioned that he could see that Davis had one hand
12    or both hands up in the air and that -- and he could
13    see his head or his face.
14  Q.  Beyond that, do you know what he could see?
15  A.  I do not.
16  Q.  Do you know whether or not the officers could see what
17    was in the immediate area surrounding Davis?
18  A.  I don't know.
19  Q.  If it is true they could not see what was in the
20    immediate area surrounding Davis, is it also true then
21    that they would not have been able to know or see what
22    Davis -- what was within his reach?
23          MR. STUDENT: Object to form.  Go ahead and
24    answer.
25  A.  That's correct.

Page 63

1  BY MR. JONES:
2  Q.  Do you know if the officers knew when they first
3    entered the trailer and started moving down the
4    hallway, do you know if they knew about the obstruction
5    in the doorway to the back room?
6  A.  When they first -- I mean they testified that they knew
7    that there was an obstruction.  I don't know when, as
8    they progressed down that short, narrow hallway, when
9    they realized there was an obstruction.  I think there
10    was testimony that the dog disappeared so they realized
11    that there was another back entrance or that there was
12    a barricaded entrance or doorway is my recollection of
13    their testimony.
14  Q.  You do not know when they realized there was a box
15    spring in the doorway, is that correct?
16  A.  That is correct.
17  Q.  In your report later on you talk about what you
18    described as verbal indications of surrender by Mr.
19    Davis, yes?
20  Q.  Can you point to what page you're referring to, just
21    so --
22  Q.  Page 18.  In the last three or four sentences you
23    wrote, was verbally indicating he was surrendering?
24  A.  That's correct.
25  Q.  And if we go back to page six, what of Mr. Davis' words

Page 64

1    do you base that conclusion on?
2          MR. STUDENT: Object to form.
3  A.  I base it on essentially the moment the canine began
4    biting him and he was screaming out in pain and asking
5    for help.  Help me please is certainly some of the
6    words that he used multiple times, and that certainly
7    is an indication to me that he is surrendering.
8  BY MR. JONES:
9  Q.  On page six in your chart or box of was what was said
10    you account or recount that Mr. Davis asked for help,
11    yes, several times?
12  A.  That's correct, yes.
13  Q.  And it's those words that you later on described in
14    your report as a verbal indication of surrender, yes?
15  A.  I would say so, yes.
16  Q.  Deputy Allen's direction or command, however you want
17    to characterize it, to Mr. Davis that he come out to
18    them?
19  A.  Correct.
20  Q.  And, you know, I understand your criticisms of that
21    direction or at least I understand what you're saying
22    in your report about that.  The question I want to ask
23    you though is:  That command that the subject or a
24    subject who has been apprehended by a canine, is that
25    consistent with how officers are trained to speak to a

Page 65

1    subject in that circumstance?
2  A.  I'm sorry.  Can you clarify that question?  Are
3    officers -- or I'm trying to clarify it so I understand
4    exactly what you're asking.  Are officers trained to
5    tell the suspect to do something that is physically
6    impossible when they're being bit by a dog?  I don't
7    think that's the training that most officers adhere to.
8  Q.  Whether or not officers are, as part of canine
9    training, are trained to give a command like that for
10    an individual who's been apprehended by a canine, are
11    they trained to tell the individual to come to them?
12  A.  While the dog is engaged and biting their arm, I don't
13    believe so.
14  Q.  Are there any circumstances where officers who are
15    getting canine training are trained to give a command
16    like that?
17  A.  If it's reasonable, but you can't expect that an
18    individual that is being attacked by a canine is going
19    to have the ability to simply walk out, calmly walk out
20    of a bedroom.  And, furthermore, there's some confusion
21    on whether or not Koda was trained to attack based on
22    movement and whether -- or whether or not -- well,
23    whether or not he was attacked based on the movement of
24    the suspect.  The situation where Koda was placed into
25    the attic the handler told the suspect don't move or if



Page 66

1    you keep moving he's going to attack you more.  He told
2    him not to move.  So what was Koda trained to do, to
3    attack based on movement or to attack or to allow the
4    suspect to simply walk away.  How does the dog know
5    that the suspect is not trying to flee or escape or --
6    none of it makes sense on what they asked the suspect
7    to do in this circumstance.
8  Q.  On page six of your report you say a couple of times
9    once that the officers claim that they were unable to
10   gain immediate access to the room and a second time
11   that Officer Allen claimed he was unable to get into
12   the room.  I want to ask you:  What do you mean when
13   you say they claim they couldn't get into the room?
14 A.  Well, that's what they wrote in their police reports.
15 Q.  So did you --
16 A.  I'm not disputing that that wasn't factual.
17 Q.  Okay.  Well, the way you phrased it led me to wonder.
18   Do you dispute that they were not able to get into the
19   room, at least initially, because of the obstruction in
20   the doorway?
21 A.  No, I don't dispute that at all.  And, likewise, Davis
22   was unable to walk out of the room with the canine
23   hanging on him through an opening of 12 inches.  So,
24   no, I agree with both of those.
25 Q.  If Koda had been released from Mr. Davis before he was

Page 67

1    -- well, strike that.
2        If Koda had been directed to release from Mr.
3    Davis before the officers were in the room, would the
4    officers have had the ability to control his movement,
5    that is Mr. Davis' movement?
6  A.  Certainly.
7  Q.  How would they have done that, if they were not in the
8    room at the time Koda was released?
9  A.  Well, and again this is hypothetical, but they
10   certainly -- Officer Allen testified that he had the
11   ability to call Koda off and have him sit and stay in
12   front of the suspect, and he decided not do that.  He
13   also said he had the ability to recall Koda.  And if he
14   would have recalled the canine back to him they simply
15   could have instructed Davis to come out with his hands
16   up.  And that's tactically -- would have been
17   tactically safer for the officer, and is something that
18   I believe any reasonable officer would have done based
19   on these circumstances.
20 Q.  If Koda had been released and Officer Allen or Sergeant
21   Hodek had given the direction to Davis to come out with
22   his hands up and Mr. Davis had chosen not to do that,
23   would the officer at that point, under that scenario,
24   have been able to physically control Mr. Davis'
25   movements at that point?

Page 68

1  A.  Certainly.  They could have redeployed the dog, easily
2    redeployed the dog or they could have made another
3    tactical decision and used other options that were
4    available to them if they really felt that they had a
5    barricaded armed suspect in the back room.
6  Q.  What would those other tactical options have been, if
7    Koda had been released and Mr. Davis had counteracted a
8    directive to come out with his hands up?
9  A.  Well, certainly the most obvious was they could have
10   redeployed the dog, if that was a decision that they
11   wanted to make.  I believe --
12 Q.  You said there were other tactical options beyond that.
13 A.  Yes.
14 Q.  What would those have been?
15 A.  Certainly.  The more acceptable options, I believe,
16   would have been for them, if they believed that he was
17   armed and barricaded as they said in the deposition and
18   in the report, that they should have treated it as it as
19   such.  They should have treated the situation as a
20   possibly barricaded gunman that was refusing to comply
21   with their request, and they should have either
22   deployed a team that was knowledgeable on how to safely
23   conclude and resolve the situation, such as a trained
24   SWAT team with a negotiator or they could have
25   introduced OC spray, perhaps they could have used their

Page 69

1    taser.  There were many other options that they could
2    have and certainly were better options for all involved
3    and even for the safety of the officers.  If they truly
4    believed he was armed, the tactical decisions they made
5    were inconsistent with generally accepted police
6    practices.
7  Q.  If Koda had been released while the officers were still
8    outside the room and Mr. Davis had not complied with
9    the directive to come out with his hands up, would the
10   officers in that moment have been able to control his
11   hands?
12       MR. STUDENT:  Object to form.  You can
13   answer.
14 A.  They would not have needed to control their hands.
15   They were in a position of -- there wasn't apparently
16   immediate eyesight for them.  They had the ability to
17   use deadly force if they needed to.  They simply should
18   have or could have commanded Davis to walk out with his
19   hands up, and if he refused to do so other tactical
20   options should have been considered.
21 Q.  My question is:  If they had called Koda off or Officer
22   Allen had called Koda off while the officers were still
23   outside the room and Mr. Davis had not complied with
24   the directive to come out, in that moment would the
25   officers have been able to control his hands?



Page 70

```
 1   A.  They didn't have the ability to control his hands when
 2       they went into the room with their weapons holstered
 3       and the ballistic vests off.  The dog had ahold of one
 4       arm.  As you pointed out when you were showing me the
 5       photographs that that bed was cluttered with all kinds
 6       of debris.  There could have been a weapon any place
 7       underneath that, and certainly Davis had the ability to
 8       access a weapon.  So it would have been much safer for
 9       the officers to treat it as a -- to treat it as a
10       tactical barricaded situation and to have the suspect
11       come out, especially since the fact that he was
12       obviously injured.  In all likelihood, he would have
13       complied.
14   Q.  Well, I don't think you answered the question I posed
15       to you.
16   A.  Okay.  I'm sorry.  I'll try to.
17   Q.  It's not a criticism.  If the officers or Officer Allen
18       had released Koda while he and Sergeant Hodek were
19       still outside the room and had directed Mr. Davis to
20       come out to them with his hands up, but he had not
21       complied with that directive, in that moment would the
22       officers have been able to control Mr. Davis' hands?
23   A.  No.  No.
24   Q.  So we talked generally about two opinions you hold in
25       this matter, one that Officer Allen should not have
```

Page 71

```
 1       released the dog into the trailer, and two that he
 2       should have called the dog off Mr. Davis sooner, yes?
 3   A.  Essentially, yes.
 4   Q.  And are those the two -- let me ask it a different way.
 5       Are there other opinions that you hold in this matter?
 6   A.  No.  Those are essentially the two opinions that I
 7       hold.
 8   Q.  Okay.  Why was it not reasonable for Officer Allen to
 9       release Koda into the trailer when he did?
10   A.  Well, first of all, based on the information I
11       reviewed, the officer did not have the ability to
12       verbally recall the dog at any time.  I have not seen
13       any evidence that suggests that he had the ability to
14       verbally recall the dog.  If he did not have the
15       ability to verbally recall the dog, he knew or should
16       have known that that dog was going to attack anybody
17       that it encountered in the trailer, and that he did not
18       have the ability to verbally recall it, and that he
19       would have to physically remove the dog from the
20       suspect.  And for those reasons I believe it was
21       unnecessary and unreasonable for him to release the dog
22       into a situation that he knew that he could not
23       control.
24   Q.  So aside from the fact that, in your words you haven't
25       seen any evidence that Officer Allen couldn't recall
```

Page 72

```
 1       Koda at his command, what other reasons are there for
 2       your conclusion that it was not reasonable for Allen to
 3       release Koda into the trailer when he did?
 4   A.  Well, and also as I stated in my report, I believe the
 5       dog was unpredictable and vicious.  Allen knew or
 6       should have known the dog bit a police officer.  And he
 7       should have known that he did not have full control
 8       over the use of force via the canine dog that he was
 9       deploying.
10   Q.  I hear you.  I've heard you say that.  What I want to
11       know is whether there are any other reasons beyond your
12       belief that he couldn't control the dog that lead you
13       to conclude it was not reasonable to release the dog
14       into the trailer?
15   A.  Well, and also that there were other tactical options
16       that should have been considered based on the totality
17       of the circumstances.
18   Q.  And those tactical options include calling for a SWAT
19       team?
20   A.  Well, he can't have it both ways.  He concluded or he
21       rationalized that the use of force was reasonable and
22       necessary because he believed the suspect Davis was
23       barricaded and armed.  If a suspect is barricaded and
24       armed it is, I would say, an automatic SWAT call out at
25       that time.  And it certainly would have been a
```

Page 73

```
 1       situation where he would have perhaps considered other
 2       better tactical options.  As you pointed out perhaps in
 3       your questioning early on, if there was a window into
 4       that back bedroom, I don't believe there was, but if
 5       there was then certainly the window should have been
 6       used as part of the tactical options to apprehend Mr.
 7       Davis in a way that was not only safer for Mr. Davis
 8       but safer for the police officers.
 9   Q.  So aside from calling a SWAT team, what other
10       alternatives, more reasonable tactical options were
11       there, aside from releasing the dog into the trailer?
12   A.  Well, if he knew or in my view he knew or should have
13       known that he did not have the ability to verbally
14       recall the dog or to control the dog, I believe they
15       should have considered perhaps -- I don't think it was
16       the best scenario, but they could have considered using
17       OC spray, they could have considered using a taser.
18       There was -- there was no need for urgency in this
19       situation.  If Davis was in that back bedroom, he
20       wasn't going any place.  They had the perimeter
21       established around the trailer.  There was no sense of
22       urgency that caused them to have to rush in and make a
23       split second decision on how to apprehend him.
24           Reasonable officers would have attempted to
25       diffuse the situation.  If they really believed he was
```



## Page 74

```
 1      in there, there were other options that they should
 2      have considered including allowing the dog to be kept
 3      on leash, on the lead, if he knew that he couldn't
 4      control it otherwise.
 5   Q.   Other than calling for a SWAT team, using OC spray,
 6      using a taser, and entering the trailer with Koda on a
 7      lead, what other more reasonable options existed, in
 8      your opinion?
 9   A.   Department negotiator.  Again, this is predicated on
10      the rational that Officer Allen claims in his testimony
11      that they believe the suspect was, again, barricaded
12      and armed.  Barricaded and armed means that you use
13      other alternative tactical -- you make other
14      alternative tactical decisions that are safe for the
15      officers so they don't have to use deadly force or that
16      -- to resolve it without the use of force, if possible.
17   Q.   Is there any other more reasonable options that you
18      would add to the list that you've already given me?
19   A.   I think the list that I gave you is pretty
20      comprehensive.
21   Q.   Do you know anything about the SWAT team for Barron
22      County?
23   A.   I don't know a lot about the SWAT team.  I know about
24      SWAT teams in general.  I was the chairman of our SWAT
25      team, and I've been using SWAT teams for over 40 years
```

## Page 75

```
 1      throughout my career.  So I'm very familiar with the
 2      use of SWAT teams not only in my own departments, but
 3      other departments.
 4   Q.   Do you know anything about the Barron County SWAT team?
 5   A.   I don't.
 6   Q.   And in terms of OC spray are you suggesting that from
 7      outside the trailer an officer would have deployed OC
 8      spray into the trailer?
 9   A.   I'm saying there's other options that should have been
10      considered, and that perhaps could have been one.
11   Q.   When you identify OC spray as another option what did
12      you mean?
13   A.   That chemical spray could have been deployed inside the
14      trailer.  Actually, let me add one more to the list.
15      And it is -- if you look at the use of force policy for
16      the Barron County Sheriff's Office, there is also
17      diversionary devices that could have been used to
18      safely have taken Mr. Davis into custody.  They chose
19      not to use a diversionary device, distraction device as
20      it's sometimes called, that's indicated in their own
21      policies and procedures, commonly known as a flash bang
22      device.
23   Q.   When you identify the use of a taser as another more
24      reasonable alternative what specifically do you mean?
25   A.   Well, when you're comparing use of force they knew or
```

## Page 76

```
 1      should have known that they would not have the ability
 2      to control the canine once it was released from the
 3      lead.  When they knew they didn't have the ability to
 4      control the dog what I'm suggesting is that other
 5      options should have been considered, up to and
 6      including a taser.
 7   Q.   And how would a taser have been deployed in this
 8      instance?
 9   A.   I'm not sure it could have been.  I think it should
10      have been considered.
11   Q.   Are there any other tactical options that you believe
12      they should have considered, beyond those you've
13      already identified?
14   A.   Beyond the several that I gave you, I'm sure there's
15      others.  There's other non-deadly use of forces that
16      are indicated in their use of force that I'm not
17      familiar with.  There's something called Bohra Bohra, I
18      believe.  I'm not sure exactly how that's utilized, but
19      it's certainly an option that they provide to their
20      deputies, and I'm not sure that it was considered or
21      why it wasn't considered.
22   Q.   On page 19 of your report you talk about deescalation?
23   A.   That's correct.
24   Q.   And you identify various forms of deescalation
25      techniques in the very last sentence, yes?
```

## Page 77

```
 1   A.   I do, yes.
 2   Q.   Would you agree that command presence was used in this
 3      instance?
 4   A.   Well, command presence, meaning the show of force, I
 5      don't believe was used adequately.  It was used
 6      briefly.  There was no sense of urgency.  There was no
 7      reason to have to immediately go into a use of force
 8      situation.  So I don't believe it was used
 9      appropriately, no.
10   Q.   What is command presence, to your understanding?
11   A.   It's a term that I use to identify a show of force, a
12      number of officers on the scene, the fact there that
13      was a perimeter, there was no way for the individual to
14      escape, even if he had the ability to flee the trailer.
15      That's what I mean by command presence.
16   Q.   What do you mean by advisements?
17   A.   Various advisements, we know you're inside the trailer,
18      we're going to wait you out, we're not going anywhere,
19      this is going to end with -- the only way this is going
20      to end is with you being taken into custody.  Again,
21      there was no sense of urgency.  Use of force did not
22      have to be immediately used, and it did not have to be
23      used for the duration it is used.
24   Q.   And what do you mean by warnings?
25   A.   The various warnings such as we're not leaving, there's
```

**MAGNA** ▶
LEGAL SERVICES

Page 78

```
1       20 police officers out here, you're going to be taken
2    into custody, and it's up to you to surrender
3    peacefully or we're going to wait you out essentially.
4  Q.   What do you mean by verbal persuasion, other than what
5    you've already described?
6  A.   If they certainly believe what they said in their
7    testimony, meaning Officer Allen, that this was a
8    barricaded armed suspect in a back room that was a
9    barricaded trailer, they had an obligation to deploy a
10   hostage negotiator and to use verbal persuasion before
11   they considered use of force.
12 Q.   So with respect to your opinion that Koda should have
13   been released earlier when I review your report or when
14   I read it it seems to me that you articulate various
15   elements or factors that led you to that conclusion.
16   And what I'd like to do is identify those elements or
17   factors, if we can, okay?
18 A.   Okay.
19 Q.   And so I'm going to walk through a list.  What I'm
20   interested in is whether or not you agree that that was
21   a factor and element in you reaching your conclusion,
22   and then at the end, you know, obviously I'll ask you
23   to identify any others that I've missed, okay?
24 A.   So you're asking, just so I'm clear, on the duration of
25   how long the canine engaged and bit Mr. Davis?
```

Page 79

```
1  Q.   Yes.
2  A.   Not whether or not because I'm clear on the other
3    options that should have been considered other than
4    deploying the dog, but once it's deployed we're only
5    discussing the proportionality and the duration of the
6    dog bite?
7  Q.   Yes.
8  A.   Okay.  I understand.
9  Q.   So I understood that one element or factor in you
10   reaching the conclusion you did on that issue was your
11   understanding that Mr. Davis was face or stomach down
12   on the mattress.  Do you agree?
13 A.   Well, that was one factor in the totality of the
14   circumstances.  It's my understanding that he was -- I
15   don't know if it would have changed my opinion if he
16   was on his back or sitting or standing, but that was --
17   the facts are, my understanding, was that he was in a
18   prone position, yes.
19 Q.   Okay.  Another fact or element in you reaching the
20   conclusion you did on that issue was your understanding
21   that Mr. Davis had his hands up or out as he had been
22   commanded?
23 A.   It was one of the factors that I considered, yes.
24 Q.   And another factor was your understanding that he did
25   not display threatening or aggressive behavior towards
```

Page 80

```
1    the officers, yes?
2  A.   That's correct.
3  Q.   Another factor was your understanding that it was not
4    possible for Mr. Davis to flee, correct?
5  A.   That's my understanding, yes.
6  Q.   Another factor was your understanding or belief that
7    Mr. Davis' behavior constituted passive resistance at
8    most, correct?
9  A.   The fact that he was hiding, yes.
10 Q.   Another factor was your understanding or belief that
11   Mr. Davis verbally indicated he wanted to surrender?
12 A.   He did, yes.
13 Q.   That was a factor in your reaching your opinion, yes?
14 A.   That's correct.  And he was pleading for help, yes.
15 Q.   Another factor was your understanding or belief that
16   Sergeant Hodek had deadly force coverage, to use your
17   words, yes?
18 A.   He had the ability to use deadly force, yes.
19 Q.   Well, you wrote in your report that he had officer
20   safety/deadly force coverage on Mr. Davis?
21 A.   That's correct.
22 Q.   And that was an element in your reaching your opinion
23   on the issue of when Koda should have been released,
24   yes?
25 A.   That is correct.
```

Page 81

```
1  Q.   And another element or factor in your reaching that
2    opinion was your understanding or belief that Mr. Davis
3    did not have a weapon or at least as was ultimately
4    determined, correct?
5  A.   I'm not sure -- ask me that question again, if you
6    could, please?
7  Q.   You wrote that -- on page 18 you list a number of
8    things including among them was that Davis was, quote,
9    without a weapon?
10 A.   That's my understanding, that's correct, yes.
11 Q.   And so that was another factor in your reaching your
12   conclusion that Koda should have been recalled sooner,
13   correct?
14 A.   Again, in the totality of the circumstances.
15 Q.   And so other than those that I have just listed or that
16   we've just discussed were there any factors or elements
17   that led you to conclude that Koda should have been
18   recalled earlier and that it was not reasonable not to
19   recall him earlier?
20 A.   Those are the factors that I considered, yes.
21 Q.   Are there any others?  I just want to be sure I
22   understand the complete list.
23 A.   Well, the fact that the use of force continued for over
24   two minutes, which was certainly unreasonable and
25   inconsistent with generally accepted police practices.
```



Page 82

1    Law enforcement officers don't deploy -- don't use --
2    when somebody is begging for help we don't continue to
3    use force against those individuals.  It's almost
4    tantamount to torturing somebody that's screaming for
5    help, and it's -- the -- the canine, in my view, is
6    just like a taser.  You have to justify every second
7    that you pull that trigger on a taser or every baton
8    hit to a suspect has to be justified.  And to simply
9    say it was a dog so I let him bite him for two minutes
10   is unreasonable.
11   Q.   The length of a dog being deployed in and of itself is
12        not determinative of whether or not it's reasonable or
13        unreasonable, correct?
14   A.   Well, I think if -- again, you're asking hypothetical.
15        I'm looking at this situation.  The fact of this
16        situation to allow the dog to continue to bite him for
17        two minutes was certainly unreasonable and inconsistent
18        with the use of force policies stated in the Barron
19        County Policies and Procedure, and my understanding of
20        policies, use of force policies throughout the country.
21   Q.   That's based though not -- that's not some rule of
22        thumb relative to length of time that a dog is
23        deployed.  Your conclusion about the fact that two
24        minutes was too long was based on those elements or
25        factors that we just discussed, correct?

Page 83

1    A.   Well, no, he immediately surrendered or attempted to
2         surrender, and apparently the use of force continued
3         for two minutes.
4    Q.   Are there other factors, beyond those that we have
5         already discussed, starting with fact that Mr. Davis,
6         to your understanding, was prone on the mattress,
7         running through the fact that Mr. Davis, to your
8         understanding, didn't have a weapon?  Are there any
9         other factors that led you to conclude that the length
10        of time Koda was deployed was not reasonable under the
11        circumstances?
12   A.   Well, that and also when I looked at other incidents
13        involving the canine handler and his dog there was
14        another instance which they deployed the canine against
15        the suspect that was passively resisting by hiding, and
16        it turned out to be a juvenile that was hiding in the
17        trailer underneath a bathroom cabinet.  The individual
18        certainly had no place to go, no place to run, no way
19        to flee, but they decided to deploy the dog and allow
20        the dog to bite this individual, and turned out to be a
21        juvenile.  So I concluded that the dog is being used
22        consistently inappropriately.  And often times it's
23        used to certainly just to inflict no legitimate law
24        enforcement purpose, other than to inflict pain on a
25        suspect.

Page 84

1    Q.   So focusing on this specific incident I really just
2         want to understand if we have fully identified the
3         facts or factors that led you to conclude the dog
4         should have been recalled sooner.  Are there any others
5         that we haven't discussed, specifically relating to the
6         facts of this incident?
7    A.   All of these factors were taken into account in
8         reaching my conclusion, but as far as the factors that
9         you've identified I believe -- I believe you covered
10        all of them.
11   Q.   You said -- you said a few moments ago, and you said
12        this in your report, that you haven't seen any evidence
13        that Officer Allen had the ability to control Koda with
14        verbal commands?
15   A.   That's correct.
16   Q.   And aside from the incident with the Cameron police
17        officer, are there other facts that you're aware of
18        that lead you to conclude that he couldn't control Koda
19        with verbal commands?
20   A.   That and when he -- when Koda was deployed up into the
21        attic clearly they were not able, the officer was not
22        able to recall him.  He said he had to climb into the
23        attic and physically remove him from the suspect, and
24        that was pretty consistent with what happened here.
25        Koda was not verbally called to release.  He had to

Page 85

1         physically restrain the dog then verbally recall
2         him.
3    Q.   So my question was specific to Officer Allen.
4    A.   Well --
5    Q.   That -- hang on a second.
6    A.   I'm sorry.  Go ahead.
7    Q.   The incident you're talking about in the attic was with
8         a different officer, correct?
9    A.   Same dog, different officer is my understanding.
10   Q.   All right.  So I'll come back to that.
11   A.   Okay.
12   Q.   But if we focus on Officer Allen, aside from the
13        incident involving the Cameron police officer, are
14        there other facts that you're aware of that tell you
15        that Officer Allen was not able to control Koda with
16        verbal commands?
17   A.   I could only -- my conclusion is based on the
18        information that was provided.
19   Q.   I'm asking you what information --
20   A.   Right.
21   Q.   -- I'm asking you what information relative to Officer
22        Allen led you to that conclusion?
23   A.   There was another incident involving I believe it was a
24        drug house, a search warrant at a drug house.  I
25        believe the dog bit the wrong suspect.  There was a



Page 86

```
 1    reason why he could not be recalled.  I believe the
 2    door shut behind the dog and he wasn't able to recall
 3    him, but the incidents that I was provided I did not
 4    see any evidence that the officer was able to recall
 5    the dog.
 6  Q.  I'm not trying to ask a trick question.  I'm just
 7    trying to understand specifically rather than speaking
 8    in generalities.
 9  A.  Okay.
10  Q.  Again, setting aside the Cameron police officer
11    situation, what other specific events or incidents
12    involving Officer Allen and Koda lead you to conclude
13    that Officer Allen could not control Koda with verbal
14    commands?
15  A.  Those are the ones that I considered.
16  Q.  So other than the Cameron police officer incident, what
17    other incidents involving Officer Allen led you to
18    conclude that he couldn't control Koda with verbal
19    commands?
20  A.  Even in this particular case --
21  Q.  Hang on a second.  Without talking about this case,
22    what other -- I'll come to this case.
23  A.  Okay.
24  Q.  What other events or incidents or facts involving
25    Officer Allen and Koda, other than the Cameron police
```

Page 87

```
 1    officer situation, led you to conclude that Officer
 2    Allen could not control Koda with verbal commands?
 3  A.  Those are the cases that I can recall at this time.
 4  Q.  Well, you keep saying those cases.  Other than the
 5    Cameron police officer incident, what cases are you
 6    talking about?
 7  A.  Well, I'm still using the attic.  You asked me not to
 8    use the attic so we'll discount that.  The fact that he
 9    deployed the dog on a juvenile is inconsistent with
10    training and policy.
11  Q.  I'm only asking about the question of his ability to
12    verbally recall Koda.  That's my specific question.
13  A.  Okay.
14  Q.  Because you offer an opinion about that specific
15    subject.  Other than the Cameron police officer
16    incident or situation, what other events relating to
17    Officer Allen and Koda lead you to conclude that he
18    could not recall Koda with verbal commands?
19  A.  Just what I testified to.  If we're not going to talk
20    about the attic situation, that's all that I was able
21    to review, and that's the conclusion I came to.
22  Q.  Okay.  So that was based on the attic situation
23    involving Officer Carroll and the Cameron police
24    officer situation, is that correct?
25  A.  If we're not talking about this case, yes.
```

Page 88

```
 1  Q.  Okay.  And what is it about the Cameron police officer
 2    event that tells you that Officer Allen was not able to
 3    recall Koda with verbal commands?
 4  A.  No.  I -- as far as the dog is unpredictable.
 5    Obviously, if the dog bit a fellow police officer, it's
 6    unpredictable and it demonstrates that Officer Allen
 7    did not have control over this dog.
 8  Q.  And what about what happened with Mr. Davis tells you
 9    that Officer Allen could not control or recall Koda
10    with verbal commands?
11  A.  Well, there's a number of factors.  First of all,
12    Officer Allen said that he never attempted to recall
13    the dog at all which is, in my view, certainly a
14    problem.  Secondly, he describes in his deposition the
15    out command on how to recall the dog by using the words
16    come out.  And if you listen to the audio of this
17    incident there were several times where he was yelling
18    come out, come out, come out.  And he claims that it
19    was to have Davis come out, but I'm not sure if the dog
20    is trained to come out or be released based on the
21    words come out how he can distinguish between who the
22    handler is talking to.  Certainly, if come out is the
23    command for the dog to come back to him, he certainly
24    was saying this multiple times on the audio and
25    certainly the dog did not respond.
```

Page 89

```
 1  Q.  Anything else about this specific incident that was
 2    part of your or was part of your belief that Officer
 3    Allen can't control the dog with verbal commands?
 4  A.  That's essentially the information that I used to
 5    conclude what I concluded.
 6  Q.  And your opinion or belief that Koda is unpredictable
 7    and dangerous, you talk about that in your report, yes?
 8  A.  I do.
 9  Q.  And you base that in part or you base that in your
10    report at least, as far as you use the written report,
11    on the incident involving the Cameron police officer,
12    yes?
13  A.  One of the incidents, yes.  Yeah.
14  Q.  Well, that's the only one you talk about as -- never
15    mind.  Rather than characterizing your report, I'll
16    just ask you:  Other than that incident, what other
17    incidents led you to conclude that Koda is
18    unpredictable and dangerous?
19  A.  Well, again, we have to go back to the -- regardless of
20    who the handler is, we have to go back to the attic
21    situation where the dog was released into an attic and
22    the handler at the time wrote in his report or
23    testified that he had to physically climb into the
24    attic to get the dog to release the suspect.  And
25    throughout that he was giving, and I'm paraphrasing,
```



Page 90

1    but he was giving commands and telling the suspect not
2    to move because the dog is trained to aggressively
3    attack if you move.  And that's pretty important.  It
4    doesn't matter who the handler is.  It depends on the
5    dog's training and disposition is, at least in my view.
6    Q.   So other than the attic incident involving Officer
7         Carroll and the Cameron police officer event, what
8         other facts or incidents led you to conclude that Koda
9         is unpredictable and dangerous?
10   A.   Well, they allowed it to bite a juvenile as well, I
11        mean if we're adding to the list.
12   Q.   Well, is that -- is that part of your belief that Koda
13        was unpredictable and dangerous or is that part of your
14        belief that he had been used inappropriately in prior
15        incidents?
16   A.   I think -- I think you hit on it exactly.  I think it's
17        a combination of both the canine as well as the handler
18        making inappropriate decisions on the use of force.
19   Q.   So how was the incident with the juvenile reflective of
20        Koda being dangerous?
21   A.   Well, a canine, by virtue of its training, is
22        dangerous.  They have the ability to deploy a huge
23        amount of pressure, and any time that a canine bites
24        somebody it can cause significant injuries to a person.
25        So canines in general have to be treated as perhaps a

Page 91

1    dangerous weapon.
2    Q.   But the point in your report seemed to be that Koda was
3         -- not just that canines are dangerous, but that Koda
4         in particular was dangerous or am I misreading your
5         report?
6    A.   No, you read it correctly.
7    Q.   Okay.  So then going back --
8    A.   You can't -- if you accidentally discharge a firearm
9         and shoot a police officer, it's pretty significant.
10        If you let your canine accidentally use -- accidentally
11        bite another police officer, in my view the canine is
12        unpredictable and uncontrollable.
13   Q.   And so going back to the event with the juvenile, what
14        about that event led you to is part of your conclusion
15        that Koda is dangerous and unpredictable?
16   A.   Well, either the canine handler made a decision to
17        allow the dog to unjustly bite an individual or the
18        canine was uncontrollable and bit him without the
19        direction of the officer.
20   Q.   I just want to understand your opinion.
21   A.   I can appreciate that.
22   Q.   Is the juvenile incident in some way reflective of Koda
23        being unpredictable and dangerous or not?
24            MR. STUDENT:  Object to form.  You can
25        answer, if you can.

Page 92

1    A.   In that particular case, I believe it was the handler
2         that was responsible for the use of force.  Every time
3         the dog bites somebody or injures somebody it's the
4         handler's responsibility.  So is the dog dangerous,
5         yes.  If a dog bites you under any circumstances it's
6         perhaps dangerous.  In this particular case, I believe
7         the officer, the use of force on a juvenile was
8         inappropriate for the facts and circumstances.
9    BY MR. JONES:
10   Q.   Other than the situation in the attic involving Officer
11        Carroll and the incident with the Cameron police
12        officer, were there any other facts or events that led
13        you to conclude that Koda is unpredictable and
14        dangerous?
15   A.   Other than what we -- other than what we discussed,
16        that is the only information that I have.
17   Q.   So on page 10 of your report you start a discussion of
18        prior deployments of Koda and you preface it by the
19        sentence that these incidents demonstrate that Koda was
20        used by Officer Allen and other members of the Barron
21        County Sheriff's office in a way that routinely and
22        consistently disregarded the inherent risk, likelihood
23        of excessive force, and the foreseeable danger
24        associated with deploying Koda.  Do you see where I am?
25   A.   Yes.

Page 93

1    Q.   And so if I understand this section of your report
2         you're discussing these prior incidents because you
3         believe they show that Officer Allen and other officers
4         routinely and consistently used Koda in a way that was
5         not reasonable, is that correct?
6    A.   Well, based on the incidents that I reviewed, yes.
7    Q.   And --
8    A.   And -- I'm sorry.  And it's conflicting on how the dog
9         is trained.  Is he trained to attack based on movement
10        or is he trained to allow the suspect to walk with him
11        and return to the handler.  So there was some -- the
12        two handlers, there was some confusion on what the dog
13        is trained to do.
14   Q.   So you ultimately what is your point relative to the
15        incident with Mr. Davis with respect to these prior
16        uses of Koda?
17   A.   Well, I was surprised that Officer Allen had never even
18        discussed the prior incident with Officer Carroll about
19        in the attic situation.  He testified that he never
20        even discussed it with him.  And I think it's important
21        to understand how a canine is going to respond.
22        Carroll was directing the suspect not to move or the
23        dog was going to attack him further and be more
24        aggressive.  On the other hand, Officer Allen is
25        telling the suspect to simply get up and walk out here.



Page 94

1    Which is it?  What -- which way is the dog trained, is
2    he trained to attack on movement or is he trained to
3    attack if somebody is not laying still and not -- and
4    complying with their commands.
5 Q.  So how, in your view, is it material or relevant to
6    your opinions relating to the Trevor Davis situation
7    that in your view Koda had been routinely and
8    consistently used in a way that was unreasonable by his
9    handlers?
10 A.  Well, I think I -- I mean I don't know how many
11    situations I need to describe.  I described the
12    juvenile situation, I --
13 Q.  I'm not asking you to describe the situations.  I'm
14    asking you to tell me why it's important for your
15    opinions about Trevor Davis that these past incidents
16    had occurred?
17 A.  Well, it's important because like the juvenile Davis
18    was hiding, all right, passive resistance, and yet they
19    determined that the dog was going to attack and inflict
20    injury to the suspect.  Regardless of Davis' reaction,
21    whether he decided to comply or not, that dog was going
22    to continue to inflict injury on him until he was
23    physically removed by the handler.  I mean it's very
24    clear to me.
25 Q.  So, in essence, is your point that the fact that Koda

Page 95

1    or your belief that Koda had been misused in the past
2    is evidence that he was misused in this instance?
3 A.  I think it's predictable of what's going to happen in
4    the future.  If the dog is misused in the past, I think
5    it's foreseeable and predictable.
6 Q.  Well, the fact that these prior incidents had occurred
7    made it more likely that Koda was going to be misused
8    by Officer Allen in this situation.  Is that a fair
9    statement of your opinion?
10     MR. STUDENT:  Object to form.
11 BY MR. JONES:
12 Q.  Go ahead, sir.
13 A.  I believe he was misused in this situation, yes.
14 Q.  That's not my question.  My question is:  Do you
15    believe that these prior incidents made it more likely
16    that he was going to be misused in this situation?
17 A.  I do.
18 Q.  So, briefly, on this these prior incidents the first
19    one was the situation in the attic with Officer
20    Carroll, correct?
21 A.  Yes.
22 Q.  That did not involve Officer Allen, correct?
23 A.  Correct.
24 Q.  And, briefly, why do you believe that Koda was used
25    unreasonably or that Koda was used in a way that

Page 96

1    constituted excessive force in that event?
2 A.  Well, they knew the suspect was in the attic.  They
3    released the dog to bite him, and it served no, in my
4    view, no legitimate law enforcement purpose at that
5    point to essentially have the canine go up into the
6    attic and bite him.  And if there was certainly, you
7    know, like the Davis situation if the officer believed
8    he was armed and dangerous, a few minutes later Officer
9    Carroll climbed up in the attic and physically engaged
10    the suspect so it makes no sense.  Either you believe
11    the suspect is armed and you're going to act
12    accordingly or you don't.  And if you don't believe
13    he's armed then that would be reasonable to climb up in
14    the attic and handcuff him and drag him down, as is
15    what happened with the Carroll situation.
16 Q.  The second incident you talk about was from July 2018,
17    this one involving Officer Allen and a subject by the
18    name of Enersen, correct?
19 A.  That's correct.
20 Q.  E-n-e-r-s-e-n?
21 A.  That's correct.
22 Q.  Was there a problem with Officer Allen's ability to
23    release or recall Koda in this situation?
24 A.  Thank you for bringing this up.  I forgot about this
25    incident.  But, again, the canine should not have been

Page 97

1    used.  The suspect had not committed a crime.  There
2    was -- the dog was released before the officer even
3    spoke to the alleged victim or the caller.  And the use
4    of force occurred before the officer even understood
5    what had happened, whether or not a crime was
6    committed.  So, again, it's another instance of an
7    inappropriate use of force via the canine by the
8    handler.
9 Q.  Was there a problem with the recall of Koda in this
10    instance?
11 A.  Give me one second, if you don't mind, for me to
12    refresh my memory.  Okay.  I'm sorry.  If you --
13 Q.  Sure.  With the Enersen situation in July of 2018, was
14    there any problem with Officer Allen's ability to
15    recall Koda after he had been deployed?
16 A.  It doesn't sound like he did.
17 Q.  I'm -- I'm sorry.  What are you saying?
18 A.  There's no evidence that he verbally recalled him.  He
19    said I did remove my canine from the suspect and he was
20    taken into custody.  There is no indication that he
21    verbally recalled the dog.  I read that to understand
22    -- it was my understanding by reading that is that he
23    physically removed the dog from the suspect before the
24    suspect was taken into custody.
25 Q.  So --

Page 98

1  A.   So this is, in my view, further evidence that the dog
2       was not trained to verbally release suspects.
3  Q.   And that conclusion in this incident is based on the
4       words, quote, I did remove my canine from the suspect,
5       end quote?
6  A.   That's correct.
7  Q.   The third incident you talk about is the situation with
8       the juvenile, correct, from June of 2017?
9  A.   That's correct.
10 Q.   And that involved Officer Carroll, not Officer Allen?
11 A.   That's my understanding, yes.
12 Q.   And was there a problem with the recall of Koda in that
13      instance?
14 A.   I don't think there was a problem with the recall, no.
15 Q.   And I understand you believe that the use of Koda in
16      the first instance was unjustified and constituted
17      excessive force, correct?
18 A.   I do believe that, yes.
19 Q.   And can you explain briefly why?
20 A.   Well, first of all, the suspect was a juvenile.  They
21      had information that it was a juvenile.  The suspect
22      was hiding in a bathroom cabinet under a sink.  It had
23      no ability to flee, to fight, to do anything other than
24      to surrender.  And they indiscriminantly allowed the
25      dog to bite the kid.  I don't understand the rational.

Page 99

1       And it served, in my view, no legitimate law
2       enforcement purpose to allow the dog to simply bite
3       somebody.  It didn't change whether or not the guy had
4       a weapon in his hand or didn't have a weapon in his
5       hand.  It was simply indiscriminate use of canine force
6       that was unnecessary.
7  Q.   The next incident you talk about is the July 2018
8       situation involving the Cameron police officer,
9       correct?
10 A.   That's correct.
11 Q.   And forgive me, I don't want to cover a territory we've
12      already gone over, but there wasn't a problem with the
13      recall of Koda in this instance, was there?
14 A.   Perhaps there would have been.  If he saw him charging
15      towards a uniformed officer, he should have had the
16      ability to verbally recall him.
17 Q.   Well, I guess my question is not can we theorize about
18      possible problems, but are you aware of a problem with
19      the recall of Koda in this instance?
20 A.   Well, let me phrase it like this . . . Certainly the
21      dog was not recalled prior to biting the police officer
22      is all I know about the situation.
23 Q.   And do you know anything about how it came to be that
24      Koda ripped the officer's pants?
25 A.   Yes.  I mean I read the police report.  I have a

Page 100

1       general understanding of what occurred.
2  Q.   So what occurred?
3  A.   They were doing a building search on a school.  The dog
4       was released up on the second floor.  The officer,
5       according to the report, was in an area that, quote, an
6       officer should not have been there.  When the dog
7       approached the officer made a quick reaction, and the
8       dog bit the officer is my understanding.
9  Q.   The last incident you talk about is from February of
10      2020 with a Dale Nedlund, correct?
11 A.   That's correct.
12 Q.   N-e-d-l-u-n-d.  Was there a problem with the release or
13      recall of Koda in that instance?
14 A.   Well, he was not able to recall the dog, yes.
15 Q.   And that's because the door had closed behind Koda?
16 A.   Whatever the circumstances were, it's an officer's
17      responsibility, if he's going to release a dog, to
18      control him.  Certainly, the fact that the door shut
19      behind him was one of the factors that prevented him
20      from recalling the dog.
21 Q.   Was there a situation in that event where Officer Koda
22      [sic] directed Koda to release a bite and Koda didn't
23      do so?
24 A.   I don't have that information.  I don't know.
25 Q.   And why was the use of Koda excessive or unreasonable,

Page 101

1       in your view, in that instance?
2  A.   Well, the dog bit somebody that was not a suspect and
3       was not wanted for a felony.
4  Q.   Any other reason?
5  A.   I think that's the reason.
6  Q.   You talk in your report about find and bite versus bark
7       and hold, yes?
8  A.   I do.
9  Q.   In 2019 was there an industry standard with respect to
10      which of those techniques would be employed or trained
11      relative to canines?
12 A.   I'm not sure of 2019, if there was or not.
13 Q.   Is there one now?
14 A.   No.  I think there is still a gray area between what is
15      the right method.  And I don't think that there is
16      necessarily an industry standard at this point, based
17      on bark and hold.  I do know anecdotally that there are
18      departments throughout the country that are no longer
19      allowing their dogs to search for individuals off
20      leash.  I believe the Seattle Police Department
21      implemented a policy a few years ago that prohibits
22      other canine handlers to release their dogs off leash
23      because of the unpredictability of the dog and the
24      likelihood that the dogs can use force, regardless of
25      whether or not the suspect surrenders or not.



Page 102

1  Q.  Is the find and bite method you describe it in your
2      report as quote/unquote more common.  Do you recall
3      that?
4  A.  I would say based on my experience it's more common
5      yes.
6  Q.  And was that the case in 2019, that it was more common
7      among police officers using canines to deploy them
8      using the find and bite method?
9  A.  I would say it was more common to use the find and bite
10     method, but also every find and bite has to be looked
11     at critically and has to be assessed on the merits on
12     whether or not it was reasonable.
13 Q.  Neither standard or neither technique is per se
14     constitutional or per se unconstitutional, correct?
15        MR. STUDENT:  Object to form.  You can
16     answer.
17 A.  I would agree.
18 BY MR. JONES:
19 Q.  It's always going to be under weather the totality of
20     the circumstances the particular deployment was
21     reasonable or objectively reasonable or not objectively
22     reasonable, correct?
23 A.  Exactly.  Yes.
24 Q.  But in 2019 do you agree that among the departments
25     using canines that the find and bite method was more --

Page 103

1      was the more commonly used technique?
2  A.  I can't cite a national study or survey that would
3      allow me to answer that question pointing to an
4      authority.  I can say anecdotally, based on my
5      experience, that the find and bite was more common.
6  Q.  And is that still true today?
7  A.  I would say so, yes.
8  Q.  And there are recognized drawbacks to the bark and hold
9      technique, correct?
10 A.  There are.
11 Q.  And what are they?
12 A.  Essentially, the drawback is you're allowing the dog to
13     make a decision on whether or not force is going to be
14     used.  If the suspect -- the dog is trained to bark and
15     hold, and if the suspect moves he's supposed to attack.
16     So essentially the theory is that the bark and hold
17     method you're allowing the dog to make the use of force
18     decision versus the officer.
19 Q.  Are there any other recognized drawbacks?
20 A.  I'm sure there are, but that's the most important one I
21     think from my perspective.
22        MR. JONES:  Okay.  Why don't we go ahead and
23     take that break.
24        (Brief recess.)
25 BY MR. JONES:

Page 104

1  Q.  Mr. Tiderington, you said you have a copy of your
2      report, correct?
3  A.  I do.
4  Q.  So does that include the appendices as well?
5  A.  It does.
6  Q.  So appendix one, which I will mark separately as
7      Exhibit 2, you have that in front of you, your CV?
8  A.  I do.
9  Q.  And that copy of your CV, is that current and complete
10     as of today?
11 A.  No.  Since I did this I've retired as the Chief of
12     Police about two weeks ago.  So that would have to be
13     amended.
14 Q.  And that's you retired from Plymouth Township Police
15     Department?
16 A.  I did.
17 Q.  Okay.  Other than that, is appendix one to your report,
18     your CV, current and complete?
19 A.  Yes.
20 Q.  And I understand you had been with Plymouth Township
21     for 21 years, approximately?
22 A.  Approximately, 20 years as the police chief, yes.
23 Q.  Were you hired as the police chief?
24 A.  I was.
25 Q.  And so that was your title or role the entire time you

Page 105

1      were with that department?
2  A.  That's correct.
3  Q.  And you say you retired a couple weeks ago?
4  A.  I did.
5  Q.  Congratulations?
6  A.  Thank you.
7  Q.  In your retirement do you have employment other than
8      working as an expert or consultant on cases?
9  A.  No, I do not.
10 Q.  And Plymouth Township, is that Suburban Detroit?
11 A.  It is.
12 Q.  And how big of a department is it, in terms of
13     officers?
14 A.  We have some 50 employees, 30 to 32 sworn officers,
15     depending on the budget.
16 Q.  And what was the command structure underneath you as
17     chief.
18 A.  I had two assistant chiefs, well, actually one
19     assistant chief, a lieutenant, four or five sergeants,
20     and detectives and patrol officers.
21 Q.  And why did you retire?
22 A.  Isn't 44 years enough?  That's a very good reason.  No.
23     It was after 20 years as a police chief I felt it was
24     time to retire.
25 Q.  Were you --

## Page 106

1    A.   On my own terms, just to be clear about that.
2    Q.   Were you ever disciplined in any way as the chief of
3       police for Plymouth Township?
4    A.   I was not.
5    Q.   Were you ever sued for -- well, let me strike that.
6           Police chiefs get sued lots of times simply
7       for being the police chief, yes?
8    A.   That's correct.
9    Q.   Did you ever get sued for anything you actually
10      personally were involved in?
11    A.   Not personally involved in.  I mean in my capacity as a
12      police chief I've been named in lawsuits.
13    Q.   But nothing that you personally did or didn't do?
14    A.   Not in my capacity as police chief, no.
15    Q.   And did Plymouth Township have canine officers?
16    A.   We did.
17    Q.   How many?
18    A.   We had two canine officers.
19    Q.   Was that true the entire 20 years there were there?
20    A.   That was throughout the 20 -- two different canine
21      officers throughout that 20 year period.  I think we
22      had a total of three different dogs.
23    Q.   Okay.  And so at any given time during your time as
24      police chief was there one canine officer at a time?
25    A.   Yes.

## Page 107

1    Q.   All right.  And the Plymouth Township Police
2      Department, during your tenure as chief, were the
3      canine officers trained to use the bark and hold or the
4      bite and hold technique?
5    A.   Bite and hold.
6    Q.   And the officers who worked as the canine officers
7      where did they receive their canine training?
8    A.   Here in Michigan.  I don't -- there was a couple
9      different licensing.  There was a training facility
10      nearby, and it was part of the consortium of canine
11      handlers through various departments that would do
12      monthly training exercises and certifications.
13    Q.   And do you recall specifically the name of the entity
14      or organization that did the initial training for your
15      canine officers?
16    A.   You know, I don't.  There was a couple different ones,
17      but I don't recall as we sit here today.
18    Q.   And did you, as chief of police, have a role in
19      training those officers, those canine officers at
20      Plymouth department, Plymouth Township Police
21      Department?
22    A.   Well, I had a role in setting policies and procedures.
23      Certainly I did not provide canine training.  I
24      attended canine training, and witnessed it, and
25      participated to some extent, but I was not a canine

## Page 108

1      trainer, if that's the question.
2    Q.   That was the question.  And you said you -- did you
3      attend canine training while you were the chief of
4      police in Plymouth?
5    A.   I have.
6    Q.   And is that in an observer role or was there some other
7      role you had in those training sessions?
8    A.   Observer, but they also got me to put the sleeve on and
9      I've done that on several occasions.
10    Q.   Okay.  Other than watch the training, did you
11      otherwise, and I guess being bitten, did you otherwise
12      participate in the training sessions that you attended
13      as chief?
14    A.   Well, participated in the extent of developing policies
15      on how canines would be used and what review and
16      assessments we would make, but not part of the
17      day-to-day or monthly training exercises, I was not
18      part of that.
19    Q.   And as chief of police were you ever out of the field
20      with officers when one of the department's canines was
21      deployed?
22    A.   I have been, yes.
23    Q.   That was while you were in Plymouth or with the
24      Plymouth Police Department?
25    A.   Correct.

## Page 109

1    Q.   And how many times was that true?
2    A.   Maybe a dozen times or eight to 10 times, not
3      frequently.
4    Q.   And in those instances what was your role on scene?
5    A.   Well, obviously I was, you know, the ranking command
6      officer, but the practical decision of what to do was
7      left up to the sergeant and the canine handler.
8    Q.   How did it come to be that as chief of police you were
9      in the field for those however many it was deployments
10      of a canine?
11    A.   Again, I remember specifically a couple where they were
12      searching for a suspect, and I was leaving a meeting,
13      and I was close by, and I would often times respond.  I
14      kind of consider myself to be a hands-on chief, and I
15      would respond to various incidents.  Again, not a lot
16      -- and, again, that's over 20 years.  So eight to 10
17      times over 20 years I was not a frequent flyer on calls
18      for service.
19    Q.   And I understand that you were with the Fort Lauderdale
20      Police Department for the 20 years before you went to
21      Plymouth?
22    A.   For 21 or 22, yes.
23    Q.   Roughly 1981 to 2001?
24    A.   Almost 2002.  I think November of 2001 I guess.
25    Q.   And what was your rank when you were hired?

MAGNA ►
LEGAL SERVICES

Page 110

1   A.   I was hired as a patrol officer.
2   Q.   And what was your rank when you left Fort Lauderdale?
3   A.   I retired as a police captain in charge of special
4        investigations.
5   Q.   And when you left Fort Lauderdale was that a
6        retirement?
7   A.   It was.
8   Q.   You had years of service on years of service and age to
9        be able to retire?
10  A.   It just required age of service.
11  Q.   Okay.
12  A.   I'm sorry.  Number of years of service.  Twenty and out
13       is what I'm trying to explain.
14  Q.   On pages 25 and 26 of your CV you list information
15       about when you were with the Fort Lauderdale Police
16       Department?
17  A.   Correct.
18  Q.   And at least my read of those bullet points is sort of
19       a chronology of your time and assignments?
20  A.   That's correct.
21  Q.   When you were with that department?
22  A.   Correct.
23  Q.   Starting with the police academy and then running up
24       through what you've already described being a captain
25       in special investigations?

Page 111

1   A.   That is correct.
2   Q.   And did the Fort Lauderdale Police Department have a
3        canine unit?
4   A.   Yes, we did.
5   Q.   Were you ever part or assigned to that canine unit?
6   A.   I was in charge of some of the canines in Fort
7        Lauderdale, not assigned necessarily specifically to
8        the canine unit, but I had had canine officers working
9        directly under my command.
10  Q.   And working off of the bullet points from your CV
11       relating to your time in Fort Lauderdale what
12       assignment was it where you or which assignments, if
13       there's more than one, where you had some supervisory
14       responsibility for officers who were assigned to the
15       canine unit?
16  A.   Well, both as a patrol sergeant we -- Lauderdale had
17       quite a large canine unit.  I think we had eight or 10
18       canines at the time and handlers.  So I would
19       frequently utilize canines as part of my patrol
20       responsibilities.  Later on as a supervisor in charge
21       of the special investigations I had a number of canines
22       and canine handlers assigned directly to me that were
23       cross trained as drug dogs as well as a normal patrol
24       dog as well.
25  Q.   And so when you had officers under your supervision who

Page 112

1        were canine officers did your role include sort of
2        supervising deployments of those dogs?
3   A.   Absolutely.
4   Q.   Was that true both as a patrol sergeant and as a
5        captain in special investigations?
6   A.   Well, more so -- well, both, but more so as a patrol
7        sergeant we had to make decisions on whether or not to
8        deploy the canine.  And in our department at that time
9        the ranking officer was in charge of making any
10       decision relating to the use of a canine.  Later when I
11       became the special investigations commander the same
12       thing, I was in charge of policy, canine policy as well
13       as review of the use of canines during deployments.
14  Q.   How often is a -- how long were you a patrol sergeant
15       with Fort Lauderdale?
16  A.   I made several different stops there.  I was a patrol
17       officer there for, I don't know, three or four years.
18       I did several stints as a patrol sergeant.  I was then
19       -- when I was promoted I went back as a patrol captain
20       if you will then was in charge of a district.  And so
21       hard to say specifically, but throughout my career I
22       probably served five or six years in patrol division.
23  Q.   And were you ever a canine officer yourself?
24  A.   I was not.
25  Q.   And is it possible for you to estimate how many times

Page 113

1        you were involved personally in a decision to deploy a
2        canine when you were with Fort Lauderdale?
3   A.   I mean it's a guess.  I mean it was I would say 50 to a
4        hundred times.  I know that doesn't narrow it down, but
5        in a 21 year career and we utilized canines pretty
6        frequently in Fort Lauderdale for various things.
7   Q.   Did you ever undergo training to be certified, if
8        that's the right word, as a canine officer yourself?
9   A.   No.
10  Q.   Is that the right term of art?
11  A.   Yes.
12  Q.   Were you ever disciplined, during your time with the
13       Fort Lauderdale Police Department?
14  A.   I was not.
15  Q.   Were you ever sued?
16  A.   I think there were a couple lawsuits.  But, again, it
17       had nothing to do specifically with me personally.  It
18       was -- but I was named in maybe two or three different
19       lawsuits in Fort Lauderdale.
20  Q.   Do you recall what those were about?
21  A.   I know what one was about.  One of our confidential
22       informants was kidnapped in Columbia and she sued -- at
23       that time I was assigned to the drug enforcement
24       administration.  She sued the DEA, and I was named,
25       initially named, and then I was removed from the

**MAGNA** ▶
LEGAL SERVICES

Page 114

```
1      complaint, but I was named in that lawsuit for failing
2      to protect her.
3   Q.  Do you recall what the others were about?
4   A.  No, I don't offhand.  I don't believe any of them were
5      ever -- I believe all of them were dismissed, but I
6      don't remember specifically.
7   Q.  And you worked in Detroit for the Detroit Police
8      Department for --
9   A.  I did.
10  Q.  -- two or three years at the end of -- in the late
11     '70s?
12  A.  I did, yes.
13  Q.  And was that as a patrol officer?
14  A.  Yes.
15  Q.  And were you ever assigned as a canine officer with the
16     Detroit PD?
17  A.  I was not.
18  Q.  By the way, Fort Lauderdale, its canine unit, were
19     those officers and dogs trained with the bark and hold
20     or bite and hold technique?
21  A.  At the time it was primarily bite and hold.
22  Q.  When you say primarily that suggests that there was a
23     mix?
24  A.  Well, I'm suggesting that because it depended on the
25     dog as well.  There were some dogs that would not even
```

Page 115

```
1      -- and it was primarily a canine command decision on
2      what dogs would be released from the lead or what dogs
3      would always be on a lead doing searches.
4   Q.  I think we covered this, but in your career as a police
5      officer were you ever -- did you ever work or were you
6      ever assigned to a canine unit?
7   A.  I was not.  Well, let me clarify did I ever work, all
8      right.
9   Q.  Let me ask the question differently.  I understand your
10     point.  Were you ever, in your career as a police
11     officer, were you ever assigned to a canine unit?
12  A.  I was not.
13  Q.  And you never worked as a canine officer yourself,
14     correct?
15  A.  That's correct.
16  Q.  In Wisconsin when you become a certified law
17     enforcement officer you get a certification from the
18     state of Wisconsin certifying that you've completed the
19     necessary training?
20  A.  Right.
21  Q.  So in that sense in what states have you been certified
22     as a law enforcement officer?
23  A.  Certified in the state of Michigan and also the state
24     of Florida.
25  Q.  I understand you have an associate's degree from Mercy
```

Page 116

```
1      College of Detroit?
2   A.  That's correct.
3   Q.  What year?
4   A.  Probably -- I should know this, right?  1978, '79, I
5      think.
6   Q.  And what year did you get your bachelor's from Florida
7      Atlantic?
8   A.  Probably 1982.
9   Q.  And I understand you went to a command officers
10     development program at the University of Louisville
11     Southern Police Institute?
12  A.  That's correct.
13  Q.  And what year was that?
14  A.  That would have been 1990, '88 or, I'm sorry, '89 or
15     '90, I believe.
16  Q.  You also mentioned in your CV that you had over 2,000
17     hours of advanced police training and leadership
18     classes as part of your in-serviced training as an
19     officer?
20  A.  That's correct.
21  Q.  Do you have a written record of the course subjects in
22     which you have received in-service training as an
23     officer?
24  A.  I do not have a written record of that.
25  Q.  On pages 22 through 25 of your CV you describe or list
```

Page 117

```
1      in a table what I understand to be training that you
2      have provided as a trainer?
3   A.  As a trainer, yes.
4   Q.  And you list various trainings or venues for training
5      on page 22 through 24, correct?
6   A.  Correct.
7   Q.  And that's all training you provided?
8   A.  It is.
9   Q.  And did any of those training programs that you
10     provided cover the use of canines?
11  A.  I think -- no, not the use of force by canine, but
12     canine as it relates to drug investigations and
13     establishing probable cause, but not specifically for
14     canine handling or search and seizure protocols.
15  Q.  Then you list a number of subjects or areas of
16     instruction that you have given on pages 24 through 25,
17     correct?
18  A.  Correct.
19  Q.  I don't see canine or canine deployments, use of force
20     by canines listed, correct?
21  A.  That's correct.
22  Q.  And is it fair to say that you have not provided
23     training or instruction yourself relative to the
24     deployment or use of force with a canine?
25  A.  That is correct.
```

Page 118

1    Q.   Have you ever completed, that is as a trainee, any
2         training in the state of Wisconsin?
3    A.   No.
4    Q.   Have you ever given any training, so as a trainer, in
5         the state of Wisconsin?
6    A.   I don't think so.
7    Q.   And I assume this is true, but if you could confirm you
8         have not gone through the police academy here in
9         Wisconsin?
10   A.   I have not.
11   Q.   And do you have any knowledge as to the substance of
12        what is trained in the police academy here in
13        Wisconsin, other than your general knowledge as a law
14        enforcement officer with 40 years of experience?
15   A.   A general understanding.  I did go on the state
16        certification website, I forget what it is at this
17        point, and I believe the training standard is 486 hours
18        or 476 hours, and the standards were pretty consistent
19        with my understanding of standards nationwide.
20   Q.   So you were able to review just general standards
21        relating to the training academy here in Wisconsin?
22   A.   I did, yes.
23   Q.   Were you able to review the specific or the substance
24        of any of the training modules as they are presented to
25        recruits here in Wisconsin?

Page 119

1    A.   No, I was not able to do that.
2    Q.   Are you familiar with the manual, that's my word, with
3         respect to use of force as it's presented to recruits
4         here in Wisconsin?
5    A.   I don't believe I reviewed that, no.
6    Q.   In appendix two to your report that I've marked or will
7         mark as Exhibit 3 you provide a list of prior
8         testimony, correct, as an expert?
9    A.   Testimony and/or other cases that I've been involved
10        in.  Some of the cases listed I haven't necessarily
11        testified either at trial or deposition.
12   Q.   So just looking at each one individually quickly, this
13        first one is state of Florida -v- Waite, W-a-i-t-e,
14        from this year, correct?
15   A.   Correct.
16   Q.   You have testified there and it was by deposition?
17   A.   That's correct.
18   Q.   Do you have a copy of that transcript yourself?
19   A.   I do not.
20   Q.   And you were hired by the lawyer who's listed at the
21        bottom of the box relating to this case?
22   A.   Yes.
23   Q.   And so you were retained on the defense side of that
24        criminal case?
25   A.   That's correct.

Page 120

1    Q.   And what's the nature of your work as an expert in that
2         case, what's the issue that you're addressing?
3    A.   Police practices.
4    Q.   And does that case involve --
5    A.   Use of force.
6    Q.   Does that case involve the deployment or use of force
7         by canine?
8    A.   No, it does not.
9    Q.   The second case you list is from 2021, that's
10        Guttenberg versus the United States, correct?
11   A.   That's correct.
12   Q.   You're retained by the Department of Justice?
13   A.   That's correct.
14   Q.   On behalf of the defense, correct?
15   A.   That's correct, yes.
16   Q.   You have not testified in that case?
17   A.   I have not.
18   Q.   And what is that case about?
19   A.   It involves the Parkland High School shooting, and the
20        family members of the deceased sued the FBI, Department
21        of Justice for not following up on specific tips that
22        were provided about the potential shooting.
23   Q.   That case does not involve the deployment or use of
24        force by a canine, correct?
25   A.   No.  None of the cases listed have anything to do with

Page 121

1         canine.
2    Q.   Okay.  Thank you.  The other case from 2021 or another
3         case from 2021 is the BBK Tobacco case?
4    A.   That's correct.
5    Q.   You were retained by the defense?
6    A.   That's correct.
7    Q.   And you gave deposition testimony?
8    A.   I did.
9    Q.   Do you have a copy of that transcript?
10   A.   I don't believe I do.
11   Q.   What does that case involve or about?
12   A.   It's a trademark violation case, trademark
13        infringement.
14   Q.   The next case you list is also from 2021 dated Bailey?
15   A.   That's correct.
16   Q.   You were retained by the plaintiff in that case?
17   A.   That's correct.
18   Q.   And you have given testimony by deposition?
19   A.   Yes.
20   Q.   What does that case involve or what is it about?
21   A.   Use of force, inappropriate use of force by the San
22        Antonio Police Department.
23   Q.   But not involving the use or deployment of a canine?
24   A.   No.
25   Q.   The next case from 2021 is Jane Doe versus two

Page 122

1      corporate entities, correct?
2   A.   That's correct.
3   Q.   And you were retained by the plaintiff in that case?
4   A.   Yes.
5   Q.   And you've testified by deposition?
6   A.   That's correct.
7   Q.   Do you have a copy of that transcript?
8   A.   I don't think I do.  I don't think I have any
9      transcripts of my deposition, but I'll have to verify
10     that.  If I do, I'll provide it to my counsel or the
11     counsel and he can provide it to you, if you like?
12  Q.   Thank you.  And that case involves a premises liability
13     claim?
14  A.   Yes.
15  Q.   Not involving the use of canine or deployment of a
16     canine?
17  A.   Correct.
18  Q.   And then the last two cases, one from 2016 and one from
19     2015, the first one from 2016 United States versus
20     Olivares?
21  A.   Correct.
22  Q.   You were retained by the defense in that case?
23  A.   I was.
24  Q.   And you testified at trial?
25  A.   At a hearing.

Page 123

1   Q.   And that's a criminal matter?
2   A.   It is.  Yes, it is.
3   Q.   And it did not involve the use of a canine, correct?
4   A.   Correct.
5   Q.   And then the last one Alvarez-Mena versus Miami Dade
6      County and some individuals from 2015, yes?
7   A.   Yes.
8   Q.   And you testified by deposition?
9   A.   I did.  Yeah, deposition.
10  Q.   For the plaintiff or plaintiffs?
11  A.   Correct.
12  Q.   And that case involved police practices, but not the
13     use or deployment or use of force by canine?
14  A.   Correct.
15  Q.   The list here on pages 30 through 33 in appendix two to
16     your report, is that a complete list of all of the
17     cases you have worked on as an expert since 2015, I
18     guess aside from this case?
19  A.   No.  It's actually a listing of cases that I either
20     testified in either deposition or trial.
21  Q.   Okay.  Well, I guess I asked the question that way
22     because at least one of these cases you didn't testify
23     in.
24  A.   I notice that.  And it was actually an oversight.
25  Q.   So if I understood from the narrative in your CV, you

Page 124

1      have been working as an expert or a consultant for
2      about the last five years?
3   A.   That's correct.
4   Q.   So roughly back to 2015, the first case you've listed?
5   A.   I believe -- well, I did another case maybe in 2005 or,
6      I'm sorry, when I was still in Fort Lauderdale.  So it
7      would have been before 2001, but primarily from about
8      2015, yes.
9   Q.   And, approximately, how many cases have you served as
10     an expert in, other than the ones that are listed in
11     appendix two to your report?
12  A.   Probably 30 to 40 cases.
13  Q.   Did any of those cases involve the deployment of a
14     canine or a use of force by a canine?
15  A.   No.
16  Q.   How many other cases are you serving as an expert in,
17     currently?
18  A.   I don't have the exact number, but somewhere around 20
19     to 25 cases.
20  Q.   In the time period that you were serving as an expert
21     while you were still employed as the chief of police in
22     Plymouth?
23  A.   Correct.
24  Q.   What percentage of your professional time was spent as
25     an expert witness relative to your professional time as

Page 125

1      chief of police?
2   A.   Oh, it was a part-time nights and weekend job
3      essentially, and I would take maybe one or two cases a
4      year.  So it was a very small percentage of time spent
5      versus my full time capacity as a police chief.
6   Q.   Appendix two also includes your fee schedule, correct?
7   A.   It does.
8   Q.   Have you ever sent or provided to Mr. Student an
9      invoice for your work in this case?
10  A.   I have.
11  Q.   How many times?
12  A.   Well, let me clarify.  I received a retainer and I have
13     an -- I believe I have an invoice that needs or that
14     will be sent out at the end of July.
15  Q.   Okay.  Have you -- aside from the retainer, have you
16     actually sent any invoices as of today?
17  A.   I don't think so.
18  Q.   And does that invoice account for all of your hours
19     spent as an expert in this case?
20  A.   It will, yes.
21  Q.   Do you have any -- do you know how many hours you spent
22     in the case up through signing your written report in
23     the case?
24  A.   I don't know offhand.  I mean I know we're going to
25     take a break and I can get those numbers for you, if

Page 126

1    you like.
2    Q.   Your invoice, that will account for hours spent in
3         reviewing materials and preparing your report, correct?
4    A.   That's correct.
5    Q.   And it will account for hours you spent preparing for
6         today's deposition?
7    A.   It will, yes.
8    Q.   And what did you do to prepare for today's deposition?
9              MR. STUDENT:  I'll object to the extent it
10        calls for expert work product or expert and attorney
11        communications.
12   BY MR. JONES:
13   Q.   I do not want to hear about what you and Mr. Student
14        may have discussed to prepare.  I just want to know the
15        activities you engaged in to prepare for the
16        deposition.
17   A.   I essentially reviewed my report and the other material
18        that was provided to me.
19   Q.   Did you review anything, other than your written report
20        or the material that's listed I think in appendix three
21        to your report, in preparing for your deposition today?
22   A.   I reviewed some case law.
23   Q.   Aside from case law?
24   A.   That was pretty much it.  I had a conversation with Mr.
25        Student, but other than that -- and, quite frankly, it

Page 127

1    was a very brief conversation.
2    Q.   I'm going to share my screen one last time.  Are you
3         able to see the screen, Mr. Tiderington?
4    A.   I can, yes.
5    Q.   I'm showing you what I'll mark as Exhibit 9.
6    A.   Right.
7    Q.   Which is a nine page document that Mr. Student sent to
8         me of communications between you and him.
9    A.   Okay.
10   Q.   Have you seen -- well, you can only see one at a time
11        and I'm happy to scroll through, but let's just --
12   A.   I've reviewed those, if that is the question.
13   Q.   Thank you.  And I'm happy to scroll through them, if
14        you need me to answer these questions, but aside from
15        these nine pages have you and Mr. Student had any other
16        communications in writing relating to your compensation
17        for your work?
18   A.   No.  Other than the retainer agreement.
19   Q.   And other than these nine pages, and again I'm happy to
20        scroll through them if you want me to, have you and Mr.
21        Student had any communications in writing in which you
22        identified facts or data for you to rely on in doing
23        your work and forming your opinions?
24   A.   No.
25   Q.   And are there any other communications in writing

Page 128

1         between you and Mr. Student in which he identified
2         assumptions for you to rely on in doing your work and
3         forming your opinions?
4    A.   No.
5    Q.   On page two of Exhibit or what I'll mark as Exhibit 9
6         is an e-mail from Mr. Student to you back in March of
7         this year, yes?
8    A.   That's correct.
9    Q.   And he refers to a timeline of events that he was
10        providing you, yes?
11   A.   Yes.
12   Q.   And so page three of the report or page three of this
13        exhibit, is that the timeline that he was referring to
14        in the prior page?
15   A.   With the Bates stamp 00067?
16   Q.   Yes.
17   A.   Yes, I believe that was provided to me.
18   Q.   The question is:  This timeline or this chronology of
19        events, is that the timeline that Mr. Student was
20        referring to in this March 10th e-mail on page two?
21   A.   I'm assuming it was.  I created my own timeline so
22        based on that I'm sure it was provided to me.  But,
23        like I said, if you look at my timeline it's somewhat
24        different than his.
25   Q.   I understand.

Page 129

1    A.   But --
2    Q.   Are you --
3    A.   I'm sorry?
4    Q.   I don't want to cut you off.  Go ahead.
5    A.   No, that's fine.
6    Q.   Are you aware of any other timeline that Mr. Student
7         provided to you, beside what's on the screen on page
8         three of Exhibit 9?
9    A.   No.
10   Q.   And lastly, on page eight of the exhibit in that first
11        paragraph of this e-mail from June 7th Mr. Student
12        refers to a spreadsheet of the items that he had
13        provided for review that he was attaching to this
14        e-mail.  Do you see that?
15   A.   Yes.
16   Q.   If I go to the next page, I'll flip -- I'll rotate it
17        if you need me to, but is that the spreadsheet that he
18        was referring to in the prior e-mail?
19   A.   I believe it is, yes.
20             MR. JONES:  Okay.  Give me just a second.
21        Thank you, Mr. Tiderington.  That's all the questions I
22        have.
23             THE WITNESS:  Thank you, sir.
24             MR. STUDENT:  I would like to take a 10
25        minute break and review everything to see if I have any



Page 130

1    follow-up questions here.  Is that okay?
2         MR. JONES:  That's fine with me.
3         (Brief recess.)
4    EXAMINATION BY MR. STUDENT:
5    Q.   I guess I just want to ask a couple quick questions,
6         chief.  First, was there any evidence that you reviewed
7         and that was provided to you that suggested that Mr.
8         Davis was not surrendering from the moment in time Koda
9         began to bite him?
10   A.   No.  I believe he was surrendering, yes.
11   Q.   In your extensive training and experience are you
12        familiar with the factors that would lead an
13        objectively reasonable officer to conclude that a
14        suspect is fleeing?
15   A.   Is fleeing, yes, I'm familiar with those factors.
16   Q.   And you're able to evaluate whether a suspect in a
17        specific case is fleeing or not?
18   A.   Or had the ability to flee, yes.
19   Q.   Likewise, in your extensive training and experience,
20        are you able to evaluate whether a suspect presents a
21        threat to an officer's safety or the safety of anybody
22        else in the vicinity?
23   A.   Based on my review of a video or real scene or real
24        time a video of what occurred I believe I have the
25        ability to do that, yes.

Page 131

1    Q.   And so in your training and experience are you
2         confident you can provide opinions as to whether a
3         suspect is fleeing or whether a suspect is presenting
4         any sort of threat to an officer's safety?
5    A.   I can, yes.
6    Q.   And is that something you've done over your career?
7    A.   Certainly.
8    Q.   Okay.  In your capacity as a chief?
9    A.   As a command officer, as a police chief, as a patrol
10        supervisor throughout my career it's something I would
11        do on a daily basis, evaluate the appropriateness of
12        police tactics or use of force.
13   Q.   Okay.  And in your training as an officer and/or a
14        chief did you ever receive information or instruction
15        regarding how to determine if a suspect is fleeing?
16   A.   Well, there's factors -- again, every situation would
17        be different.  You would look at the totality of the
18        circumstances and whether or not the suspect had the
19        ability to flee, number one, and whether or not he was
20        actively trying to resist arrest by fleeing.
21   Q.   Okay.
22   A.   As far as specific training, I don't know that there is
23        specific training that I could point to that would
24        detail that.
25   Q.   In your training and experience, have you come to know

Page 132

1         what the difference is between passive resistance and
2         active resistance?
3    A.   Yes.
4    Q.   Likewise, have you come to know what it means for a
5         suspect to surrender to police?
6    A.   I do understand what that means, yes.
7    Q.   How about for a suspect to be compliant with police
8         commands?
9    A.   I understand what that means and have experienced it
10        throughout my career.
11   Q.   After Koda began to bite Mr. Davis, is it your opinion,
12        based on all of the evidence that you've reviewed, that
13        Mr. Davis was compliant?
14   A.   To the extent that he could, yes.
15        MR. STUDENT:  Okay.  That covers the couple
16   things I wanted to talk about.  I don't know if Mr.
17   Jones might have some additional follow-up questions.
18        MR. JONES:  I do not.  Thank you again, sir.
19        MR. STUDENT:  I would like to note that the
20   witness would like to review and sign the transcript.
21        MR. JONES:  And I would like to order,
22   electronic copy only.
23        MR. STUDENT:  I'm good with just electronic
24   condensed is fine.
25        (The deposition was concluded at 2:03 p.m.)

Page 133

1              CERTIFICATE OF NOTARY
2
3    STATE OF MICHIGAN        )
4                             ) SS
5    COUNTY OF OAKLAND        )
6         I, Gina A. Ruggeri, Certified Shorthand Reporter, a
7    Notary Public in and for the above county and state, do
8    hereby certify that the above deposition was taken before me
9    at the time and place hereinbefore set forth; that the
10   witness was by me first duly sworn to testify to the truth,
11   and nothing but the truth, that the foregoing questions asked
12   and answers made by the witness were duly recorded by me
13   stenographically and reduced to computer transcription; that
14   this is a true, full and correct transcript of my
15   stenographic notes so taken; and that I am not related to,
16   nor of counsel to either party nor interested in the event of
17   this cause.
18
19
20   _____
21   Gina A. Ruggeri, CSR 7805
22   Notary Public,
23   Oakland County, Michigan
24   My Commission expires:  June 20, 2024.
25



---

**A**

**a.m**
1:16 4:3

**ability**
38:1 47:14 53:2,5
57:11,13 59:9,12,22
60:3,10 65:19 67:4
67:11,13 69:16 70:1
70:7 71:11,13,15,18
73:13 76:1,3 77:14
80:18 84:13 87:11
90:22 96:22 97:14
98:23 99:16 130:18
130:25 131:19

**able**
5:9 37:25 40:6 43:1,2
43:9,15,17,18,21
45:24,25 46:5 57:15
57:18 61:8,11,14
62:21 66:18 67:24
69:10,25 70:22
84:21,22 85:15 86:2
86:4 87:20 88:2
100:14 110:9
118:20,23 119:1
127:3 130:16,20

**absolutely**
51:5 53:16 54:9
112:3

**academy**
110:23 118:8,12,21

**acceptable**
68:15

**accepted**
69:5 81:25

**access**
66:10 70:8

**accidentally**
91:8,10,10

**account**
7:14 64:10 84:7
125:18 126:2,5

**accurate**
7:14

**acknowledging**

30:3

**act**
96:11

**acted**
51:24

**actions**
50:15,22,23 51:11,22
52:5,13 53:17

**active**
35:24 132:2

**actively**
36:3 131:20

**activities**
13:4 126:15

**actual**
33:14 60:6

**add**
74:18 75:14

**adding**
90:11

**additional**
7:24 8:21 132:17

**addressing**
120:2

**adequately**
77:5

**adhere**
65:7

**administration**
113:24

**advanced**
116:17

**advisements**
77:16,17

**affirmative**
39:12

**affirmatively**
39:3,7,18

**afraid**
23:24

**age**
110:8,10

**aggravated**
26:22

**aggressive**
23:11 79:25 93:24

**aggressively**
90:2

**ago**
84:11 101:21 104:12
105:3

**agree**
12:3 22:2,4,12 23:2
26:25 27:6 35:20
39:16,20,21 49:10
54:3 55:20 66:24
77:2 78:20 79:12
102:17,24

**agreement**
4:9 127:18

**ahead**
12:10 13:12 15:5,19
41:2 62:23 85:6
95:12 103:22 129:4

**ahold**
70:3

**air**
62:12

**ajones@hansenrey...**
2:15

**alleged**
97:3

**Allen**
1:9 4:23 11:22 12:1,5
12:18 13:8 14:12
15:9 23:17 33:2,15
36:15 38:10 45:24
46:13 48:12,16 53:8
54:25 55:6,11 56:15
56:17 61:5,6,9 62:4
66:11 67:10,20
69:22 70:17,25 71:8
71:25 72:2,5 74:10
78:7 84:13 85:3,12
85:15,22 86:12,13
86:17,25 87:2,17
88:2,6,9,12 89:3
92:20 93:3,17,24
95:8,22 96:17 98:10

**Allen's**
45:23 46:17,20 48:8
61:19 64:16 96:22

**aggressively**
90:2

97:14

**allow**
66:3 82:16 83:19
91:17 93:10 99:2
103:3

**allowed**
90:10 98:24

**allowing**
74:2 101:19 103:12
103:17

**alternative**
74:13,14 75:24

**alternatives**
73:10

**Alvarez-Mena**
123:5

**amended**
12:8,21 104:13

**amendment**
13:9,14,19 14:14,20
14:23

**amount**
14:4 90:23

**and/or**
36:23 119:9 131:13

**Andrew**
2:10 4:21

**anecdotally**
101:17 103:4

**announce**
35:8

**announcement**
36:17

**anonymous**
25:16

**answer**
12:10 13:12 14:17
15:5,7,20 16:1
24:12 25:3 32:3
34:9 53:5 58:6
62:24 69:13 91:25
102:16 103:3
127:14

**answered**
14:16 15:1,6 70:14

**answers**



133:12
**Antonio**
121:22
**anybody**
39:11 71:16 130:21
**apologize**
59:15
**apparently**
27:20 28:18 29:21
35:12 36:17 37:5
44:20 69:15 83:2
**appear**
40:3 43:2
**APPEARANCES**
2:1
**appeared**
26:5
**appearing**
1:22 2:8,16
**appears**
26:8 27:8 30:21 31:5
40:15,24 41:8 44:1
44:6 48:22 49:3
**appendices**
5:15 104:4
**appendix**
3:16,17,18 5:20,23
6:2,5,10,13 7:17 8:9
8:19,25 10:8 104:6
104:17 119:6
123:15 124:11
125:6 126:20
**apply**
57:11,13
**appreciate**
91:21
**apprehend**
73:6,23
**apprehended**
41:23 42:4,6 64:24
65:10
**apprehension**
9:10
**approach**
47:4
**approached**

28:24 100:7
**appropriate**
13:16 60:25
**appropriately**
77:9
**appropriateness**
131:11
**approximately**
104:21,22 124:9
**area**
28:24 40:24 42:6
44:6,7 51:5 62:17
62:20 100:5 101:14
**areas**
22:4 117:15
**argue**
28:2
**argumentative**
14:25
**arm**
65:12 70:4
**armed**
26:6,13 32:15,22
37:13 50:2 51:17
52:13,20,23 53:1
68:5,17 69:4 72:23
72:24 74:12,12 78:8
96:8,11,13
**arrest**
26:2,13 27:1,6
131:20
**arrived**
27:9,13,22 28:16
**art**
113:10
**article**
3:22 21:5,8 22:16
24:2 25:6,8,10,10
**articles**
21:11,17 22:6,8
49:19
**articulate**
78:14
**articulated**
13:24 15:13
**articulates**

14:19
**articulating**
16:7
**aside**
9:12 11:6 47:11
50:17 53:7,7 55:20
71:24 73:9,11 84:16
85:12 86:10 123:18
125:15 126:23
127:14
**asked**
14:5 15:1 64:10 66:6
87:7 123:21 133:11
**asking**
18:24 34:17 47:25,25
49:16 59:13 60:19
60:22 61:12 64:4
65:4 78:24 82:14
85:19,21 87:11
94:13,14
**assessed**
102:11
**assessment**
31:23
**assessments**
108:16
**assigned**
111:5,7,14,22 113:23
114:15 115:6,11
**assignment**
111:12
**assignments**
110:19 111:12
**assistance**
11:5
**assistant**
105:18,19
**associate's**
115:25
**associated**
92:24
**ASSOCIATES**
2:3
**associating**
32:9
**Association**

17:17
**assume**
45:6 47:5 118:7
**assuming**
34:1,15 50:9 128:21
**assumptions**
128:2
**Atlantic**
116:7
**attached**
3:12
**attaching**
129:13
**attachments**
5:15
**attack**
24:23 65:21 66:1,3,3
71:16 90:3 93:9,23
94:2,3,19 103:15
**attacked**
23:19 24:6,20 65:18
65:23
**attempt**
36:12
**attempted**
73:24 83:1 88:12
**attempting**
35:18 47:2
**attend**
108:3
**attended**
107:24 108:12
**attic**
24:20,21 65:25 84:21
84:23 85:7 87:7,8
87:20,22 89:20,21
89:24 90:6 92:10
93:19 95:19 96:2,6
96:9,14
**attorney**
4:22 8:5 126:10
**attorney/expert**
8:4
**attorneys**
4:8
**audio**



MAGNA
LEGAL SERVICES

5:1 54:18 88:16,24

**authored**
21:1,5

**authoritative**
21:20,23

**authority**
103:4

**automatic**
72:24

**available**
68:4

**aware**
84:17 85:14 99:18
129:6

---

**B**

**bachelor's**
116:6

**back**
6:23 8:23 10:1,4 19:2
28:20 41:22 42:16
42:22 44:3,5,8,10
44:16,19 45:7,17
46:14,23 47:7,15,20
48:4,11,17,20 49:23
50:7,14,19,24 51:2
51:4,17,21 52:2,5,7
52:11,16 53:9,14,15
53:24 55:3 63:5,11
63:25 67:14 68:5
73:4,19 78:8 79:16
85:10 88:23 89:19
89:20 91:7,13
112:19 124:4 128:6

**backing**
52:9

**bail**
26:23

**Bailey**
121:14

**ballistic**
52:2 70:3

**bang**
75:21

**bar**
22:16

**bark**
18:20 101:6,17 103:8
103:14,16 107:3
114:19

**barricaded**
51:15 52:22 53:2
63:12 68:5,17,20
70:10 72:23,23
74:11,12 78:8,9

**Barron**
25:16 74:21 75:4,16
82:18 92:20

**base**
64:1,3 89:9,9

**based**
14:8 24:23 34:24
42:17 43:22 44:11
45:21 47:13 48:8,13
49:16,20 50:5,11,15
50:22 56:16 57:22
57:22,24 58:21
60:23,24 61:16 62:6
65:21,23 66:3 67:18
71:10 72:16 82:21
82:24 85:17 87:22
88:20 93:6,9 98:3
101:16 102:4 103:4
128:22 130:23
132:12

**basically**
10:11 43:24

**basis**
131:11

**Bates**
128:15

**bathroom**
41:8 43:12,25 44:18
45:5 53:22 83:17
98:22

**baton**
82:7

**battery**
26:22

**BBK**
121:3

**bed**

44:6,13 48:23 49:2
54:5 70:5

**bedding**
48:23

**bedroom**
41:22 42:3,22 44:4,8
44:11,16,19 45:1,7
46:1,15 47:3,7,15
47:20 48:4,10,11,17
48:20 49:18 51:5,17
52:2,7,11 53:9,14
53:15,25 54:4,4
65:20 73:4,19

**began**
25:15 64:3 130:9
132:11

**begging**
82:2

**behalf**
2:8,16 120:14

**behavior**
79:25 80:7

**belief**
46:20 72:12 80:6,10
80:15 81:2 89:2,6
90:12,14 95:1

**believe**
9:14 10:3 14:16 15:6
15:21 16:17 18:4
25:21 26:6,14 27:15
28:15 29:13,16,19
29:24 30:6,11,16
33:21 35:22 36:8,21
37:1,7,12,20,23,23
38:1,5,13 40:3,10
40:20 41:22 42:1,8
42:15 45:19,22
46:16 48:18 50:9,23
51:11,12,17,19,23
52:6,19 56:20 61:11
61:19 62:6 65:13
67:18 68:11,15
71:20 72:4 73:4,14
74:11 76:11,18 77:5
77:8 78:6 84:9,9
85:23,25 86:1 92:1

92:6 93:3 95:13,15
95:24 96:10,12
98:15,18 101:20
114:4,5 116:15
118:17 119:5
121:10 124:5
125:13 128:17
129:19 130:10,24

**believed**
51:1 52:12,22 53:1
68:16 69:4 72:22
73:25 96:7

**best**
73:16

**better**
69:2 73:2

**beyond**
8:8 56:25 62:14
68:12 72:11 76:12
76:14 83:4

**big**
46:4 105:12

**bit**
43:5 65:6 72:6 78:25
85:25 88:5 91:18
100:8 101:2

**bite**
52:17 79:6 82:9,16
83:20 90:10 91:11
91:17 96:3,6 98:25
99:2 100:22 101:6
102:1,8,9,10,25
103:5 107:4,5
114:20,21 130:9
132:11

**bites**
90:23 92:3,5

**biting**
22:23 23:6,21,22
25:1 64:4 65:12
99:21

**bitten**
23:24 24:4 25:2
108:11

**blockage**
56:2,4



**blocked**
56:8
**body**
33:11 48:13 54:18
**Bohra**
76:17,17
**bottom**
17:22 18:11,16,21
119:21
**box**
42:11 45:9 63:14
64:9 119:21
**break**
5:6 10:1 19:3 103:23
125:25 129:25
**brief**
103:24 127:1 130:3
**briefly**
77:6 95:18,24 98:19
**bringing**
96:24
**Broadway**
2:12
**budget**
105:15
**building**
100:3
**bullet**
17:22 18:11 110:18
111:10
**bypass**
56:1

——————— **C** ———————
**cabinet**
49:1 83:17 98:22
**call**
25:16,19,22 56:4
57:6 67:11 72:24
**called**
28:13 55:11 69:21,22
71:2 75:20 76:17
84:25
**caller**
97:3
**calling**

52:10,15 72:18 73:9
74:5
**calls**
109:17 126:10
**calmly**
65:19
**camera**
33:11 48:13 54:18
**Cameron**
84:16 85:13 86:10,16
86:25 87:5,15,23
88:1 89:11 90:7
92:11 99:8
**canine**
11:23 15:17 18:16,23
19:16 22:22,23
23:10 24:7 33:4,7,8
33:18 64:3,24 65:8
65:10,15,18 66:22
67:14 72:8 76:2
78:25 82:5 83:13,14
90:17,21,23 91:10
91:11,16,18 93:21
96:5,25 97:7,19
98:4 99:5 101:22
106:15,18,20,24
107:3,6,7,10,15,19
107:23,24,25 108:3
109:7,10 111:3,5,8
111:8,15,17,22
112:1,8,10,12,23
113:2,8 114:15,18
115:1,6,11,13
117:11,12,14,19,19
117:24 120:7,24
121:1,23 122:15,16
123:3,13 124:14,14
**canines**
18:3 20:6 21:12,19
21:24 23:7 90:25
91:3 101:11 102:7
102:25 108:15,20
111:6,18,19,21
112:13 113:5
117:10,20
**capacity**

106:11,14 125:5
131:8
**captain**
110:3,24 112:5,19
**capture**
37:22 38:6
**car**
27:10,18
**career**
75:1 112:21 113:5
115:4,10 131:6,10
132:10
**Carroll**
87:23 90:7 92:11
93:18,22 95:20 96:9
96:15 98:10
**cars**
27:13
**case**
1:7 6:6,21 7:12,23,25
7:25 9:5,7 11:22
15:23 16:2 23:5,5
23:15 24:3,10 25:7
29:4 34:19 38:20
49:17 50:12 86:20
86:21,22 87:25 92:1
92:6 102:6 119:21
119:24 120:2,4,6,9
120:16,18,23 121:2
121:3,3,11,12,14,16
121:20,25 122:3,12
122:22 123:12,18
124:4,5 125:9,19,22
125:23 126:22,23
130:17
**cases**
87:3,4,5 105:8 119:9
119:10 120:25
122:18 123:17,19
123:22 124:9,12,13
124:16,19 125:3
**categorize**
35:23
**caught**
28:4,10
**cause**

90:24 117:13 133:17
**caused**
73:22
**causes**
23:10
**center**
17:19
**certain**
10:4 61:15
**certainly**
11:2 23:8,16 27:4
28:11 38:1,16 39:8
40:9 41:18 44:25
51:3,15 52:8 53:2
58:10,13 59:8 64:5
64:6 67:6,10 68:1,9
68:15 69:2 70:7
72:25 73:5 76:19
78:6 81:24 82:17
83:18,23 88:13,22
88:23,25 96:6 99:20
100:18 107:23
131:7
**CERTIFICATE**
133:1
**certification**
115:17 118:16
**certifications**
107:12
**certified**
4:5 113:7 115:16,21
115:23 133:6
**certify**
133:8
**certifying**
115:18
**cetera**
11:8
**chairman**
74:24
**chance**
45:24
**change**
36:6 58:25 99:3
**changed**
79:15



**changes**
58:1
**characterize**
36:5 64:17
**characterizing**
89:15
**charge**
110:3 111:6,20 112:9
112:12,20
**charges**
26:20,25 27:7
**charging**
99:14
**Charlie**
21:2,5
**chart**
64:9
**chase**
35:25 36:14
**chemical**
52:11,15 75:13
**chief**
104:11,22,23 105:17
105:19,23 106:2,7
106:12,14,24 107:2
107:18 108:3,13,19
109:8,14 124:21
125:1,5 130:6 131:8
131:9,14
**chiefs**
17:17 105:18 106:6
**child**
39:10
**chose**
75:18
**chosen**
67:22
**Christopher**
1:9 4:23
**chronology**
110:19 128:18
**circumstance**
65:1 66:7
**circumstances**
12:2 13:6 14:10
15:11 16:25 17:5

34:3 38:8 52:23
60:23 65:14 67:19
72:17 79:14 81:14
83:11 92:5,8 100:16
102:20 131:18
**cite**
103:2
**claim**
66:9,13 122:13
**claimed**
66:11
**claims**
74:10 88:18
**clarification**
8:18 10:24
**clarify**
55:9 61:24 65:2,3
115:7 125:12
**classes**
116:18
**clear**
13:17 15:25 41:3
78:24 79:2 94:24
106:1
**clearly**
84:21
**climb**
84:22 89:23 96:13
**climbed**
96:9
**close**
109:13
**closed**
100:15
**closer**
43:5,11
**closet**
44:7 49:4,18 54:6
**clothes**
49:4
**clothing**
48:23 49:18
**clutter**
54:5
**cluttered**
48:21 56:12 70:5

**College**
116:1
**Columbia**
113:22
**combination**
90:17
**come**
33:9 35:3 64:17
65:11 67:15,21 68:8
69:9,24 70:11,20
85:10 86:22 88:16
88:18,18,18,19,20
88:21,22,23 109:8
131:25 132:4
**coming**
23:9
**command**
64:16,23 65:9,15
72:1 77:2,4,10,15
88:15,23 105:16
109:5 111:9 115:1
116:9 131:9
**commanded**
69:18 79:22
**commander**
112:11
**commands**
84:14,19 85:16 86:14
86:19 87:2,18 88:3
88:10 89:3 90:1
94:4 132:8
**Commencing**
1:16
**Commission**
133:24
**committed**
36:22 97:1,6
**common**
102:2,4,6,9 103:5
**commonly**
75:21 103:1
**communications**
8:3,5 10:12,20 48:15
126:11 127:8,16,21
127:25
**compared**

13:21 14:16
**comparing**
13:4 14:6,7 75:25
**compensation**
127:16
**complaint**
114:1
**complete**
7:14,18 81:22 104:9
104:18 123:16
**completed**
115:18 118:1
**compliant**
35:16 132:7,13
**complied**
69:8,23 70:13,21
**comply**
68:20 94:21
**complying**
94:4
**comprehensive**
74:20
**computer**
133:13
**concept**
19:17 22:12
**concern**
32:17 48:19 52:6
**concerned**
37:16 53:10,13,16
54:7,10,11
**concerns**
48:14
**conclude**
28:9 47:1 50:15
68:23 72:13 81:17
83:9 84:3,18 86:12
86:18 87:1,17 89:5
89:17 90:8 92:13
130:13
**concluded**
30:25 31:6 32:8 39:9
47:13 48:3,6,8,10
50:21 51:8 57:24
72:20 83:21 89:5
132:25



**conclusion**
28:7 32:25 38:3 64:1
   72:2 78:15,21 79:10
   79:20 81:12 82:23
   84:8 85:17,22 87:21
   91:14 98:3
**conclusions**
11:17 12:14
**condensed**
132:24
**conduct**
26:22
**conference**
5:1
**confident**
131:2
**confidential**
113:21
**confirm**
57:18 118:7
**conflicting**
93:8
**confusion**
65:20 93:12
**Congratulations**
105:5
**connected**
25:23
**connection**
7:22 8:16,24 11:6
   24:9
**Connor**
13:25
**consider**
21:20,23 58:16,18
   109:14
**consideration**
60:6
**considered**
8:22 32:11 51:25
   52:9 58:4 59:11
   69:20 72:16 73:1,15
   73:16,17 74:2 75:10
   76:5,10,12,20,21
   78:11 79:3,23 81:20
   86:15

**consistent**
15:9 23:19 33:17,19
   64:25 84:24 118:18
**consistently**
83:22 92:22 93:4
   94:8
**consortium**
107:10
**constituted**
80:7 96:1 98:16
**constitutional**
102:14
**consultant**
105:8 124:1
**contain**
52:24
**contemplated**
17:6
**CONTENTS**
3:1
**continue**
46:3 82:2,16 94:22
**continued**
81:23 83:2
**control**
67:4,24 69:10,14,25
   70:1,22 71:23 72:7
   72:12 73:14 74:4
   76:2,4 84:13,18
   85:15 86:13,18 87:2
   88:7,9 89:3 100:18
**conversation**
10:15 126:24 127:1
**conversations**
10:14
**convinced**
53:6
**copy**
5:14,24 6:5 7:1,5,6
   20:5 104:1,9 119:18
   121:9 122:7 132:22
**corporate**
122:1
**correct**
5:24,25 6:8,16,18,22
   11:19,20,23 12:15

12:16 14:1 15:11,14
16:6 17:15,21 18:1
18:3,7,8 20:16 21:3
25:15,20,24,25 26:2
27:11,14,16,19,22
27:24 28:4,10,17,20
29:8,12,15,18,19,20
29:23 30:7,10,11,17
30:18,22 31:1,2,4,8
31:11,23 33:4,9,10
33:15,20 34:5,10,23
35:2,5,7,9,11,17,19
36:3,4,24 37:4,14
37:18 42:22 43:6,7
43:12,13,25 44:19
45:1,15,16 46:3,8
48:25 49:2 51:10
54:1,2,15,23 55:1,3
55:16,17 56:14
59:21 62:25 63:15
63:16,24 64:12,19
76:23 80:2,4,8,14
80:21,25 81:4,10,13
82:13,25 84:15 85:8
87:24 93:5 95:20,22
95:23 96:18,19,21
98:6,8,9,17 99:9,10
100:10,11 102:14
102:22 103:9 104:2
105:2 106:8 108:25
110:17,20,22 111:1
115:14,15 116:2,12
116:20 117:5,6,17
117:18,20,21,25
119:8,14,15,17,25
120:10,11,13,14,15
120:24 121:4,6,15
121:17 122:1,2,6,17
122:21 123:3,4,11
123:14 124:3,23
125:6 126:3,4 128:8
133:14
**correctly**
5:23 16:5 57:17 91:6
**coterminous**
12:7

**counsel**
8:20 15:3 49:8
   122:10,11 133:16
**counteracted**
68:7
**country**
82:20 101:18
**counts**
26:23
**county**
25:16 74:22 75:4,16
   82:19 92:21 123:6
   133:5,7,23
**couple**
66:8 105:3 107:8,16
   109:11 113:16
   130:5 132:15
**course**
6:14 11:21 25:4
   116:21
**court**
1:1,22 4:4 11:18
   12:15 13:25
**cover**
48:17,17,18 57:3,14
   99:11 117:10
**coverage**
57:6,9,25 58:5,8,17
   58:18 59:4,11,14,18
   59:22 60:6 80:16,20
**covered**
84:9 115:4
**covering**
30:19,25
**covers**
132:15
**created**
128:21
**crime**
97:1,5
**criminal**
119:24 123:1
**critically**
102:11
**criticism**
70:17



criticisms
64:20
cross
111:23
CSR
1:18 133:21
current
7:21 104:9,18
currently
40:9 124:17
custody
75:18 77:20 78:2
97:20,24
cut
129:4
CV
5:24 104:7,9,18
110:14 111:10
116:16,25 123:25

**D**

Dade
123:5
daily
131:11
Dale
100:10
danger
92:23
dangerous
37:8 89:7,18 90:9,13
90:20,22 91:1,3,4
91:15,23 92:4,6,14
96:8
data
127:22
date
8:25
dated
121:14
David
25:23 29:7
Davis
1:5 9:10,12 23:17
25:17,22 26:1 27:9
27:17 28:9 29:18

30:3,4,10,14,19
31:1,4,20,25 33:22
34:6,21 35:3 36:22
37:7,12,20 38:5,13
38:22 39:5,19 41:23
42:3,6,21 43:1,3,9
43:15,17,21 44:3
45:17,25 46:3,17
47:15 48:4,9,9 51:1
52:17 53:25 55:12
55:22 61:3,5,6,10
61:14,15 62:5,7,11
62:17,20,22 63:19
64:10,17 66:21,25
67:3,15,21,22 68:7
69:8,18,23 70:7,19
71:2 72:22 73:7,7
73:19 75:18 78:25
79:11,21 80:4,11,20
81:2,8 83:5,7 88:8
88:19 93:15 94:6,15
94:17 96:7 130:8
132:11,13
Davis'
24:4 28:16 39:25
40:13 63:25 67:5,24
70:22 80:7 94:20
day-to-day
108:17
DEA
113:24
deadly
57:3,6,9,11,13,23,25
58:5,8,10,14,17,18
58:20 59:4,8,9,11
59:12,13,18,22 60:4
60:7,10,13,16,20,25
69:17 74:15 80:16
80:18
dealers
32:10
debate
13:14
debris
70:6
deceased

120:20
decided
36:7 67:12 83:19
94:21
decides
58:20
decision
52:14 53:8 58:20
60:24 68:3,10 73:23
91:16 103:13,18
109:6 112:10 113:1
115:1
decisions
51:13 69:4 74:14
90:18 112:7
deescalation
76:22,24
defendant
1:10 2:16 4:22
defense
119:23 120:14 121:5
122:22
define
27:3
definition
27:4 36:11
degree
115:25
demonstrate
92:19
demonstrates
88:6
department
20:15 27:3 74:9
101:20 104:15
105:1,12 107:2,20
107:21 108:24
109:20 110:16,21
111:2 112:8 113:13
114:8 120:12,20
121:22
department's
108:20
departments
75:2,3 101:18 102:24
107:11

depended
114:24
depending
105:15
depends
59:22 90:4
depict
40:23 41:20 42:5
depicts
9:17 49:15
deploy
58:10 59:9,12,22
60:4,10,13,16 78:9
82:1 83:19 90:22
102:7 112:8 113:1
deployed
68:22 75:7,13 76:7
79:4 82:11,23 83:10
83:14 84:20 87:9
97:15 108:21
deploying
11:23 72:9 79:4
92:24
deployment
60:7 102:20 117:24
120:6,23 121:23
122:15 123:13
124:13
deployments
92:18 109:9 112:2,13
117:19
deposed
4:24
deposition
1:14 4:1,6 5:13 6:10
7:18 27:24 34:18
39:25 40:13 45:23
47:13 61:13,17,19
61:23 62:6 68:17
88:14 119:11,16
121:7,18 122:5,9
123:8,9,20 126:6,8
126:16,21 132:25
133:8
depositions
45:22



deputies
76:20
Deputy
11:22 12:1,5,18 13:8
    14:12 15:9 33:2,15
    36:15 62:4 64:16
describe
18:24 94:11,13 102:1
    116:25
described
24:10 63:18 64:13
    78:5 94:11 110:24
describes
88:14
Description
3:14
detail
131:24
details
26:5,9
detectives
105:20
determinative
82:12
determine
57:19 58:14 61:18
    131:15
determined
81:4 94:19
determining
60:9
Detroit
105:10 114:7,7,16
    116:1
developing
108:14
development
116:10
device
75:19,19,22
devices
75:17
dictate
16:11,18,19 17:3
dictated
15:16 16:3,8

difference
15:15,21 16:9,17,20
    132:1
different
14:2 17:4 39:1 71:4
    85:8,9 106:20,22
    107:9,16 112:16
    113:18 128:24
    131:17
differently
11:25 27:4 35:13
    115:9
diffuse
73:25
directed
67:2 70:19 100:22
directing
23:17 24:24,25 93:22
direction
64:16,21 67:21 91:19
directive
68:8 69:9,24 70:21
directly
111:9,22
disagree
22:9
disappeared
63:10
discharge
91:8
disciplined
106:2 113:12
disclaimer
15:2
discount
87:8
discussed
41:13 81:16 82:25
    83:5 84:5 92:15
    93:18,20 126:14
discussing
79:5 93:2
discussion
92:17
dismissed
114:5

disorderly
26:22
dispatch
25:16 31:9
dispense
4:24
display
79:25
disposition
90:5
dispute
26:12,15,20,24 29:3
    31:12,16,17 45:10
    45:13 66:18,21
disputing
66:16
disregarded
92:22
distinguish
88:21
distraction
75:19
district
1:1,2 112:20
diversionary
75:17,19
division
112:22
DMJ
3:21 20:18
document
3:20,23 5:16,21 6:3
    6:11,25 7:7 19:18
    19:20,25 20:5,7,12
    20:22 22:3 127:7
documents
6:17 8:21 10:5 22:13
Doe
121:25
dog
23:6,9,20,20,22,23
    24:20 25:1,2 34:24
    36:16,18,20 37:11
    39:5 52:21 53:3,6
    55:7,11,22 56:6
    63:10 65:6,12 66:4

68:1,2,10 70:3 71:1
71:2,12,14,15,16,19
71:21 72:5,6,8,12
72:13 73:11,14,14
74:2 76:4 79:4,6
82:9,11,16,22 83:13
83:19,20,21 84:3
85:1,9,25 86:2,5
87:9 88:4,5,7,13,15
88:19,23,25 89:3,21
89:24 90:2 91:17
92:3,4,5 93:8,12,23
94:1,19,21 95:4
96:3 97:2,21,23
98:1,25 99:2,21
100:3,6,8,14,17,20
101:2,23 103:12,14
103:17 111:24
114:25
dog's
24:23 90:5
dogs
101:19,22,24 106:22
111:23 112:2
114:19,25 115:2,2
doing
4:25 30:21 100:3
115:3 127:22 128:2
domestic
26:8
door
29:7,11,11 33:3
42:19 47:6,10,12,16
47:20,20 48:6,15,18
86:2 100:15,18
doorstep
38:10
doorway
42:12 44:3,19 54:8
56:3,5,8 63:5,12,15
66:20
dozen
109:2
drafting
21:14
drag



96:14
**draw**
11:17 31:25
**drawback**
103:12
**drawbacks**
103:8,19
**drawers**
49:1,5 54:5
**drawn**
54:16 58:4
**drew**
38:3
**driveway**
27:10,14
**drug**
31:16,21 32:6,9,10
32:14,19 39:8 85:24
85:24 111:23
113:23 117:12
**drugs**
32:8,13
**duly**
4:17 133:10,12
**duration**
77:23 78:24 79:5

---

**E**

**e-mail**
128:6,20 129:11,14
129:18
**e-mails**
10:13
**E-n-e-r-s-e-n**
96:20
**earlier**
78:13 81:18,19
**early**
73:3
**easier**
7:7 49:13
**easily**
68:1
**eight**
109:2,16 111:17
129:10

**eighth**
42:7
**either**
7:6 8:4 23:17 32:22
37:8 41:18 47:20
53:19 68:21 91:16
96:10 119:11
123:19,20 133:16
**electronic**
132:22,23
**element**
78:21 79:9,19 80:22
81:1
**elements**
78:15,16 81:16 82:24
**eminent**
60:2
**employed**
101:10 124:21
**employees**
105:14
**employment**
105:7
**encounter**
61:15
**encountered**
71:17
**Enersen**
96:18 97:13
**enforcement**
13:1 17:18 21:12,19
21:24 32:13 46:6
59:18 82:1 83:24
96:4 99:2 113:23
115:17,22 118:14
**engaged**
55:22 65:12 78:25
96:9 126:15
**engine**
27:11
**enter**
51:14
**entered**
44:4 46:15 47:19
49:22 53:12 54:22
55:2 56:9,10,11

63:3
**entering**
74:6
**entire**
104:25 106:19
**entities**
122:1
**entity**
107:13
**entrance**
41:22 43:24 63:11,12
**entranceway**
42:3 45:6
**entryway**
42:9 53:9 55:3
**equipment**
4:7
**escape**
48:4,11 66:5 77:14
**especially**
70:11
**essence**
94:25
**essentially**
17:3 23:6,11 25:9,22
64:3 71:3,6 78:3
89:4 96:5 103:12,16
125:3 126:17
**established**
73:21
**establishing**
117:13
**estimate**
112:25
**et**
11:7
**evade**
35:11 37:21 38:6
**evading**
35:13,14
**evaluate**
130:16,20 131:11
**event**
88:2 90:7 91:13,14
96:1 100:21 133:16
**events**

8:17 9:3,6 25:13,15
86:11,24 87:16
92:12 128:9,19
**evidence**
39:12 46:24 50:18
71:13,25 84:12 86:4
95:2 97:18 98:1
130:6 132:12
**exact**
40:20 124:18
**exactly**
27:15 28:6 43:17
44:15 49:14 53:23
61:7,24 65:4 76:18
90:16 102:23
**Examination**
3:3,4 4:19 130:4
**examined**
4:17
**example**
24:19
**excessive**
11:23 12:5,19,21
13:9,18,24 14:3,13
14:22 92:23 96:1
98:17 100:25
**exchange**
29:14 54:21
**Executive**
19:25
**exercises**
23:8 107:12 108:17
**exhibit**
3:14 5:13,19 6:2,10
6:13,23 7:10,17,17
19:14,20 20:5,18
21:4 39:25 40:13
104:7 119:7 127:5
128:5,5,13 129:8,10
**Exhibits**
3:11,12
**existed**
74:7
**expect**
25:1 65:17
**expectation**



34:2 42:24
**experience**
6:7 23:7 24:5 32:12
46:6,10 102:4 103:5
118:14 130:11,19
131:1,25
**experienced**
42:24 132:9
**expert**
6:7,15,20 7:11 8:5
10:7,19 12:25 105:8
119:8 120:1 123:17
124:1,10,16,20,25
125:19 126:10,10
**expires**
133:24
**explain**
23:4 24:17 98:19
110:13
**explains**
24:3,5
**express**
7:11
**extensive**
130:11,19
**extent**
8:2 13:11 15:1 49:6
107:25 108:14
126:9 132:14
**exterior**
47:3 48:16
**eyesight**
69:16

———————

**F**

**face**
62:13 79:11
**faced**
13:5 14:9 16:24
**facility**
107:9
**fact**
8:23 11:19 12:15
23:13,13 24:4 28:2
31:20 32:4 38:21
42:17 51:7 53:5

70:11 71:24 77:12
79:19 80:9 81:23
82:15,23 83:5,7
87:8 94:25 95:6
100:18
**factor**
23:14 60:9 78:21
79:9,13,24 80:3,6
80:10,13,15 81:1,11
**factored**
23:16 24:2
**factors**
32:10 58:22 59:23
60:5 78:15,17 79:23
81:16,20 82:25 83:4
83:9 84:3,7,8 88:11
100:19 130:12,15
131:16
**facts**
8:16 9:2 14:10 16:25
25:13 38:19 39:2,17
44:2,12 49:17 50:6
50:12,12 60:23
79:17 84:3,6,17
85:14 86:24 90:8
92:8,12 127:22
**factual**
66:16
**failing**
114:1
**fair**
16:16 40:12 50:5
95:8 117:22
**fairly**
56:24
**false**
26:21
**familiar**
19:18 41:18 75:1
76:17 119:2 130:12
130:15
**family**
120:20
**far**
84:8 88:4 89:10
131:22

**FBI**
120:20
**fear**
22:22
**February**
100:9
**fee**
6:5 125:6
**fellow**
88:5
**felonies**
27:1,2,5,7 36:23
**felony**
26:5,13,16,20,21,21
26:23 101:3
**felt**
68:4 105:23
**fences**
35:25 36:13
**field**
13:1 108:19 109:9
**Fifth**
41:17
**fight**
98:23
**fighting**
23:20,23
**file**
22:7
**filled**
49:4,18
**find**
36:10 38:2 101:6
102:1,8,9,10,25
103:5
**fine**
7:8 129:5 130:2
132:24
**firearm**
51:2 91:8
**first**
4:17 28:16 29:10,17
40:12 42:19 56:15
63:2,6 71:10 88:11
95:18 98:16,20
119:13 122:19

124:4 129:10 130:6
133:10
**fit**
46:5
**five**
22:15 105:19 112:22
124:2
**flash**
75:21
**fled**
28:19
**flee**
28:17 37:21,24,24
45:25 46:3,8,18
47:15 48:9,9,14
66:5 77:14 80:4
83:19 98:23 130:18
131:19
**fleeing**
37:23 130:14,15,17
131:3,15,20
**flip**
129:16
**floor**
100:4
**Florida**
115:24 116:6 119:13
**flyer**
109:17
**focus**
13:15 85:12
**focusing**
84:1
**follow-up**
130:1 132:17
**following**
120:21
**follows**
4:18
**footage**
54:18
**footnote**
19:24 20:9,13,15,22
22:15,20
**footnotes**
20:25



**force**
11:23,24 12:1,5,18
  12:20 13:8,16,18,23
  14:3,12,19,21 15:8
  15:10,12 16:4 18:6
  46:11 52:21 57:3,6
  57:9,12,13,23,25
  58:5,8,10,14,17,18
  58:20 59:4,8,9,11
  59:12,13,18,22 60:4
  60:7,10,13,17,25
  69:17 72:8,21 74:15
  74:16 75:15,25
  76:16 77:4,7,11,21
  78:11 80:16,18,20
  81:23 82:3,18,20
  83:2 90:18 92:2,7
  92:23 96:1 97:4,7
  98:17 99:5 101:24
  103:13,17 117:11
  117:19,24 119:3
  120:5,6,24 121:21
  121:21 123:13
  124:14 131:12
**forced**
60:20
**forces**
76:15
**foregoing**
133:11
**foreseeable**
92:23 95:5
**forget**
118:16
**forgive**
99:11
**forgot**
96:24
**form**
12:9 13:10 14:25
  15:19 16:13 22:10
  24:11 30:20 32:2,20
  34:8 36:8 49:25
  62:23 64:2 69:12
  91:24 95:10 102:15
**formatting**

11:2
**forming**
17:20,25 21:13
  127:23 128:3
**forms**
76:24
**Fort**
109:19 110:2,5,15
  111:2,6,11 112:15
  113:2,6,13,19
  114:18 124:6
**forth**
133:9
**found**
36:2
**Foundation**
20:1
**four**
8:20 17:14,16,22
  18:11 63:22 105:19
  112:17
**fourth**
12:7,21 13:9,14,19
  14:4,13,20,23 41:14
**frame**
42:11 45:9
**frankly**
126:25
**frequent**
109:17
**frequently**
109:3 111:19 113:6
**front**
7:5 29:7,11,15 32:18
  33:2,3 47:11 67:12
  104:7
**frozen**
19:8
**full**
72:7 125:5 133:14
**fully**
16:14 84:2
**function**
11:18
**further**
93:23 98:1

**furthermore**
65:20
**future**
95:4

---
### G

**gain**
66:10
**gap**
42:10 45:15
**general**
74:24 90:25 100:1
  118:13,15,20
**generalities**
86:8
**generally**
69:5 70:24 81:25
**getting**
27:17 65:15
**Gina**
1:18 4:4 133:6,21
**give**
4:13 33:18 54:14
  65:9,15 97:11
  129:20
**given**
4:11 34:2 38:8,10
  53:10 54:3,4 67:21
  74:18 106:23
  117:16 118:4
  121:18
**giving**
89:25 90:1
**go**
6:23 9:25 10:1,4 12:9
  13:12 15:5,19 18:23
  41:2 44:17,18 45:1
  45:4 46:7 62:23
  63:25 77:7 83:18
  85:6 89:19,20 95:12
  96:5 103:22 118:15
  129:4,16
**going**
7:4 8:1,23 10:6 13:10
  13:13 14:24 19:4
  23:25 30:4 34:24

36:1,10 37:25 38:2
39:22 42:16 45:24
45:25 48:14 65:18
66:1 71:16 73:20
77:18,18,19,19 78:1
78:3,19 87:19 91:7
91:13 93:21,23
94:19,21 95:3,7,16
96:11 100:17
102:19 103:13
125:24 127:2
**good**
4:20 19:10,12 105:22
132:23
**Graham**
13:21,25 14:17,19
15:13,18 16:11,19
17:6
**grammar**
11:7
**gray**
101:14
**grounds**
12:9 14:24
**guess**
11:25 24:19 27:2
35:14 45:6,19 49:16
51:22 57:16 99:17
108:11 109:24
113:3 123:18,21
130:5
**guidance**
19:24 20:6
**gunman**
68:20
**Guttenberg**
120:10
**guy**
99:3
**guys**
19:8

---
### H

**hairs**
35:15
**half**



45:15
**hallway**
40:24 41:1,7 42:21
43:5,11,12 44:17,22
44:25 45:4 53:15,20
55:21 56:14,18,19
56:21 61:4 62:2,5
62:10 63:4,8
**hand**
24:24 25:1 56:17,19
58:3,8,12,16 62:11
93:24 99:4,5
**handcuff**
96:14
**handler**
24:20 65:25 83:13
88:22 89:20,22 90:4
90:17 91:16 92:1
93:11 94:23 97:8
109:7
**handler's**
92:4
**handlers**
93:12 94:9 101:22
107:11 111:18,22
**handling**
117:14
**hands**
62:12 67:15,22 68:8
69:9,11,14,19,25
70:1,20,22 79:21
**hands-on**
109:14
**hang**
53:18,18 85:5 86:21
**hanging**
66:23
**HANSEN**
2:11
**happen**
95:3
**happened**
27:17 84:24 88:8
96:15 97:5
**happy**
19:22 127:11,13,19

**hard**
112:21
**Haseltine**
25:23 29:7,10,17,22
30:2,9,14,19,25
31:3,10 32:4 38:9
**Haseltine's**
31:19 32:18
**head**
58:13,15 62:13
**header**
11:12
**hear**
5:2 19:8,9,10,11
28:25 72:10 126:13
**heard**
33:14,23,24 34:1,4
35:3 72:10
**hearing**
122:25
**held**
4:6
**help**
64:5,5,10 80:14 82:2
82:5
**hereinbefore**
133:9
**hide**
36:8
**hiding**
24:21 35:12,13,22,23
36:1 38:1,16 80:9
83:15,16 94:18
98:22
**high**
35:25 36:14 120:19
**hired**
104:23 109:25 110:1
119:20
**hit**
82:8 90:16
**Hodek**
46:13 53:8 54:25
56:15,18 61:2,12
62:1 67:21 70:18
80:16

**Hodek's**
61:16
**hold**
18:20 24:22 55:5
70:24 71:5,7 101:7
101:17 103:8,15,16
107:3,4,5 114:19,20
114:21
**holster**
51:16 58:19
**holstered**
51:4 70:2
**holstering**
51:19 52:1,4
**hoping**
36:1,9 38:2
**hostage**
78:10
**hours**
116:17 118:17,18
125:18,21 126:2,5
**house**
39:8 85:24,24
**huge**
90:22
**hundred**
113:4
**hypothetical**
60:18,22 67:9 82:14

———————————

**I**

**IACP**
3:19 17:18,24 18:3,6
18:9,12,16 19:16
**IACP's**
18:22
**identified**
9:2 22:4 57:20 61:10
62:7 76:13 84:2,9
127:22 128:1
**identify**
8:16 40:6 75:11,23
76:24 77:11 78:16
78:23
**immediate**
62:17,20 66:10 69:16

**immediately**
77:7,22 83:1
**implemented**
101:21
**importance**
24:8 25:9
**important**
90:3 93:20 94:14,17
103:20
**impossible**
23:18 65:6
**imprisonment**
26:21
**in-service**
116:22
**in-serviced**
116:18
**inappropriate**
90:18 92:8 97:7
121:21
**inappropriately**
11:18 83:22 90:14
**inch**
45:14,15
**inches**
66:23
**incident**
9:10 84:1,6,16 85:7
85:13,23 86:16 87:5
87:16 88:17 89:1,11
89:16 90:6,19 91:22
92:11 93:15,18
96:16,25 98:3,7
99:7 100:9
**incidents**
83:12 86:3,11,17,24
89:13,17 90:8,15
92:19 93:2,6 94:15
95:6,15,18 109:15
**include**
19:17,20 72:18 104:4
112:1
**included**
22:4 27:1,6
**includes**
125:6



**including**
1:22 38:8 58:23 74:2
76:6 81:8
**inconsistent**
15:13 52:13 53:17
69:5 81:25 82:17
87:9
**INDEX**
3:11
**indicate**
51:23
**indicated**
26:18 75:20 76:16
80:11
**indicating**
63:23
**indication**
48:2,13 50:1 64:7,14
97:20
**indications**
63:18
**indiscriminantly**
98:24
**indiscriminate**
99:5
**individual**
24:21 44:17 51:15
65:10,11,18 77:13
83:17,20 91:17
**individually**
119:12
**individuals**
23:8 32:15 82:3
101:19 123:6
**induce**
22:23
**industry**
101:9,16
**inferences**
31:24
**inflict**
83:23,24 94:19,22
**influence**
11:18
**informants**
113:22

**information**
7:24 26:9 32:1 46:21
71:10 85:18,19,21
89:4 92:16 98:21
100:24 110:14
131:14
**infringement**
121:13
**inherent**
92:22
**initial**
107:14
**initially**
28:25 35:19 66:19
113:25
**injured**
70:12
**injures**
92:3
**injuries**
9:11,12 90:24
**injury**
94:20,22
**input**
11:5
**inside**
9:16,17,23,23 75:13
77:17
**instance**
76:8 77:3 83:14 95:2
97:6,10 98:13,16
99:13,19 100:13
101:1
**instances**
109:4
**Institute**
116:11
**instructed**
67:15
**instruction**
117:16,23 131:14
**instructions**
4:25
**Integrity**
20:20
**intend**

12:13
**intended**
11:17 55:8,18
**intending**
12:6
**interacting**
32:14
**interaction**
29:6
**interested**
78:20 133:16
**interfere**
12:14
**interior**
40:15
**International**
17:17
**introduced**
68:25
**introducing**
52:10,15
**introduction**
11:12
**investigations**
110:4,25 111:21
112:5,11 117:12
**invoice**
125:9,13,18 126:2
**invoices**
125:16
**involve**
95:22 120:4,6,23
121:11,20 123:3
124:13
**involved**
10:22 69:2 98:10
106:10,11 113:1
119:9 123:12
**involves**
120:19 122:12
**involving**
9:10 83:13 85:13,23
86:12,17,24 87:23
89:11 90:6 92:10
96:17 99:8 121:23
122:15

**issue**
5:1 9:3,7 11:21 55:19
60:8 79:10,20 80:23
120:2
**issued**
33:3
**issues**
19:18
**items**
8:18,19 49:5 129:12

**J**

**J**
1:14 3:2 4:16
**Jane**
121:25
**January**
20:19
**job**
125:2
**jog**
44:18,18,23 45:5
**jogs**
44:20
**Jones**
2:10 3:3 4:19,21 8:7
8:12,15 12:12 13:22
15:4,24 16:15 17:1
19:10,13 22:14
24:15 30:23 32:5,21
33:1 34:11,16 49:9
50:4 63:1 64:8 92:9
95:11 102:18
103:22,25 126:12
129:20 130:2
132:17,18,21
**judged**
57:25
**July**
1:17 4:2 96:16 97:13
99:7 125:14
**jumping**
26:23 35:25 36:13
**June**
7:21,23 8:10,25 98:8
129:11 133:24



**Justice**
20:16 120:12,21
**justified**
59:24 82:8
**justify**
82:6
**juvenile**
83:16,21 87:9 90:10
90:19 91:13,22 92:7
94:12,17 98:8,20,21

## K

**keep**
10:10 66:1 87:4
**kept**
74:2
**kid**
98:25
**kidnapped**
113:22
**kind**
109:14
**kinds**
70:5
**kitchen**
40:24 41:5 44:16
**knew**
27:21,23 31:9 34:6
34:12,24 37:21 38:5
46:14,17,22 47:18
48:1,3,9 50:1,16,18
50:21,24 51:9,20
53:11 56:5,8 63:2,4
63:6 71:15,22 72:5
73:12,12 74:3 75:25
76:3 96:2
**knife**
53:21
**know**
4:23 5:3,7 6:25 7:1
9:17,18,25 10:1,2
15:6 18:19 19:1,3
23:20 25:3 26:4,5
27:15 29:18 30:3,10
31:14,15 33:24
38:15,17 40:8,14,17

40:20 41:1,4,7
43:16,16,17 44:15
44:20,21 45:2,18
46:4,13 47:6,8,8,10
47:18 48:1 49:7,23
50:7,13 53:18,22
56:21,23,25 57:6
61:2,7,25 62:4,9,14
62:16,18,21 63:2,4
63:7,14 64:20 66:4
72:11 74:21,23,23
75:4 77:17 78:22
79:15 94:10 96:7
99:22,23 100:24
101:17 107:16
109:5 112:17 113:4
113:21 116:4
125:21,24,24
126:14 131:22,25
132:4,16
**knowing**
27:23 32:19 38:18,23
39:13 43:22 44:24
47:16
**knowledge**
44:11 118:11,13
**knowledgeable**
68:22
**known**
34:10,21 38:15 39:7
47:24 71:16 72:6,7
73:13 75:21 76:1
**Koda**
24:19,24 52:17 55:15
55:19 65:21,24 66:2
66:25 67:2,8,11,13
67:20 68:7 69:7,21
69:22 70:18 71:9
72:1,3 74:6 78:12
80:23 81:12,17
83:10 84:13,18,20
84:25 85:15 86:12
86:13,18,25 87:2,12
87:17,18 88:3,9
89:6,17 90:8,12,20
91:2,3,15,22 92:13

92:18,19,24 93:4,16
94:7,25 95:1,7,24
95:25 96:23 97:9,15
98:12,15 99:13,19
99:24 100:13,15,21
100:22,22,25 130:8
132:11

## L

**large**
46:9,10 111:17
**lastly**
6:9 129:10
**late**
114:10
**Lauderdale**
109:19 110:2,5,15
111:2,7,11,16
112:15 113:2,6,13
113:19 114:18
124:6
**law**
7:25 13:1 17:18
21:12,19,24 22:17
25:6 32:13 46:6
59:17 82:1 83:23
96:4 99:1 115:16,22
118:13 126:22,23
**lawsuit**
9:3 25:13 114:1
**lawsuits**
106:12 113:16,19
**lawyer**
59:17 119:20
**laying**
94:3
**layout**
34:2 54:3
**lead**
52:5 72:12 74:3,7
76:3 84:18 86:12
87:17 115:2,3
130:12
**leadership**
116:17
**learned**

31:9
**leash**
74:3 101:20,22
**leaving**
77:25 109:12
**led**
47:22 50:23 51:11,19
61:10 66:17 78:15
81:17 83:9 84:3
85:22 86:17 87:1
89:17 90:8 91:14
92:12
**left**
44:18,23 45:5 56:19
109:7 110:2,5
**legal**
11:16,17 12:14
**legitimate**
83:23 96:4 99:1
**length**
5:15 82:11,22 83:9
**let's**
53:7 127:11
**level**
14:19
**liability**
122:12
**licensing**
107:9
**lie**
29:20,25 30:7,12,17
**lieutenant**
105:19
**likelihood**
70:12 92:22 101:24
**likewise**
66:21 130:19 132:4
**line**
57:14 60:15
**list**
6:6,14 7:18 74:18,19
75:14 78:19 81:7,22
90:11 110:14
116:25 117:4,15
119:7 120:9 121:14
123:15,16



**listed**
8:9,18 10:8 21:15,16
22:13 81:15 117:20
119:10,20 120:25
124:4,10 126:20
**listen**
88:16
**listened**
33:11 54:19
**listing**
123:19
**little**
43:5
**location**
25:17 46:18 52:24
**long**
6:24 56:21 78:25
82:24 112:14
**longer**
101:18
**look**
8:20 9:25 10:5 19:1
47:2 49:8 54:12
75:15 128:23
131:17
**looked**
49:14 83:12 102:10
**looking**
31:19,25 34:12 38:25
62:8 82:15 119:12
**looks**
41:18 42:11 56:24
**lot**
48:23 74:23 109:15
**lots**
106:6
**Louisville**
116:10
**lying**
44:3,13

———————
**M**
**Magna**
1:15
**making**
22:21 36:12 90:18

112:9
**male**
28:25
**manual**
119:2
**March**
128:6,20
**mark**
5:12 6:1,9,13 19:14
20:4,18 21:4 104:6
119:7 127:5 128:5
**marked**
5:19 39:24 119:6
**material**
94:5 126:17,20
**materials**
6:14 7:19,22 8:3,8,24
9:1 10:7 126:3
**matter**
4:23 5:14 6:15 7:10
10:19,23 11:6 22:7
57:20,22 70:25 71:5
90:4 123:1
**matters**
26:7
**mattress**
44:23 79:12 83:6
**mean**
10:13,13 12:19,19,22
12:23,24,25 13:3,4
13:7 17:7,9 22:1
23:22 28:3 33:3
34:17 56:2 57:9
58:8 63:6 66:12
75:12,24 77:15,16
77:24 78:4 90:11
94:10,23 99:25
106:11 113:3,3
125:24
**meaning**
77:4 78:7
**means**
7:6 23:23 37:25 48:3
48:11 74:12 132:4,6
132:9
**measure**

42:10
**measurement**
45:8
**meet**
4:20
**meeting**
109:12
**members**
92:20 120:20
**memory**
97:12
**mention**
48:6
**mentioned**
17:12 62:11 116:16
**Mercy**
115:25
**merits**
102:11
**MESHBESHER**
2:3
**Mesloh**
21:2,5
**methamphetamine**
26:17
**method**
101:15 102:1,8,10,25
103:17
**Miami**
123:5
**Michigan**
2:5 4:5 107:8 115:23
133:3,23
**midnight**
25:19
**Milwaukee**
2:13 4:22
**mind**
7:2 16:10 89:15
97:11
**Minneapolis**
2:5
**minute**
36:6,6 55:9 129:25
**minutes**
81:24 82:9,17,24

83:3 96:8
**mirror**
41:21
**mischaracterize**
49:7
**mischaracterizes**
13:11 15:2
**misreading**
91:4
**missed**
78:23
**misused**
95:1,2,4,7,13,16
**mix**
114:23
**model**
18:3,15,22,24 19:17
19:21
**modules**
118:24
**moment**
39:5 50:17 53:7 58:1
58:1,24,24,25 59:1
60:24 64:3 69:10,24
70:21 130:8
**moments**
84:11
**Monday**
1:17
**monthly**
107:12 108:17
**morning**
4:20 9:21
**move**
5:5 6:24 7:7 24:25
28:16 55:24 58:9
65:25 66:2 90:2,3
93:22
**moved**
33:2 49:22 53:15,20
55:2,21,24 56:14
62:1,5,10
**movement**
24:24 65:22,23 66:3
67:4,5 93:9 94:2
**movements**



67:25
**moves**
103:15
**moving**
24:22 44:5 60:6 63:3
66:1
**multiple**
26:22 64:6 88:24

**N**

**N-e-d-l-u-n-d**
100:12
**name**
4:4,21 20:1 96:18
107:13
**named**
106:12 113:18,24,25
114:1
**narrative**
123:25
**narrow**
42:3 56:24 63:8
113:4
**national**
17:18 103:2
**nationwide**
118:19
**nature**
120:1
**nearby**
107:10
**necessarily**
16:22 22:2 23:22
101:16 111:7
119:10
**necessary**
72:22 115:19
**Nedlund**
100:10
**need**
5:6 19:22 73:18
94:11 127:14
129:17
**needed**
59:9 69:14,17
**needs**

125:13
**negotiator**
68:24 74:9 78:10
**neither**
102:13,13
**never**
88:12 89:14 93:17,19
115:13
**new**
40:4
**night**
25:20
**nights**
125:2
**nine**
40:1 41:9 127:7,15
127:19
**ninth**
42:9 45:8
**non-deadly**
76:15
**normal**
15:16 16:3,8,10,17
16:23 17:2,8 23:21
111:23
**North**
2:12
**notary**
4:5 133:1,7,22
**note**
10:9 19:2 132:19
**noted**
7:21
**notes**
10:10,11,13,15,18,19
133:15
**notice**
123:24
**November**
109:24
**number**
32:7,10 52:11,19
58:21 59:23 77:12
81:7 88:11 110:12
111:21 117:15
124:18 131:19

**numbers**
125:25

**O**

**Oakland**
133:5,23
**oath**
4:18
**object**
12:9 13:10 14:24
15:19 16:13 22:10
24:11 30:20 32:2,20
34:8 49:6,25 62:23
64:2 69:12 91:24
95:10 102:15 126:9
**objection**
8:2,11 13:20 16:21
32:24 34:14
**objectively**
12:1 102:21,21
130:13
**obligation**
78:9
**observation**
22:21 24:1,9 25:5
**observed**
53:19,22
**observer**
108:6,8
**obstructed**
60:21
**obstructing**
31:3
**obstruction**
63:4,7,9 66:19
**obstructions**
56:4,12
**obvious**
41:6,20 68:9
**obviously**
6:23 46:10 53:25
61:11 70:12 78:22
88:5 109:5
**OC**
68:25 73:17 74:5
75:6,7,11

**occasions**
108:9
**occupied**
31:20
**occur**
23:13
**occurred**
37:3 38:11 53:11
94:16 95:6 97:4
100:1,2 130:24
**offense**
31:16,21 32:6,19
**offer**
12:4,14,17 13:7 15:8
87:14
**offering**
13:17 14:12,14,21
15:12 16:2
**offhand**
19:1 22:11 114:4
125:24
**office**
75:16 92:21
**officer**
13:2 15:10,22,22
16:23,24 17:5,10
23:16 24:22 28:8
30:24 31:6,18,24
32:18 36:21,25 37:6
37:10,15,19 38:4,9
38:10,13,20 39:3
42:25 43:21 45:22
45:23 46:6,13,16,16
46:20 48:8,12 53:10
53:13,24 54:25 55:6
55:11 56:15 57:2,10
57:19,21 58:7,9,11
58:15,16,19,21 59:3
59:18,19,25 60:3,8
60:10,12,15 66:11
67:10,17,18,20,23
69:21 70:17,25 71:8
71:11,25 72:6 74:10
75:7 78:7 80:19
84:13,17,21 85:3,8
85:9,12,13,15,21



86:4,10,12,13,16,17
86:25 87:1,1,5,15
87:17,23,24 88:1,2
88:5,6,9,12 89:2,11
90:6,7 91:9,11,19
92:7,10,12,20 93:3
93:17,18,24 95:8,19
95:22 96:7,8,17,22
97:2,4,14 98:10,10
99:8,15,21 100:4,6
100:7,8,21 103:18
106:24 109:6 110:1
112:9,17,23 113:8
114:13,15 115:5,11
115:13,17,22
116:19,23 118:14
130:13 131:9,13
**officer's**
45:22 46:16 47:13
99:24 100:16
130:21 131:4
**officers**
13:5 14:9 27:9,13,22
28:13,16,23 29:6,18
29:22,24 30:2,9
31:9 33:18 34:7,12
35:11,12,21 36:1,3
36:8,9,13 38:23
39:8,8,13,15,18
42:18,25 43:9,14
44:4 45:11 46:22
47:2,17,18 48:16
49:22 50:13,18,24
51:20 53:8,19 54:22
55:21 56:8 61:3
62:16 63:2 64:25
65:3,4,7,8,14 66:9
67:3,4 69:3,7,10,22
69:25 70:9,17,22
73:8,24 74:15 77:12
78:1 80:1 82:1 93:3
102:7 105:13,14,20
106:15,18,21 107:3
107:6,6,15,19,19
108:20 111:8,14,25
112:1 114:19 116:9

**Oh**
125:2
**okay**
5:18 6:25 7:9 10:16
17:13 23:1 25:14
26:15,19 28:1,3
41:14 55:14,18
59:15 66:17 70:16
71:8 78:17,18,23
79:8,19 85:11 86:9
86:23 87:13,22 88:1
91:7 97:12 103:22
104:17 106:23
108:10 110:11
121:2 123:21
125:15 127:9
129:20 130:1 131:8
131:13,21 132:15
**Olivares**
122:20
**once**
56:11 66:9 76:2 79:4
**ones**
21:16 40:6 86:15
107:16 124:10
**opening**
45:9,10 46:12 66:23
**opinion**
12:4,17 13:7,18
14:12,15,21 15:8,12
25:11 55:6 74:8
78:12 79:15 80:13
80:22 81:2 87:14
89:6 91:20 95:9
132:11
**opinions**
6:20 7:11,15 8:22
11:12 16:2,7 17:20
17:25 21:13 23:5,14
24:2,9,13 25:7
55:10,13,15 70:24
71:5,6 94:6,15
127:23 128:3 131:2
**option**
75:11 76:19
**options**

52:1,8 56:1 68:3,6,12
68:15 69:1,2,20
72:15,18 73:2,6,10
74:1,7,17 75:9 76:5
76:11 79:3
**order**
58:9 132:21
**organization**
107:14
**outside**
10:19 21:17 28:24
31:19 47:7 69:8,23
70:19 75:7
**outstanding**
26:2
**overall**
31:22
**oversight**
123:24
**overt**
36:12
**owned**
31:20

──────────────────
**P**
──────────────────

**p.m**
132:25
**page**
1:12 3:2,14 8:20
11:11 17:14,16,22
18:11,15,17 40:12
54:12 63:20,22,25
64:9 66:8 76:22
81:7 92:17 117:5
127:7 128:5,12,12
128:14,20 129:7,10
129:16
**pages**
5:15 6:24 110:14
116:25 117:16
123:15 127:15,19
**pain**
64:4 83:24
**pants**
99:24
**paper**

18:6 19:18 21:1
**paragraph**
11:10,11 18:21,22
23:12 129:11
**paraphrase**
33:14
**paraphrasing**
89:25
**Parkland**
120:19
**Parkway**
2:4
**part**
5:18 21:25 22:1,12
31:22 34:19 40:4
65:8 73:6 89:2,2,9
90:12,13 91:14
107:10 108:16,18
111:5,19 116:18
**part-time**
125:2
**Partially**
24:5
**participate**
108:12
**participated**
107:25 108:14
**particular**
11:10 15:23 18:12
86:20 91:4 92:1,6
102:20
**particularly**
22:22
**parties**
1:22 4:10,10
**party**
133:16
**passive**
35:22,23 36:5,9,11
80:7 94:18 132:1
**passively**
35:14,20 83:15
**patrol**
19:16 20:6 105:20
110:1 111:16,19,23
112:4,6,14,16,18,19



112:22 114:13
131:9
**PD**
114:16
**peacefully**
78:3
**people**
24:6
**percentage**
124:24 125:4
**PERF**
20:3,7
**perimeter**
52:25 73:20 77:13
**period**
54:21 106:21 124:20
**perplexed**
54:10
**person**
4:11 23:6 25:2 34:22
38:14,16 39:4,4
90:24
**personally**
106:10,11,13 113:1
113:17
**perspective**
39:1 103:21
**persuasion**
78:4,10
**photo**
40:8,12,18,21,21
41:12,12,14,17,19
41:24 42:5,7,9 43:4
43:11
**photograph**
43:22 49:7,8,14,15
**photographs**
9:6,9,12,13,14,15,22
40:1 49:21 70:5
**photos**
9:18,19 10:2,4 40:2,5
**phrase**
99:20
**phrased**
54:20 66:17
**physically**

65:5 67:24 71:19
84:23 85:1 89:23
94:23 96:9 97:23
**picture**
41:9 42:16 44:22
45:8,14
**pictures**
45:3 48:20
**piece**
32:1
**Pittsburgh**
22:17 25:6
**place**
70:6 73:20 83:18,18
133:9
**placed**
24:19 65:24
**plaintiff**
1:6 2:8 121:16 122:3
123:10
**plaintiffs**
123:10
**pleading**
80:14
**please**
5:3,7 64:5 81:6
**Plymouth**
104:14,20 105:10
106:3,15 107:1,20
107:20 108:4,23,24
109:21 124:22
**point**
5:6 6:24 8:18 10:24
18:11 23:1 24:1,9
25:5 33:2 35:10
36:7,15,19,19 37:7
37:11,16,20 38:5,12
38:25 40:16 43:1,4
43:8,15,16,20,24
44:24 53:3,12,24
58:2,2 61:9 63:20
67:23,25 91:2 93:14
94:25 96:5 101:16
115:10 118:17
131:23
**pointed**

17:23 70:4 73:2
**pointing**
103:3
**points**
61:15 110:18 111:10
**police**
12:25 13:4,15 14:7,9
15:16 16:3,8,10,18
17:2,4,17 19:25
20:20 24:6 26:7,10
26:18 28:4,15 30:24
31:11 33:7 38:3
42:24 66:14 69:5
72:6 73:8 78:1
81:25 84:16 85:13
86:10,16,25 87:5,15
87:23 88:1,5 89:11
90:7 91:9,11 92:11
99:8,21,25 101:20
102:7 104:12,14,22
104:23 105:23
106:3,6,7,12,14,24
107:1,18,20 108:4
108:19,24 109:8,20
110:3,15,23 111:2
113:13 114:7 115:4
115:10 116:11,17
118:8,12 120:3
121:22 123:12
124:21 125:1,5
131:9,12 132:5,7
**policies**
20:6 75:21 82:18,19
82:20,20 107:22
108:14
**policy**
17:18 18:3,15,19,22
18:25 19:17,21
75:15 87:10 101:21
112:12,12
**porch**
29:15
**portions**
22:8
**posed**
70:14

**poses**
60:2
**position**
52:22 57:11 69:15
79:18
**possession**
26:16
**possible**
57:2 59:4 60:12
74:16 80:4 99:18
112:25
**possibly**
39:9 52:22 68:20
**potential**
46:3 120:22
**potentially**
24:3 37:8,13
**practical**
23:18 109:6
**practice**
12:25
**practices**
12:25 13:15 14:7
15:16 16:3,8,10,18
17:3 20:6 69:6
81:25 120:3 123:12
**predicated**
74:9
**predictable**
95:3,5
**preface**
92:18
**premises**
122:12
**prepare**
126:8,14,15
**prepared**
7:10 14:6
**preparing**
6:18 7:19 10:22
126:3,5,21
**presence**
53:14 54:7 77:2,4,10
77:15
**present**
11:12



**presented**
118:24 119:3
**presenting**
131:3
**presents**
130:20
**pressure**
90:23
**pretty**
74:19 84:24 90:3
    91:9 113:5 118:18
    126:24
**prevented**
100:19
**primarily**
114:21,22 115:1
    124:7
**Principals**
20:19
**printed**
7:2,6
**prior**
6:7 16:1 90:14 92:18
    93:2,15,18 95:6,15
    95:18 99:21 119:7
    128:14 129:18
**probable**
117:13
**probably**
30:15 41:3 43:10,23
    112:22 116:4,8
    124:12
**probation**
31:10,14,21 32:4,19
**problem**
88:14 96:22 97:9,14
    98:12,14 99:12,18
    100:12
**problems**
99:18
**Procedure**
82:19
**procedures**
75:21 107:22
**proceed**
44:25

**process**
10:6
**product**
8:5,6 126:10
**professional**
124:24,25
**program**
116:10
**programs**
117:9
**progressed**
63:8
**prohibits**
101:21
**promoted**
112:19
**Promoting**
20:19
**prone**
79:18 83:6
**proofing**
11:7
**proofread**
11:1,4
**proofreader**
10:25
**property**
25:23 27:9,10,19,22
    28:20 34:7
**proportionality**
79:5
**protect**
114:2
**protected**
8:4
**protocols**
117:14
**provide**
11:5 76:19 107:23
    119:7 122:10,11
    131:2
**provided**
7:24 8:19 9:2 15:7
    85:18 86:3 117:2,7
    117:10,22 120:22
    125:8 126:18

128:17,22 129:7,13
    130:7
**providing**
128:10
**public**
4:5 133:7,22
**publication**
3:19,21 19:15 20:16
    20:19
**publications**
10:9 17:11,16 18:10
    18:13 21:11,17,18
    21:22 22:6,8
**published**
17:19,24
**pull**
82:7
**pulled**
27:14
**purpose**
83:24 96:4 99:2
**pursuant**
4:9
**put**
5:12,18 8:1 11:25
    18:6 19:25 20:4,18
    21:4 35:13 108:8

**Q**
**qualify**
53:4
**question**
7:5 8:13 10:24 11:22
    12:11 15:1,25 16:14
    18:10 25:3 41:3
    44:10 49:10,12
    50:11 55:7,18 57:4
    57:16 58:6 59:12
    64:22 65:2 69:21
    70:14 81:5 85:3
    86:6 87:11,12 95:14
    95:14 99:17 103:3
    108:1,2 115:9
    123:21 127:12
    128:18
**questioning**

73:3
**questions**
5:3 10:6 25:4,12
    34:17 39:22 60:18
    60:22 127:14
    129:21 130:1,5
    132:17 133:11
**quick**
100:7 130:5
**quickly**
5:5 55:19,21,24,25
    119:12
**quite**
8:12 111:17 126:25
**quote**
81:8 98:4,5 100:5
**quote/unquote**
102:2

**R**
**ran**
28:3
**rank**
109:25 110:2
**ranking**
109:5 112:9
**rational**
74:10 98:25
**rationalized**
72:21
**reach**
62:22
**reaching**
6:20 8:22 78:21
    79:10,19 80:13,22
    81:1,11 84:8
**react**
23:8,25 24:6
**reacted**
13:3
**reacting**
23:23
**reaction**
23:10,21 94:20 100:7
**read**
25:8 27:24 78:14



91:6 97:21 99:25
110:18
**reading**
22:11 97:22
**ready**
57:11 59:10,20
**real**
130:23,23
**realized**
55:25 56:2 63:9,10
63:14
**really**
40:8 58:6 68:4 73:25
84:1
**reason**
5:2 26:12,15,19,24
29:3 31:12,16,17
45:10,13 52:21 77:7
86:1 101:4,5 105:22
**reasonable**
11:24 12:2,18,21
13:8,19,23 14:3,8
14:20,22 15:10,22
16:24 17:4,10 28:7
28:8 30:24 31:6,24
32:17,25 36:21,25
37:6,10,15,19 38:4
38:12 39:8 50:3
52:14,24 53:10,13
54:6 59:24 60:13,16
61:1 65:17 67:18
71:8 72:2,13,21
73:10,24 74:7,17
75:24 81:18 82:12
83:10 93:5 96:13
102:12,21,21,22
130:13
**reasonableness**
16:22
**reasonably**
60:4
**reasons**
71:20 72:1,11
**reassess**
53:3
**recall**

9:22 11:1 22:17
27:25 40:11 53:2,6
67:13 71:12,14,15
71:18,25 73:14
81:19 84:22 85:1
86:2,4 87:3,12,18
88:3,9,12,15 96:23
97:9,15 98:12,14
99:13,16,19 100:13
100:14 102:2
107:13,17 113:20
114:3
**recalled**
67:14 81:12,18 84:4
86:1 97:18,21 99:21
**recalling**
100:20
**receive**
107:7 131:14
**received**
116:22 125:12
**recess**
103:24 130:3
**recognize**
5:16,20 6:3,11 20:7
40:14
**recognized**
103:8,19
**recollection**
63:12
**record**
8:2 116:21,24
**recorded**
133:12
**recording**
33:12
**recount**
64:10
**recruits**
118:25 119:3
**redeployed**
68:1,2,10
**reduced**
133:13
**refer**
7:2,6 18:15 19:24

21:17,22 22:16 57:5
**reference**
18:2,5 20:2 22:25
23:1,4 24:1 46:24
53:21 61:20,22
**referenced**
8:21 15:3 52:20
**references**
18:9
**referred**
10:9 17:19,24 18:7
18:13 20:15 21:1,13
**referring**
19:21 20:9,12,22
21:8 63:20 128:13
128:20 129:18
**refers**
128:9 129:12
**reflective**
90:19 91:22
**refresh**
97:12
**refused**
69:19
**refusing**
68:20
**regarding**
18:23 131:15
**regardless**
89:19 94:20 101:24
**relate**
9:9 16:2 23:14
**related**
133:15
**relates**
18:10 117:12
**relating**
9:2,6 10:18 21:11,19
22:22 26:25 84:5
87:16 94:6 111:11
112:10 118:21
119:21 127:16
**relative**
5:6 15:17 25:6 44:3
54:5 82:22 85:21
93:14 101:11

117:23 124:25
**release**
33:7 67:2 71:9,21
72:3,13 84:25 89:24
96:23 98:2 100:12
100:17,22 101:22
**released**
34:25 36:15,17,20
37:12 39:6 55:7,11
55:15,19 56:6 66:25
67:8,20 68:7 69:7
70:18 71:1 76:2
78:13 80:23 88:20
89:21 96:3 97:2
100:4 115:2
**releasing**
73:11
**relevance**
24:8
**relevant**
24:2,13,17 25:10
31:18 94:5
**relied**
17:20,25 18:7,13
21:13,21
**rely**
127:22 128:2
**remember**
29:2 49:12,13 109:11
114:6
**Remote**
1:15 4:1
**remotely**
1:22 4:9
**remove**
71:19 84:23 97:19
98:4
**removed**
94:23 97:23 113:25
**removes**
58:19
**removing**
52:1,3
**report**
3:15 5:14,16,20 6:2
6:11,18 7:10,19 8:9



8:20 10:8,10,23
11:7,11,13,15 12:4
12:13,17 13:11 14:6
15:3 17:12 18:3,5
18:15 19:21,24
20:10,13,23 21:1,9
21:14,15,16,18,23
22:5,13,16 24:13
26:7,18 31:11 54:12
57:5 59:19 62:6
63:17 64:14,22 66:8
68:18 72:4 76:22
78:13 80:19 84:12
89:7,10,10,15,22
91:2,5 92:17 93:1
99:25 100:5 101:6
102:2 104:2,17
119:6 123:16
124:11 125:22
126:3,17,19,21
128:12

**reported**
25:22

**reporter**
1:23 4:4,6,7 133:6

**reports**
26:10 28:15 38:3
48:2 66:14

**representing**
4:22

**request**
52:25 68:21

**required**
57:12 110:10

**Research**
19:25

**resist**
131:20

**resistance**
35:22,23,24 36:5,9
36:11 80:7 94:18
132:1,2

**resisting**
35:20 83:15

**resolve**
68:23 74:16

**respect**
78:12 93:15 101:9
119:3

**respond**
52:25 88:25 93:21
109:13,15

**responded**
27:17

**response**
24:4

**responsibilities**
111:20

**responsibility**
92:4 100:17 111:14

**responsible**
92:2

**restrain**
85:1

**retained**
119:23 120:12 121:5
121:16 122:3,22

**retainer**
125:12,15 127:18

**retire**
105:21,24 110:9

**retired**
104:11,14 105:3
110:3

**retirement**
105:7 110:6

**return**
93:11

**review**
9:5,13,15 22:16,17
44:11 50:5,12 61:13
61:18,23 78:13
87:21 108:15
112:13 118:20,23
126:19 129:13,25
130:23 132:20

**reviewed**
6:14,17 7:19,22 8:10
8:24 9:1,14,17,19
10:5 22:6 34:18
40:11 71:11 93:6
119:5 126:17,22

127:12 130:6
132:12

**reviewing**
9:22 10:7 126:3

**REYNOLDS**
2:11

**rhetorical**
25:3

**Rich**
8:13 19:10,11

**rich@stevemesbes...**
2:7

**RICHARD**
2:2

**right**
20:1 44:18,23 45:1
49:5 56:17 85:10,20
94:18 101:15 107:1
113:8,10 115:8,20
116:4 127:6

**ripped**
99:24

**risk**
92:22

**robbery**
26:6,13

**role**
104:25 107:18,22
108:6,7 109:4 112:1

**room**
4:8 28:20 45:12,17
46:23 49:23,24 50:8
50:14,20,25 51:2,8
51:9,12,14,21 52:5
52:16 54:7 55:3
63:5 66:10,12,13,19
66:22 67:3,8 68:5
69:8,23 70:2,19
78:8

**rotate**
129:16

**rough**
54:17,19,20

**roughly**
32:12 43:4 109:23
124:4

**routinely**
92:21 93:4 94:7

**Ruggeri**
1:18 4:4 133:6,21

**rule**
8:4 12:14 82:21

**run**
36:3 37:25 83:18

**running**
27:11,18 28:9,13
35:24 83:7 110:23

**rush**
73:22

---

**S**

**safe**
74:14

**safely**
60:4 68:22 75:18

**safer**
67:17 70:8 73:7,8

**safety**
69:3 130:21,21 131:4

**safety/deadly**
80:20

**San**
121:21

**saw**
99:14

**saying**
13:23 14:2,5 17:4,23
39:12 56:7 61:16
64:21 75:9 87:4
88:24 97:17

**scenario**
36:6 39:7 61:7 67:23
73:16

**scene**
9:6 28:8 30:24 36:21
37:7,11,16,20 38:5
38:13,21 39:3 77:12
109:4 130:23

**schedule**
6:5 125:6

**school**
100:3 120:19



**screaming**
64:4 82:4
**screen**
5:9,12,18 6:1 7:3,8
    19:4,5,7 20:4,18,20
    21:4,6 39:23,24
    40:9 41:12 127:2,3
    129:7
**scroll**
19:22 39:25 127:11
    127:13,20
**scrolling**
40:1
**se**
102:13,14
**search**
31:3 85:24 100:3
    101:19 117:14
**searched**
53:25
**searches**
115:3
**searching**
109:12
**Seattle**
101:20
**second**
18:20 26:16 36:7,7
    40:18 42:16 47:10
    47:20 48:6 56:15
    58:24,24,25,25
    66:10 73:23 82:6
    85:5 86:21 96:16
    97:11 100:4 120:9
    129:20
**Secondly**
88:14
**section**
25:10 27:25 93:1
**see**
5:9,11 18:9 19:4,11
    20:1,20 21:6 43:1,3
    43:9,15,17,18,21
    46:24 57:2,15,20,21
    58:3,7,15,23 59:3,6
    60:1,8,12 61:2,6,8,9

61:11,20,21,24 62:1
62:5,7,9,11,13,14
62:16,19,21 86:4
92:24 117:19 127:3
127:10 129:14,25
**seen**
38:24 40:2,3,4,6,8,11
    40:18 41:11,14,17
    41:18,25 42:14
    48:20 53:21 71:12
    71:25 84:12 127:10
**seizure**
117:14
**selling**
32:8,13
**sense**
24:3 28:5 51:5 66:6
    73:21 77:6,21 96:10
    115:21
**sent**
125:8,14,16 127:7
**sentence**
11:3,15 76:25 92:19
**sentences**
63:22
**separately**
104:6
**September**
21:5
**sergeant**
46:13 54:25 56:15
    61:2,6,12,16,20,25
    67:20 70:18 80:16
    109:7 111:16 112:4
    112:7,14,18
**sergeants**
105:19
**serious**
27:1,2,5 36:22
**served**
96:3 99:1 112:22
    124:9
**service**
109:18 110:8,8,10,12
**serving**
124:16,20

**sessions**
108:7,12
**set**
14:9 16:25 25:15
    49:1,5 52:24 53:7
    133:9
**setting**
50:17 55:20 86:10
    107:22
**seventh**
42:5
**share**
19:4 39:23 127:2
**Shelard**
2:4
**Sheriff's**
75:16 92:21
**shoot**
57:15,17 91:9
**shooting**
58:12 120:19,22
**short**
63:8
**shorthand**
4:5 133:6
**shortly**
25:19
**shot**
44:21
**shots**
9:23
**show**
6:9 34:25 35:6 40:18
    41:9,24 42:2 77:4
    77:11 93:3
**showing**
20:4 39:24 40:14
    42:10 44:22 45:8
    70:4 127:5
**shows**
41:4 45:14
**shut**
86:2 100:18
**sic**
100:22
**side**

29:11 49:2 56:17,19
    119:23
**sight**
57:14 60:15
**sign**
132:20
**significant**
90:24 91:9
**signing**
125:22
**similar**
13:3 40:21
**simply**
11:7 24:16 35:25
    65:19 66:4 67:14
    69:17 82:8 93:25
    99:2,5 106:6
**sink**
41:21 98:22
**sir**
15:5 95:12 129:23
    132:18
**sit**
61:25 62:4 67:11
    107:17
**sitting**
79:16
**situation**
13:3 15:17 16:4,9,12
    16:19 31:23 47:5
    53:3 65:24 68:19,23
    70:10 71:22 73:1,19
    73:25 77:8 82:15,16
    86:11 87:1,16,20,22
    87:24 89:21 92:10
    93:19 94:6,12 95:8
    95:13,16,19 96:7,15
    96:23 97:13 98:7
    99:8,22 100:21
    131:16
**situations**
94:11,13
**six**
17:22 18:11 54:12
    63:25 64:9 66:8
    112:22



**size**
38:10
**sleeve**
108:8
**slightly**
56:17,18
**slow**
59:15
**small**
125:4
**solemnly**
4:12
**somebody**
23:19,20,24 82:2,4
90:24 92:3,3 94:3
99:3 101:2
**somebody's**
58:7,13
**someone's**
58:15
**somewhat**
60:21 128:23
**sooner**
55:7,12 71:2 81:12
84:4
**sorry**
8:12,14 19:12 41:2
58:11 61:6 65:2
70:16 85:6 93:8
97:12,17 110:12
116:14 124:6 129:3
**sort**
42:17 49:1 54:17
56:17 110:18 112:1
131:4
**sound**
47:4 97:16
**sounds**
27:16
**Southern**
116:11
**speak**
64:25
**speaking**
23:11 86:7
**special**

**size**
110:3,25 111:21
112:5,11
**specific**
18:2,5,9,12 84:1 85:3
86:11 87:12,14 89:1
118:23 120:21
130:17 131:22,23
**specific/similar**
11:16
**specifically**
9:22 21:15 22:9
44:10 75:24 84:5
86:7 107:13 109:11
111:7 112:21
113:17 114:6
117:13
**speed**
35:25 36:14
**spent**
124:24 125:4,19,21
126:2,5
**split**
35:14 73:23
**spoke**
97:3
**spray**
52:11,15 68:25 73:17
74:5 75:6,8,11,13
**spreadsheet**
129:12,17
**spring**
42:11 45:9 63:15
**squad**
27:13
**SS**
133:4
**stamp**
128:15
**standard**
13:21,24 14:17,19
15:13,18 16:11,19
17:6 101:9,16
102:13 118:17
**standards**
118:18,19,20
**standing**

**specific**
31:18,25 32:18 42:25
43:18 45:5 54:8
79:16
**standpoint**
23:18
**start**
5:9 43:5 92:17
**started**
4:21 44:5 63:3
**starting**
17:14 83:5 110:23
**starts**
11:12
**state**
4:5 18:22 54:4
115:18,23,23 118:2
118:5,15 119:13
133:3,7
**stated**
72:4 82:18
**statement**
55:9 95:9
**states**
1:1 115:21 120:10
122:19
**stay**
67:11
**stenographic**
133:15
**stenographically**
133:13
**stints**
112:18
**stipulate**
4:10
**stomach**
79:11
**stop**
23:20,22 24:22 28:14
**stops**
112:16
**straight**
44:21 45:1
**strangulation**
26:20
**strike**

**state**
39:15 41:10,24 67:1
106:5
**structure**
11:3 105:16
**Student**
2:2 3:4 8:1,11,14
10:12 12:9 13:10,20
14:24 15:19 16:13
16:21 19:7,12 22:10
24:11 30:20 32:2,20
32:24 34:8,14 49:6
49:25 54:16 62:23
64:2 69:12 91:24
95:10 102:15 125:8
126:9,13,25 127:7
127:15,21 128:1,6
128:19 129:6,11,24
130:4 132:15,19,23
**studies**
7:25
**study**
103:2
**subject**
21:20,24 22:23,24
57:2 58:23 59:3,5
60:12,16 64:23,24
65:1 87:15 96:17
**subjects**
17:23 18:11 116:21
117:15
**substance**
118:11,23
**Suburban**
105:10
**subvert**
11:17
**sued**
106:5,6,9 113:15,22
113:24 120:20
**suffocation**
26:21
**suggest**
50:18
**suggested**
38:20 39:2,18 130:7
**suggesting**



58:10,11 75:6 76:4
114:24
**suggests**
46:25 71:13 114:22
**Suite**
2:4,12
**supervising**
112:2
**supervision**
111:25
**supervisor**
111:20 131:10
**supervisory**
111:13
**supposed**
103:15
**Supreme**
13:25
**sure**
10:3 12:11 16:14
17:8 23:6 29:2
41:16 55:10 57:4
60:23 76:9,14,18,20
81:5,21 88:19 97:13
101:12 103:20
128:22
**surprised**
54:9 93:17
**surrender**
35:18 63:18 64:14
78:2 80:11 83:2
98:24 132:5
**surrendered**
83:1
**surrendering**
63:23 64:7 130:8,10
**surrenders**
101:25
**surrounding**
62:17,20
**survey**
103:2
**suspect**
24:25 50:1 51:1,17
52:12,20 58:3 59:6
60:1,2,9 61:10 62:7

65:5,24,25 66:4,5,6
67:12 68:5 70:10
71:20 72:22,23
74:11 78:8 82:8
83:15,25 84:23
85:25 89:24 90:1
93:10,22,25 94:20
96:2,10,11 97:1,19
97:23,24 98:4,20,21
101:2,25 103:14,15
109:12 130:14,16
130:20 131:3,3,15
131:18 132:5,7
**suspected**
36:22 50:3
**suspects**
46:7 98:2
**sustained**
9:11
**SWAT**
52:10,15,25 68:24
72:18,24 73:9 74:5
74:21,23,24,24,25
75:2,4
**swear**
4:12
**sworn**
4:9,11,17 105:14
133:10
**syntax**
11:7

——————————
**T**
——————————
**table**
3:1 117:1
**tactical**
47:4 51:5,7,13,18,25
52:8,14 56:1,4 68:3
68:6,12 69:4,19
70:10 72:15,18 73:2
73:6,10 74:13,14
76:11
**tactically**
67:16,17
**tactics**
131:12

**take**
19:3 51:16 103:23
125:3,25 129:24
**takeaway**
26:11
**taken**
1:15 51:3 60:5 75:18
77:20 78:1 84:7
97:20,24 133:8,15
**talk**
17:2,16 63:17 76:22
87:19 89:7,14 96:16
98:7 99:7 100:9
101:6 132:16
**talked**
70:24
**talking**
8:3 9:21 18:20 28:25
29:1 57:7 85:7
86:21 87:6,25 88:22
**tantamount**
82:4
**tape**
42:10
**target**
57:15,18,20,21 58:14
60:21
**taser**
69:1 73:17 74:6
75:23 76:6,7 82:6,7
**team**
52:10,15 68:22,24
72:19 73:9 74:5,21
74:23,25 75:4
**teams**
74:24,25 75:2
**tech**
22:20
**technique**
102:13 103:1,9 107:4
114:20
**techniques**
76:25 101:10
**tell**
45:3,4 49:14 65:5,11
85:14 94:14

**telling**
24:22 90:1 93:25
**tells**
88:2,8
**tenure**
107:2
**term**
37:24 77:11 113:10
**terminology**
11:16 17:9
**terms**
12:7,20 16:4 51:14
75:6 105:12 106:1
**territory**
99:11
**testified**
4:17 47:17 61:8 63:6
67:10 87:19 89:23
93:19 119:11,16
120:16 122:5,24
123:8,20
**testify**
123:22 133:10
**testimony**
4:10,12 6:7 13:12
15:2 46:16,17,19,20
47:13 48:5,8 51:10
51:21,22 52:18
56:11,16,20 61:5
63:10,13 74:10 78:7
119:8,9 121:7,18
**Thank**
5:8 96:24 105:6
121:2 122:12
127:13 129:21,23
132:18
**that--**
55:5
**theorize**
99:17
**theory**
103:16
**thing**
17:8 112:12
**things**
23:17 32:7 36:6 52:3



52:12,16,19 81:8
113:6 132:16
**think**
12:23 13:13,14 14:5
14:16 15:25 17:7,7
17:9 19:7 22:11
28:7 43:20 55:24
59:12 61:9 63:9
65:7 70:14 73:15
74:19 76:9 82:14
90:16,16,16 93:20
94:10 95:3,4 98:14
101:5,14,15 103:21
106:21 109:24
111:17 113:16
115:4 116:5 117:11
118:6 122:8,8
125:17 126:20
**thinking**
28:6
**third**
41:9 43:4,11 98:7
**Thirty**
59:17
**THOMAS**
1:14 3:2 4:16
**threat**
51:24 60:3 130:21
131:4
**threatening**
79:25
**three**
3:18 6:10,13 7:17 8:9
8:19,25 10:8 11:11
26:16 33:20,21 52:3
63:22 106:22
112:17 113:18
114:10 126:20
128:12,12 129:8
**thumb**
82:22
**Tiderington**
1:14 3:2 4:16,20 5:10
19:15 53:18 104:1
127:3 129:21
**ties**

22:20 23:4
**time**
7:12 26:1 27:23
35:10,21 36:15,19
36:19 37:7,11,16,20
39:14 42:22 45:11
48:19 52:25 54:21
61:15 66:10 67:8
71:12 72:25 82:22
83:10 87:3 89:22
90:23 92:2 104:25
105:24 106:23,23
106:24 110:19
111:11,18 112:8
113:12,23 114:21
124:20,24,25 125:4
125:5 127:2,10
130:8,24 133:9
**timeline**
54:14,16 128:9,13,18
128:19,21,23 129:6
**times**
23:9 33:20,21 54:19
57:5 60:20 61:6
64:6,11 66:8 83:22
88:17,24 106:6
109:1,2,2,13,17
112:25 113:4
125:11
**tips**
120:21
**title**
104:25
**titled**
20:5
**Tobacco**
121:3
**today**
61:25 103:6 104:10
107:17 125:16
126:21
**today's**
126:6,8
**told**
29:17,17,19,22,24
30:2,3,6,9,9,11,14

30:16 38:9 65:25
66:1
**top**
58:15
**torturing**
82:4
**total**
106:22
**totality**
72:16 79:13 81:14
102:19 131:17
**Township**
104:14,20 105:10
106:3,15 107:1,20
**trade**
32:14
**trademark**
121:12,12
**traffickers**
32:10
**trailer**
9:15,16,18,23,24
27:18 28:19,20,21
28:24 29:1,7,10,12
29:23 31:19,20 32:9
32:18,23 33:3,6,8,8
33:23 34:3,22,25
35:4 36:16,20 37:12
37:17 38:11,14,14
38:17,22 39:5,6,19
39:22 40:15,25
42:18 44:4 45:17
46:15 47:3,11,12,19
47:21,22 48:17
49:22 52:10 53:12
54:22 55:2,16 56:9
56:12 63:3 71:1,9
71:17 72:3,14 73:11
73:21 74:6 75:7,8
75:14 77:14,17 78:9
83:17
**trained**
13:2 24:23 33:18
64:25 65:4,9,11,15
65:21 66:2 68:23
88:20 90:2 93:9,9

93:10,13 94:1,2,2
98:2 101:10 103:14
107:3 111:23
114:19 118:12
**trainee**
118:1
**trainer**
108:1 117:2,3 118:4
**training**
23:8 65:7,9,15 87:10
90:5,21 107:7,9,12
107:14,19,23,24
108:3,7,10,12,17
113:7 115:19
116:17,18,22 117:1
117:4,7,9,23 118:2
118:4,17,21,24
130:11,19 131:1,13
131:22,23,25
**trainings**
117:4
**transcript**
3:12 34:19 54:17,18
54:20 119:18 121:9
122:7 132:20
133:14
**transcription**
133:13
**transcripts**
122:9
**treat**
70:9,9
**treated**
68:18,19 90:25
**Trevor**
1:5 29:18 30:3 94:6
94:15
**trial**
119:11 122:24
123:20
**trick**
86:6
**trier**
12:15
**triers**
11:19



**trigger**
82:7
**true**
62:19,20 103:6
106:19 109:1 112:4
118:7 133:14
**truly**
52:12 53:1 69:3
**truth**
4:13,13,14 133:10,11
**try**
5:5 23:21 46:7,11
70:16
**trying**
16:16 24:16 35:10
37:21 38:6 45:11
57:19 65:3 66:5
86:6,7 110:13
131:20
**turned**
83:16,20
**Twenty**
110:12
**two**
3:17 6:2,5 10:14,17
28:25,25 54:22 61:3
70:24 71:1,4,6
81:24 82:9,17,23
83:3 93:12 104:12
105:18 106:18,20
113:18 114:10
119:6 121:25
122:18 123:15
124:11 125:3,6
128:5,20
**type**
26:8 51:2
**typical**
15:16 16:3,8,10,17
16:23 17:2,8

**U**

**ultimate**
11:21
**ultimately**
81:3 93:14

**unable**
66:9,11,22
**unbroken**
57:14
**unconstitutional**
102:14
**uncontrollable**
91:12,18
**undergo**
113:7
**underlying**
8:17 25:13
**underneath**
70:7 83:17 105:16
**understand**
5:13,23 11:4,21
12:11 14:11 15:18
16:5,14,16,18 17:23
19:15,17 24:16
32:12 38:19,25 39:2
39:17 55:5,5,10,14
56:7 57:4,16 59:15
64:20,21 65:3 79:8
81:22 84:2 86:7
91:20 93:1,21 97:21
98:15,25 104:20
109:19 115:9,25
116:9 117:1 128:25
132:6,9
**understanding**
14:8 15:11 22:21
25:12,18 26:3 27:12
28:12,22,23 29:9
33:22 34:6,18 42:17
42:20,23 43:8,14
44:2,9,13 45:20
46:18 49:17,20 50:6
50:11 51:10 54:24
56:16 61:14 77:10
79:11,14,17,20,24
80:3,5,6,10,15 81:2
81:10 82:19 83:6,8
85:9 97:22 98:11
100:1,8 118:15,19
**understood**
5:3,4 7:4 16:1 43:20

54:21 79:9 97:4
123:25
**uniformed**
99:15
**unit**
18:23 111:3,5,8,15
111:17 114:18
115:6,11
**United**
1:1 120:10 122:19
**University**
22:17 116:10
**unjustified**
98:16
**unjustly**
91:17
**unnecessary**
71:21 99:6
**unobstructed**
60:15,19
**unpredictability**
101:23
**unpredictable**
72:5 88:4,6 89:6,18
90:9,13 91:12,15,23
92:13
**unreasonable**
12:6 14:13 60:14
71:21 81:24 82:10
82:13,17 94:8
100:25
**unreasonably**
95:25
**urgency**
73:18,22 77:6,21
**use**
11:16 12:6,17 13:16
15:17 16:4 18:6,16
21:12,19,24 37:4,24
52:21 57:23 58:20
59:19 69:17 72:8,21
74:12,15,16 75:2,15
75:19,23,25 76:15
76:16 77:7,11,21
78:10,11 80:16,18
81:23 82:1,3,18,20

83:2 87:8 89:10
90:18 91:10 92:2,7
97:3,7 98:15 99:5
100:25 101:24
102:9 103:17 107:3
112:10,13 117:10
117:11,19,24 119:3
120:5,6,23 121:21
121:21,23 122:15
123:3,13,13 124:14
131:12
**uses**
93:16
**usual**
4:24
**utilization**
18:23
**utilize**
111:19
**utilized**
76:18 113:5

**V**

**v-**
13:25 119:13
**vantage**
40:16 42:25 43:4,8
43:15,20,24
**various**
10:9 76:24 77:17,25
78:14 107:11
109:15 113:6 117:4
**venues**
117:4
**verbal**
63:18 64:14 78:4,10
84:14,19 85:16
86:13,18 87:2,18
88:3,10 89:3
**verbally**
53:5 63:23 71:12,14
71:15,18 73:13
80:11 84:25 85:1
87:12 97:18,21 98:2
99:16
**verify**



122:9
**versus**
7:3 59:13 101:6
103:18 120:10
121:25 122:19
123:5 125:5
**vest**
51:3,16
**vests**
51:8,18 52:2,4 70:3
**vicinity**
130:22
**vicious**
23:9 72:5
**victim**
97:3
**video**
4:25 9:17 10:2,2
40:10 41:18 130:23
130:24
**videoconferencing**
4:7
**view**
15:9,15 42:18 53:7
60:21 61:14 73:12
82:5 88:13 90:5
91:11 94:5,7 96:4
98:1 99:1 101:1
**viewing**
49:21
**violated**
13:9
**violation**
121:12
**violent**
27:7 36:23
**virtue**
90:21
**voices**
28:25 29:1
**volume**
34:2
**vs-**
1:7

———————
**W**
———————

**W-a-i-t-e**
119:13
**wait**
55:9 77:18 78:3
**Waite**
119:13
**walk**
51:16 65:19,19 66:4
66:22 69:18 78:19
93:10,25
**walked**
51:4
**walking**
52:2,4
**want**
6:24 7:7 9:25 11:10
13:13,15 14:11
17:11 25:12 28:3,10
35:14 49:8 64:16,22
66:12 72:10 81:21
84:2 91:20 99:11
126:13,14 127:20
129:4 130:5
**wanted**
22:15 26:1 68:11
80:11 101:3 132:16
**warning**
33:17,20
**warnings**
33:4,18,23 34:4,24
35:3 38:9 77:24,25
**warrant**
26:6 85:24
**warrants**
26:2,4,10,13,16 27:1
27:6
**wasn't**
15:9 46:10 48:7
66:16 69:15 73:20
76:21 86:2 99:12
**watch**
108:10
**watched**
33:11
**waving**
58:12

**way**
12:22,23 17:4 23:24
27:23 37:24 38:17
38:23 39:13 43:22
44:24 46:3 47:4,16
50:19 61:3 66:17
71:4 73:7 77:13,19
83:18 91:22 92:21
93:4 94:1,8 95:25
106:2 114:18
123:21
**ways**
24:17 25:5 72:20
**we'll**
87:8
**we're**
4:25 9:21 77:18,18
77:25 78:3 79:4
87:19,25 90:11
125:24
**we've**
48:20 81:16 99:11
**weapon**
37:4 51:2,16 53:1
57:10 58:4,19 59:10
59:19 70:6,8 81:3,9
83:8 91:1 99:4,4
**weapons**
32:22 37:17 49:24
50:2,7,9,13,16,19
50:21,24 51:4,9,12
51:19,20,24 52:1,4
52:7 53:14,19 54:7
70:2
**weather**
102:19
**website**
118:16
**weekend**
125:2
**weeks**
104:12 105:3
**went**
28:19 70:2 109:20
112:19 116:9
**weren't**

50:24 51:9,20
**WESTERN**
1:2
**whatsoever**
51:6
**white**
18:6
**wide**
45:10 56:23
**width**
42:10
**wife**
10:25 11:5
**window**
46:2,4,7,8,23,25
48:14,18 73:3,5
**windows**
45:18,20 46:1,14
**Wisconsin**
1:2 2:13 115:16,18
118:2,5,9,13,21,25
119:4
**witness**
4:7,8,11,15 6:21 7:12
10:7 19:9 124:25
129:23 132:20
133:10,12
**witnessed**
107:24
**wonder**
66:17
**woods**
30:15
**word**
22:3,11 113:8 119:2
**words**
29:14 33:14 63:25
64:6,13 71:24 80:17
88:15,21 98:4
**work**
6:6,15 7:23 8:5,5,25
9:5 10:18 11:6 22:7
34:19 115:5,7 120:1
125:9 126:10
127:17,23 128:2
**worked**



61:3 107:6 114:7
  115:13 123:17
**working**
23:7 105:8 111:8,10
  124:1
**worries**
59:16
**wouldn't**
28:2 46:11
**write**
11:15
**writing**
127:16,21,25
**written**
89:10 116:21,24
  125:22 126:19
**wrong**
85:25
**wrote**
63:23 66:14 80:19
  81:7 89:22

**X**

**Y**

**Yeah**
13:13 19:12,12 89:13
  123:9
**year**
18:19,24 106:21
  113:5 116:3,6,13
  119:14 125:4 128:7
**years**
13:1 32:13 59:17,17
  74:25 101:21
  104:21,22 105:22
  105:23 106:19
  109:16,17,20 110:8
  110:8,12 112:17,22
  114:10 118:14
  124:2
**yelled**
33:6
**yelling**
88:17

**Z**

**zero**
59:17

**0**

**00067**
128:15

**1**

**1**
1:12 3:15 5:13,19
  6:23 7:10 39:25
  40:13
**10**
92:17 109:2,16
  111:17 129:24
**10:00**
1:16
**10:02**
4:3
**104**
3:16
**10th**
128:20
**11**
19:24 20:9 45:14
**11th**
7:21,23 8:10,25
**12**
45:14 66:23
**127**
3:23
**133**
1:12
**14**
20:25
**15**
18:15,17 21:1
**16**
20:15,23
**17**
20:13
**18**
1:17 4:2 63:22 81:7
**19**
3:19 76:22

**1978**
116:4
**1981**
109:23
**1982**
116:8
**1990**
116:14

**2**

**2**
3:16 104:7
**2,000**
116:16
**2:03**
132:25
**20**
3:20,21 78:1 104:22
  105:23 106:19,20
  106:21 109:16,17
  109:20 124:18
  133:24
**2001**
20:16,19 109:23,24
  124:7
**2002**
109:24
**2005**
124:5
**2006**
21:5
**2015**
19:16 122:19 123:6
  123:17 124:4,8
**2016**
122:18,19
**2017**
98:8
**2018**
96:16 97:13 99:7
**2019**
101:9,12 102:6,24
**2020**
100:10
**2021**
120:9 121:2,3,14,25

**2022**
1:17 4:2 7:21
**2024**
133:24
**21**
3:22 104:21 109:22
  113:5
**21-CV-565**
1:7
**22**
109:22 116:25 117:5
**24**
117:5,16
**25**
110:14 116:25
  117:16 124:19
**26**
8:4 110:14

**3**

**3**
3:17 6:2 119:7
**30**
105:14 123:15
  124:12
**301**
2:12
**310**
2:4
**32**
105:14
**33**
123:15
**34**
5:15 6:23

**4**

**4**
3:3,18 6:10,13 7:17
**40**
32:12 74:25 118:14
  124:12
**400**
2:12
**414.326.4952**
2:14



**44**
13:1 105:22
**476**
118:18
**486**
118:17

---
### 5
**5**
3:15,19 19:14,20
**50**
105:14 113:3
**52**
3:4
**53202**
2:13
**55441**
2:5

---
### 6
**6**
3:17,18,20 20:5
**612.332.2000**
2:6

---
### 7
**7**
3:21 20:18
**70s**
114:11
**7805**
1:18 133:21
**79**
116:4
**7th**
129:11

---
### 8
**8**
3:22 21:4
**88**
116:14
**89**
116:14

---
### 9

**9**
3:23 127:5 128:5
  129:8
**90**
116:15
**9800**
2:4

