IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

TREVOR DAVIS,

                Plaintiff,                                      OPINION AND ORDER

v.

                                                          21-cv-565-wmc

CHRISTOPHER ALLEN,

                Defendant.

Defendant Christopher Allen, a police officer with the Barron County Sheriff's Department, ordered a police dog to "bite and hold" plaintiff Trevor Davis for approximately two minutes during his arrest on multiple warrants. As a result, Davis suffered severe and permanent injuries to his left arm. In this lawsuit, Davis claims that Allen's command to his police dog constituted the use of excessive force in violation of the Fourth Amendment. Before the court is Officer Allen's motion for summary judgment (dkt. #14), arguing that his use of force was reasonable under the circumstances, but even if not, he is entitled to qualified immunity. Because there are genuine disputes of material fact regarding how much force a reasonable officer would use under the circumstances here, summary judgment will be denied.

UNDISPUTED FACTS[1]

On the night of May 9, 2019, the Barron County Sheriff's Department received an anonymous call that Davis was present at a property of a known drug offender in Cameron, Wisconsin. At the time, Davis had multiple outstanding warrants for his arrest, including

---

[1] Unless otherwise indicated, the following facts are material and undisputed. The court has drawn these facts from the parties' proposed findings of fact and responses, as well as from defendant Allen's bodycam footage of the incident.

for armed robbery, possession of methamphetamine, strangulation and suffocation, false imprisonment, aggravated battery, disorderly conduct and bail jumping. Several officers from the sheriff's department responded to the Cameron property, including defendant Allen and his patrol dog, "Koda." When the officers arrived, Davis was sitting in his car, but as soon as he saw the police vehicles, Davis exited his car and ran out of view.

After exiting their own vehicle, Deputies Allen and Koda, Sergeant Darren Hodek and another deputy approached a residential trailer on the property and spoke with its resident, David Haseltine. Haseltine initially denied knowing Davis, denied that he was on the property, and denied that anyone was in the trailer. Although the police officers had not seen Davis enter the trailer, they nevertheless suspected that Davis was inside based on the direction he had run and Haseltine's demeanor. Moreover, knowing that Haseltine was himself on probation for a drug conviction, the officers told him that they were going to search his trailer, after which Haseltine conceded that he was lying about not having seen Davis.

In light of Davis's warrants for crimes involving the use of drugs, a weapon and violence, as well has Haseltine's prior drug conviction, Deputy Allen was concerned that Davis might be armed or that there might be weapons in the trailer. In addition, the trailer was a small, cluttered space with a narrow hallway and items strewn about, such that Koda could access spaces that the officers could not readily see. As a result, Sergeant Hodek and Deputy Allen decided to send Koda into the trailer first to search for Davis, who had indeed gone into the trailer and by then had gone into a bedroom located in the back of the trailer and lay down on a mattress on the floor.

Before releasing Koda into the trailer, however, Deputy Allen yelled: "Sheriff K9. Announce yourself now or I will send the dog in the house. You will be bit." After a pause, Allen again yelled: "Sheriff K9. Final warning. If you're in the house you need to announce yourself now or you will be bit. Final warning." After Allen received no response, he gave Koda the command, "Find him," then released Koda into the trailer.

According to Davis, he heard Allen's announcement from the bedroom where he was hiding, but decided not to respond or leave the bedroom. Although unbeknownst to the officer at that time, Davis further represents that instead, he lay face down on the bedding, with his head pointed towards the door of the bedroom, his hands behind his head and his fingers interlaced. He also admits hearing Koda moving about the trailer, but still failed to announce his presence to the officers.

Within a few seconds, Koda found Davis in the bedroom and bit him on his upper left arm between his elbow and shoulder. Koda was trained in a "bite and hold" technique, which meant that he would not release Davis's arm until ordered to do so by his handler, Deputy Allen. Davis began to yell, "Help, help, help me," to which Allen responded, "Show me your hands. Do not fight my dog. Show me your hands. Do not fight my dog. Come out to me. Come out to me." Davis continued to shout for help, yelling, "Help me please, help I can't, I need your help." Deputy Allen and Sergeant Hodek then entered the trailer and moved through the kitchen and into a narrow hallway toward the back bedroom, continuing to command Davis to come out. While moving through the hallway, Sergeant Hodek also told Allen that he had seen a knife in the trailer, and both officers drew their firearms. As the officers approached the bedroom door, Allen saw glimpses of Davis through the door, such that Allen could alternatively see Davis's face, one of his hands,

3

and at times, his face and one of his hands. However, the entry and view into the bedroom were obstructed by a large box spring standing on end and protruding into the doorway.

Deputy Allen had a better view of Davis once he reached the threshold of the bedroom door, which was open about 12 inches. However, the parties dispute how much the officers could see of Davis through the bedroom door. Allen concedes that once he reached the door, he was able to see both of Davis's hands, at times, but that Davis's body was obscured by piles of clothing and bedding on the mattress where he lay. Davis says that he was on top of the clothing and bedding, not under them, and that his hands were raised behind his head and clearly visible to Allen from the doorway. It is clear from the bodycam footage that once Allen reached the doorway, Davis continued to yell for help and yelled, "please make him stop, my arm," "look what he is doing to me," and "look what he is doing to my muscle, help, help me please."

Due to the box spring obstructing the doorway, the officers could not enter the bedroom without removing their Kevlar vests. Allen and Hodek attempted to push the box spring out of the way but were unable to do so. They decided to remove their vests so that they could enter the bedroom, with Allen entering first and Hodek providing cover with his firearm. When Allen and Hodek reached Davis, they could see that both of his hands were raised and on or near the back of his head. Allen then grabbed Koda's collar, ordered him to release Davis, and placed him on a leash. At that point, approximately two minutes had elapsed between the time Koda first took hold of Davis and the time Allen commanded Koda to release Davis.

Hodek handcuffed Davis and led him out of the trailer, after which a tourniquet was applied to his arm. He was then transported to a local hospital by ambulance, and

4

subsequently flown by helicopter to a hospital in Eau Claire. As a result of the canine bite, Davis's arm is disfigured and permanently disabled. He also reports constant and severe pain in his left arm because of his injuries.

## OPINION

Plaintiff Davis contends that defendant Deputy Allen used excessive force in violation of the Fourth Amendment when he ordered his canine partner to find and bite him, and then permit the dog to bite Davis's arm for two minutes before recalling him. Allen contends that his actions did not violate the Fourth Amendment, and even if they did, he is entitled to qualified immunity.

### I. Fourth Amendment Excessive Force

Deputy Allen's ordering Koda to "bite and hold" Davis was a seizure subject to the reasonableness requirements of the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Whether force is reasonable "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985). Courts must evaluate the reasonableness of an officer's action not through "the 20/20 vision of hindsight" but from "the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396. A police officer's use of force is unconstitutional if, judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest. *Becker v. Elfreich*, 821 F.3d 920, 925 (7th Cir. 2016).

5

Certainly, Deputy Allen's order for Koda to "bite and hold" was a significant use of force, "at the higher end of the spectrum," meaning that the government's intrusion on Davis's rights was significant. *Id.* at 926. Accordingly, the court must balance this significant intrusion with the government's interests at stake. Allen argues that his actions were objectively reasonable, based on the information he had at the time: (1) plaintiff had outstanding arrest warrants for multiple felonies, including crimes involving weapons and violence, which meant he could be armed with one or more deadly weapons; (2) he had bolted from his car and fled from law enforcement; (3) he was ignoring instructions to surrender; and (4) the trailer was small but cluttered, making it unsafe for officers to search without the assistance of a canine.

The court agrees that these circumstances made Deputy Allen's initial decision to direct Koda into the trailer to search for and detain Davis objectively reasonable under the Fourth Amendment, especially when Davis may have been armed and dangerous, had already evaded officers, and was hiding in a location difficult for officers to approach safely. *E.g., Becker*, 821 F.3d at 927 (officers may be justified in using a K9 to locate someone who might be armed, is concealing himself in a house, and could ambush officers); *Johnson v. Scott*, 576 F.3d 658, 660 (7th Cir. 2009). However, given the parties disputes of fact, it is a closer question whether those same circumstances justify Deputy Allen's failure to order Koda to release Davis earlier than he did so, and potentially mitigate the significant injury to Davis's arm and related pain.

Specifically, Davis contends that Deputy Allen should have ordered Koda to release Davis as soon as Allen heard Davis screaming for help. Davis further contends that it was objectively unreasonable to order and expect Davis to "come out" with Koda locked on his

6

arm. In support of his argument, Davis cites to the report of his police practices expert, who opines that a reasonable and well-trained deputy would not have permitted a canine unit to bite a suspect for two minutes after the dog had located the suspect. (Thomas Tiderington Rep. (dkt. #19) 17–19). Instead, Tiderington opines that a reasonable officer would have recalled the dog and ordered Davis to exit the bedroom with his hands up or, if that failed, a reasonable officer would have used a SWAT team to create a perimeter around the trailer in which Davis was confined, then used pepper spray or a taser (or otherwise attempted) to persuade Davis to surrender. At the very least, Davis argues, Deputy Allen should have recalled Koda once he had proceeded to the hallway (or at least to the bedroom door) and could see that Davis was lying prone with his hands above his head and suffering from a severe wound inflicted by Koda.

As the Seventh Circuit has explained, "as the threat changes, so too should the degree of force." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010). Thus, even if a police officer is justified in using force against a suspect initially, the officer cannot continue to do so if the individual has been subdued and no longer poses a threat. *Id.* at 863 (looking at "totality of circumstances" means that "a jury might reasonably conclude that the circumstances of the encounter here reduced the need for force as the situation progressed"); *Strand v. Minchuk*, 910 F.3d 909, 915 (7th Cir. 2018) ("If the facts and circumstances show that an individual who once posed a threat has become 'subdued and complying with the officer's orders,' the officer may not continue to use force."); *Horton v. Pohjecky*, 883 F.3d 941, 950 (7th Cir. 2018) ("Even though an officer may in one moment confront circumstances in which he could constitutionally use deadly force, that does not necessarily mean he may still constitutionally use deadly force the next moment."); *Alicea*

7

*v. Thomas*, 815 F.3d 283, 288 (7th Cir. 2016) ("[S]ignificant force is unreasonable after a suspect has stopped resisting or evading arrest.")

Of course, whether the officers perceived that Davis had been subdued and no longer posed a sufficient threat to justify continuing Koda's bites are material issues of disputed fact that a jury must resolve. For example, while a reasonable jury could *not* conclude that Deputy Allen acted with excessive force in employing Koda to find and bite Davis under all the circumstances here, that same jury could find that as soon as Allen heard Davis screaming in pain and begging for help, a reasonable officer would have known that Davis could not comply with orders to come out while being actively bitten, and so, should have recalled Koda and reassessed the situation. Likewise, the jury could conclude that upon seeing Davis laying on his stomach, with his hands raised and suffering from a serious injury, a reasonable officer would have ordered Koda to release Davis.

Deputy Allen's arguments to the contrary are persuasive, but ultimately also dependent on material disputed issues of fact. For example, Allen argues that he could not always see Davis's hands, and that he appeared, at times, to jerk his arm away from Koda. He also points out that the location of the bedroom presented a particularly dangerous situation for the officers. However, Davis responds that his arms were always visible and above his head, and as discussed above, there were other less significant options available to the officers than continuing the infliction of such significant force. Similarly, Allen argues that Davis might still have been armed, and until under the officers' physical control after being handcuffed, he presented an ongoing risk of accessing a weapon on his person or around his bedding.

As the Seventh Circuit has explained, however, "in every arrest there is a possibility that the individual is armed and that does not justify allowing [a police dog] to continue to bite [the suspect] while [the officer] . . . handcuff[s] him." *Becker*, 821 F.3d at 927–28; *see also Ellis v. Wynalda*, 999 F.2d 243, 247 (7th Cir. 1993) ("While it was possible that [the suspect] carried a concealed weapon, as much as it is possible that every felon might be carrying a weapon, [the officer] had no particular reason to believe that [the suspect] was armed."). Further, Officer Allen was himself armed and was not alone: Sergeant Hodek was in the trailer with Allen, with an AR15 rifle drawn to provide backup.

Thus, there is a reasonable argument, which plaintiff's expert makes, that "this is not the case of a single officer attempting to control and detain multiple suspects." *Abbott v. Sangamon Cty.*, 705 F.3d 706, 731 (7th Cir. 2016). Moreover, if a jury believed Davis's version of events, they could find that by the time two officers reached the bedroom door, they clearly saw Davis's hands above his hand and would have known that Davis no longer presented a risk of harm to the officers or the public. Thus, taking the facts and reasonable inferences in the light *most* favorable to Davis, a reasonable jury *could* find that Deputy Allen used excessive force by not calling off Koda sooner.

## II. Qualified Immunity

Deputy Allen also contends that even if his use of force was excessive, he is immune from suit because it was not *clearly* established at the time he arrested Davis that permitting a police dog to maintain a bite until the suspect was in physical control violated Davis's Fourth Amendment rights under the circumstances here. Generally, qualified immunity protects government officials from liability for civil damages insofar as their conduct did

not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When properly applied, it protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted). Of particular importance, courts must apply qualified immunity correctly in excessive force cases, because the results in this area of the law "depends very much on the facts of each case." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018).

At the time of the events of this case, it was nevertheless established that a police officer could not use "significant force" on a suspect who was subdued, attempting to surrender, or at most, passively resisting and presenting no risk of imminent harm to others. *Miller v. Gonzalez*, 761 F.3d 822, 829 (7th Cir. 2014) (clearly established that officer cannot use significant force against suspect who was prone and subdued at gunpoint). This prohibition against significant force against a "subdued" suspect applies "notwithstanding a suspect's previous behavior—including resisting arrest, threatening officer safety, or potentially carrying a weapon." *Id.* at 829. In *Miller,* for example, the suspect was in flight and then became trapped in an enclosed area after jumping a fence. *Id.* at 824–25. Upon reaching him, the officer ordered him to lie on the ground, spread eagle, which he did. *Id.* at 825. The officer then jumped over the fence and landed on the plaintiff, breaking his jaw. *Id.* at 825. At summary judgment, the officer denied that he could see that the plaintiff was spread-eagle on the ground, while the plaintiff asserted that he was in plain view. *Id.* In light of this factual dispute, the Seventh Circuit held that summary judgment was inappropriate because, accepting plaintiff's version of facts, it was

unreasonable for the officer to intentionally use force after the suspect was subdued. *Id.* at 830. The court likewise denied qualified immunity to the officer, holding that "the law is clearly established that police officers cannot use 'significant' force on suspects who are only passively resisting arrest." *Id.* at 829.

Relying on *Miller* and other excessive force cases, the Seventh Circuit and several other courts have regularly reversed summary judgment decisions in favor of defendants or denied qualified immunity in canine excessive force lawsuits where there are genuine factual disputes about whether the suspect was subdued, or only passively resisting, and thus, no longer presenting an imminent threat of harm at the time the dog was deployed or during the dog's continued seizure of the suspect. *E.g., Becker*, 821 F.3d at 927 (failing to recall dog after it was clear that suspect was not a threat could be excessive force); *Alicea*, 815 F.3d at 286–87 (ordering dog to attack a suspect who had fled and hidden in an above-ground pool, but was allegedly attempting to comply with orders of armed officers to surrender, was excessive force); *Cooper v. Brown*, 844 F.3d 517, 521, 523 (5th Cir. 2016) (affirming denial of qualified immunity where police dog "continued biting [the nonresistant suspect] for one to two minutes"; officer did not command the dog to release his bite until suspect had rolled onto his stomach and was in handcuffs; and officer had "no reason to believe that [the suspect] posed a threat"); *McCollum v. Drewitz*, No. 21-CV-316-JPS, 2022 WL 4776279, at *13 (E.D. Wis. Oct. 3, 2022) (denying summary judgment where officer permitted dog to continue biting and holding suspect who had been tased and was subdued on the ground); *Keammerer v. Eldridge*, No. 2:20-CV-376-PPS-JPK, 2021 WL 4893585, at *3–4 (N.D. Ind. Oct. 20, 2021) (denying qualified immunity because "there is clearly established law that allowing a police dog to bite a restrained and non-

resisting suspect equates to excessive force"); *Stone v. Porter Cnty. Sheriff's Dep't*, No. 2:14-CV-287, 2017 WL 4357453, at *7 (N.D. Ind. Sept. 29, 2017) (denying summary judgment and qualified immunity for use of excessive force and failure to intervene after the suspect fled a traffic stop and the police dog allegedly continued attacking the suspect after he was secured).

As in these cases, there are genuine and material factual disputes about whether Deputy Allen's failure to recall Koda at an earlier point during the encounter amounted to the use of "significant force" against a "subdued" or, at most, "passively resistant" suspect. Given these factual disputes regarding the circumstances and timing of Deputy Allen's decision to release Koda from his hold on Davis, Allen is not entitled to qualified immunity on this record. Of course, this does not foreclose the court still applying the doctrine of qualified immunity to Deputy Allen at *or after* a full airing of the facts at trial.

ORDER

IT IS ORDERED that defendant Christopher Allen's motion for summary judgment (dkt. #14) is DENIED.

Entered this 12th day of April, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge